LATHAM & WATKINS LLP
 Steven M. Bauer (Bar No. 135067)
  steven.bauer@lw.com
 Sadik Huseny (Bar No. 224659)
  sadik.huseny@lw.com
 Amit Makker (Bar No. 280747)
  amit.makker@lw.com
 Shannon D. Lankenau (Bar. No. 294263)
  shannon.lankenau@lw.com
505 Montgomery Street, Suite 1900
San Francisco, California 94111
Telephone:  415.391.0600
Facsimile:  415.395.8095

LATHAM & WATKINS LLP
 Richard P. Bress (*pro hac vice* pending)
  rick.bress@lw.com
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone:  202.637.2200
Facsimile:  202.637.2201

*Attorneys for Plaintiffs City of San Jose,
California; King County, Washington;
Arlington County, Virginia; Black Alliance for
Just Immigration; Sam Liccardo; Zerihoun
Yilma; and Lovette Kargbo-Thompson*

LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
 Kristen Clarke (*pro hac vice* pending)
  kclarke@lawyerscommittee.org
 Jon M. Greenbaum (Bar No. 166733)
  jgreenbaum@lawyerscommittee.org
 Ezra D. Rosenberg (*pro hac vice* pending)
  erosenberg@lawyerscommittee.org
 Dorian L. Spence (*pro hac vice* pending)
  dspence@lawyerscommittee.org
 Maryum Jordan (Bar No. 325447)
  mjordan@lawyerscommittee.org
 Ajay Saini (*pro hac vice* pending)
  asaini@lawyerscommittee.org
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone:  202.662.8600
Facsimile:  202.783.0857

PUBLIC COUNSEL
 Mark Rosenbaum (Bar No. 59940)
  mrosenbaum@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone:  213.385.2977
Facsimile:  213.385.9089

*[Representation information listed below]*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CITY OF SAN JOSE, CALIFORNIA; KING COUNTY, WASHINGTON; ARLINGTON COUNTY, VIRGINIA; BLACK ALLIANCE FOR JUST IMMIGRATION, a California nonprofit corporation; Sam Liccardo; Zerihoun Yilma; and Lovette Kargbo-Thompson, <br><br> Plaintiffs, <br><br> vs. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce; U.S. DEPARTMENT OF COMMERCE, U.S. CENSUS BUREAU, STEVEN DILLINGHAM, in his official capacity as Director of the U.S. Census Bureau, and CHERYL L. JOHNSON, in her official capacity as Clerk of the U.S. House of Representatives, <br><br> Defendants. | CASE NO. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      On July 21, 2020, President Donald J. Trump issued a Presidential Order titled "Memorandum Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census" (the "Apportionment Exclusion Order").  The Apportionment Exclusion Order states that, for the first time in this country's history, undocumented immigrants no longer count as "persons" under the Constitution.  In spite of the Constitution's words, in spite of statutory command, and in spite of the unbroken practice of every administration since 1790, the President will "exclude from the apportionment base aliens who are not in a lawful immigration status." He has ordered the Secretary of Commerce to provide him with 2020 decennial census information "to carry out" his objective.  85 Fed. Reg. 44679 (July 23, 2020) (Attachment 1). The President's stated justification for reversing our country's democratic tradition is his personal view of a nation "more consonant with the principles of representative democracy."

2.      The Apportionment Exclusion Order is illegal.  It violates the Constitution and the Census Act, and it discriminates against people based on race, ethnicity, and national origin in violation of the Due Process and Equal Protection Clauses.  By this Complaint, Plaintiffs seek declaratory and injunctive relief invalidating the Order and ensuring that it does not taint or subvert the ongoing 2020 Census or the apportionment process.

3.      The Apportionment Exclusion Order violates the plain text of the Constitution, which consistently considers a person to be a person.  The Constitution's Apportionment Clause, as amended by the Fourteenth Amendment, states that Representatives "shall be apportioned among the several States . . . according to their respective Numbers," U.S. Const. art. I, § 2, cl. 3; *id*. amend. XIV, § 2, which requires "counting the whole number of persons in each State," U.S. Const. amend. XIV, § 2.  When the drafters meant to exclude certain classes of persons, they said so expressly, e.g., "excluding Indians not taxed." *Id.*  No provision excludes undocumented immigrants residing in the United States.  Furthermore, regardless of their immigration status, they have never before been deemed *non*-persons under the Constitution.  *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term.").

4.      The Apportionment Exclusion Order also violates the plain text of the Census Act.  13 U.S.C. § 141; *see also* 2 U.S.C. § 2a(a).  The Census Act directs the Secretary of Commerce to administer the census and to report to the President "the tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States."  13 U.S.C. § 141(b).  The President is then required to transmit to Congress "a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions."  2 U.S.C. § 2a(a). The Order violates the Act by directing the Secretary (and by extension the Department of Commerce and its officials), in the decennial census report, to transmit information that does not actually include the correct population for apportionment, so that the President can exercise his purported "discretion" to miscount persons.

5.      By excluding undocumented immigrants from the definition of persons for apportionment purposes, the Apportionment Exclusion Order abandons over two hundred years of consensus among all three branches of government, through Republican and Democratic administrations alike.  Since the Nation's founding, every administration has understood that requirement to mean what it says: "person" means "person."  And every administration that has addressed the issue, including those of Ronald Reagan and George H.W. Bush, has rejected any claim that undocumented immigrants are not among the "whole number of persons in each State." U.S. Const. amend. XIV, § 2.  But under this Apportionment Exclusion Order, all "persons" somehow becomes "all persons *except* those the sitting president in any given census year may deem unworthy of inclusion."  No President has ever been granted, and no President has, unfettered discretion to rewrite the Constitution and 200 years of history through such personal fiat.

6.      One year ago, the United States Supreme Court held that the Secretary of Commerce's claimed justification for inserting a question about citizenship in the census was "a distraction" and "contrived."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1    Here, once again, the stated reason for defining undocumented immigrants as non-persons is

2    contrived.  The Order itself reveals that the President's intent is to reapportion congressional

3    seats away from disfavored States such as California and to dilute the congressional

4    representation of ethnic and racial minorities.  That plan follows a consistent history of actions

5    and statements by the President and his advisors showing that the Apportionment Exclusion

6    Order is motivated by an intent to discriminate against these ethnic and racial minorities.

7         7.    The Apportionment Exclusion Order advances an unprecedented effort to alter the

8    basis of our representative democracy, heedless of the plain constitutional and statutory text,

9    precedent, and unbroken historical practice.  Plaintiffs seek declarative and injunctive relief to

10   ensure that it does not succeed.

11                      **JURISDICTION AND VENUE**

12        8.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1346(a), and

13   1361.

14        9.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1).

15   Defendants are United States officers or agencies sued in their official capacities, a substantial

16   part of the events or omissions giving rise to this action have occurred or will occur in this

17   district, and one or more Plaintiffs reside in this district.

18        10.   This Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201

19   and 2202.

20        11.   The proper intradistrict assignment for this action is the San Jose Division, in light

21   of the location of Plaintiffs City of San Jose, Santa Clara County, and the Mayor of San Jose,

22   Sam Liccardo.

23                            **PARTIES**

24   **A.    Plaintiffs**

25        12.   Plaintiff City of San Jose is a municipal corporation in the County of Santa Clara,

26   California.  It is the tenth-largest city in the United States, with an estimated population of

27   1,927,852.  Since its founding, San Jose has always been a home to immigrant communities.

28   Today, nearly 40% of its population was born in another country, and nearly one-third of its

1     population is of Hispanic, Latino, Black, or African American origin.  San Jose is part of

2     California's 17th congressional district.  It brings this action on its own behalf as a municipal

3     corporation.

4            13.     Plaintiff King County is a municipal corporation organized as a home rule charter

5     county and political subdivision under the laws of the State of Washington.  It is the most

6     populous county in Washington, encompassing the cities of Seattle, Bellevue, Kent, Redmond,

7     among others.  In 2019, the Census Bureau estimated that King County's population was

8     2,252,782.  Approximately 21 percent of its population is made up of immigrants, a

9     large majority of whom come from Asia, Latin America, and Africa.  King County is represented

10     in Washington's 1st, 7th, 8th, and 9th congressional districts.  It brings this action on its own

11     behalf as a municipal corporation.

