LATHAM & WATKINS LLP
  Steven M. Bauer (Bar No. 135067)
    steven.bauer@lw.com
  Sadik Huseny (Bar No. 224659)
    sadik.huseny@lw.com
  Amit Makker (Bar No. 280747)
    amit.makker@lw.com
  Shannon D. Lankenau (Bar. No. 294263)
    shannon.lankenau@lw.com
  Cindy Guan (Bar No. 317036)
    cindy.guan@lw.com
505 Montgomery Street, Suite 1900
San Francisco, California 94111
Telephone:  415.391.0600
Facsimile:  415.395.8095

LATHAM & WATKINS LLP
  Richard P. Bress (admitted *pro hac vice*)
    rick.bress@lw.com
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone:  202.637.2200
Facsimile:  202.637.2201

*Attorneys for Plaintiffs City of San Jose,*
*California; King County, Washington;*
*Arlington County, Virginia; Harris County,*
*Texas; Black Alliance for Just Immigration; Sam*
*Liccardo; Rodney Ellis; Zerihoun Yilma; Lovette*
*Kargbo-Thompson; and Santcha Etienne*

LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
  Kristen Clarke (*pro hac vice* pending)
    kclarke@lawyerscommittee.org
  Jon M. Greenbaum (Bar No. 166733)
    jgreenbaum@lawyerscommittee.org
  Ezra D. Rosenberg (admitted *pro hac vice*)
    erosenberg@lawyerscommittee.org
  Dorian L. Spence (admitted *pro hac vice*)
    dspence@lawyerscommittee.org
  Maryum Jordan (admitted *pro hac vice*)
    mjordan@lawyerscommittee.org
  Ajay Saini (admitted *pro hac vice*)
    asaini@lawyerscommittee.org
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone:  202.662.8600
Facsimile:  202.783.0857

PUBLIC COUNSEL
  Mark Rosenbaum (Bar No. 59940)
    mrosenbaum@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone:  213.385.2977
Facsimile:  213.385.9089

*[Representation information listed below]*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CITY OF SAN JOSE, CALIFORNIA; KING
COUNTY, WASHINGTON; ARLINGTON
COUNTY, VIRGINIA; HARRIS COUNTY, TEXAS;
BLACK ALLIANCE FOR JUST IMMIGRATION, a
California nonprofit corporation; SAM LICCARDO;
RODNEY ELLIS; ZERIHOUN YILMA; LOVETTE
KARGBO-THOMPSON; and SANTCHA ETIENNE,

Plaintiffs,

vs.

DONALD J. TRUMP, in his official capacity as
President of the United States; WILBUR L.
ROSS, JR., in his official capacity as
Secretary of Commerce; U.S. DEPARTMENT OF
COMMERCE; U.S. CENSUS BUREAU; and
STEVEN DILLINGHAM, in his official capacity as
Director of the U.S. Census Bureau,

Defendants.

CASE NO. 5:20-cv-05167-LHK

**FIRST AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

***THREE-JUDGE COURT
REQUESTED PURSUANT
TO 28 U.S.C. § 2284***

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# INTRODUCTION

1.      On July 21, 2020, President Donald J. Trump issued a Presidential Order titled "Memorandum Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census" (the "Apportionment Exclusion Order").  The Apportionment Exclusion Order states that, for the first time in this country's history, undocumented immigrants will not be treated as "persons" under the Constitution.  In spite of the Constitution's plain text and drafting history, in spite of precedent, in spite of statutory command, and in spite of the unbroken practice of every administration since 1790, the President has declared that he will "exclude from the apportionment base aliens who are not in a lawful immigration status."  To accomplish this, he has ordered the Secretary of Commerce to provide him with 2020 decennial census information "to carry out" his objective.  85 Fed. Reg. 44679 (July 23, 2020) (Attachment 1).  The President's stated justification for reversing our country's democratic tradition is his personal view of a nation "more consonant with the principles of representative democracy."

2.      The Apportionment Exclusion Order is illegal.  It violates the Constitution and the Census Act, and it discriminates against people based on race, ethnicity, and national origin in violation of the Due Process and Equal Protection Clauses.  By this Complaint, Plaintiffs seek declaratory and injunctive relief invalidating the Order and ensuring that it does not taint or subvert the ongoing 2020 Census or the apportionment process.

3.      The Apportionment Exclusion Order violates the plain text of the Constitution. The Constitution's Apportionment Clause, as amended by the Fourteenth Amendment, states that Representatives "shall be apportioned among the several States . . . according to their respective Numbers," U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2, which requires "counting the whole number of persons in each State," U.S. Const. amend. XIV, § 2.  When the drafters meant to exclude certain classes of persons, they said so expressly, e.g., "excluding Indians not taxed."  *Id.* No provision excludes undocumented immigrants residing in the United States.  And regardless of their immigration status, the Supreme Court has squarely held that undocumented immigrants are *persons* under the Constitution.  *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 210 (1982)

("Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term.").

4.     The Apportionment Exclusion Order also violates the plain text of the Census Act. 13 U.S.C. § 141; *see also* 2 U.S.C. § 2a(a). The Census Act directs the Secretary of Commerce to administer the census and to report to the President "the tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b). The President is then required to transmit to Congress "a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions." 2 U.S.C. § 2a(a). The Order violates the Act by directing the Secretary (and by extension the Department of Commerce and its officials), in the decennial census report, to transmit information that does not actually include the correct population for apportionment, so that the President can exercise his purported "discretion" to miscount persons.

5.     Defendants' own statements make clear their intent to effectuate the Apportionment Exclusion Order by determining the number of undocumented persons in each State through the use of statistical sampling or reliance on incomplete administrative records. Use of either of these methods will violate the Census Act and the Constitution. The use of statistical sampling to estimate the population of undocumented immigrants in each State violates the Constitution's and the Census Act's prohibitions against the use of statistical sampling in connection with the apportionment of congressional representatives. U.S. Const. art. I, § 2, cl. 3; 13 U.S.C. § 195. And relying in the alternative on a patchwork of administrative records that the Administration has admitted are inaccurate will lead to an unlawfully and unconstitutionally inaccurate population count for apportionment.

6.     By excluding undocumented immigrants from the definition of persons for apportionment purposes, the Apportionment Exclusion Order abandons over two hundred years of consensus among all three branches of government, through Republican and Democratic

administrations alike.  Since the Nation's founding, every administration has understood that requirement to mean what it says: "person" means "person."  And every administration that has addressed the issue, including those of Ronald Reagan and George H.W. Bush, has rejected any claim that undocumented immigrants are not among the "whole number of persons in each State."  U.S. Const. amend. XIV, § 2.  But under this Apportionment Exclusion Order, all "persons" somehow becomes "all persons *except* those the sitting president in any given census year may deem unworthy of inclusion."  No President has ever been granted, and no President has, unfettered discretion to rewrite the Constitution and 200 years of history through such personal fiat.

7.      One year ago, the United States Supreme Court held that the Secretary of Commerce's claimed justification for inserting a question about citizenship in the census was "a distraction" and "contrived."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019).  Here, once again, the stated reason for defining undocumented immigrants as non-persons is contrived.  The Order itself reveals that the President's intent is to reapportion congressional seats away from disfavored States such as California and to dilute the congressional representation of ethnic and racial minorities.  That plan follows a consistent history of actions and statements by the President and his advisors showing that the Apportionment Exclusion Order is motivated by an intent to discriminate against these ethnic and racial minorities.

8.      The Apportionment Exclusion Order advances an unprecedented effort to alter the basis of our representative democracy, heedless of the plain constitutional and statutory text, precedent, and unbroken historical practice.  Plaintiffs seek declaratory and injunctive relief to ensure that it does not succeed.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1346(a), and 1361.

10.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1).  Defendants are United States officers or agencies sued in their official capacities, a substantial

part of the events or omissions giving rise to this action have occurred or will occur in this district, and one or more Plaintiffs reside in this district.

11.     This Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

12.     The proper intradistrict assignment for this action is the San Jose Division, in light of the location of Plaintiffs City of San Jose, Santa Clara County, and the Mayor of San Jose, Sam Liccardo.

## REQUEST FOR THREE-JUDGE COURT

13.     Plaintiffs respectfully request that a three-judge court be convened to hear this case.

14.     Section 2284(b)(1) specifically requires that:

> Upon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge.

28 U.S.C. § 2284(b)(1).  This action warrants a three-judge court for two reasons.

15.     First, pursuant to 28 U.S.C. § 2284(a), a "district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."  28 U.S.C. § 2284(a).  Plaintiffs challenge the constitutionality of the Apportionment Exclusion Order, which by excluding from the apportionment base all persons who are not in a lawful immigration status, will misapportion congressional districts.

16.     Second, Plaintiffs challenge Defendants' use of any statistical method for enumerating the total undocumented population to determine the population for purposes of the apportionment of Representatives in Congress, in violation of 13 U.S.C. § 195, in connection with the 2020 Census.  Pursuant to Public Law No. 105-119, § 209(e)(1), 111 Stat. 2440 (1997) (13 U.S.C. § 141 note(e)(1)), consideration of this claim "shall be heard and determined by a district court of three judges in accordance with section 2284 of title 28, United States Code."

**PARTIES**

A.     **Plaintiffs**

17.     Plaintiff City of San Jose is a municipal corporation in the County of Santa Clara, California.  It is the tenth-largest city in the United States, with an estimated population of 1,927,852.  Since its founding, San Jose has always been a home to immigrant communities.  Today, nearly 40 percent of its population was born in another country, and nearly one-third of its population is of Hispanic, Latinx, Black, or African American origin.  San Jose is part of California's 17th congressional district.  It brings this action on its own behalf as a municipal corporation.

18.     Plaintiff King County is a municipal corporation organized as a home rule charter county and political subdivision under the laws of the State of Washington.  It is the most populous county in Washington, encompassing the cities of Seattle, Bellevue, Kent, Redmond, among others.  In 2019, the Census Bureau estimated that King County's population was 2,252,782.  Approximately 21 percent of its population is made up of immigrants, a large majority of whom come from Asia, Latin America, and Africa.  King County is represented in Washington's 1st, 7th, 8th, and 9th congressional districts.  It brings this action on its own behalf as a municipal corporation.