12            14.     Plaintiff Arlington County is a political subdivision of the Commonwealth of

13     Virginia.  The 2010 Census reported that Arlington County had a population of 207,627.  In

14     2019, the Census Bureau estimated that Arlington's population was 236,842.  Approximately 23

15     percent of Arlington County's population is made up of immigrants, most of whom are Hispanic.

16     Arlington County is part of Virginia's 8th congressional district.  It brings this action on its own

17     behalf as a political subdivision of the Commonwealth of Virginia.

18            15.     Plaintiff Black Alliance for Just Immigration ("BAJI") is a nonprofit organization

19     organized and existing under the laws of California, with offices in California, Florida, Georgia,

20     and New York.  BAJI collaborates with African Americans and Black immigrants to organize

21     and advocate for equal and just laws in their communities.  BAJI campaigns to advance racial

22     justice and provides partner organizations with varied assistance—particularly on immigration

23     policy—and it spends significant resources educating its partner organizations, individuals, and

24     other constituents through presentations, workshops, publications, technical assistance, and

25     trainings.  BAJI is a membership organization, and its members either pay dues or volunteer their

26     time to support the organization.  Members also actively participate in BAJI's self-governance

27     and decision-making at the local level.

28

1    16.    Plaintiff Sam Liccardo is the Mayor of the City of San Jose.  He is a resident and

2    citizen of Santa Clara County, California, where he is registered to vote and regularly exercises

3    his right to vote.

4    17.    Plaintiff Zerihoun Yilma is the Board Chair of BAJI.  He is a resident and citizen

5    of Los Angeles County, California, where he is registered to vote and regularly exercises his

6    right to vote.

7    18.    Plaintiff Lovette Kargbo-Thompson is an Organizer and Member of BAJI.  She is

8    a resident and citizen of Lawrenceville, Georgia, where she is registered to vote and regularly

9    exercises her right to vote.

10   **B.    Defendants**

11   19.    Defendant Donald J. Trump is the President of the United States and is sued in his

12   official capacity.

13   20.    President Trump issued the Apportionment Exclusion Order that determined that

14   undocumented immigrants will not be counted in the apportionment for the House of

15   Representatives, contrary to the Constitution and 2 U.S.C. § 2a(a).  The Apportionment

16   Exclusion Order directs the Secretary of Commerce to aid the President in carrying out this

17   determination.  It orders the Secretary (and by extension, the Department of Commerce and the

18   Census Bureau/Census Bureau officials who are within the Department of Commerce), in

19   preparing the decennial census report, to provide the President with information that does *not*

20   include the correct population for apportionment, thus tainting and subverting the census and

21   apportionment process.  Declaratory relief against the President is needed to prevent the

22   unconstitutional and unlawful conduct directed by the Order.

23   21.    Defendant Wilbur L. Ross is the Secretary of the U.S. Department of Commerce

24   and is sued in his official capacity.  Secretary Ross oversees the U.S. Department of Commerce,

25   the Census Bureau, the decennial census, and the census tabulations reported to the President.

26   22.    Defendant U.S. Department of Commerce is a cabinet agency within the

27   Executive Branch responsible for administering the decennial census and transmitting its

28   tabulations to the President.

23.     Defendant Census Bureau is an agency within the Department of Commerce responsible for planning and administering the decennial census.

24.     Defendant Steven Dillingham is the Director of the Census Bureau and is sued in his official capacity.

25.     The Apportionment Exclusion Order directs Secretary Ross to take "all appropriate action" to provide the President with information permitting the President to take unconstitutional and unlawful actions as alleged herein.

26.     As an agency within the Department of Commerce, the Census Bureau is under Secretary Ross's supervision, but is directly headed by Director Dillingham.

27.     The Apportionment Exclusion Order requires Secretary Ross, the Department of Commerce, the Census Bureau, and Director Dillingham to provide the President with a census decennial report that excludes undocumented immigrants from the apportionment calculation. There is no reason to believe that these Defendants have refused to comply with the Order or subsequent directives related to the Order.  Relief against Secretary Ross, the Department of Commerce, the Census Bureau, and Director Dillingham is necessary to ensure that the apportionment process is conducted lawfully.

28.     Defendant Cheryl L. Johnson is the Clerk of the United States House of Representatives and is responsible for "send[ing] to the executive of each State a certificate of the number of Representatives to which such State is entitled" following a decennial reapportionment.  2 U.S.C. § 2a(b).  She is sued in her official capacity.

29.     As the transmitter of the certificate of the number of Representatives to each State under 2 U.S.C. § 2a(b), Clerk Johnson (or her successor) is the last link in the President's unconstitutional and unlawful actions as alleged herein.  Relief against Clerk Johnson is needed to remedy the unconstitutional and unlawful conduct flowing from the Apportionment Exclusion Order, and to ensure that any non-compliant statement submitted by the President to the Clerk is appropriately handled and not allowed to subvert the apportionment process.

## ALLEGATIONS

**A.    The Constitution Requires Apportioning Members of the House of Representatives Based on the Total Number of Persons Residing in Each State**

30.    A plain text reading of the Constitution provides a sufficient basis to resolve this matter in favor of plaintiffs.  Article I, Section 2, Clause 3 (the "Apportionment Clause") expressly addresses the apportionment of Representatives:

> Representatives . . . shall be apportioned among the several States . . . according to their respective Numbers, which shall be determined by adding to the whole Number of free *Persons*, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons.  The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.

U.S. Const. art. I, § 2, cl. 3 (emphasis added).

31.    The Fourteenth Amendment, enacted in the wake of the Civil War, eliminated the Apportionment Clause's three-fifths component and provided that Representatives must be apportioned based on "the whole number of *persons* in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2 (emphasis added).

32.    The Constitution "was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Dist. of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (citation omitted).  And when that ordinary meaning is clear, "there is no room for construction and no excuse for interpolation or addition." *United States v. Sprague*, 282 U.S. 716, 731 (1931).  Here, the meaning of constitutional provisions specifying "persons" is unambiguous and thus controlling.

33.    The ordinary meaning of "person" remains the same today as it was when the Constitution and the Fourteenth Amendment were ratified.  "Person" means a human being. *See, e.g.*, *Person*, Samuel Johnson, A Dictionary of the English Language (6th ed. 1785) ("A general loose term for a human being; one; a man."); *Person*, Noah Webster, American Dictionary of the English Language (1865) ("[A] living human being; a man, woman, or child; an individual of the

1   human race."); *Person*, Merriam-Webster Online Dictionary ("1. Human, Individual"),

2   https://www.merriam-webster.com/dictionary/person (last visited July 27,

3   2020)[https://perma.cc/S58J-7F97].  That ordinary meaning of person does not exclude persons

4   who are undocumented immigrants.

5         34.   The broader text of the Constitution also makes clear that the Framers knew that

6   the word "person" is broad and encompasses all human beings.  When the Framers sought to

7   exclude certain *classes* of persons, they did so expressly:  They excluded "Indians not taxed,"

8   and they discounted the value for enumeration purposes of persons who were not "free"—*i.e.*,

9   slaves—by forty percent.  U.S. Const. art. I, § 2, cl. 3.  The drafters of the Fourteenth

10  Amendment, in turn, retained the exclusion of "Indians not taxed," but abolished the three-fifths

11  clause.  *See* U.S. Const. amend. XIV, § 2.  Under basic interpretative principles, the drafters'

12  choice to "explicitly enumerate[] certain exceptions" to the general rule that all persons are to be

13  included means that "additional exceptions are not to be implied, in the absence of evidence of a

14  contrary . . . intent."  *Class v. United States*, 138 S. Ct. 798, 808 (2018) (quoting *Andrus v.

15  Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)).  *Cf. Pine Grove Tp. v. Talcott*, 86 U.S. 666,

16  674-75 (1873) (applying to the Constitution the canon that when one or more things of a class

17  are expressly mentioned, others of the same class are excluded).

18        35.   The all-inclusive meaning of "persons" in the Apportionment Clause and Section

19  2 of the Fourteenth Amendment is confirmed further by binding precedent interpreting the

20  meaning of the same word used elsewhere in the Constitution and, specifically, the Fourteenth

21  Amendment.  "When seeking to discern the meaning of a word in the Constitution, there is no

22  better dictionary than the rest of the Constitution itself."  *Ariz. State Legislature v. Ariz. Indep.