19.     Plaintiff Arlington County is a political subdivision of the Commonwealth of Virginia.  The 2010 Census reported that Arlington County had a population of 207,627.  In 2019, the Census Bureau estimated that Arlington's population was 236,842.  Approximately 23 percent of Arlington County's population is made up of immigrants, most of whom are Hispanic.  Arlington County is part of Virginia's 8th congressional district.  It brings this action on its own behalf as a political subdivision of the Commonwealth of Virginia.

20.     Plaintiff Harris County is a political subdivision of the State of Texas, existing under the Texas Constitution and the laws of the State of Texas.  Harris County is the most populous county in Texas and the third most populous county in the United States.  In 2019, the Census Bureau estimated that Harris County's population was 4,713,325, of which 26.1 percent was foreign born.  Approximately 43.7 percent of Harris County's population is Hispanic or

Latinx and 20 percent of its population is Black or African American.  Harris County is represented in Texas' 2nd, 7th, 9th, 10th, 18th, 22nd, 29th, and 36th congressional districts.  It brings this action on its own behalf as a political subdivision of the State of Texas.

21.     Plaintiff Black Alliance for Just Immigration ("BAJI") is a nonprofit organization organized and existing under the laws of California, with offices in California, Florida, Georgia, and New York.  BAJI collaborates with African Americans and Black immigrants to organize and advocate for equal and just laws in their communities.  BAJI campaigns to advance racial justice and provides partner organizations with varied assistance—particularly on immigration policy—and it spends significant resources educating its partner organizations, individuals, and other constituents through presentations, workshops, publications, technical assistance, and trainings.  BAJI is a membership organization, and its members either pay dues or volunteer their time to support the organization.  Members also actively participate in BAJI's self-governance and decision-making at the local level.

22.     Plaintiff Sam Liccardo is the Mayor of the City of San Jose.  He is a resident and citizen of Santa Clara County, California, where he is registered to vote and regularly exercises his right to vote.

23.     Plaintiff Rodney Ellis is a Harris County Commissioner and former Texas State Senator for the 13th State Senate District in Texas.  He is a resident and citizen of Houston, Texas in Harris County, where he is registered to vote and regularly exercises his right to vote.

24.     Plaintiff Zerihoun Yilma is the Board Chair of BAJI.  He is a resident and citizen of Los Angeles County, California, where he is registered to vote and regularly exercises his right to vote.

25.     Plaintiff Lovette Kargbo-Thompson is an Organizer and Member of BAJI.  She is a resident and citizen of Lawrenceville, Georgia, where she is registered to vote and regularly exercises her right to vote.

26.     Plaintiff Santcha Etienne is an Organizer and Member of BAJI.  She is a resident and citizen of North Miami, Florida, where she is registered to vote and regularly exercises her right to vote.

**B.**     **Defendants**

27.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

28.     President Trump issued the Apportionment Exclusion Order that announced that undocumented immigrants will not be counted in the apportionment for the House of Representatives, contrary to the Constitution and 2 U.S.C. § 2a(a).  The Apportionment Exclusion Order directs the Secretary of Commerce to aid the President in carrying out this determination.  It orders the Secretary (and by extension, the Department of Commerce and the Census Bureau/Census Bureau officials who are within the Department of Commerce), in preparing the decennial census report, to provide the President with information that excludes all undocumented immigrants and therefore does *not* include the correct population for apportionment, tainting and subverting the census and apportionment process.  Declaratory relief against the President is needed to prevent the unconstitutional and unlawful conduct directed by the Order.

29.     Defendant Wilbur L. Ross is the Secretary of the U.S. Department of Commerce and is sued in his official capacity.  Secretary Ross oversees the U.S. Department of Commerce, the Census Bureau, the decennial census, and the census tabulations reported to the President.

30.     Defendant U.S. Department of Commerce is a cabinet agency within the Executive Branch responsible for administering the decennial census and transmitting its tabulations to the President.

31.     Defendant Census Bureau is an agency within the Department of Commerce responsible for planning and administering the decennial census.

32.     Defendant Steven Dillingham is the Director of the Census Bureau and is sued in his official capacity.

33.     As an agency within the Department of Commerce, the Census Bureau is under Secretary Ross's supervision, but is directly headed by Director Dillingham.

34.     The Apportionment Exclusion Order requires Secretary Ross, the Department of Commerce, the Census Bureau, and Director Dillingham to take "all appropriate action" to

provide the President with a census decennial report that excludes undocumented immigrants from the apportionment calculation.  There is no reason to believe that these Defendants have refused to comply with the Order or subsequent directives related to the Order.  Relief against Secretary Ross, the Department of Commerce, the Census Bureau, and Director Dillingham is necessary to ensure that the apportionment process is conducted lawfully.

## ALLEGATIONS

**A.**  **The Constitution Requires Apportioning Members of the House of Representatives Based on the Total Number of Persons Residing in Each State**

35.    A plain text reading of the Constitution provides a sufficient basis to resolve this matter in plaintiffs' favor.  Article I, Section 2, Clause 3 (the "Apportionment Clause") expressly addresses the apportionment of Representatives:

> Representatives . . . shall be apportioned among the several States . . . according to their respective Numbers, which shall be determined by adding to the whole Number of free *Persons*, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons.  The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.

U.S. Const. art. I, § 2, cl. 3 (emphasis added).

36.    The Fourteenth Amendment, enacted in the wake of the Civil War, eliminated the Apportionment Clause's three-fifths component and provided that Representatives must be apportioned based on "the whole number of *persons* in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2 (emphasis added).

37.    The Constitution "was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Dist. of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (citation omitted).  And when that ordinary meaning is clear, "there is no room for construction and no excuse for interpolation or addition." *United States v. Sprague*, 282 U.S. 716, 731 (1931).  Here, the meaning of constitutional provisions specifying "persons" is unambiguous and thus controlling.

38.     The ordinary meaning of "person" remains the same today as it was when the Constitution and the Fourteenth Amendment were ratified.  "Person" means a human being.  *See, e.g.*, *Person*, Samuel Johnson, A Dictionary of the English Language (6th ed. 1785) ("A general loose term for a human being; one; a man."); *Person*, Noah Webster, American Dictionary of the English Language (1865) ("[A] living human being; a man, woman, or child; an individual of the human race."); *Person*, Merriam-Webster Online Dictionary ("1. Human, Individual"), https://www.merriam-webster.com/dictionary/person (last visited July 27, 2020)[https://perma.cc/S58J-7F97].  That ordinary meaning of person does not exclude persons who are undocumented immigrants.

39.     The broader text of the Constitution also makes clear that the Framers knew that the word "person" encompasses all human beings.  When the Framers sought to exclude certain *classes* of persons residing in the United States, they did so expressly:  They excluded "Indians not taxed," and they discounted the value for enumeration purposes of persons who were not "free"—*i.e.*, slaves—by forty percent.  U.S. Const. art. I, § 2, cl. 3.  The drafters of the Fourteenth Amendment, in turn, retained the exclusion of "Indians not taxed," but abolished the three-fifths clause.  *See* U.S. Const. amend. XIV, § 2.  Under basic interpretative principles, the drafters' choice to "explicitly enumerate[] certain exceptions" to the general rule that all persons are to be included means that "additional exceptions are not to be implied, in the absence of evidence of a contrary . . . intent."  *Class v. United States*, 138 S. Ct. 798, 808 (2018) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)).  *Cf. Pine Grove Tp. v. Talcott*, 86 U.S. 666, 674-75 (1873) (applying to the Constitution the canon that when one or more things of a class are expressly mentioned, others of the same class are excluded).

40.     The intended inclusive meaning of "persons" in the Apportionment Clause and Section 2 of the Fourteenth Amendment is confirmed further by binding precedent interpreting the meaning of the same word used elsewhere in the Constitution and, specifically, the Fourteenth Amendment.  "When seeking to discern the meaning of a word in the Constitution, there is no better dictionary than the rest of the Constitution itself."  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2680 (2015) (Roberts, C.J., dissenting)

1   (collecting cases); *see also Hurtado v. California*, 110 U.S. 516, 534-35 (1884) ("due process"

2   had the same meaning in the Fourteenth and Fifth Amendments because "the same phrase was

3   employed"); *Martin v. Hunter's Lessee*, 14 U.S. 304,  329, 1 Wheat. 304, 329 (1816) (examining

4   the use of the phrase "shall be vested" in locations across the Constitution to determine its

5   consistent meaning).

6       41.      In *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Supreme Court held that the

7   "persons" protected by Section 1 of the Fourteenth Amendment and the Fifth Amendment's Due

8   Process Clause include everyone in the United States: "The fourteenth amendment to the

9   constitution is not confined to the protection of citizens. . . . [Its due process and equal

10  protection] provisions are universal in their application, to all persons within the territorial

11  jurisdiction, without regard to any differences of race, of color, or of nationality." *Id*. at 369.

12  The Court reiterated this principle in *Zadvydas v. Davis*, 533 U.S. 678 (2001), stating that

13  "persons" under the Due Process Clause includes everyone "within the United States, including

14  aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693

15  (collecting cases).  There is a strong presumption that the word carries the same comprehensive

16  meaning in the Apportionment Clause and Section 2 of the Fourteenth Amendment.

17      42.      The Framers of the Constitution reflected their understanding of the breadth of the

18  term "persons" in another provision too.  *See* U.S. Const. art. I, § 9, cl. 1 (using "persons" to

19  refer to slaves who could be "[i]mport[ed]" into the United States until 1808).  And, when the

20  drafters of the Fourteenth Amendment intended to describe a narrower class than *all* persons,

21  they chose a narrower term.  Section 1, for instance, differentiates between "persons" in the

22  Citizenship, Equal Protection, and Due Process Clauses, and "citizens" in the Privileges and

23  Immunities Clause.  U.S. Const. amend. XIV, § 1.  When the drafters of the Fourteenth

24  Amendment sought to qualify "persons" by whether they are citizens of the United States and of

25  the State wherein they reside, they did so explicitly.  *See* U.S. Const. amend. XV, § 1 ("*All*

26  *persons born or naturalized in the United States and subject to the jurisdiction thereof*, are

27  citizens of the United States and of the State wherein they reside.") (emphasis added).