23  Redistricting Comm'n*, 135 S. Ct. 2652, 2680 (2015) (Roberts, C.J., dissenting) (collecting

24  cases); *see also Hurtado v. California*, 110 U.S. 516, 534-35 (1884) ("due process" had the same

25  meaning in the Fourteenth and Fifth Amendments because "the same phrase was employed");

26  *Martin v. Hunter's Lessee*, 14 U.S. 304,  329, 1 Wheat. 304, 329 (1816) (examining the use of

27  the phrase "shall be vested" in locations across the Constitution to determine its consistent

28  meaning).

36.     In *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Supreme Court held that the "persons" protected by Section 1 of the Fourteenth Amendment and the Fifth Amendment's Due Process Clause include everyone in the United States: "The fourteenth amendment to the constitution is not confined to the protection of citizens. . . . [Its due process and equal protection] provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *Id*. at 369. The Court reiterated this principle in *Zadvydas v. Davis*, 533 U.S. 678 (2001), stating that "persons" under the Due Process Clause includes everyone "within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id*. at 693 (collecting cases).  There is a strong presumption that the word carries the same comprehensive meaning in the Apportionment Clause and Section 2 of the Fourteenth Amendment.

37.     The Framers of the Constitution reflected their understanding of the breadth of the term "persons" in another provision too.  *See* U.S. Const. art. I, § 9, cl. 1 (using "persons" to refer to slaves who could be "[i]mport[ed]" into the United States until 1808).  And, when the drafters of the Fourteenth Amendment intended to describe a narrower class than *all* persons, they chose a narrower term.  Section 1, for instance, differentiates between "persons" in the Citizenship, Equal Protection, and Due Process Clauses, and "citizens" in the Privileges and Immunities Clause.  U.S. Const. amend. XIV, § 1.  Section 2 likewise differentiates between "persons" and "citizens."  The first sentence requires "counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2.  By contrast, the second sentence is limited to "citizens": "But when the right to vote at any election . . . is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, . . . the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State." *Id*.  The use of these two different words in Section 2 is not accidental.  To the contrary, "[f]rom [a] difference of phraseology, . . . a difference of constitutional intention may, with propriety, be inferred.  It is hardly to be presumed that the variation in the language

1    could have been accidental.  It must have been the result of some determinate reason."  *Martin*,

2    14 U.S. at 334 (Story, J.).

3        38.    The Framers would have been aware that choosing the word "persons" would

4    include at least women, children, bound servants—and aliens, since the same article of the

5    Constitution grants Congress the power "to establish an uniform Rule of Naturalization."  U.S.

6    Const. art. 1, § 8, cl. 4; *see also Garza v. Cty. of Los Angeles*, 918 F.2d 763, 774 (9th Cir. 1990)

7    ("The framers were aware that this apportionment and representation base would include

8    categories of persons who were ineligible to vote—women, children, bound servants, convicts,

9    the insane, and, at a later time, aliens.").  And ultimately the Framers adopted without comment

10   or debate the term "persons" in place of the phrase "free citizens and inhabitants" as the basis for

11   apportionment in the House.  *See* 2 Records of the Federal Convention of 1787, pp. 571, 590-91

12   (M. Farrand ed. 1911).

13       39.    Interpreting "person" according to its ordinary, inclusive meaning is also the

14   reading most consistent with the Framers' theory of representative democracy.  In the Federalist

15   Papers, James Madison explained that it "is a fundamental principle of the proposed constitution

16   that as the aggregate number of representatives allotted to the several states, is to be . . . founded

17   on the aggregate number of inhabitants; so, the right of choosing this allotted number in each

18   state, is to be exercised by such part of the inhabitants, as the state itself may designate."  The

19   Federalist No. 54, p. 284 (James Madison) (G. Carey & J. McClellan eds. 2001).  This means

20   that "the basis of *representation* in the House was to include all inhabitants—although slaves

21   were counted as only three-fifths of a person—even though States remained free to deny many of

22   those inhabitants the right to participate in the selection of their representatives."  *Evenwel v.*

23   *Abbott*, 136 S. Ct. 1120, 1127 (2016).  "Endorsing apportionment based on total population,

24   Alexander Hamilton declared: 'There can be no truer principle than this—that every individual

25   of the community at large has an equal right to the protection of government.'"  *Id.* (citing 1

26   Records of the Federal Convention of 1787, p. 473 (M. Farrand ed. 1911)).

27       40.    The drafting history of the Fourteenth Amendment likewise confirms that the

28   word "persons" does not exclude undocumented immigrants.  The 39th Congress, which enacted

the Fourteenth Amendment, began its first session on December 4, 1865, shortly after the Civil War (and two days before ratification of the Thirteenth Amendment).  Cong. Globe, 39th Cong., 1st Sess. 1, 3 (Dec. 4, 1865).  Because recently freed slaves had become "free Persons" and not "other Persons" under the Enumeration Clause, they had greater weight in apportionment, and Southern representation in Congress was expected to increase significantly.  *See* William W. Van Alstyne, *The Fourteenth Amendment, the "Right" to Vote, and the Understanding of the Thirty-Ninth Congress*, 1965 Sup. Ct. Rev. 33, 46 ["Van Alstyne, *The Fourteenth Amendment*"]; Gregory E. Maggs, *A Critical Guide to Using the Legislative History of the Fourteenth Amendment to Determine The Amendment's Original Meaning*, 4 Conn. L. Rev. 1069, 1089-90 (2017); *Oregon v. Mitchell*, 400 U.S. 112, 157 (1970) (Harlan, J., concurring in part and dissenting in part).

41.     The 39th Congress actively debated several different methods for calculating apportionment, including whether to base apportionment on the population of voters, citizens, or all persons residing in a State.  *See generally* Van Alstyne, *The Fourteenth Amendment*, 1965 Sup. Ct. Rev. at 45-48; *Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980).  At the time of the debate, non-citizens were counted in determining representation in Congress.  *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 353 (Jan. 22, 1866) (statement of Rep. Rogers) ("Every man in this House knows perfectly well in the several States a person under the age of twenty-one years cannot vote, citizens cannot vote, and the whole class of females, constituting nearly one half of the population of this country, cannot vote; yet for these persons the States are entitled to representation.").

42.     Some in Congress advocated apportionment based on the number of voters instead of the number of persons, for two reasons: to deal with the changing composition of Congress that would occur were the then-current population-based apportionment to continue, and to encourage expansion of the franchise to the freed slaves.  *See* Van Alstyne, *The Fourteenth Amendment*, 1965 Sup. Ct. Rev. at 46-47.  But the voter-based apportionment proposal was met with the objection that "population is the true basis of representation," Cong. Globe, 39th Cong., 1st Sess. 141 (Jan. 8, 1866) (statement of Rep. Blaine), and practical

1  concerns about States with roughly the same population but vastly different number of voters.

2  *Id.*

3       43.     Both houses of the 39th Congress extensively discussed continued inclusion of

4  non-citizens in apportionment in the debate over whether it would be equitable to stop using

5  population as the basis for apportionment.  *See, e.g.*, *id.* at 359 (Jan. 22, 1866) (statement of Rep.

6  Conkling) ("Many of the large States now hold their representation in part by reason of their

7  aliens, and the Legislatures and people of these States are to pass upon the amendment.  It must

8  be acceptable to them.").

9       44.     This drafting history demonstrates that congressional supporters and opponents of

10  population-based apportionment knew that the outcome of the debate would affect the counting

11  of non-citizens.  And ultimately both the Senate and the House roundly rejected the proposal to

12  base representation on the voting population rather than the total population.  *See* Cong. Globe,

13  39th Cong., 1st Sess. 2991 (June 6, 1866) (proposal defeated 31-7 in the Senate); *id.* at 535, 538

14  (Jan. 31, 1866) (proposal defeated 131-29 in the House).  Instead, the 39th Congress retained the

15  Constitution's principle of apportioning Representatives based on total population.

16      **B.**    **Uniform Historical Practice Confirms That The Constitution Means**

17            **What It Says**

18       45.     Unbroken constitutional practice confirms what the constitutional text and

19  drafting history make plain: the apportionment must be based on the enumeration of *all* persons

20  residing in each State, regardless of legal status.