28

43.     Section 2 of the Fourteenth Amendment likewise differentiates between "persons" and "citizens."  The first sentence requires "counting the whole number of persons in each State, excluding Indians not taxed."  U.S. Const. amend. XIV, § 2.  By contrast, the second sentence is limited to "citizens": "But when the right to vote at any election . . . is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, . . . the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State." *Id*.  The use of these two different words in Section 2 is not accidental.  To the contrary, "[f]rom [a] difference of phraseology, . . . a difference of constitutional intention may, with propriety, be inferred.  It is hardly to be presumed that the variation in the language could have been accidental.  It must have been the result of some determinate reason."  *Martin*, 14 U.S. at 334 (Story, J.).

44.     The Framers would have been aware that choosing the word "persons" would include at least women, children, bound servants—and aliens, since the same article of the Constitution grants Congress the power "to establish an uniform Rule of Naturalization."  U.S. Const. art. 1, § 8, cl. 4; *see also Garza v. Cty. of Los Angeles*, 918 F.2d 763, 774 (9th Cir. 1990) ("The framers were aware that this apportionment and representation base would include categories of persons who were ineligible to vote—women, children, bound servants, convicts, the insane, and, at a later time, aliens.").  And ultimately the Framers adopted without comment or debate the term "persons" in place of the phrase "free citizens and inhabitants" as the basis for apportionment in the House.  *See* 2 Records of the Federal Convention of 1787, pp. 571, 590-91 (M. Farrand ed. 1911).

45.     Interpreting "person" according to its ordinary, inclusive meaning is also the reading most consistent with the Framers' theory of representative democracy.  In the Federalist Papers, James Madison explained that it "is a fundamental principle of the proposed constitution that as the aggregate number of representatives allotted to the several states, is to be . . . founded on the aggregate number of inhabitants; so, the right of choosing this allotted number in each state, is to be exercised by such part of the inhabitants, as the state itself may designate."  The

Federalist No. 54, p. 284 (James Madison) (G. Carey & J. McClellan eds. 2001).  This means that "the basis of *representation* in the House was to include all inhabitants—although slaves were counted as only three-fifths of a person—even though States remained free to deny many of those inhabitants the right to participate in the selection of their representatives."  *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016).  "Endorsing apportionment based on total population, Alexander Hamilton declared: 'There can be no truer principle than this—that every individual of the community at large has an equal right to the protection of government.'"  *Id.* (citing 1 Records of the Federal Convention of 1787, p. 473 (M. Farrand ed. 1911)).

46.     The drafting history of the Fourteenth Amendment likewise confirms that the word "persons" does not exclude undocumented immigrants.  The 39th Congress, which enacted the Fourteenth Amendment, began its first session on December 4, 1865, shortly after the Civil War (and two days before ratification of the Thirteenth Amendment).  Cong. Globe, 39th Cong., 1st Sess. 1, 3 (Dec. 4, 1865).  Because recently freed slaves had become "free Persons" and not "other Persons" under the Enumeration Clause, they had greater weight in apportionment, and Southern representation in Congress was expected to increase significantly.  *See* William W. Van Alstyne, *The Fourteenth Amendment, the "Right" to Vote, and the Understanding of the Thirty-Ninth Congress*, 1965 Sup. Ct. Rev. 33, 46 ["Van Alstyne, *The Fourteenth Amendment*"]; Gregory E. Maggs, *A Critical Guide to Using the Legislative History of the Fourteenth Amendment to Determine The Amendment's Original Meaning*, 4 Conn. L. Rev. 1069, 1089-90 (2017); *Oregon v. Mitchell*, 400 U.S. 112, 157 (1970) (Harlan, J., concurring in part and dissenting in part).

47.     The 39th Congress actively debated several different methods for calculating apportionment, including whether to base apportionment on the population of voters, citizens, or all persons residing in a State.  *See generally* Van Alstyne, *The Fourteenth Amendment*, 1965 Sup. Ct. Rev. at 45-48; *Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980).  At the time of the debate, non-citizens were counted in determining representation in Congress.  *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 353 (Jan. 22, 1866) (statement of Rep. Rogers ("Every man in this House knows perfectly well in the several States

a person under the age of twenty-one years cannot vote, unnaturalized citizens cannot vote, and the whole class of females, constituting nearly one half of the population of this country, cannot vote; yet for these persons the States are entitled to representation.").

48.     Some in Congress advocated apportionment based on the number of voters instead of the number of persons, for two reasons: to deal with the changing composition of Congress that would occur were the then-current population-based apportionment to continue, and to encourage expansion of the franchise to the freed slaves. *See* Van Alstyne, *The Fourteenth Amendment*, 1965 Sup. Ct. Rev. at 46-47.  But the voter-based apportionment proposal was met with the objection that "population is the true basis of representation," Cong. Globe, 39th Cong., 1st Sess. 141 (Jan. 8, 1866) (statement of Rep. Blaine), and practical concerns about States with roughly the same population but vastly different number of voters. *Id.*

49.     Both houses of the 39th Congress extensively discussed continued inclusion of non-citizens in apportionment in the debate over whether it would be equitable to stop using population as the basis for apportionment.  *See, e.g.*, *id.* at 359 (Jan. 22, 1866) (statement of Rep. Conkling) ("Many of the large States now hold their representation in part by reason of their aliens, and the Legislatures and people of these States are to pass upon the amendment.  It must be acceptable to them.").

50.     This drafting history demonstrates that congressional supporters and opponents of population-based apportionment knew that the outcome of the debate would affect the counting of non-citizens.  And ultimately both the Senate and the House roundly rejected the proposal to base representation on the voting population rather than the total population.  *See* Cong. Globe, 39th Cong., 1st Sess. 2991 (June 6, 1866) (proposal defeated 31-7 in the Senate); *id.* at 535, 538 (Jan. 31, 1866) (proposal defeated 131-29 in the House).  Instead, the 39th Congress retained the Constitution's principle of apportioning Representatives based on total population.

**B.    Uniform Historical Practice Confirms That The Constitution Means What It Says**

51.    Unbroken historical practice confirms what the constitutional text and drafting history make plain: the apportionment must be based on the enumeration of *all* persons residing in each State, regardless of legal status.

52.    When interpreting the Constitution, courts consistently turn to historical practice for guidance.  *See, e.g.*, *Evenwel*, 136 S. Ct. at 1132 ("What constitutional history and our prior decisions strongly suggest, settled practice confirms."); *see generally* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1 (2019).  And that historical sword cuts both ways—it can condone or condemn.  For instance, in *NLRB v. Noel Canning*, the Court upheld the constitutionality of certain types of recess appointments based in large part on the "longstanding 'practice of the government.'"  573 U.S. 513, 525 (2014) (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 401 (1819)).  This year, by contrast, the Supreme Court invalidated the structure of an independent agency, noting that sometimes "the most telling indication of [a] severe constitutional problem . . . is a lack of historical precedent to support it."  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2201 (2020) (internal quotation marks omitted).

53.    Historical practice has played a particularly salient role in cases involving the census, like this one.  Just last year the Supreme Court noted in a census case that its "interpretation of the Constitution is guided by a Government practice that has been open, widespread, and unchallenged since the early days of the Republic."  *Dep't of Commerce v. New York*, 139 S. Ct. at 2567 (citation omitted).  That same theme is recurrent in the Supreme Court's other cases addressing the census.  *See, e.g.*, *Wisconsin v. City of New York*, 517 U.S. 1, 21 (1996) (emphasizing "the importance of historical practice in" understanding the Enumeration Clause); *Franklin*, 505 U.S. at 806 (examining the history of the administration of the census to determine whether the Secretary had violated the Enumeration Clause); *United States Dep't of Commerce v. Montana*, 503 U.S. 442, 465 (1992) (examining the historical practice of apportionment under Article I, Section 2 to inform its meaning).

54.     Here, the exclusion of undocumented persons from the census's apportionment base would contradict over two centuries of consistent practice.  From the very first census, the population base for purposes of apportionment has always included all persons residing in the United States, including undocumented persons.

55.     Close historical analogues to undocumented persons demonstrate that the census must count all persons residing in a State, regardless of whether they are residing in that State with the right papers or not.  For example, in the 1860 Census—the only one conducted after Congress enacted the Fugitive Slave Act of 1850 (which required free States to cooperate with the capture and return of escaped slaves within their borders, who were deemed to have no lawful presence there, *see* 9 Stat. 462-65 (1850)) but before ratification of the Thirteenth Amendment—the census explicitly counted fugitive slaves in Northern States as part of the "free colored population," despite their unlawful residence in those States.  *See* Bureau of the Census, *Population of The United States in 1860*, at vi-vii, xi, xv-xvi (Gov't Printing Office 1864) (discussing changes in the fugitive slave population from 1850 to 1860), [https://perma.cc/H5GS-3M8V].

56.     Throughout the two-hundred-year history of the United States, the census has always reflected the settled understanding that *all* persons residing in the United States—citizens and non-citizens alike—must be counted to fulfill the Constitution's "actual Enumeration" mandate.  U.S. Const., art. I, § 2, cl. 3; *Klutznick*, 486 F. Supp. at 576; *see also Plyler*, 457 U.S. at 210 (holding that the Equal Protection Clause applies to persons who are in the country without proper authorization because "[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term").

57.     During the first half of the 20th century, a variety of proposals were made in Congress to exclude aliens from the apportionment base, but it was recognized that such a result would require a constitutional amendment.  For example, in 1929, the Senate Legislative Counsel concluded that, without a constitutional amendment, "statutory exclusion of aliens from the apportionment base would be unconstitutional."  *Klutznick*, 486 F. Supp. 564, 576-77

1    (D.D.C.) (three-judge court), appeal dismissed, 447 U.S. 916 (1980) (citing 71 Cong. Rec. 1821

2    (1929)).

3           58.     Again in 1940, Congress considered whether "aliens who are in this country in

4    violation of law have the right to be counted and represented." *Id.* (quoting 86 Cong. Rec. 4372

5    (1940)).  Representative Celler of New York explained:

> The Constitution says that all persons shall be counted. I cannot
> quarrel with the founding fathers.  They said that all should be
> counted.  We count the convicts who are just as dangerous and just
> as bad as the Communists or as the Nazis, ***as those aliens here
> illegally***, and I would not come here and have the temerity to say
> that the convicts shall be excluded, if the founding fathers say they
> shall be included.  The only way we can exclude them would be to
> pass a constitutional amendment.