21       46.     When interpreting the Constitution, courts consistently turn to historical practice

22  for guidance.  *See, e.g.*, *Evenwel*, 136 S. Ct. at 1132 ("What constitutional history and our prior

23  decisions strongly suggest, settled practice confirms."); *see generally* William Baude,

24  *Constitutional Liquidation*, 71 Stan. L. Rev. 1 (2019).  And that historical sword cuts both

25  ways—it can condone or condemn.  For instance, in *NLRB v. Noel Canning*, the Court upheld the

26  constitutionality of certain types of recess appointments based in large part on the "longstanding

27  'practice of the government.'"  573 U.S. 513, 525 (2014) (quoting *McCulloch v. Maryland*, 4

28  Wheat. 316, 401 (1819)).  This year, by contrast, the Supreme Court invalidated the structure of

1   an independent agency, noting that sometimes "the most telling indication of [a] severe

2   constitutional problem . . . is a lack of historical precedent to support it." *Seila Law LLC v.*

3   *Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2201 (2020) (internal quotation marks omitted).

4       47.    Historical practice has played a particularly salient role in cases involving the

5   census, like this one.  Just last year the Supreme Court noted in a census case that its

6   "interpretation of the Constitution is guided by a Government practice that has been open,

7   widespread, and unchallenged since the early days of the Republic." *Dep't of Commerce v. New*

8   *York*, 139 S. Ct. at 2567 (citation omitted).  That same theme is recurrent in the Supreme Court's

9   other cases addressing the census. *See, e.g.*, *Wisconsin v. City of New York*, 517 U.S. 1, 21

10  (1996) (emphasizing "the importance of historical practice in" understanding the Enumeration

11  Clause); *Franklin*, 505 U.S. at 806 (examining the history of the administration of the census to

12  determine whether the Secretary had violated the Enumeration Clause); *United States Dep't of*

13  *Commerce v. Montana*, 503 U.S. 442, 465 (1992) (examining the historical practice of

14  apportionment under Article I, Section 2 to inform its meaning).

15      48.    Here, the exclusion of undocumented persons from the census's apportionment

16  base would contradict over two centuries of consistent practice.  From the very first census, the

17  population base for purposes of apportionment has always included all persons residing in the

18  United States, including undocumented persons.

19      49.    Close historical analogues to undocumented persons demonstrate that the census

20  must count all persons residing in a State, regardless of whether they are residing in that State

21  with the right papers or not.  For example, in the 1860 Census—the only one conducted after

22  Congress enacted the Fugitive Slave Act of 1850 (which required free States to cooperate with

23  the capture and return of escaped slaves within their borders, who were deemed to have no

24  lawful presence there, *see* 9 Stat. 462-65 (1850)) but before ratification of the Thirteenth

25  Amendment—the census explicitly counted fugitive slaves in Northern States as part of the "free

26  colored population," despite their unlawful residence in those States. *See* Bureau of the Census,

27  *Population of The United States in 1860*, at vi-vii, xi, xv-xvi (Gov't Printing Office 1864)

28

1 | (discussing changes in the fugitive slave population from 1850 to 1860),

2 | [https://perma.cc/H5GS-3M8V].

3 |     50.    Throughout the two-hundred-year history of the United States, the census has

4 | always reflected the settled understanding that *all* persons residing in the United States—citizens

5 | and non-citizens alike—must be counted to fulfill the Constitution's "actual Enumeration"

6 | mandate.  U.S. Const., art. I, § 2, cl. 3; *Klutznick*, 486 F. Supp. at 576; *see also Plyler*, 457 U.S.

7 | at 210 (holding that the Equal Protection Clause applies to persons who are in the country

8 | without proper authorization because "[w]hatever his status under the immigration laws, an alien

9 | is surely a 'person' in any ordinary sense of that term").

10 |     51.    During the first half of the 20th century, a variety of proposals were made in

11 | Congress to exclude aliens from the apportionment base, but it was recognized that such a result

12 | would require a constitutional amendment.  For example, in 1929, the Senate Legislative

13 | Counsel concluded that, without a constitutional amendment, "statutory exclusion of aliens from

14 | the apportionment base would be unconstitutional."  *Klutznick*, 486 F. Supp. 564, 576-77

15 | (D.D.C.) (three-judge court), appeal dismissed, 447 U.S. 916 (1980) (citing 71 Cong. Rec. 1821

16 | (1929)).

17 |     52.    Again in 1940, Congress considered whether "aliens who are in this country in

18 | violation of law have the right to be counted and represented."  *Id.* (quoting 86 Cong. Rec. 4372

19 | (1940)).  Representative Celler of New York explained:

> The Constitution says that all persons shall be counted. I cannot
> quarrel with the founding fathers.  They said that all should be
> counted.  We count the convicts who are just as dangerous and just
> as bad as the Communists or as the Nazis, ***as those aliens here
> illegally***, and I would not come here and have the temerity to say
> that the convicts shall be excluded, if the founding fathers say they
> shall be included.  The only way we can exclude them would be to
> pass a constitutional amendment.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1  *Id.* (quoting 86 Cong. Rec. 4372 (1940)) (emphasis added).  On this basis, Congress rejected a

2  proposal to exclude "aliens" from the apportionment base.  *See id.*

3       53.     More recently, in the 111th Congress, Joint Resolution 11 proposed an

4  amendment to the Constitution to apportion based only on citizenship.  *See* H.R.J. Res. 11, 111th

5  Cong. (2009).  Other than being referred to committees, no action was taken.

6       54.     The Executive Branch, too, has repeatedly recognized—under Presidents of both

7  parties—that the Constitution requires congressional apportionment based on total population,

8  irrespective of citizenship or immigration status.

9       55.     For example, in 1980, under President Jimmy Carter, private plaintiffs filed a

10  lawsuit in the District of Columbia seeking to exclude "illegal aliens" from the census and the

11  congressional apportionment base.  *Klutznick*, 486 F. Supp. at 565.  Opposing the suit, the U.S.

12  Department of Justice ("DOJ") told the court that the plaintiffs "s[ought] a radical revision of the

13  constitutionally mandated system for allocation of Representatives to the States of the Union and

14  an equally radical revision of the historic mission of the decennial census."  Federal Defs.' Post-

15  Arg. Mem. at 1, *Klutznick*, No. 79-3269 (D.D.C. filed Feb. 15, 1980).

16       56.     "[F]or 200 years," DOJ told courts, "the decennial census has counted all

17  residents of the states irrespective of their citizenship or immigration status," and those numbers

18  were used for apportionment.  *Id.*  Given "the clear and unequivocal language of Section 2 of the

19  Fourteenth Amendment," DOJ argued that the "radical revision" that the plaintiffs sought could

20  come only from "a constitutional amendment."  *Id.*  DOJ also explained that such a revision

21  would be "patently unfair" to residents of communities in which undocumented immigrants live,

22  as undocumented immigrants "demand[] precisely the same level of the services from the

23  municipalities and states in which [they] reside as do all other citizens."  *Id.* at 12.

24       57.     In 1988, under President Ronald Reagan, the Director of the Office of

25  Management and Budget sought the views of DOJ on yet another proposal to exclude "illegal

26  aliens" from congressional apportionment base.  DOJ concluded that the proposed legislation

27  was "unconstitutional."  Letter from Thomas M. Boyd, Acting Assistant Attorney General, dated

28  June 29, 1988, at 5 (included in 1990 Census Procedures and Demographic Impact on the State

1  of Michigan: Hearing Before the Committee on Post Office and Civil Service, House of

2  Representatives, One Hundredth Congress, Second Session, June 24, 1988 at 240 (United States:

3  U.S. Government Printing Office 1988)).  In DOJ's view, it was "clear" that, under the

4  Fourteenth Amendment, "all persons, *including aliens residing in this country*, [must] be

5  included" in the congressional apportionment base.  *Id.* at 2 (emphasis added).  In fact, DOJ

6  noted, the Reconstruction Congress "rejected arguments that representation should be based on

7  people with permanent ties to the country" and "consciously chose to include aliens."  *Id.* at 2-3.

8         58.    In its 1988 opinion, DOJ explained that, for apportionment purposes, the

9  Fourteenth Amendment does not distinguish between "aliens" who are and are not lawfully

10  present in the United States.  Furthermore, DOJ explained, in analyzing the Fourteenth

11  Amendment, "the Supreme Court . . . has read the word 'person' to include illegal aliens."  *Id.* at

12  3-4 (citing *Plyler*, 457 U.S. at 210).