11   *Id.* (quoting 86 Cong. Rec. 4372 (1940)) (emphasis added).  On this basis, Congress rejected a

12   proposal to exclude "aliens" from the apportionment base.  *See id.*

13          59.     More recently, in the 111th Congress, Joint Resolution 11 proposed an

14   amendment to the Constitution to apportion based only on citizenship.  *See* H.R.J. Res. 11, 111th

15   Cong. (2009).  Other than being referred to committees, no action was taken.

16          60.     The Executive Branch, too, has repeatedly recognized—under Presidents of both

17   parties—that the Constitution requires congressional apportionment based on total population,

18   irrespective of citizenship or immigration status.

19          61.     For example, in 1980, under President Jimmy Carter, private plaintiffs filed a

20   lawsuit in the District of Columbia seeking to exclude "illegal aliens" from the census and the

21   congressional apportionment base.  *Klutznick*, 486 F. Supp. at 565.  Opposing the suit, the U.S.

22   Department of Justice ("DOJ") told the court that the plaintiffs "s[ought] a radical revision of the

23   constitutionally mandated system for allocation of Representatives to the States of the Union and

24   an equally radical revision of the historic mission of the decennial census."  Federal Defs.' Post-

25   Arg. Mem. at 1, *Klutznick*, No. 79-3269 (D.D.C. filed Feb. 15, 1980).

26          62.     "[F]or 200 years," DOJ told courts, "the decennial census has counted all

27   residents of the states irrespective of their citizenship or immigration status," and those numbers

28   were used for apportionment.  *Id.*  Given "the clear and unequivocal language of Section 2 of the

Fourteenth Amendment," DOJ argued that the "radical revision" that the plaintiffs sought could come only from "a constitutional amendment." *Id.* DOJ also explained that such a revision would be "patently unfair" to residents of communities in which undocumented immigrants live, as undocumented immigrants "demand[] precisely the same level of the services from the municipalities and states in which [they] reside as do all other citizens." *Id.* at 12.

63.     In 1988, under President Ronald Reagan, the Director of the Office of Management and Budget sought the views of DOJ on yet another proposal to exclude "illegal aliens" from congressional apportionment base. DOJ concluded that the proposed legislation was "unconstitutional." Letter from Thomas M. Boyd, Acting Assistant Attorney General, dated June 29, 1988, at 5 (included in 1990 Census Procedures and Demographic Impact on the State of Michigan: Hearing Before the Committee on Post Office and Civil Service, House of Representatives, One Hundredth Congress, Second Session, June 24, 1988 at 240 (United States: U.S. Government Printing Office 1988)). In DOJ's view, it was "clear" that, under the Fourteenth Amendment, "all persons, *including aliens residing in this country*, [must] be included" in the congressional apportionment base. *Id.* at 2 (emphasis added). In fact, DOJ noted, the Reconstruction Congress "rejected arguments that representation should be based on people with permanent ties to the country" and "consciously chose to include aliens." *Id.* at 2-3.

64.     In its 1988 opinion, DOJ explained that, for apportionment purposes, the Fourteenth Amendment does not distinguish between "aliens" who are and are not lawfully present in the United States. Furthermore, DOJ explained, in analyzing the Fourteenth Amendment, "the Supreme Court . . . has read the word 'person' to include illegal aliens." *Id.* at 3-4 (citing *Plyler*, 457 U.S. at 210).

65.     In 1989, under President George H. W. Bush, DOJ issued a similar opinion. Once again, a Senator had "requested the views of the Department of Justice concerning the constitutionality of proposed legislation excluding illegal or deportable aliens from the decennial census count." Letter from Carol T. Crawford, Assistant Attorney General, dated Sept. 22, 1989, at 1, 135 Cong. Rec. S12235 (1989). DOJ responded that "section two of the Fourteenth Amendment which provides for 'counting the whole number of persons in each state' and the

original Apportionment and Census Clauses of Article I section two of the Constitution *require that inhabitants of States who are illegal aliens be included* in the census count." *Id.* (emphasis added).  At that time, current Attorney General William Barr was the head of DOJ's Office of Legal Counsel.  In that position, he would be expected to have reviewed and approved the DOJ opinion.

66.  In 2015, under President Barack Obama, DOJ again concluded that Article I, § 2 and the Fourteenth Amendment "were purposely drafted to refer to 'persons,' rather than to voters, and to include people who could not vote"—specifically including "aliens."  Br. for the United States as *Amicus Curiae*, *Evenwel v. Abbott*, No. 14-940, at 18 (quoting Cong. Globe, 39th Cong., 1st Sess. 141, 359), 2015 U.S. S. Ct. Briefs LEXIS 3387.  In DOJ's words, this is because "the federal government act[s] in the name of (and thereby represent[s]) all people, whether they [are] voters or not, and whether they [are] citizens or not." *Id.* at 19.

67.  In preparation for the 2020 Census, the Bureau solicited and received two rounds of public comment on the Census Residence Rule and Residence Situations "to allow the public to recommend any changes they would like to be considered for the 2020 Census" with respect to "where people are counted.  Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525, 5526 (2018).  As with the residence rules governing prior censuses, the Census Bureau's 2020 Residence Rule requires that "[c]itizens of foreign countries living in the United States" be "[c]ounted at the U.S. residence where they live and sleep most of the time." *Id*. at 5533.

68.  This aligns with the census concept of "usual residence," which "is grounded in the law providing for the first census, the Act of March 1, 1790, expressly specifying that persons be enumerated at their 'usual place of abode.'"  83 Fed. Reg. at 5526.  The Census Bureau promulgates such criteria as to every decennial census.  *See* U.S. Census, 2020 Census Residence Criteria and Residence Situations (Feb. 25, 2020), https://www.census.gov/programs-surveys/decennial-census/2020-census/about/residence-rule.html [https://perma.cc/5W42-NCQ7].

69.     Until now, no President of any political party has deviated from the understanding of the Framers and drafters of the Fourteenth Amendment that congressional apportionment must be based on total population, irrespective of citizenship or immigration status.  Nor, until now, has any President sought to exclude from the apportionment base any class of persons residing in the United States, regardless of whether they are eligible to vote, are U.S. citizens, or undocumented immigrants.

70.     The judiciary, too, has consistently shared this understanding.  For over fifty years, the Supreme Court has found it "abundantly clear . . . that in allocating Congressmen the number assigned to each state should be determined solely by the number of the State's inhabitants."  *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964).  Just four years ago, the Supreme Court stated that the Constitution "select[s] . . . total population as the basis for allocating congressional seats, . . . *whether or not [individuals] qualify as voters*."  *Evenwel*, 136 S. Ct. at 1129 (emphasis added).  No court in the United States has ever held otherwise.

**C.     The Census Act Likewise Requires Apportionment Based on the Total Number of Persons Residing in Each State**

71.     The Enumeration Clause and Fourteenth Amendment empower Congress to enact legislation governing administration of the census and apportionment.  In the Census Act of 1954, Congress delegated to the Secretary of Commerce responsibility for administering the census, including supervision of the Census Bureau.  13 U.S.C. §§ 1, 2, 4; 68 Stat. 1012 (1954); 90 Stat. 2459 (1976); *see also* 32 Stat. 51 (1902) (creating "Census Office"); 32 Stat. 825 (1903) (housing "Census Office" within the Department of Commerce and Labor).

72.     The Census Act mandates that "[t]he Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year."  It authorizes the Secretary to conduct the census "in such form and content as he may determine."  13 U.S.C. § 141(a).  Under the direction of the Secretary and the Bureau Director, the Bureau conducts the constitutionally required census every ten years by counting all U.S. residents in the place where they live.  The Census Bureau's rules state that its enumeration procedures "are guided by the constitutional and statutory mandates to count *all residents* of the

several states," including "[c]itizens of foreign countries living in the United States."  U.S. Census Bureau, *Residence Criteria and Residence Situations for the 2020 Census of the United States* at 1-2 (emphasis added), https://www.census.gov/content/dam/Census/programs-surveys/decennial/2020-census/2020-Census-Residence-Criteria.pdf (last accessed July 27, 2020).

73.     The Census Act also sets forth the procedure and timeline for distribution and use of the results of the decennial census, instructing the Secretary to submit to the President "[t]he tabulation of *total population* by States . . . as required for the apportionment of Representatives in Congress among the several States."  13 U.S.C. § 141(b) (emphasis added).

74.     Thereafter, the President must "transmit to the Congress a statement showing the *whole number of persons in each State* excluding Indians not taxed, *as ascertained under the . . . decennial census of the population*, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member."  2 U.S.C. § 2a(a) (emphasis added).

75.     The "method of equal proportions" is a method of apportionment based on each State's population designed to minimize disparities in "population per Representative" among States.  71 Cong. Rec. at 4965 (Mar. 2 1929) ("Memorandum on the Method of Equal Proportions" by Professor Edward Huntington noting unanimous adoption of method by Advisory Committee of the Census); 67 Cong. Rec. at 7078 (Apr. 7, 1926) (Advisory Committee report describing method as providing "an apportionment in which the ratios between the representation and the population of the Several States are as nearly alike as possible").  The Department of Justice has recognized that the method of equal proportions relies on each State's total population.  Br. for Appellants, *Dep't of Commerce v. Montana*, 503 U.S. 442 (1992), 1992 WL 672939, at *9-11 ("Under all of the methods, the formula for establishing each State's priorities has as its numerator the population of the State.").

76.     "Each State shall be entitled . . . to the number of Representatives shown in the [President's] statement" and "no State to receive less than one Member."  2 U.S.C. § 2a(b).  "It

shall be the duty of the Clerk of the House of Representatives, within fifteen calendar days after the receipt of such statement, to send to the executive of each State a certificate of the number of Representatives to which such State is entitled under this section." *Id.*

      **D.**    **The Census Act and Enumeration Clause of the Constitution Require an Accurate Enumeration and Prohibit the Use of Statistical Sampling to Determine the Total Population for Congressional Apportionment**

    77.    The Census Act expressly prohibits "the use of the statistical method known as 'sampling' in carrying out" "the determination of population for purposes of apportionment of Representatives in Congress among the several States[.]" 13 U.S.C. § 195.