13         59.    In 1989, under President George H. W. Bush, DOJ issued a similar opinion.  Once

14  again, a Senator had "requested the views of the Department of Justice concerning the

15  constitutionality of proposed legislation excluding illegal or deportable aliens from the decennial

16  census count."  Letter from Carol T. Crawford, Assistant Attorney General, dated Sept. 22, 1989,

17  at 1, 135 Cong. Rec. S12235 (1989).  DOJ responded that "section two of the Fourteenth

18  Amendment which provides for 'counting the whole number of persons in each state' and the

19  original Apportionment and Census Clauses of Article I section two of the Constitution *require*

20  *that inhabitants of States who are illegal aliens be included* in the census count."  *Id.* (emphasis

21  added).  At that time, current Attorney General William Barr was the head of DOJ's Office of

22  Legal Counsel.  In that position, he would be expected to have reviewed and approved the DOJ

23  opinion.

24         60.    In 2015, under President Barack Obama, DOJ again concluded that Article I, § 2

25  and the Fourteenth Amendment "were purposely drafted to refer to 'persons,' rather than to

26  voters, and to include people who could not vote"—specifically including "aliens."  Br. for the

27  United States as *Amicus Curiae*, *Enwel v. Abbott*, No. 14-940, at 18 (quoting Cong. Globe,

28  39th Cong., 1st Sess. 141, 359), 2015 U.S. S. Ct. Briefs LEXIS 3387.  In DOJ's words, this is

1  because "the federal government act[s] in the name of (and thereby represent[s]) all people,

2  whether they [are] voters or not, and whether they [are] citizens or not." *Id.* at 19.

3      61.    In preparation for the 2020 Census, the Bureau solicited and received two rounds

4  of public comment on the Census Residence Rule and Residence Situations "to allow the public

5  to recommend any changes they would like to be considered for the 2020 Census" with respect

6  to "where people are counted." Final 2020 Census Residence Criteria and Residence Situations,

7  83 Fed. Reg. 5525, 5526 (2018). As with the residence rules governing prior censuses, the

8  Census Bureau's 2020 Residence Rule requires that "[c]itizens of foreign countries living in the

9  United States" be "[c]ounted at the U.S. residence where they live and sleep most of the time."

10  *Id*. at 5533.

11      62.    This aligns with the census concept of "usual residence," which "is grounded in

12  the law providing for the first census, the Act of March 1, 1790, expressly specifying that

13  persons be enumerated at their 'usual place of abode.'" 83 Fed. Reg. at 5526. The Census

14  Bureau promulgates such criteria as to every decennial census. *See* U.S. Census, 2020 Census

15  Residence Criteria and Residence Situations (Feb. 25, 2020), https://www.census.gov/programs-

16  surveys/decennial-census/2020-census/about/residence-rule.html [https://perma.cc/5W42-

17  NCQ7].

18      63.    Until now, no President of any political party has deviated from the understanding

19  of the Framers and drafters of the Fourteenth Amendment that congressional apportionment must

20  be based on total population, irrespective of citizenship or immigration status. Nor, until now,

21  has any President sought to recalculate the apportionment base by removing any class of persons

22  residing in the United States, regardless of whether they are eligible to vote, are U.S. citizens, or

23  undocumented immigrants.

24      64.    The judiciary, too, has consistently shared this understanding. For over fifty

25  years, the Supreme Court has found it "abundantly clear . . . that in allocating Congressmen the

26  number assigned to each state should be determined solely by the number of the State's

27  inhabitants." *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964). Just four years ago, the Supreme

28  Court stated that the Constitution "select[s] . . . total population as the basis for allocating

1   congressional seats, . . . *whether or not [individuals] qualify as voters*." *Evenwel*, 136 S. Ct. at

2   1129 (emphasis added).  No court in the United States has ever held otherwise.

3       **C.**     **The Census Act Requires Apportionment Based on the Total Number of**

4                  **Persons Residing in Each State**

5       65.     The Enumeration Clause and Fourteenth Amendment empower Congress to enact

6   legislation governing administration of the census and apportionment.  In the Census Act of

7   1954, Congress delegated to the Secretary of Commerce responsibility for administering the

8   census, including supervision of the Census Bureau.  13 U.S.C. §§ 1, 2, 4; 68 Stat. 1012 (1954);

9   90 Stat. 2459 (1976); *see also* 32 Stat. 51 (1902) (creating "Census Office"); 32 Stat. 825 (1903)

10  (housing "Census Office" within the Department of Commerce and Labor).

11      66.     The Census Act mandates that "[t]he Secretary shall, in the year 1980 and every

12  10 years thereafter, take a decennial census of population as of the first day of April of such

13  year."  It authorizes the Secretary to conduct the census "in such form and content as he may

14  determine."  13 U.S.C. § 141(a).  Under the direction of the Secretary and the Bureau Director,

15  the Bureau conducts the constitutionally required census every ten years by counting all U.S.

16  residents in the place where they live.  The Census Bureau's rules state that its enumeration

17  procedures "are guided by the constitutional and statutory mandates to count *all residents* of the

18  several states," including "[c]itizens of foreign countries living in the United States."  U.S.

19  Census Bureau, *Residence Criteria and Residence Situations for the 2020 Census of the United*

20  *States* at 1-2 (emphasis added), https://www.census.gov/content/dam/Census/programs-

21  surveys/decennial/2020-census/2020-Census-Residence-Criteria.pdf  (last accessed July 27,

22  2020).

23      67.     The Census Act also sets forth the procedure and timeline for distribution and use

24  of the results of the decennial census, instructing the Secretary to submit to the President "[t]he

25  tabulation of *total population* by States . . . as required for the apportionment of Representatives

26  in Congress among the several States."  13 U.S.C. § 141(b) (emphasis added).

27      68.     Thereafter, the President must "transmit to the Congress a statement showing the

28  *whole number of persons in each State* excluding Indians not taxed, *as ascertained under the . . .*

*decennial census of the population*, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member." 2 U.S.C. § 2a(a) (emphasis added).

69.     "Each State shall be entitled . . . to the number of Representatives shown in the [President's] statement" and "no State to receive less than one Member." 2 U.S.C. § 2a(b). "It shall be the duty of the Clerk of the House of Representatives, within fifteen calendar days after the receipt of such statement, to send to the executive of each State a certificate of the number of Representatives to which such State is entitled under this section." *Id.*

**D.     President Trump's Unlawful Apportionment Exclusion Order**

70.     Despite the Constitution's unambiguous command and two centuries of consistent practice, President Trump, on July 21, 2020, issued the Apportionment Exclusion Order, excluding undocumented persons from the apportionment base following the 2020 Census and ordering the Secretary of Commerce to use the census reporting process to facilitate that exclusion. Contemporaneously, the President issued a statement that he is "directing the Secretary of Commerce to exclude illegal aliens from the apportionment base following the 2020 census." *See* Statement from the President Regarding Apportionment (July 21, 2020), https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment/.

71.     Although the Apportionment Exclusion Order is styled a "Memorandum," that label has no legal significance—because the Order's language and its publication in the Federal Register confirm that it has binding legal force and effect. *See* 44 U.S.C. § 1505(a) (requiring executive documents with "general applicability and legal effect" to be published in the Federal Register); *Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44679 (July 23, 2020) ("order[ing]" that action be taken). And "there is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order." *Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29 (2000); *see also Medellin v. Texas*, 552 U.S.

491, 524 (2008) (analyzing presidential memorandum's legal effects under *Youngstown* tripartite framework for executive action).

72. Section 1 of the Apportionment Exclusion Order provides the purported authority for the President's action. It states that "Congress has charged the Secretary of Commerce (the Secretary) with directing the conduct of the decennial census in such form and content as the Secretary may determine (13 U.S.C. 141(a))." Apportionment Exclusion Order § 1. It also states that "[t]he President, by law, makes the final determination regarding the 'whole number of persons in each State,' which determines the number of Representatives to be apportioned to each State, and transmits these determinations and accompanying census data to the Congress (2 U.S.C. 2a(a))." *Id.* The Apportionment Exclusion Order then asserts that the President has "discretion to settle the apportionment." *Id.*

73. Section 1 of the Apportionment Exclusion Order observes that the Constitution's requirement that "persons in each State, excluding Indians not taxed" be enumerated in the census "has been interpreted to mean that only the 'inhabitants' of each State should be included." *Id.* The Order then claims that the President has discretion "to determine who qualifies as an 'inhabitant.'" *Id.*

74. Purportedly in the exercise of that discretion, the Apportionment Exclusion Order announces that the President has "determined that respect for the law and protection of the integrity of the democratic process warrant the exclusion of illegal aliens from the apportionment base," without regard to whether they reside in the United States. *Id.* § 2. The Apportionment Exclusion Order also sets forth the President's motivation: he wants to punish States like California and Washington that, he says, have adopted "policies that encourage illegal aliens to enter this country" by diminishing their "representation in the House of Representatives." *Id.* Indeed, the Order specifically identifies "one State [that] is home to more than 2.2 million illegal aliens, constituting more than 6 percent of the State's entire population," and states that "two or three" congressional seats would be allocated in this State than would otherwise be allocated not counting those undocumented persons. On information and belief, that "one State" is California, where Plaintiffs City of San Jose, BAJI, Sam Liccardo, and Zerihoun Yilma are located. *See*

Pew Research Center, *U.S. unauthorized immigrant population estimate by state, 2016* (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/.