    78.    The Supreme Court has held squarely that 13 U.S.C. § 195 "prohibits the use of sampling in calculating the population for purposes of apportionment." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 340  (1999).

    79.    The Supreme Court explained further that 13 U.S.C. § 195 prohibits the use of statistical sampling for apportionment purposes, "[w]hether used as a 'supplement' or as a 'substitute.'" *Id.* at 342.

    80.    Likewise, the Constitutional mandate to make an "actual Enumeration" requires the Census Bureau to make an actual count.  The use of statistical sampling to estimate "the whole number of persons in each State" . . . in lieu of any effort to actually count such persons violates the constitutional requirement of an "actual Enumeration."  U.S. Const. art. I, § 2, cl. 3; *see U.S. House of Representatives*, 525 U.S. at 346-47 (Scalia, J. concurring in part) ("Dictionaries roughly contemporaneous with the ratification of the Constitution demonstrate that an 'enumeration' requires an actual counting, and not just an estimation of number.").

    81.    The Supreme Court has recognized that the Enumeration Clause embodies a "strong constitutional interest in accuracy," and observed that "the Framers expected census enumerators to seek to reach each individual household" when making determinations that bear on apportionment.  *Utah v. Evans*, 536 U.S. 452, 477-78 (2002).  To the extent other "methods substitute for any such effort, it may be argued that the Framers did not believe that the Constitution authorized their use." *Id.*

82.    Defendants recently conceded these points.  When Secretary Ross issued his memorandum reinstating a citizenship question on the 2020 Census, he repeatedly emphasized the importance of "*complete and accurate data*" and stated that "it is [] incumbent upon the Department [of Commerce] and Census Bureau to make every effort to provide a complete and accurate decennial census" in order to secure the "foundational elements of our democracy," "including apportionment of Congressional seats among states."  Memorandum to Karen Dunn Kelley, Under Secretary for Economic Affairs, from the Sec'y of Commerce on Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire, at 1, 8 (Mar. 26, 2018), https://www.commerce.gov/sites/default/files/2018-03-26_2.pdf.

83.    Thereafter, when the State of New York and others challenged the addition of a citizenship question to the 2020 Census as a violation of (*inter alia*) the Enumeration Clause, the Department of Justice—on behalf of Defendants—recognized that "the Constitution's reference to 'actual Enumeration' is simple: population [for purposes of apportionment] is to be determined *through a person-by-person headcount, rather than through estimates or conjecture*."  Br. in Support of Defendants' Mot. to Dismiss (ECF No. 155) at 30, *New York v. Dep't of Commerce*, No. 1:18-cv-02921-JMF (S.D.N.Y. filed May 25, 2018) (emphasis added); *see also id.* at 25 (stating that the Enumeration Clause "provides a simple judicial standard for determining the constitutionality" of a practice used in creating data used for apportionment: "the Secretary must perform a *person-by-person headcount*, rather than an estimate of population" (emphasis added)).

84.    Consistent with the Constitution's demand for an "actual Enumeration," starting "[f]rom the very first census" in 1790, "Congress has prohibited the use of statistical sampling in calculating the population for purposes of apportionment."  *House of Representatives*, 525 U.S. at 335.  Instead, it has required that "enumeration . . . be made by an *actual inquiry at every dwelling-house . . . and not otherwise*."  *Id.* (emphasis added) (quoting Act of Mar. 26, 1810, § 1, 2 Stat. 565-66).

### E.     President Trump's Unlawful Apportionment Exclusion Order

85.     Despite the Constitution's unambiguous command and two centuries of consistent practice, President Trump, on July 21, 2020, issued the Apportionment Exclusion Order, excluding undocumented persons from the apportionment base following the 2020 Census and ordering the Secretary of Commerce to use the census reporting process to facilitate that exclusion.  Contemporaneously, the President issued a statement that he is "directing the Secretary of Commerce to exclude illegal aliens from the apportionment base following the 2020 census."  *See* Statement from the President Regarding Apportionment (July 21, 2020), https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment/.

86.     Although the Apportionment Exclusion Order is styled a "Memorandum," that label has no legal significance—because the Order's language and its publication in the Federal Register confirm that it has binding legal force and effect.  *See* 44 U.S.C. § 1505(a) (requiring executive documents with "general applicability and legal effect" to be published in the Federal Register); *Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44679 (July 23, 2020) ("order[ing]" that action be taken).  And "there is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order."  *Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29 (2000); *see also Medellin v. Texas*, 552 U.S. 491, 524 (2008) (analyzing presidential memorandum's legal effects under *Youngstown* tripartite framework for executive action).

87.     Section 1 of the Apportionment Exclusion Order provides the purported authority for the President's action.  It states that "Congress has charged the Secretary of Commerce (the Secretary) with directing the conduct of the decennial census in such form and content as the Secretary may determine (13 U.S.C. 141(a))."  Apportionment Exclusion Order § 1.  It also states that "[t]he President, by law, makes the final determination regarding the 'whole number of persons in each State,' which determines the number of Representatives to be apportioned to each State, and transmits these determinations and accompanying census data to the Congress (2

1  U.S.C. 2a(a)).”  *Id.*  The Apportionment Exclusion Order then asserts that the President has

2  “discretion to settle the apportionment.”  *Id.*

3      88.     Section 1 of the Apportionment Exclusion Order observes that the Constitution’s

4  requirement that “persons in each State, excluding Indians not taxed” be enumerated in the

5  census “has been interpreted to mean that only the ‘inhabitants’ of each State should be

6  included.”  *Id.*  The Order then claims that the President has discretion “to determine who

7  qualifies as an ‘inhabitant.’”  *Id.*

8      89.     Purportedly in the exercise of that discretion, the Apportionment Exclusion Order

9  announces that the President has “determined that respect for the law and protection of the

10  integrity of the democratic process warrant the exclusion of illegal aliens from the apportionment

11  base,” without regard to whether they reside in the United States.  *Id.* § 2.  The Apportionment

12  Exclusion Order also sets forth the President’s motivation: he wants to punish States like

13  California and Washington that, he says, have adopted “policies that encourage illegal aliens to

14  enter this country” by diminishing their “representation in the House of Representatives.”  *Id.*

15  Indeed, the Order specifically identifies “one State [that] is home to more than 2.2 million illegal

16  aliens, constituting more than 6 percent of the State’s entire population,” and states that “two or

17  three” congressional seats would be allocated in this State than would otherwise be allocated not

18  counting those undocumented persons.  On information and belief, that “one State” is California,

19  where Plaintiffs City of San Jose, BAJI, Sam Liccardo, and Zerihoun Yilma are located.  *See*

20  Pew Research Center, *U.S. unauthorized immigrant population estimate by state, 2016* (Feb. 5,

21  2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-

22  state/.

23      90.     To implement the Apportionment Exclusion Order, the President orders the

24  Secretary of Commerce, “[i]n preparing his report to the President under section 141(b) of title

25  13 . . . to provide information permitting the President, to the extent practicable, to exercise the

26  President’s discretion to carry the policy . . . .”  Apportionment Exclusion Order § 3.  In other

27  words, the Secretary is directed to provide information in the census report he is statutorily

28

1    required to transmit to the President that will enable the President to categorize undocumented

2    immigrants as "non-persons" and thereby exclude them from the apportionment calculation.

3         91.    The President's stated legal justification for this action is that the Constitution's

4    requirement that "persons in each State, excluding Indians not taxed" be enumerated in the

5    census "has never been understood to include in the apportionment base every individual

6    physically present within a State's boundaries at the time of the census.  Instead, he notes, the

7    term 'persons in each State' has been interpreted to mean that only the 'inhabitants' of each State

8    should be included."  *Id.* § 1.  The Apportionment Exclusion Order states that "[d]etermining

9    which persons should be considered 'inhabitants' for the purposes of apportionment requires the

10   exercise of judgment," and it defends excluding undocumented persons as an exercise of that

11   judgment.  *Id.*

12        92.    That rationale is contrived.  Under the Constitution, Representatives are

13   apportioned among the States by "counting the whole number of persons in each State."  U.S.

14   Const. amend. XIV, § 2.  Accepting that this means persons who actually reside in the United

15   States, and that tourists are not included for these purposes, millions of undocumented persons in

16   fact reside in California and the United States.  They are not just tourists passing through.  *See,*

17   *e.g.*, Brian Baker, *Estimates of the Illegal Alien Population Residing in the United States:*

18   *January 2015*, Office of Immigration Statistics, Dep't of Homeland Security (Dec. 2018),

19   https://www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf

20   (estimating 12 million undocumented immigrants living in the United States, and estimating 2.9

21   million living in California).

22        93.    The Order's focus on "inhabitants" is immaterial.  To begin, the Constitution

23   speaks of "persons," not "inhabitants."  But even if the term used were "inhabitants," the result

24   would be the same.  The meaning of "inhabitant" (now, in 1787, and in 1865) is persons who

25   reside in a place—without any overlay or additional requirement of legal documentation or

26   status.  *See, e.g.*, *Inhabitant*, Samuel Johnson, A Dictionary of the English Language (6th ed.

27   1785) ("Dweller; one that lives or refides [sic] in a place."); *Inhabitant*, Noah Webster,

28   American Dictionary of the English Language (1865) ("1. One who dwells or resides

permanently in a place, or who has a fixed residence, as distinguished from an occasional lodger or visitor"); *Inhabitant*, Merriam-Webster Online Dictionary ("one that occupies a particular place regularly, routinely, or for a period of time"), https://www.merriam-webster.com/dictionary/inhabitant (last visited July 27, 2020). "Inhabitant" is not restricted to "citizen," which connotes a particular relationship with the government, and which lawmakers in 1787, again in 1865, and again now, know very well how to use when they want to limit the scope of persons to the smaller class of citizens of the United States alone. *See, e.g.*, 2 Records of the Federal Convention of 1787, pp. 182-83 (M. Farrand ed. 1911) (draft of Constitution providing "proportions of direct taxation shall be regulated by the whole number of white and other free citizens and inhabitants, of every age, sex and condition, including those bound to servitude for a term of years, and three fifths of all other persons not comprehended in the foregoing description, (except Indians not paying taxes) . . . ."); U.S. Const. art. I, § 2, cl. 2 & § 3, cl. 2 (qualifications to be a Representative or Senator include "be[ing] nine years a Citizen of the United States" as well as "an inhabitant of that State [in or for] which he shall be chosen"); U.S. Const. amend. XIV, § 2 (referring to "male inhabitants of [a] State, being twenty-one years of age, and citizens of the United States").