75.     To implement the Apportionment Exclusion Order, the President orders the Secretary of Commerce, "[i]n preparing his report to the President under section 141(b) of title 13 . . . to provide information permitting the President, to the extent practicable, to exercise the President's discretion to carry the policy . . . ."  Apportionment Exclusion Order § 3.  In other words, the Secretary is directed to provide information in the census report he is statutorily required to transmit to the President—that will enable the President to unlawfully categorize undocumented immigrants as "non-persons" and thereby exclude them from the apportionment calculation.

76.     The President's stated legal justification for this action is that the Constitution's requirement that "persons in each State, excluding Indians not taxed" be enumerated in the census "has never been understood to include in the apportionment base every individual physically present within a State's boundaries at the time of the census.  Instead, the term 'persons in each State' has been interpreted to mean that only the 'inhabitants' of each State should be included."  *Id.* § 1.  The Apportionment Exclusion Order states that "[d]etermining which persons should be considered 'inhabitants' for the purposes of apportionment requires the exercise of judgment," and it defends excluding undocumented persons as an exercise of that judgment.  *Id.*

77.     That rationale is contrived.  Under the Constitution, Representatives are apportioned among the States by "counting the whole number of persons in each State."  U.S. Const. amend. XIV, § 2.  Accepting that this means persons who actually reside in the United States, and that tourists are not included for these purposes, millions of undocumented persons in fact reside in California and the United States.  They are not just tourists passing through.  *See, e.g.*, Brian Baker, *Estimates of the Illegal Alien Population Residing in the United States: January 2015*, Office of Immigration Statistics, Dep't of Homeland Security (Dec. 2018), https://www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf

1   (estimating 12 million undocumented immigrants living in the United States, and estimating 2.9

2   million living in California).

3          78.     The Order's focus on "inhabitants" is misguided.  To begin, the Constitution

4   speaks of "persons," not "inhabitants."  But even if the term used were "inhabitant," the result

5   would be the same.  "Inhabitant" would be co-extensive with the definition of "person" in this

6   context, which means (now, in 1787, and in 1865) persons who reside in a place—without any

7   overlay or additional requirement of legal documentation or status.  *See, e.g.*, *Inhabitant*, Samuel

8   Johnson, A Dictionary of the English Language (6th ed. 1785) ("Dweller; one that lives or

9   refides [sic] in a place."); *Inhabitant*, Noah Webster, American Dictionary of the English

10  Language (1865) ("1. One who dwells or resides permanently in a place, or who has a fixed

11  residence, as distinguished from an occasional lodger or visitor"); *Inhabitant*, Merriam-Webster

12  Online Dictionary ("one that occupies a particular place regularly, routinely, or for a period of

13  time"), https://www.merriam-webster.com/dictionary/inhabitant (last visited July 27, 2020).

14  "Inhabitant" is not equivalent with "citizen," which connotes a fundamentally different

15  relationship with the government, and which lawmakers in 1787, again in 1865, and again now,

16  know very well how to use when they want to limit the scope of persons to the smaller class of

17  citizens of the United States alone.  *See, e.g.*,  2 Records of the Federal Convention of 1787, pp.

18  182-83 (M. Farrand ed. 1911) (draft of Constitution providing "proportions of direct taxation

19  shall be regulated by the whole number of white and other free citizens and inhabitants, of every

20  age, sex and condition, including those bound to servitude for a term of years, and three fifths of

21  all other persons not comprehended in the foregoing description, (except Indians not paying

22  taxes) . . . ."); U.S. Const. art. I, § 2, cl. 2 & § 3, cl. 2 (qualifications to be a Representative or

23  Senator include "be[ing] nine years a Citizen of the United States" as well as "an inhabitant of

24  that State [in or for] which he shall be chosen"); U.S. Const. amend. XIV, § 2 (referring to "male

25  inhabitants of [a] State, being twenty-one years of age, and citizens of the United States").

26

27

28

**E.      Harm to Plaintiffs**

79.      Plaintiffs incorporate by reference the above allegations in this Complaint.

80.      Millions of  undocumented immigrants reside in California and the United States.

81.      The voting power of Plaintiffs Sam Liccardo, Zerihoun Yilma, and Lovette Kargbo-Thompson will be diluted by the Apportionment Exclusion Order because, by excluding millions of persons from the apportionment count, it will likely cause California to have fewer Representatives spread across their home States of California and Georgia.  *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330-33 (1999) (state's expected loss of a Representative following reapportionment conferred standing on the state's voters).

82.      BAJI is harmed because the Apportionment Exclusion Order causes BAJI to divert resources—including time and money—from other important matters that it ordinarily would be addressing through presentations, workshops, publications, technical assistance, and trainings.  The Administration's decision to exclude all undocumented persons from the apportionment calculations, and to require that the Department of Commerce and by extension the Census Bureau report such information to the President, will discourage undocumented immigrants from responding to the ongoing 2020 Census because of fear that the government will identify and retaliate against undocumented persons who fill out the census.  As another federal court has already found, and the Supreme Court has upheld on review, undocumented immigrants have a high nonresponse rate to the census and that rate is likely to increase disproportionately if the administration of the census involves questions about citizenship.  *See New York v. United States Dep't of Commerce*, 351 F. Supp. 3d 502, 578-85 (S.D.N.Y. 2019), aff'd in relevant part, rev'd in part and remanded *sub nom. Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019).  BAJI has spent and will continue to spend additional time and resources educating and encouraging its partners and constituents to appropriately fill out the census in order to counteract the chilling effect of the Apportionment Exclusion Order.

83.      The exclusion of undocumented persons from the Representatives apportionment among the States will frustrate and undermine BAJI's core mission of promoting equal and just laws through building coalitions and initiating campaigns with African Americans and Black

1   immigrants, and fostering racial, economic, and social equality for the communities it serves.

2   *See Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982); *see also Fair Hous. of Marin v.*

3   *Combs,* 285 F.3d 899, 905 (9th Cir. 2002); *E. Bay Sanctuary Covenant v. Barr*, No. 19-16487,

4   2020 WL 3637585, at *9 (9th Cir. July 6, 2020).

5         84.    BAJI is also indirectly harmed by the injury to its individual members, including

6   Plaintiffs Yilma and Kargbo-Thompson set forth above, and thus has associational standing to

7   sue on behalf of those injured members.  Just as Plaintiffs Yilma and Kargbo-Thompson have

8   standing to sue in their own right, other BAJI members are similarly situated.  The interests

9   sought to be protected by this Complaint are germane to BAJI's purpose as an organization,

10  including having legal apportionment in the House to build coalitions and initiate campaigns

11  with African Americans and Black immigrants.  The claims and relief requested here do not

12  require participation of BAJI's individual members.  *See Hunt v. Wash. State Apple Advert.*

13  *Comm'n*, 432 U.S. 333, 343 (1977); *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938

14  F.3d 1147, 1155 (9th Cir. 2019).

15        85.    Finally, all Plaintiffs—Sam Liccardo, Zerihoun Yilma, Lovette Kargbo-

16  Thompson, BAJI, the City of San Jose, King County, and Arlington County—will be harmed by

17  the chilling effect of the Apportionment Exclusion Order on the response rate to the ongoing

18  2020 Census, as discussed above.  As noted, the Order's announcement that undocumented

19  immigrants will not be counted in the apportionment base is likely to disproportionately suppress

20  the response rate from undocumented immigrants.  And the lower response rate from

21  undocumented immigrants caused by the Order will harm all Plaintiffs by diminishment of

22  political representation, loss of federal funds, degradation of census data, and diversion of

23  resources.