> **F.     The Apportionment Exclusion Order Will Necessitate Reliance on Wholly Incomplete and Inaccurate Data or the Use of Statistical Sampling**

94.     No Government agency has ever undertaken a person-by-person enumeration of undocumented immigrants in each State.

95.     Following the Supreme Court's decision last year enjoining Secretary Ross from including a citizenship question on the 2020 Census in *Department of Commerce v. New York*, 139 S. Ct. at 2575-76, the President issued Executive Order Executive Order 13880 on July 11, 2019, directing all executive agencies instead to provide the Department of Commerce with access to administrative records that may be useful in accomplishing the President's objective of determining the number of citizens and non-citizens in the country.

96.     On August 3, 2020, the Census Bureau announced that it is "continu[ing] its work on meeting the requirements of Executive Order 13880 issued July 11, 2019 and the Presidential

Memorandum issued July 21, 2020."  U.S. Census Bureau, Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a Complete and Accurate 2020 Census Count (Aug. 3, 2020), https://www.census.gov/newsroom/press-releases/2020/delivering-complete-accurate-count.html.

97.     Without a 2020 Census question regarding immigration status, the Census Bureau lacks the means to accurately enumerate the population of undocumented immigrants in each State in order to exclude them from the total population apportionment count.  The Department of Commerce has expressly conceded that it "lack[s] . . . accurate estimates of the resident undocumented population on a state-by-state basis."  Defs' Supp. Rule 26(a)(1) Disclosures and Rule 26(a)(2)(C) Disclosures, *State of Alabama v. Dep't of Commerce*, Case No. 2:18-cv-00772-RDP (N.D. Ala. March 13, 2020).

98.     The administrative records, which the President has directed are to be the basis for the Department of Commerce's enumeration of the undocumented population, are riddled with inaccuracies and inconsistencies.  Jeffrey Mervis, *Why the U.S. Census Bureau could have trouble complying with Trump's order to count citizens*, Science Mag. (Sept. 16, 2019), https://www.sciencemag.org/news/2019/09/why-us-census-bureau-could-have-troublecomplying-trump-s-order-count-citizens (detailing the "formidable challenge" in relying on administrative records); Ruth Greenwood, et al, Collection of State Administrative Records Data, OMB Control Number 0607-0995 (Jan. 17, 2020), https://campaignlegal.org/sites/default/files/2020-01/Final%20Campaign%20Legal%20Center%20Comment%20OMB%20Control%20No%200607-0995.pdf (noting that "[s]tate administrative data on individual citizenship status are notoriously riddled with errors and outdated information" and "records misidentify naturalized U.S. citizens as non-U.S. citizens"); Jennifer Van Hook, *Counting 11 million undocumented immigrants is easier than Trump thinks*, The Conversation (July 17, 2019, 7:22 AM EDT), https://theconversation.com/counting-11-million-undocumented-immigrants-is-easier-than-trump-thinks-120459 (observing that administrative records provide "inconsistent information about the same person," have "limited value for describing those who fall outside of the

1    administrative records system," and will require researchers to "make assumptions about

2    coverage error").  Moreover, administrative records do not provide information as to lawful

3    immigration status, as opposed to citizenship, and cannot therefore be used to determine whether

4    census respondents are undocumented, as opposed to lawful, immigrants.

5           99.    In the absence of a means to accurately enumerate the total population *excluding*

6    undocumented immigrants, the Census Bureau will have no choice but to rely either on statistical

7    sampling to estimate the number of undocumented persons in each State or on inaccurate

8    administrative records regarding citizenship in order to deliver to the President an apportionment

9    base that excludes undocumented immigrants from the "whole number of persons in each State."

10          100.   The Government has already admitted that Defendants may use statistical

11   modeling to estimate the undocumented population and thereby calculate an apportionment

12   population that excludes undocumented immigrants.  In separate litigation, Department of Justice

13   attorney Stephen Ehrlich recently stated that there may be a need for "some statistical modeling"

14   in order to effectuate the Apportionment Exclusion Order, though the Government had not yet

15   "formulated a methodology."  Hansi Lo Wang, *Trump Sued Over Attempt To Omit Unauthorized*

16   *Immigrants From A Key Census Count*, N.P.R. (July 24, 2020, 10:11 AM ET),

17   https://www.npr.org/2020/07/24/894322040/trump-sued-for-attempt-to-omitunauthorized-

18   immigrants-from-a-key-census-count.

19          101.   When asked at a recent congressional hearing how the Census Bureau intends to

20   calculate the number of undocumented immigrants in each State, the Bureau's current Director,

21   Defendant Dillingham, responded that its "experts" would "look at our administrative data and

22   any [other] data that we have," including data obtained from outside sources, then "determine . . .

23   the [President's desired] statistic" by "appl[ying]" unspecified "methodologies" to that data.

24   Oversight Committee, *Counting Every Person: Hearing on Safeguarding the 2020 Census*

25   *Against the Trump Administration's Unconstitutional Attacks*, YouTube (July 29, 2020),

26   https://www.youtube.com/watch?v=SKXS8e1Ew7c.

27          102.   Because actual enumeration of undocumented immigrants is not possible, any

28   quantification of undocumented immigrants that the Secretary of Commerce would provide to

1    the President pursuant to the Apportionment Exclusion Order, or that the President would

2    thereafter rely upon in preparing the apportionment base for transmission to Congress, would

3    violate 13 U.S.C. § 195 or 2 U.S.C. § 2a(a) and the Enumeration Clause of the U.S. Constitution.

4        **G.    Harm to Plaintiffs**

5        103.    Plaintiffs incorporate by reference the above allegations in this Complaint.

6        104.    Millions of undocumented immigrants reside in California and the United States.

7        105.    The voting power of Plaintiffs Sam Liccardo, Rodney Ellis, Zerihoun Yilma,

8    Lovette Kargbo-Thompson, and Santcha Etienne will be diluted by the Apportionment Exclusion

9    Order because, by excluding millions of persons from the apportionment count, it will likely

10   cause their home states of California, Texas, Florida, and possibly Georgia to have fewer

11   Representatives.  *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330-

12   33 (1999) (state's expected loss of a Representative following reapportionment conferred

13   standing on the state's voters).

14       106.    BAJI is harmed because the Apportionment Exclusion Order already has caused,

15   and absent relief in this action will continue to cause, BAJI to divert resources—including time

16   and money—from other important matters that it ordinarily would be addressing through

17   presentations, workshops, publications, technical assistance, and trainings.  As another federal

18   court has already found, and the Supreme Court upheld on review, undocumented immigrants

19   already have a high nonresponse rate to the census.  *See New York v. United States Dep't of*

20   *Commerce*, 351 F. Supp. 3d 502, 578-85 (S.D.N.Y. 2019), aff'd in relevant part, rev'd in part

21   and remanded *sub nom. Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019).  The

22   Administration's announced decision to exclude all undocumented persons from the

23   apportionment calculations, and to require that the Department of Commerce and by extension

24   the Census Bureau report such information to the President, will further discourage

25   undocumented immigrants from responding to the ongoing 2020 Census, because of fear that the

26   government will identify and retaliate against undocumented persons who fill out the census.

27   BAJI has spent and, absent relief in this action will continue to spend, additional time and

28

resources educating and encouraging its partners and constituents to appropriately fill out the census in order to counteract the chilling effect of the Apportionment Exclusion Order.

107.    The exclusion of undocumented persons from the Representatives apportionment among the States also will frustrate and undermine BAJI's core mission of promoting equal and just laws through building coalitions and initiating campaigns with African Americans and Black immigrants, and fostering racial, economic, and social equality for the communities it serves. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982); *see also Fair Hous. of Marin v. Combs,* 285 F.3d 899, 905 (9th Cir. 2002); *E. Bay Sanctuary Covenant v. Barr*, No. 19-16487, 2020 WL 3637585, at *9 (9th Cir. July 6, 2020).

108.    In addition, BAJI is indirectly harmed by the injuries to its individual members, including Plaintiffs Yilma, Kargbo-Thompson, and Etienne set forth above, and thus has associational standing to sue on behalf of those injured members.  Just as Plaintiffs Yilma, Kargbo-Thompson, and Etienne have standing to sue in their own right, other BAJI members are similarly situated.  The interests sought to be protected by this Complaint are germane to BAJI's purpose as an organization, including having legal apportionment in the House to build coalitions and initiate campaigns with African Americans and Black immigrants.  The claims and relief requested here do not require participation of BAJI's individual members.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1155 (9th Cir. 2019).

109.    Finally, all Plaintiffs—Sam Liccardo, Rodney Ellis, Zerihoun Yilma, Lovette Kargbo-Thompson, Santcha Etienne, BAJI, the City of San Jose, King County, Arlington County, and Harris County—will be harmed by the chilling effect of the Apportionment Exclusion Order on the response rate to the ongoing 2020 Census, as discussed above.  As noted, the Order's announcement that undocumented immigrants will not be counted in the apportionment base is likely to disproportionately suppress the response rate from undocumented immigrants.  And the lower response rate from undocumented immigrants caused by the Order will harm all Plaintiffs by diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources.

1

## CLAIMS FOR RELIEF

2

## FIRST CLAIM FOR RELIEF

3

**Violation of Apportionment and Enumeration Clauses, and Fourteenth Amendment
(U.S. Const., art. I, § 2; amend. XIV, § 2)**

4

110.    Plaintiffs incorporate by reference the above allegations in this Complaint.

5

111.    The Apportionment and Enumeration Clauses provide that "Representatives . . .

6

shall be apportioned among the several States . . . according to their respective Numbers, which

7

shall be determined" based on the number of "persons" in each state according to an "actual

8

Enumeration." U.S. Const. art. I, § 2.