24

25

26

27

28

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Apportionment and Enumeration Clauses, and Fourteenth Amendment**
**(U.S. Const., art. I, § 2; amend. XIV, § 2)**

86. Plaintiffs incorporate by reference the above allegations in this Complaint.

87. The Apportionment and Enumeration Clauses provide that "Representatives . . . shall be apportioned among the several States . . . according to their respective Numbers, which shall be determined" based on the number of "persons" in each state according to an "actual Enumeration." U.S. Const. art. I, § 2.

88. The Fourteenth Amendment requires the apportioning of Representatives among the States based on "the whole number of persons in each State." U.S. Const., amend. XIV, § 2.

89. Constitutional text, history, and precedent recognize undocumented immigrants as persons.

90. The Apportionment Exclusion Order denies that undocumented immigrants are "persons" for purposes of apportionment and directs that they be excluded from the apportionment base following the 2020 Census.

91. These constitutional violations have caused, are causing, and will continue to cause harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief will redress this harm.

### SECOND CLAIM FOR RELIEF
**Violation of the Fifth and Fourteenth Amendments—Malapportionment**
**(U.S. Const., amend. V, XIV)**

92. Plaintiffs incorporate by reference the above allegations in this Complaint.

93. The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the law.

94. The Equal Protection Clause of the Fourteenth Amendment, made applicable to the federal government by the Due Process Clause of the Fifth Amendment, provides that the government may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1, cl. 2.

95.     The Equal Protection Clause prohibits malapportioned congressional districts. *See Evenwel*, 136 S. Ct. at 1123-24; *Wesberry v. Sanders*, 376 U.S. 1 (1964); *Reynolds v. Sims*, 377 U.S. 533 (1964).

96.     The Apportionment Exclusion Order adopts an apportionment scheme that excludes undocumented immigrants, and therefore will lead to malapportionment by providing fewer Representatives to States with higher populations of such persons.

97.     These constitutional violations have caused, are causing, and will continue to cause harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief will redress this harm.

### THIRD CLAIM FOR RELIEF
#### Violation of Census Act—Ultra Vires
#### (2 U.S.C. § 2a; 13 U.S.C. § 141)

98.     Plaintiffs incorporate by reference the above allegations in this Complaint.

99.     The Census Act, 13 U.S.C. § 141(b), requires the Secretary to administer the decennial census and thereafter report to the President a "tabulation of total population by States . . . as required for apportionment of Representatives in Congress."

100.    Title 2 U.S.C. § 2a(a) requires the President to transmit to Congress "a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions."

101.    The Apportionment Exclusion Order violates these statutory mandates by directing the Secretary to report to the President apportionment data that is not based on the "total population" or the actual Enumeration of each state.

102.    The Apportionment Exclusion Order violates these statutory mandates by determining that the President will transmit to Congress apportionment data that is not based on "the whole number of persons in each State" and directing the Secretary of Commerce and other Defendants to facilitate this unlawful course of action.

103.    Defendants' actions beyond the scope of statutory authority are *ultra vires*

1    pursuant to 2 U.S.C. § 2a(a) and 13 U.S.C. § 141, and thereby unlawful.

2    104.    These *ultra vires* violations have caused, are causing, and will continue to cause

3    harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief

4    will redress this harm.

5                               **FOURTH CLAIM FOR RELIEF**

6    **Violation of the Fifth and Fourteenth Amendments—Intentional Discrimination**
     **(U.S. Const., amend. V, XIV)**

7    105.    Plaintiffs incorporate by reference the above allegations in this Complaint.

8    106.    The Apportionment Exclusion Order is also unlawful because it violates the core

9    constitutional protections against unlawful discrimination enshrined in the Due Process and

10   Equal Protection Clauses of the Fifth and Fourteenth Amendments.

11   107.    The Due Process Clause of the Fifth Amendment prohibits the federal

12   government from denying any person "equal protection of the laws" and, co-extensive with the

13   equal protection guarantee of the Fourteenth Amendment, prevents the federal government from

14   discrimination on the basis of race, ethnicity, national origin, and citizenship.  U.S. Const.

15   amend. V.

16   108.    These protections apply to every person within the jurisdiction of the United

17   States—regardless of citizenship status, "documentation," or any other attempted classification

18   criteria.  *See, e.g.*, *Plyler*, 457 U.S. at 210-12.

19   109.    Under these principles, applicable to undocumented immigrants, "invidious

20   discriminatory purpose" cannot be "a motivating factor" in government action.  *Vill. of Arlington*

21   *Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977).

22   110.    Contrary to these guarantees of Due Process and Equal Protection, the

23   Apportionment Exclusion Order is motivated by an intent to discriminate against Black and

24   Latino people (generally, and, in particular, Black and Latino immigrants), as demonstrated by

25   the President's consistent conduct disparaging members of these communities and seeking to

26   dilute their political power.

27   111.    The history here—culminating in the Apportionment Exclusion Order—is

28   extensive.  There is widespread public coverage of the President making numerous statements

1   indicating animosity toward communities of color.  *See, e.g.*, Josh Dawsey, *Trump derides*

2   *protections for immigrants from 'shithole' countries [Haiti, El Salvador, African countries]*,

3   Washington Post (Jan. 12, 2018, 4:52 AM PST),

4   https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-

5   shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-

6   31ac729add94_story.html; Donald J. Trump Statement on Preventing Muslim Immigration (Dec.

7   7, 2015) https://web.archive.org/web/20160204082711/https://www.donaldjtrump.com/press-

8   releases/donald-j.-trump-statement-on-preventing-muslim-immigration;  Eugene Scott, *Trump's*

9   *History of Making Offensive Comments about Nonwhite Immigrants*, Washington Post, Jan. 11,

10  2018; Julia Hirschfeld Davis et al, *Trump Alarms Lawmakers with Disparaging Words for Haiti*

11  *and Africa*, NY Times (Jan. 11, 2018), https://www.nytimes.com/2018/01/11/us/politics/trump-

12  shithole-countries.html; Matthew Choi, *Trump focuses on white people killed by police, defends*

13  *Confederate flag*, Politico (July 14, 2020, 5:45 PM EDT),

14  https://www.politico.com/news/2020/07/14/trump-racism-confederate-flag-police-361205.

15         112.    The general statements then turned to attempts by President Trump to weaken

16  these communities.  For example, in 2018, the President referred to Sanctuary laws and policies

17  as a "ridiculous, crime infested & *breeding* concept," likening undocumented immigrants

18  protected by such laws and policies to animals.  Z. Byron Wolf, *Trump blasts 'breeding' in*

19  *sanctuary cities. That's a racist term* (last updated, April 24, 2018, 11:58 PM ET),

20  https://www.cnn.com/2018/04/18/politics/donald-trump-immigrants-california/index.html

21  (emphasis added); *see also* Remarks by President Trump at a California Sanctuary State

22  Roundtable (May 16, 2018), https://www.whitehouse.gov/briefings-statements/remarks-

23  president-trump-california-sanctuary-state-roundtable/.  And President Trump repeatedly tried to

24  withhold federal funding from such states and cities, and continues to do so today, even in the

25  midst of a global pandemic that has significantly harmed undocumented immigrants.  *See, e.g.*,

26  Keya Vakil, Trump to States: Crack Down on Sanctuary Cities or I'll Hold Back Coronavirus

27  Aid (last updated, May 12, 2020, 9:14 AM EDT),

28  https://couriernewsroom.com/2020/04/30/trump-to-states-crack-down-on-sanctuary-cities-or-ill-

1  hold-back-coronavirus-aid/; Louise Radnofsky & Rebecca Ballhaus, *Trump Revives Idea on*

2  *'Sanctuary Cities' Amid Stepped Up Immigration Push*, Wall Street Journal (Apr. 12, 2019),

3  https://www.wsj.com/articles/trump-giving-strong-considerations-to-proposal-to-place-

4  immigrants-who-enter-u-s-illegally-in-sanctuary-cities-only-11555087547.

5         113.    In 2019, the President's focus turned to limiting and diluting the voting power of

6  these groups—by seeking to add a question about citizenship to the 2020 Census.  When

7  challenged about the propriety of this sudden addition, Secretary Ross claimed it was necessary

8  to enforce the Voting Rights Act.  But the courts saw through this.  Secretary Ross's decision

9  was enjoined by three district courts, and one of those cases ended up before the Supreme Court,

10 which vacated Secretary Ross's decision because his stated rationale was "contrived" and

11 "pretextual."  *Dep't of Commerce v. New York*, 139 S. Ct. at 2575-76.