9

112.    The Fourteenth Amendment requires the apportioning of Representatives among

10

the States based on "the whole number of persons in each State." U.S. Const., amend. XIV, § 2.

11

113.    Constitutional text, history, and precedent recognize undocumented immigrants as

12

persons, and millions of them reside in the United States.

13

114.    The Apportionment Exclusion Order denies that undocumented immigrants are

14

"persons" for purposes of apportionment and directs that they all be excluded from the

15

apportionment base following the 2020 Census.

16

115.    These constitutional violations have caused, are causing, and absent relief in this

17

action will continue to cause harm to Plaintiffs as alleged above, and there is a substantial

18

likelihood that the requested relief will redress this harm.

19

## SECOND CLAIM FOR RELIEF

20

**Violation of the Fifth and Fourteenth Amendments—Malapportionment
(U.S. Const., amend. V, XIV)**

21

116.    Plaintiffs incorporate by reference the above allegations in this Complaint.

22

117.    The Due Process Clause of the Fifth Amendment prohibits the federal

23

government from denying equal protection of the law.

24

118.    The Equal Protection Clause of the Fourteenth Amendment, made applicable to

25

the federal government by the Due Process Clause of the Fifth Amendment, provides that the

26

government may not "deny to any person within its jurisdiction the equal protection of the laws."

27

U.S. Const., amend. XIV, § 1, cl. 2.

28

119.    The Equal Protection Clause prohibits malapportioned congressional districts.
*See Evenwel*, 136 S. Ct. at 1123-24; *Wesberry v. Sanders*, 376 U.S. 1 (1964); *Reynolds v. Sims*, 377 U.S. 533 (1964).

120.    The Apportionment Exclusion Order adopts an apportionment scheme that excludes all undocumented immigrants, and therefore will lead to malapportionment by providing fewer Representatives to States with higher populations of such persons.

121.    These constitutional violations have caused, are causing, and absent relief in this action will continue to cause harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief will redress this harm.

**THIRD CLAIM FOR RELIEF**
**Violation of Census Act—Ultra Vires**
**(2 U.S.C. § 2a; 13 U.S.C. § 141)**

122.    Plaintiffs incorporate by reference the above allegations in this Complaint.

123.    The Census Act, 13 U.S.C. § 141(b), requires the Secretary to administer the decennial census and thereafter report to the President a "tabulation of total population by States . . . as required for apportionment of Representatives in Congress."

124.    Title 2 U.S.C. § 2a(a) requires the President to transmit to Congress "a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions."

125.    The Apportionment Exclusion Order violates these statutory mandates by directing the Secretary to report to the President apportionment data that is not based on the "total population" or the actual Enumeration of each State.

126.    The Apportionment Exclusion Order violates these statutory mandates by determining that the President will transmit to Congress apportionment data that is not based on "the whole number of persons in each State" or "the method known as the method of equal proportions" and directing the Secretary of Commerce and other Defendants to facilitate this unlawful course of action.

127.    Defendants' actions beyond the scope of statutory authority are *ultra vires* pursuant to 2 U.S.C. § 2a(a) and 13 U.S.C. § 141, and thereby unlawful.

128.    These *ultra vires* violations have caused, are causing, and absent relief in this action will continue to cause harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief will redress this harm.

**FOURTH CLAIM FOR RELIEF**
**Violation of Apportionment and Enumeration Clauses—**
**Prohibition on Use of Inaccurate and Incomplete Data and Statistical Sampling**
**(U.S. Const. art. I, § 2, cl. 3)**

1.    Plaintiffs incorporate by reference the above allegations in this Complaint.

2.    The Apportionment and Enumeration Clauses provide that "Representatives . . . shall be apportioned among the several States . . . according to their respective Numbers, which shall be determined" based on the number of "persons" in each state according to an "*actual Enumeration*."  U.S. Const. art. I, § 2 (emphasis added).

3.    The Supreme Court has recognized that the Enumeration Clause embodies a "strong constitutional interest in accuracy," and that to the extent methods other than a person-by-person headcount are used, "it may be argued that the Framers did not believe that the Constitution authorized their use."  *Utah*, 536 U.S. at 478-77.

4.    Because it has no means to accurately enumerate the total population *excluding* undocumented immigrants, the Apportionment Exclusion Order will necessitate the use of incomplete and inaccurate administrative records or statistical sampling to estimate the number of undocumented immigrants in order to exclude such persons from the "actual Enumeration" that forms the basis for apportionment of Representatives among the several States.

5.    Reliance on incomplete and inaccurate administrative records or statistical sampling to exclude undocumented immigrants from the "the whole number of persons in each State" violates the Constitution's requirement that an "*actual* Enumeration shall be made."  U.S. Const. art. I, § 2, cl. 3 (emphasis added).

6.      These constitutional violations have caused, are causing, and absent relief in this action will continue to cause harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief will redress this harm.

**FIFTH CLAIM FOR RELIEF**
**Violation of Census Act—Prohibition on Statistical Sampling**
**(13 U.S.C. § 195)**

7.      Plaintiffs incorporate by reference the above allegations in this Complaint.

8.      The Apportionment Exclusion Order also violates the Census Act's prohibition on the use of statistical sampling for the determination of population for purposes of apportionment of Representatives in Congress.  *See* 13 U.S.C. § 195.

9.      The Census Act states, "*Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States*, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of this title."  13 U.S.C. §195 (emphasis added).

10.      The Supreme Court has interpreted this language to prohibit the use of statistical sampling in determining the population count for purposes of apportionment.  *See U.S. House of Representatives*, 525 U.S. 316.

11.      Pursuant to federal law, "Any person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law (other than this Act), in connection with the 2000 or any later decennial census, to determine the population for purposes of the apportionment or redistricting of Members in Congress, may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method."  Pub. L. No. 105-119, § 209(b), 111 Stat. 2440, 2481 (1997) (13 U.S.C. § 141 note(b)).  An "aggrieved person" is defined to include "any resident of a State whose congressional representation or district *could* be changed as a result of the use of a statistical method."  *Id.* § 209(d)(1) (emphasis added).

12.      Neither the Census Bureau nor any other Government agency has ever undertaken an actual enumeration of undocumented immigrants in each State.  And the Census Bureau is not inquiring as to citizenship status in the 2020 Census, having been permanently enjoined from

doing so.  Accordingly, the only way Defendants could exclude undocumented immigrants from the enumerated count of the "the whole number of persons in each State" is by relying on incomplete and inaccurate data or extrapolating the characteristics of the entire population from a sample.

13.    Any such "sampling," which seeks to extrapolate the features of an entire population from a small segment thereof, is distinguishable from "imputation," which simply seeks to fill in missing data as part of an effort to count individuals one by one.  *See Utah*, 536 U.S. at 466-73.

14.    Excluding undocumented immigrants from the "the whole number of persons in each State" on the basis of statistical sampling violates the statutory prohibition against use of "the statistical method known as 'sampling'" for "purposes of apportionment of Representatives in Congress."  13 U.S.C. § 195.

15.    Congress has directed that challenges to use to sampling for purposes of the apportionment should be heard and resolved as soon as possible, including prior to the actual apportionment of the House of Representatives: "It shall be the duty of a United States district court hearing an action brought under this section and the Supreme Court of the United States to advance on the docket and to *expedite to the greatest possible extent the disposition of any such matter*."  Pub. L. No. 105-119, § 209(e)(2), 111 Stat. 2440, 2481 (1997) (13 U.S.C. § 141 note(e)(2)) (emphasis added).

16.    These statutory violations have caused, are causing, and absent relief in this action will continue to cause harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief will redress this harm.

### SIXTH CLAIM FOR RELIEF
### Violation of the Fifth and Fourteenth Amendments—Intentional Discrimination
### (U.S. Const., amend. V, XIV)

17.    Plaintiffs incorporate by reference the above allegations in this Complaint.

18.    The Apportionment Exclusion Order is also unlawful because it violates the core constitutional protections against unlawful discrimination enshrined in the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments.

19.     The Due Process Clause of the Fifth Amendment prohibits the federal government from denying any person "equal protection of the laws" and, co-extensive with the equal protection guarantee of the Fourteenth Amendment, prevents the federal government from discrimination on the basis of race, ethnicity, national origin, and citizenship.  U.S. Const. amend. V.

20.     These protections apply to every person within the jurisdiction of the United States—regardless of citizenship status, "documentation," or any other attempted classification criteria.  *See, e.g.*, *Plyler*, 457 U.S. at 210-12.

21.     Under these principles, applicable to undocumented immigrants, "invidious discriminatory purpose" cannot be "a motivating factor" in government action.  *Vill. of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977).

22.     Contrary to these guarantees of Due Process and Equal Protection, the Apportionment Exclusion Order is motivated by an intent to discriminate against Black and Latinx people (generally, and, in particular, Black and Latinx immigrants), as demonstrated by the President's consistent conduct disparaging members of these communities and seeking to dilute their political power.

23.     The history here—culminating in the Apportionment Exclusion Order—is extensive.  There is widespread public coverage of the President making numerous statements indicating animosity toward communities of color.  *See, e.g.*, Josh Dawsey, *Trump derides protections for immigrants from 'shithole'  countries [Haiti, El Salvador, African countries]*, Washington Post (Jan. 12, 2018, 4:52 AM PST), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html; Donald J. Trump Statement on Preventing Muslim Immigration (Dec. 7, 2015) https://web.archive.org/web/20160204082711/https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration;  Eugene Scott, *Trump's History of Making Offensive Comments about Nonwhite Immigrants*, Washington Post, Jan. 11, 2018; Julia Hirschfeld Davis et al, *Trump Alarms Lawmakers with Disparaging Words for Haiti*

*and Africa*, NY Times (Jan. 11, 2018), https://www.nytimes.com/2018/01/11/us/politics/trump-shithole-countries.html; Matthew Choi, *Trump focuses on white people killed by police, defends Confederate flag*, Politico (July 14, 2020, 5:45 PM EDT), https://www.politico.com/news/2020/07/14/trump-racism-confederate-flag-police-361205.