12        114.    It was later revealed that Thomas Hofeller, a prominent redistricting strategist for

13 the Republic Party, was involved in drafting portions of the letter from DOJ seeking to add the

14 citizenship question, including portions related to the pretextual basis.  *See* NYIC Pls.' Mot. for

15 Sanctions, *N.Y. Immigration Coalition v. U.S. Dep't of Commerce,* No. 1:18-cv-2921-JMF, ECF

16 No. 635-1 at 124-136 (S.D.N.Y. July 16, 2019); Def's Opp. to Ltr. Mot. to Compel, *N.Y.*

17 *Immigration Coal. v. U.S. Dep't of Commerce*, 1:18-cv-2921-JMF, ECF No. 451 at 3 (S.D.N.Y.

18 Oct. 30, 2018).  This was the same Thomas Hofeller who, in 2015, prepared a study titled "The

19 Use of Citizen Voting Age Population in Redistricting," in which he recommended adding a

20 citizenship question to the Census so that states could use citizen voting age population rather

21 than total population to redistrict.  According to Hofeller, this change would be "advantageous to

22 Republicans and non-Hispanic Whites," while diluting the political power of Hispanics.  *See*

23 https://www.commoncause.org/wp-content/uploads/2019/05/2015-Hofeller-Study.pdf (last

24 accessed July 27, 2020).

25        115.    President Trump himself weighed in, so as to leave no question about what had

26 driven him to add the census question struck down by the Supreme Court.  On July 5, 2019, just

27 eight days after the Supreme Court's decision, the President publically confirmed that he had

28 sought to add the citizenship question *not* to enforce the Voting Rights Act, but rather "for

1   districting" and "for appropriations," consistent with his attempts to withhold funding from

2   Sanctuary states and cities.  Remarks by President Trump Before Marine One Departure (July 5,

3   2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-

4   departure-51/.

5        116.    Taken together, the volume and consistency of the President's statements and

6   action demonstrate discriminatory intent.  Indeed, based on the President's own statements, this

7   Court has itself previously concluded that there is "evidence that Defendant Trump harbors an

8   animus against non-white, non-European aliens."  *See* Order Granting Plfs.' Mot. for Prelim. Inj.,

9   *Ramos v. Nielsen*, No. 18-cv-01554-EMC, ECF No 128 at 30 (N.D. Cal. Oct. 3, 2018).

10       117.    That leads to the present.  In the last two weeks alone, President Trump has noted

11  that "many" immigrants from Central America "are in prison for rape, murder, lots of other

12  things," and blamed Mexican immigrants for the increased number of COVID-19 cases in the

13  United States, claiming that "sharing a 2,000-mile border with Mexico" has caused a surge in

14  cases.  *See* Remarks by President Trump in Press Conference (July 14, 2020),

15  https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-conference-

16  071420/; Daniel Dale, et al., *Fact check: Trump falsely suggests kids don't transmit coronavirus*

17  *and that US case surge is due in part to protests and Mexican migration* (last updated, July 22,

18  2020, 9:48 PM ET), https://www.cnn.com/2020/07/22/politics/fact-check-trump-coronavirus-

19  briefing-july-22/index.html.

20       118.    And then—on July 21, 2020—President Trump issued the Apportionment

21  Exclusion Order at issue here.  It was a sudden decision, with little or no explanation, and one

22  that departs from the long-standing policy and practice of the United States.  And it was made

23  before the Census Bureau even developed, let alone tested a technical means to provide the

24  required information, was made without input from the public, and was made without following

25  typical agency process.  This "specific sequence of events," especially given the "historical

26  background" involving the pretext of his initial census attempt, is strong indicia of discrimination

27  and demonstrate improper motive.  *Arlington Heights*, 429 U.S.  at 267.

28

119.    But there is direct evidence, too.  The motivation is laid out in the Apportionment

Exclusion Order itself, which states point blank that it seeks to punish States that the President

says have adopted "policies that encourage illegal aliens to enter this country."  And there is no

question that the Apportionment Exclusion Order disproportionately impacts Black and Latino

communities.  *Id.* at 266 (citing to *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  States and

communities that will suffer adversely from Defendants' decision are those with large

populations of undocumented immigrants.  Undocumented immigrants are disproportionately

located in States, like California and Texas, that also have large Latino and Black populations.

Those States are most likely to be disadvantaged by Defendants' action.

120.    In light of the above, the Apportionment Exclusion Order issued by President

Trump is predicated on intentional discrimination against non-white, non-European

undocumented immigrants and has caused, is causing, and will continue to cause harm to

Plaintiffs as alleged above.  The acts of the other Defendants have been and will be necessarily

tainted by the President's animosity toward communities of color.  *Ramos v. Nielsen*, 321 F.

Supp. 3d 1083, 1123-24 (N.D. Cal. 2018).

121.    There is a substantial likelihood that the requested relief will redress this harm.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

1.    Declare that the Apportionment Exclusion Order's directive to exclude

undocumented persons from the apportionment base violates the U.S. Constitution;

2.    Declare that the Apportionment Exclusion Order's directive to exclude

undocumented persons from the apportionment base is *ultra vires* and violates 2 U.S.C. § 2a(a)

and 13 U.S.C. § 141;

3.    Declare that any statement from the President to the Congress under 2 U.S.C.

§ 2a(a) that excludes undocumented persons residing in the United States from the

apportionment base is be null and void;

4.    Enjoin Defendants Department of Commerce, Census Bureau, Ross, Dillingham,

from excluding undocumented persons from the apportionment base following the 2020 Census,

1   or acting in any capacity from assisting the President in excluding undocumented persons from

2   the apportionment base following the 2020 Census;

3          5.      Enjoin Defendant Johnson from transmitting to the States any statement or

4   apportionment determination from the President that excludes undocumented persons from the

5   apportionment base;

6          6.      Award Plaintiffs costs, expenses, and reasonable attorneys' fees;

7          7.      Award any other relief the Court deems just and proper;

8          8.      Maintain jurisdiction and monitorship over the action until such time as the

9   statement set forth in 2 U.S.C. § 2a(a), which appropriately counts undocumented persons as

10  persons and is otherwise consistent with the mandates of the Constitution and relevant statutes, is

11  provided to Congress.

12

13  Dated: July 27, 2020                          LATHAM & WATKINS LLP

14                                                By:   /s/ Sadik Huseny

15                                                Steven M. Bauer (Bar No. 135067)
16                                                Sadik Huseny (Bar No. 224659)
                                                  Amit Makker (Bar No. 280747)
17                                                Shannon D. Lankenau (Bar. No. 294263)
                                                  **LATHAM & WATKINS LLP**
18                                                505 Montgomery Street, Suite 2000
                                                  San Francisco, CA 94111
19                                                Telephone:  415.391.0600
                                                  Facsimile:  415.395.8095

20                                                Richard P. Bress (*pro hac vice* pending)
                                                  **LATHAM & WATKINS LLP**
21                                                555 Eleventh Street NW, Suite 1000
                                                  Washington, D.C. 20004
22                                                Telephone:  202.637.2200
                                                  Facsimile:  202.637.2201

23

24                                                *Attorneys for Plaintiffs City of San Jose,*
                                                  *California; King County, Washington;*
25                                                *Arlington County, Virginia; Black Alliance for*
                                                  *Just Immigration; Sam Liccardo; Zerihoun*
26                                                *Yilma; and Lovette Kargbo-Thompson*

27

28

Kristen Clarke (*pro hac vice* pending)
Jon M. Greenbaum (Bar No. 166733)
Ezra D. Rosenberg (*pro hac vice* pending)
Dorian L. Spence (*pro hac vice* pending)
Maryum Jordan (Bar No. 325447)
Ajay Saini (*pro hac vice* pending)
**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone:  202.662.8600
Facsimile:  202.783.0857

*Attorneys for Plaintiffs City of San Jose, California; King County, Washington; Black Alliance for Just Immigration; Sam Liccardo; Zerihoun Yilma; and Lovette Kargbo-Thompson*

Mark Rosenbaum (Bar No. 59940)
**PUBLIC COUNSEL**
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone:  213.385.2977
Facsimile:  213.385.9089

*Attorneys for Plaintiff City of San Jose*