24.     The general statements then turned to attempts by President Trump to weaken these communities.  For example, in 2018, the President referred to Sanctuary laws and policies as a "ridiculous, crime infested & *breeding* concept," likening undocumented immigrants protected by such laws and policies to animals.  Z. Byron Wolf, *Trump blasts 'breeding' in sanctuary cities. That's a racist term* (last updated, April 24, 2018, 11:58 PM ET), https://www.cnn.com/2018/04/18/politics/donald-trump-immigrants-california/index.html (emphasis added); *see also* Remarks by President Trump at a California Sanctuary State Roundtable (May 16, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-california-sanctuary-state-roundtable/.  And President Trump repeatedly tried to withhold federal funding from such states and cities, and continues to do so today, even in the midst of a global pandemic that has significantly harmed undocumented immigrants.  *See, e.g.*, Keya Vakil, Trump to States: Crack Down on Sanctuary Cities or I'll Hold Back Coronavirus Aid (last updated, May 12, 2020, 9:14 AM EDT), https://couriernewsroom.com/2020/04/30/trump-to-states-crack-down-on-sanctuary-cities-or-ill-hold-back-coronavirus-aid/; Louise Radnofsky & Rebecca Ballhaus, *Trump Revives Idea on 'Sanctuary Cities' Amid Stepped Up Immigration Push*, Wall Street Journal (Apr. 12, 2019), https://www.wsj.com/articles/trump-giving-strong-considerations-to-proposal-to-place-immigrants-who-enter-u-s-illegally-in-sanctuary-cities-only-11555087547.

25.     In 2019, the President's focus turned to limiting and diluting the voting power of these groups—by seeking to add a question about citizenship to the 2020 Census.  When challenged about the propriety of this sudden addition, Secretary Ross claimed it was necessary to enforce the Voting Rights Act.  But the courts saw through this.  Secretary Ross's decision was enjoined by three district courts, and one of those cases ended up before the Supreme Court, which vacated Secretary Ross's decision because his stated rationale was "contrived" and

"pretextual." *Dep't of Commerce v. New York*, 139 S. Ct. at 2575-76.

26.    It was later revealed that Thomas Hofeller, a prominent redistricting strategist for the Republic Party, was involved in drafting portions of the letter from DOJ seeking to add the citizenship question, including portions related to the pretextual basis. *See* NYIC Pls.' Mot. for Sanctions, *N.Y. Immigration Coalition v. U.S. Dep't of Commerce,* No. 1:18-cv-2921-JMF, ECF No. 635-1 at 124-136 (S.D.N.Y. July 16, 2019); Def's Opp. to Ltr. Mot. to Compel, *N.Y. Immigration Coal. v. U.S. Dep't of Commerce*, 1:18-cv-2921-JMF, ECF No. 451 at 3 (S.D.N.Y. Oct. 30, 2018). This was the same Thomas Hofeller who, in 2015, prepared a study titled "The Use of Citizen Voting Age Population in Redistricting," in which he recommended adding a citizenship question to the Census so that states could use citizen voting age population rather than total population to redistrict. According to Hofeller, this change would be "advantageous to Republicans and non-Hispanic Whites," while diluting the political power of Hispanics. *See* https://www.commoncause.org/wp-content/uploads/2019/05/2015-Hofeller-Study.pdf (last accessed July 27, 2020).

27.    President Trump himself weighed in, so as to leave no question about what had driven him to add the census question struck down by the Supreme Court. On July 5, 2019, just eight days after the Supreme Court's decision, the President publically confirmed that he had sought to add the citizenship question *not* to enforce the Voting Rights Act, but rather "for districting" and "for appropriations," consistent with his attempts to withhold funding from Sanctuary states and cities. Remarks by President Trump Before Marine One Departure (July 5, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-51/.

28.    Taken together, the volume and consistency of the President's statements and action demonstrate discriminatory intent. Indeed, based on the President's own statements, this Court has itself previously concluded that there is "evidence that Defendant Trump harbors an animus against non-white, non-European aliens." *See* Order Granting Plfs.' Mot. for Prelim. Inj., *Ramos v. Nielsen*, No. 18-cv-01554-EMC, ECF No 128 at 30 (N.D. Cal. Oct. 3, 2018).

29.    That leads to the present. In the last two weeks alone, President Trump has noted

that "many" immigrants from Central America "are in prison for rape, murder, lots of other things," and blamed Mexican immigrants for the increased number of COVID-19 cases in the United States, claiming that "sharing a 2,000-mile border with Mexico" has caused a surge in cases.  *See* Remarks by President Trump in Press Conference (July 14, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-conference-071420/; Daniel Dale, et al., *Fact check: Trump falsely suggests kids don't transmit coronavirus and that US case surge is due in part to protests and Mexican migration* (last updated, July 22, 2020, 9:48 PM ET), https://www.cnn.com/2020/07/22/politics/fact-check-trump-coronavirus-briefing-july-22/index.html.

30.     And then—on July 21, 2020—President Trump issued the Apportionment Exclusion Order at issue here.  It was a sudden decision, with little or no explanation, and one that departs from the long-standing policy and practice of the United States.  And it was made before the Census Bureau even developed, let alone tested a technical means to provide the required information, was made without input from the public, and was made without following typical agency process.  This "specific sequence of events," especially given the "historical background" involving the pretext of his initial census attempt, is strong indicia of discrimination and demonstrate improper motive.  *Arlington Heights*, 429 U.S.  at 267.

31.     But there is direct evidence, too.  The motivation is laid out in the Apportionment Exclusion Order itself, which states point blank that it seeks to punish States that the President says have adopted "policies that encourage illegal aliens to enter this country."  And there is no question that the Apportionment Exclusion Order disproportionately impacts Black and Latinx communities.  *Id.* at 266 (citing to *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  States and communities that will suffer adversely from Defendants' decision are those with large populations of undocumented immigrants.  Undocumented immigrants are disproportionately located in States, like California and Texas, that also have large Latinx and Black populations.  Those States are most likely to be disadvantaged by Defendants' action.

32.     In light of the above, the Apportionment Exclusion Order issued by President Trump is predicated on intentional discrimination against non-white, non-European

undocumented immigrants and has caused, is causing, and absent relief in this action will continue to cause harm to Plaintiffs as alleged above.  The acts of the other Defendants have been and will be necessarily tainted by the President's animosity toward communities of color. *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1123-24 (N.D. Cal. 2018).

33.     There is a substantial likelihood that the requested relief will redress this harm.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.     Declare that the Apportionment Exclusion Order's directive to exclude undocumented persons from the apportionment base violates the U.S. Constitution;

2.     Declare that the Apportionment Exclusion Order's directive to exclude undocumented persons from the apportionment base is *ultra vires* and violates 2 U.S.C. § 2a(a) and 13 U.S.C. § 141;

3.     Declare that any statement from the President to the Congress under 2 U.S.C. § 2a(a) that excludes undocumented persons residing in the United States from the apportionment base is null and void;

4.     Declare that the use of statistical sampling and/or other incomplete or inaccurate methods for calculating the population for purposes of apportionment of Representatives among the States is not an "actual Enumeration" and thus violates the U.S. Constitution;

5.     Declare that the use of statistical sampling to determine the population for purposes of apportionment of Representatives among the several States violates 13 U.S.C. § 195;

6.     Enjoin Defendants Department of Commerce, Census Bureau, Ross, and Dillingham from excluding undocumented persons from the apportionment base following the 2020 Census, or from acting in any capacity to assist the President in excluding undocumented persons from the apportionment base following the 2020 Census;

7.     Enjoin Defendants Department of Commerce, Census Bureau, Ross, and Dillingham from modeling, using, or relying on statistical sampling and/or other incomplete or inaccurate methods for calculating the population for purposes of apportionment of Representatives among the States, or from acting in any capacity to assist the President in doing

1    so;

2          8.     Award Plaintiffs costs, expenses, and reasonable attorneys' fees;

3          9.     Award any other relief the Court deems just and proper;

4          10.    Maintain jurisdiction and monitorship over the action until such time as the

5    statement set forth in 2 U.S.C. § 2a(a), which appropriately counts undocumented persons as

6    persons and is otherwise consistent with the mandates of the Constitution and relevant statutes, is

7    provided to Congress.

8

9    Dated: August 18, 2020                    LATHAM & WATKINS LLP

10                                             By:   /s/ Sadik Huseny

11                                             Steven M. Bauer (Bar No. 135067)
                                               Sadik Huseny (Bar No. 224659)
12                                             Amit Makker (Bar No. 280747)
                                               Shannon D. Lankenau (Bar. No. 294263)
13                                             Cindy Guan (Bar No. 317036)
                                               **LATHAM & WATKINS LLP**
14                                             505 Montgomery Street, Suite 2000
                                               San Francisco, CA 94111
15                                             Telephone:  415.391.0600
                                               Facsimile:  415.395.8095
16
                                               Richard P. Bress (admitted *pro hac vice*)
17                                             **LATHAM & WATKINS LLP**
                                               555 Eleventh Street NW, Suite 1000
18                                             Washington, D.C. 20004
                                               Telephone:  202.637.2200
19                                             Facsimile:  202.637.2201

20                                             *Attorneys for Plaintiffs City of San Jose,*
                                               *California; King County, Washington;*
21                                             *Arlington County, Virginia; Harris County,*
                                               *Texas; Black Alliance for Just Immigration;*
22                                             *Sam Liccardo; Rodney Ellis; Zerihoun Yilma;*
                                               *Lovette Kargbo-Thompson; and Santcha*
23                                             *Etienne*

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kristen Clarke (*pro hac vice* pending)
Jon M. Greenbaum (Bar No. 166733)
Ezra D. Rosenberg (admitted *pro hac vice*)
Dorian L. Spence (admitted *pro hac vice*)
Maryum Jordan (admitted *pro hac vice*)
Ajay Saini (admitted *pro hac vice*)
**LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW**
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone:  202.662.8600
Facsimile:  202.783.0857

*Attorneys for Plaintiffs City of San Jose,
California; King County, Washington; Harris
County, Texas; Black Alliance for Just
Immigration; Sam Liccardo; Rodney Ellis;
Zerihoun Yilma; Lovette Kargbo-Thompson;
and Santcha Etienne*

Mark Rosenbaum (Bar No. 59940)
**PUBLIC COUNSEL**
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone:  213.385.2977
Facsimile:  213.385.9089

*Attorneys for Plaintiff City of San Jose*