LATHAM & WATKINS LLP
  Steven M. Bauer (Bar No. 135067)
    steven.bauer@lw.com
  Sadik Huseny (Bar No. 224659)
    sadik.huseny@lw.com
  Amit Makker (Bar No. 280747)
    amit.makker@lw.com
  Shannon D. Lankenau (Bar. No. 294263)
    shannon.lankenau@lw.com
  Cindy Guan (Bar No. 317036)
    cindy.guan@lw.com
505 Montgomery Street, Suite 1900
San Francisco, California 94111
T: 415.391.0600 / F: 415.395.8095

LATHAM & WATKINS LLP
  Richard P. Bress (admitted *pro hac vice*)
    rick.bress@lw.com
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
T: 202.637.2200 / F: 202.637.2201

*Attorneys for Plaintiffs City of San Jose, King
County, Arlington County, Harris County, Black
Alliance for Just Immigration, Liccardo, Ellis,
Yilma, Kargbo-Thompson, and Etienne*

LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
  Kristen Clarke (admitted *pro hac vice*)
    kclarke@lawyerscommittee.org
  Jon M. Greenbaum (Bar No. 166733)
    jgreenbaum@lawyerscommittee.org
  Ezra D. Rosenberg (admitted *pro hac vice*)
    erosenberg@lawyerscommittee.org
  Dorian L. Spence (admitted *pro hac vice*)
    dspence@lawyerscommittee.org
  Maryum Jordan (admitted *pro hac vice*)
    mjordan@lawyerscommittee.org
  Ajay Saini (admitted *pro hac vice*)
    asaini@lawyerscommittee.org
1500 K Street NW, Suite 900
Washington, DC 20005
T: 202.662.8600 / F: 202.783.0857

*Attorneys for Plaintiffs City of San Jose,
King County, Harris County, Black Alliance
for Just Immigration, Liccardo, Ellis, Yilma,
Kargbo-Thompson, and Etienne*

PUBLIC COUNSEL
  Mark Rosenbaum (Bar No. 59940)
    mrosenbaum@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, California 90005
T: 213.385.2977 / F: 213.385.9089

*Attorneys for Plaintiff City of San Jose*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CITY OF SAN JOSE, CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 5:20-cv-05167-LHK-RRC-EMC<br>Case No. 5:20-cv-05169-LHK-RRC-EMC<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Date:    October 8, 2020, 2020<br>Time:    1:30 p.m.<br>Place:    Courtroom 8, 4th Floor<br>Judge:    Honorable Richard R. Clifton<br>           Honorable Lucy H. Koh<br>           Honorable Edward M. Chen |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that at 1:30 p.m. on October 8, 2020 in Courtroom 8 of the United States District Court, located at 280 South 1st Street in San Jose, CA 95113, Plaintiffs City of San Jose, King County, Arlington County, Harris County, Black Alliance For Just Immigration (BAJI), Sam Liccardo, Rodney Ellis, Zerihoun Yilma, Lovette Kargbo-Thompson, and Santcha Etienne will move for partial summary judgment on the first and third claims for relief in their First Amended Complaint pursuant to Federal Rule of Civil Procedure 56(a).

Plaintiffs seek an order entering partial summary judgment in their favor on the first and third claims for relief and (1) declaring that the directive to exclude all undocumented persons from the apportionment base, contained in the July 21, 2020 Memorandum, *Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44679 (Dkt. No. 1-1) (the Apportionment Exclusion Order), violates Article I and the Fourteenth Amendment of the U.S. Constitution; (2) declaring that the Apportionment Exclusion Order's directive to exclude all undocumented persons from the apportionment base violates 2 U.S.C. § 2a(a) and 13 U.S.C. § 141 and is *ultra vires*; (3) declaring that any statement from the President to Congress under 2 U.S.C. § 2a(a) that excludes all undocumented persons residing in the United States from the apportionment base would be unlawful and without legal effect; (4) enjoining Defendants Department of Commerce, Census Bureau, Ross, and Dillingham from excluding all undocumented persons from the apportionment base or assisting President Trump in that effort; and (5) maintaining jurisdiction over the case until a statement under 2 U.S.C. § 2a(a) that complies with the Constitution and statutory law is provided to Congress.

Plaintiffs' Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declarations of Shannon D. Lankenau, Ruth Gilgenbach, Matthew A. Barreto, Nana Gyamfi, Sam Liccardo, Zerihoun Yilma, and Rodney Ellis, and the exhibits thereto.

# MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF ISSUES TO BE DECIDED ................................................. 3

III. BACKGROUND .................................................................................................. 3

    A.   Congressional Apportionment and the Decennial Census.................................... 3

    B.   The July 21, 2020 Apportionment Exclusion Order ........................................... 5

    C.   The Backdrop to the Order .................................................................................. 6

IV.  LEGAL STANDARD .......................................................................................... 9

V.   ARGUMENT ........................................................................................................ 9

    A.   This Case Is Justiciable........................................................................................ 9

    B.   The Apportionment Exclusion Order Is Unconstitutional ................................. 14

        1.   The Constitution's Text and Structure Require Apportionment Based on Total Population............................................. 14

        2.   The Constitution's Drafting History Confirms that Apportionment Must Be Based on Total Population............................... 17

        3.   Consistent Historical Practice Confirms that the Constitution Requires Apportionment Based on Total Population ........................................................................................... 20

        4.   Defendants Have No Discretion to Exclude Undocumented Immigrant Residents from the Apportionment Base .............................. 27

    C.   The Apportionment Exclusion Order Is *Ultra Vires*............................................ 29

        1.   The Order Violates the Census Act ........................................................ 29

        2.   The Order Violates the Reapportionment Act ........................................ 31

    D.   The Apportionment Exclusion Order Violates the Constitution's Separation of Powers ........................................................................................ 33

    E.   Plaintiffs Are Entitled to Declaratory Relief and Permanent Injunctions............................................................................................................ 34

VI.  CONCLUSION................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Alabama v. U.S. Dep't of Commerce*,
   No. 18-cv-00772 (D. Ala. Aug. 3, 2020), ECF No. 158 ........................................................12

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
   135 S. Ct. 2652 (2015) ...........................................................................................................16

*Baldrige v. Shapiro*,
   455 U.S. 345 (1982) ..................................................................................................................5

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ................................................................................................................33

*Clapper v. Amnesty Int'l. USA*,
   568 U.S. 398 (2013) ..................................................................................................................9

*In re Coleman*,
   560 F.3d 1000 (9th Cir. 2009) ................................................................................................13

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008) ..................................................................................................................9

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ................................................................................................... *passim*

*Dep't of Commerce v. U.S. House of Representatives*,
   525 U.S. 316 (1999) ..............................................................................................10, 11, 14, 32

*Dist. of Columbia v. Heller*,
   554 U.S. 570 (2008) ................................................................................................................14

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ................................................................................................................35

*Erlenbaugh v. United States*,
   409 U.S. 239 (1972) ................................................................................................................29

*Evenwel v. Abbott*,
   136 S. Ct. 1120 (2016) ................................................................................................19, 21, 26

*Fed'n for Am. Immigration Reform v. Klutznick*,
   486 F. Supp. 564 (D.D.C. 1980) ............................................................................................26

*Fong Yue Ting v. United States*,
   149 U.S. 698 (1893)...........................................................................................17

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)..............................................................................27, 28, 32

*Garza v. Cty. of Los Angeles*,
   918 F.2d 763 (9th Cir. 1990) .............................................................................19

*Goldie's Bookstore v. Superior Ct.*,
   739 F.2d 466 (9th Cir. 1984) .............................................................................35

*Indep. Living Ctr. of S. California, Inc. v. Shewry*,
   543 F.3d 1050 (9th Cir. 2008) ....................................................................10, 11

*INS v. Chadha*,
   462 U.S. 919 (1983)...........................................................................................33

*Kravitz v. U.S. Dep't of Commerce*,
   366 F. Supp. 3d 681 (D. Md. 2019) ....................................................................7

*Kravitz v. U.S. Dep't of Commerce*,
   382 F. Supp. 3d 393 (D. Md. 2019) ....................................................................7

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).............................................................................................9

*Martin v. Hunter's Lessee*,
   14 U.S. 304 (1816).............................................................................................17

*Medellin v. Texas*,
   552 U.S. 491 (2008).............................................................................................5

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007)...........................................................................................34

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)...........................................................................................35

*Nelson v. NASA*,
   530 F.3d 865 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011).........................35

*New York v. Dep't of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019), *aff'd and rev'd in part sub nom. Dep't of Commerce*, 139 S. Ct. 2551 .........................................................................7

*New York v. Trump*,
   No. 20-cv-5770 (S.D.N.Y. Aug. 19, 2020), ECF No. 118.....................................12

*Plyler v. Doe,*
   457 U.S. 202 (1982)................................................................................15

*Portland Police Ass'n v. City of Portland,*
   658 F.2d 1272 (9th Cir. 1981) ...............................................................13

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
   140 S. Ct. 2183 (2020)............................................................................21

*State of California v. Ross,*
   358 F. Supp. 3d 965 (N.D. Cal. 2019) .....................................................7

*State of California v. Ross,*
   362 F. Supp. 3d 749 (N.D. Cal. 2018) ...................................................14

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014)..................................................................................9

*Thomas v. Anchorage Equal Rights Comm'n,*
   220 F.3d 1134 (9th Cir. 2000) ...............................................................12

*U.S. Dep't of Commerce v. Montana,*
   503 U.S. 442 (1992)................................................................................32

*United States v. Sprague,*
   282 U.S. 716 (1931)................................................................................14

*Utah v. Evans,*
   536 U.S. 452 (2002)..................................................................................5

*Wesberry v. Sanders,*
   376 U.S. 1 (1964)..............................................................................18, 26

*Wisconsin v. City of New York,*
   517 U.S. 1 (1996)..........................................................................2, 21, 26

*Yick Wo v. Hopkins,*
   118 U.S. 356 (1886)................................................................................15

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952)..........................................................................33, 34

*Zadvydas v. Davis,*
   533 U.S. 678 (2001)................................................................................16

**STATUTES**

2 U.S.C. § 2a .............................................................................................3

2 U.S.C. § 2a(a)................................................................................. *passim*

2 U.S.C. § 2a(b) ..........................................................................................................4

13 U.S.C. § 2 ..............................................................................................................3

13 U.S.C. § 141(a) ............................................................................................. *passim*

13 U.S.C. § 141(b) ............................................................................................. *passim*

28 U.S.C. § 2201(a) ..................................................................................................34

Pub. L. No. 83-740, 68 Stat. 1012, 1020 (1954) .....................................................30

9 Stat. 462, 462-65 (1850) .......................................................................................22

Wash. Rev. Code § 44.05.090 ....................................................................................5

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV, § 1 ....................................................................................17

U.S. Const. amend. XIV, § 2 ........................................................................1, 3, 14, 16

U.S. Const. amend. XIV, § 3 ..........................................................................16, 17

U.S. Const. art. I, § 1 ................................................................................................33

U.S. Const. art. I, § 2, cl. 2 ......................................................................................16

U.S. Const. art. I, § 2, cl. 3 ..........................................................................3, 14, 16

U.S. Const. art. I, § 3, cl. 3 ......................................................................................16

U.S. Const. art. II, § 1, cl. 2 ......................................................................................4

U.S. Const. art. II, § 1, cl. 5 ....................................................................................17

U.S. Const. art. II, § 3 ................................................................................2, 33, 34

N.J. Const. art. IV, § 2, ¶¶ 1, 3 ..................................................................................5

Okla. Const. art. V, § 10A ..........................................................................................5

Tex. Const. art. III, § 26 ..............................................................................................5

W. Va. Const. art. VI, § 4 ............................................................................................5

## REGULATIONS AND OTHER AUTHORITIES

83 Fed. Reg. 5525, 5526 n.1, 5533 (Feb. 8, 2018) ..................................................28

*Collecting Information About Citizenship Status in Connection With the*
    *Decennial Census*, 84 Fed. Reg. 33821 (July 16, 2019)............................................................8

Defs.' Reply Br., *Fed'n for Am. Immigration Reform v. Klutznick*,
    No. 79-3269, 1980 WL 683642 (D.D.C. Jan. 3, 1980)........................................................24

*Excluding Illegal Aliens From the Apportionment Base Following the 2020*
    *Census*, 85 Fed. Reg. 44,679, 44,680 (published July 23, 2020)................................... *passim*

*Legal Effectiveness of a Presidential Directive, as Compared to an Executive*
    *Order*,
    24 Op. O.L.C. 29 (2000)....................................................................................................5

*Method of Determining "Indians Not Taxed"*,
    57 Interior Dec. 195, 1940 WL 4171 (DOI 1940) ....................................................3

## I.     INTRODUCTION

For 230 years, all three branches of government have recognized and respected the fundamental rule that, except where a class of persons is expressly excluded by the Constitution itself, the apportionment of seats in the House of Representatives must be based on the total number of persons residing in each State.  On July 21, 2020, President Trump announced a policy that disposes of that constitutional rule through executive fiat.  With a pen stroke, President Trump ordered the exclusion of all persons "who are not in a lawful immigration status" from "the reapportionment of Representatives following the 2020 census," and directed the Secretary of Commerce to provide him with information "to carry out" this objective. *Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,680 (published July 23, 2020) (Dkt. No. 1-1) (the "Apportionment Exclusion Order").

President Trump's Order is manifestly unconstitutional.  The Order violates the plain language of the Apportionment Clause of Article I, as amended by the Fourteenth Amendment, which requires apportioning Representatives "among the several States according to their respective numbers" by "counting *the whole number of persons in each State*."  U.S. Const. amend. XIV, § 2 (emphasis added).  It is contrary to the Constitution's structure, drafting history, and judicial construction, all of which confirm that the drafters understood "persons in each State" to mean *all persons residing in each State*—not just those residents who are voters, citizens, or legal residents.  And it upends over two centuries of unbroken interpretation and practice—by Presidents of both parties—of including in the apportionment base all persons residing in each State regardless of voting, citizenship, or immigration status.  Text, structure, history, and practice all lead to the same conclusion:  The Constitution forbids the President from categorically excluding undocumented immigrants from the apportionment base.

The Apportionment Exclusion Order also violates the plain text of the Census Act and the Reapportionment Act.  The Census Act directs the Secretary of Commerce to administer the census and report to the President "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States."  13 U.S.C.

§ 141(b).  The Reapportionment Act, in turn, requires the President to transmit to Congress "a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions."  2 U.S.C. § 2a(a). The Order violates the Census Act by requiring the Secretary to transmit to the President something other than the "tabulation of total population."  And the Order violates the Reapportionment Act by mandating an apportionment based on something other than the "decennial census of the population," and calculated by something other than application of the mathematical "method of equal proportions."

Finally, the Apportionment Exclusion Order violates fundamental separation of powers principles enshrined in the Constitution.  The Constitution's Enumeration Clause, as amended by the Fourteenth Amendment, "vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration.'"  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (quoting *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996)).  Congress exercised this discretion by enacting the Census Act and the Reapportionment Act, which together implement the constitutional mandates that the decennial census count all persons residing in each State and that the apportionment base include all persons residing in each State.  By proclaiming the President's intent to exclude undocumented immigrants from the apportionment base, the Order defies the will of Congress.  The President's failure to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, thus violates the Constitution's separation of powers.

In short, the Apportionment Exclusion Order is unconstitutional, violates multiple statutes, and threatens deep-rooted democratic principles.  Plaintiffs respectfully ask this Court to grant summary judgment and issue declaratory and injunctive relief to stop the Order from causing profound harms to Plaintiffs and the public at large.

## II.      STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Plaintiffs are entitled to summary judgment on their claim that the Apportionment Exclusion Order violates Article I and the Fourteenth Amendment of the U.S. Constitution.

2.      Whether Plaintiffs are entitled to summary judgment on their claim that the Apportionment Exclusion Order is *ultra vires* under 13 U.S.C. § 141 and 2 U.S.C. § 2a.

3.      Whether the California Plaintiffs are entitled to summary judgment on their claim that the Apportionment Exclusion Order violates the Constitution's separation of powers.

## III.     BACKGROUND

### A.   Congressional Apportionment and the Decennial Census

Aside from two infamous exceptions, the Constitution has always required counting every person living in each State for purposes of apportioning seats in the House of Representatives.  Originally, the Apportionment Clause directed that House seats "shall be apportioned" among the States "according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons."  U.S. Const. art. I, § 2, cl. 3.  The Fourteenth Amendment eliminated the three-fifths exception and the reference to "free" persons, but retained the core determinant for apportionment:  "counting the *whole number of persons in each State*."  *Id.* amend. XIV, § 2 (emphasis added).[1]

The Constitution also directly links the apportionment process to the decennial census. To determine the population and enable reapportionment, the Enumeration Clause mandates that an "actual Enumeration" be taken every ten years "in such Manner as [Congress] shall by Law direct."  *Id*. art. I, § 2, cl. 3.  Congress has exercised that authority by creating the Census Bureau and tasking the Secretary of Commerce with administering the decennial census.  *See* 13 U.S.C. §§ 2, 141(a).

---

[1]  The Fourteenth Amendment also retained "excluding Indians not taxed," but that phrase no longer applies to anyone.  *See, e.g.*, Sol. Op. M-31039, *Method of Determining "Indians Not Taxed"*, 57 Interior Dec. 195, 1940 WL 4171, at *12 (DOI 1940) ("Since all Indians are today subject to taxation by the Federal Government, there are no longer Indians not subject to taxation." (citation omitted)).

To implement the Enumeration Clause's mandate, Congress has also specified the timeline and procedures for the decennial census and the apportionment process.  Under the Census Act, the Secretary is required to take a decennial census "as of" April 1, 2020.  *See id.* § 141(a).  Within nine months from that date—currently January 1, 2021—the Secretary must report to the President the completed "tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States."  *Id.* § 141(b).  After that, the Reapportionment Act provides that the President must—by January 10, 2021, if the next Congress starts its session as scheduled—"transmit to the Congress a statement showing the whole number of persons in each State . . . as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled" using "the method of equal proportions."  2 U.S.C. § 2a(a).  Finally, the Clerk of the House of Representatives must, within 15 calendar days, "send to the executive of each State a certificate of the number of Representatives to which such State is entitled."  *Id.* § 2a(b).

The decennial census and reapportion have significant and long-lasting implications for democratic governance at both the federal and state levels.  The process determines how many Representatives in Congress each State will have for the next decade.  *Id.*  The census and apportionment numbers also determine the number of electors that each State will have in the Electoral College—again, a decision that lasts a full decade.  *See* U.S. Const. art. II, § 1, cl. 2.  And the census numbers have enormous economic and intra-state political effects, as "[t]he population count derived from the census is used . . . also to allocate federal funds to the States and to draw electoral districts."  *Dep't of Commerce*, 139 S. Ct. at 2561.[2]  Numerous states also

---

[2]  In FY2017 alone, "316 federal spending programs relied on 2010 Census-derived data to distribute $1.5 trillion to state and local governments, nonprofits, businesses, and households across the nation."  Ex. 1, Andrew Reamer, *Counting for Dollars 2020 - The Role of the Decennial Census in the Geographic Distribution of Federal Funds Brief 7: Comprehensive Accounting of Census-Guided Federal Spending (FY2017) Part B: State Estimates*, https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/Counting%20for%20Dollars%202020 20%20-%20Comprehensive%20Accounting_Report%207B%20Feb%202020%20rev.pdf; *see also* Ex. 2, *2020 Census Count Guides Funding of New Roads and Bridges*, U.S. Census Bureau (Dec. 4, 2019), https://www.census.gov/library/stories/2019/12/2020-census-count-guides-funding-of-new-roads-and-bridges.html.  All exhibits are attached to the Declaration of Shannon D. Lankenau, filed concurrently herewith.

1   require that their intra-state legislative districts be drawn using the census numbers.  *See, e.g.*,

2   N.J. Const. art. IV, § 2, ¶¶ 1, 3; Okla. Const. art. V, § 10A; Tex. Const. art. III, § 26; W. Va.

3   Const. art. VI, § 4; Wash. Rev. Code § 44.05.090.

4        The census and apportionment process thus have a foundational "constitutional purpose"

5   and serve "important and valuable functions for the benefit of the country as a whole."  *Baldrige*

6   *v. Shapiro*, 455 U.S. 345, 353 (1982).  For these reasons, there is "a strong constitutional interest

7   in accuracy" when conducting the census and distributing political power among the States.

8   *Utah v. Evans*, 536 U.S. 452, 478 (2002).  In addition to that constitutional interest, the Census

9   Act also imposes "a duty to conduct a census that is accurate and that fairly accounts for the

10  crucial representational rights that depend on the census and apportionment."  *Dep't of*

11  *Commerce*, 139 S. Ct. at 2569 (internal quotation marks omitted).

12  **B.  The July 21, 2020 Apportionment Exclusion Order**

13       On July 21, 2020, President Trump issued the Apportionment Exclusion Order,

14  announcing that "it is the policy of the United States to exclude" undocumented immigrants from

15  the apportionment base "to the maximum extent feasible and consistent with the discretion

16  delegated to the executive branch."  85 Fed. Reg. at 44,680.[3]  The Order announces the

17  President's belief that "[e]xcluding" undocumented immigrants "from the apportionment base is

18  more consonant with the principles of representative democracy underpinning our system of

19  Government," and asserts that "[a]ffording congressional representation, and therefore formal

20  political influence, to States on account of the presence within their borders of" undocumented

21  immigrants "undermines those principles."  *Id.*  To implement this policy, the Order directs the

22  Secretary of Commerce, "[i]n preparing his report to the President under" 13 U.S.C. § 141(b), to

23  "take all appropriate action, consistent with the Constitution and other applicable law, to provide

24  information permitting the President, to the extent practicable," to exclude undocumented

25

26  [3]  Although the Apportionment Exclusion Order is styled as a "Memorandum," there is "no
    substantive difference in the legal effectiveness of an executive order and a presidential directive

27  that is styled other than as an executive order."  *Legal Effectiveness of a Presidential Directive,*
    *as Compared to an Executive Order*, 24 Op. O.L.C. 29 (2000); *see also Medellin v. Texas*, 552

28  U.S. 491, 524 (2008) (analyzing presidential memorandum's legal effects under the framework
    for executive action).

immigrants from the apportionment base.  *Id.*

The Order recognizes that excluding undocumented immigrants from the apportionment base will reduce the number of Representatives from States with larger populations of undocumented immigrants.  Indeed, the Order explicitly intends this result.  It points to "one State [that] is home to more than 2.2 million illegal aliens, constituting more than 6 percent of the State's entire population," and asserts that excluding undocumented immigrants from apportionment would cost this State "two or three" Representatives.  *Id.*  As explained, *infra* at 9-10, that targeted State is California.

The President's sole asserted legal justification for the Order is that the Constitution's requirement to apportion based on "'persons in each State, excluding Indians not taxed' . . . has never been understood to include . . . every individual physically present within a State's boundaries at the time of the census."  *Id.* at 44,679.  The Order posits that the phrase has been interpreted "to mean that only the 'inhabitants' of each State should be included."  *Id.*  It concludes that the President has the authority to determine who is an "inhabitant"—and that this discretion permits the categorical exclusion of undocumented immigrants from the apportionment base.  *Id.*

## C.  The Backdrop to the Order

The Apportionment Exclusion Order was issued against the backdrop of extensive litigation over Defendants' attempt to add a citizenship question to the 2020 census questionnaire.  In March 2018, Secretary Ross announced that the 2020 census questionnaire would include a question on citizenship status.[4]  The press release and memo accompanying the announcement asserted that the question was being added at the request of the Department of Justice "to help enforce the Voting Rights Act" (VRA).[5]

---

[4] *See* Ex. 3, *U.S. Department of Commerce Announces Reinstatement of Citizenship Question to the 2020 Decennial Census*, U.S. Dep't of Commerce (Mar. 26, 2018), https://www.commerce.gov/news/press-releases/2018/03/us-department-commerce-announces-reinstatement-citizenship-question-2020.

[5] *Id.*; *see also* Ex. 4, Memorandum from Wilbur L. Ross, Jr., Sec'y of Commerce, to Karen Dunn Kelley, Under Sec'y of Commerce for Econ. Affairs, at 1 (Mar. 26, 2018), https://www.commerce.gov/sites/default/files/2018-03-26_2.pdf.

1

2          A number of plaintiffs, including California, brought suit, challenging the decision under

3   the Administrative Procedure Act and the Constitution.  Plaintiffs argued, among other things,

4   that Defendants' real motives in adding the question were to depress response rates among

5   minorities and to enable legislative districting based on citizenship numbers instead of

6   population numbers.  But during litigation—and in sworn testimony before Congress—Secretary

7   Ross stuck to the DOJ-request and VRA-enforcement story.  *See, e.g.*, *New York v. Dep't of*

8   *Commerce*, 351 F. Supp. 3d 502, 546-47 (S.D.N.Y. 2019), *aff'd and rev'd in part sub nom. Dep't*

    *of Commerce*, 139 S. Ct. 2551.

9          After a bench trial, the District Court for the Southern District of New York concluded

10   that Secretary Ross's explanation and sworn testimony "was materially inaccurate."  *Id.* at 547.

11   The evidence established that the Secretary had sought to add the citizenship question from the

12   outset of his tenure at the Department of Commerce, and that neither DOJ's request nor

13   enforcement of the VRA had motivated those efforts.  *See id.* at 548-50.  The evidence also

14   revealed that, around March 2017, Secretary Ross spoke with "various 'senior Administration

15   officials'" about adding the citizenship question—and that those conversations included

16   discussions about "the potential effect on 'congressional apportionment'" from adding the

17   question to the census.  *Id.* at 549-50.[6]  The court held that Secretary Ross's explanation was

18   pretextual and that his decision to add the question violated the Administrative Procedure Act,

19   and enjoined him from adding the question.  *Id.* at 641, 660, 679.[7]  While these issues were

20   pending before the Supreme Court, new evidence emerged that showed the citizenship question

21   was added "possi[bly], if not likely" based on discriminatory animus—namely "to advantage

22   Republicans by diminishing Hispanics' political power."  *Kravitz v. U.S. Dep't of Commerce*,

23

24   _____

25   [6]  *See also* Ex. 5, Bryan Lowry, *That Citizenship Question on the 2020 Census? Kobach Says He Pitched It to Trump*, Kan. City Star (Mar. 27, 2018), https://www.kansascity.com/news/politics-

26   government/article207007581.html.

27   [7]  This Court likewise struck down Secretary Ross's decision to add a citizenship question.  *State of California v. Ross*, 358 F. Supp. 3d 965, 973-76 (N.D. Cal. 2019) (vacated and remanded on

28   other grounds); *see also Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 691, 756 (D. Md. 2019) (vacated and remanded on other grounds).

382 F. Supp. 3d 393, 400 (D. Md. 2019).[8]

The Supreme Court affirmed in relevant part.  The Court concluded that it could not "ignore the disconnect between the decision made and the explanation given," and observed that the VRA "enforcement rationale . . . seems to have been contrived."  *Dep't of Commerce*, 139 S. Ct. at 2575.  This decision marked "the first time the Court has ever invalidated an agency action as 'pretextual.'"  *Id.* at 2583 (Thomas, J., concurring in part and dissenting in part).

Shortly after this decision, President Trump issued an executive order requiring all federal departments and agencies to provide the Department of Commerce with administrative records to facilitate determining citizenship status in connection with the census.  *See Collecting Information About Citizenship Status in Connection With the Decennial Census*, 84 Fed. Reg. 33821 (July 16, 2019).  In his signing statement, the President declared that "[t]he Census Bureau can use this information, along with information collected through the questionnaire, to create the official census."[9]

President Trump expressly invoked this history when he issued the Apportionment Exclusion Order.  In an accompanying signing statement, he asserted that "[l]ast summer in the Rose Garden, I told the American people that I would not back down in my effort to determine the citizenship status of the United States population."[10]  He then explained that the Apportionment Exclusion Order represented a formal action to continue that same effort: "Today, I am following through on that commitment by directing the Secretary of Commerce to exclude illegal aliens from the apportionment base following the 2020 census."[11]

---

[8]  *See* Pls.' Mot. for Order to Show Cause, No. 18-cv-2921, ECF No. 595 (May 30, 2019) (detailing these evidentiary revelations); Ex. 6, Michael Wines, *Deceased G.O.P. Strategist's Hard Drives Reveal New Details on the Census Citizenship Question*, N.Y. Times (May 30, 2019), https://www.nytimes.com/2019/05/30/us/census-citizenship-question-hofeller.html (similar).

[9]  Ex. 7, Donald J. Trump, *Remarks on Citizenship and the Census* (July 11, 2019), https://www.govinfo.gov/content/pkg/DCPD-201900465/pdf/DCPD-201900465.pdf.

[10]  Ex. 8,  *Statement From the President Regarding Apportionment* (July 21, 2020), https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment.

[11]  *Id.*

## IV.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## V.     ARGUMENT

### A. This Case Is Justiciable

To satisfy standing, a plaintiff must "present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008). To establish standing at summary judgment, a plaintiff "must set forth by affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 412 (2013) (quotations and citation omitted). But for standing purposes, these facts "will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

The State of California has established injury sufficient for standing. When a State "anticipate[s] losing a seat in Congress," that "diminishment of political representation" is an injury suffered by the State. *Dep't of Commerce*, 139 S. Ct. at 2565. This type of future injury suffices for standing purposes "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

The exclusion of undocumented immigrants from the apportionment base will cause California to receive fewer seats in the House of Representatives than it is entitled to under the Constitution. A comprehensive statistical analysis by Dr. Ruth Gilgenbach shows that under a wide range of demographic assumptions, California is "highly likely"—at a 90% confidence interval—to lose at least one seat in the House. Gilgenbach Decl. ¶¶ 5, 22-23, 29-30, 32-33, 40.

President Trump has conceded this injury in the Apportionment Exclusion Order itself. As noted, the Order expressly *intends* to deprive certain States of Representatives, and recognizes the effect on California specifically. It states that excluding undocumented

immigrants from apportionment will eliminate "more than 2.2 million illegal aliens" from one State's apportionment base and cost that State "two or three" Representatives.  85 Fed. Reg. at 44680.  According to recent estimates from the Pew Research Center, California has "the largest population" of undocumented immigrants "at 2.2 million."[12]  Other than Texas, no State is estimated to have even half as many undocumented immigrants as California.[13]  The Order's reference is, unmistakably, to California.[14]

Thus, based on scientific analyses and Defendant President Trump's own statements, the State of California has established injury for standing.[15]

The individual and organizational Plaintiffs in the San Jose action have also established injury sufficient for standing.  The Supreme Court has already determined that materially identical plaintiffs have standing to sue under circumstances just like this case.  In *Department of Commerce v. U.S. House of Representatives*, various state residents brought suit seeking to enjoin the Department of Commerce's decision to use statistical sampling during the 2000 decennial census.  525 U.S. 316 (1999).[16]  The Court held that those plaintiffs had standing

---

[12]  Ex. 9, Pew Research Center, *U.S. Unauthorized Immigrant Population Estimates By State, 2016* (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/.

[13]  *Id.*; *see also* Ex. 10, Office of Immigr. Statistics, U.S. Dep't of Homeland Sec., *Population Estimates, Illegal Alien Population Residing in the United States: January 2015* at Table 3 (Dec. 2018), https://www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf (Department of Homeland Security estimating California to have the largest population of undocumented immigrants and Texas following with the second highest).

[14]  In addition to Dr. Gilgenbach's analysis, a Pew Research Center study has confirmed that the Apportionment Exclusion Order will achieve its stated goal of causing States like California to lose representation in Congress.  The study determined that "[i]f unauthorized immigrants were excluded from the apportionment count, California . . . [would] end up with one less congressional seat than [it] would have been awarded based on population change alone."  Ex. 11, Jeffrey S. Passel and D'Vera Cohn, *How Removing Unauthorized Immigrants From Census Statistics Could Affect House Reapportionment*, Pew Research Center (July 24, 2020), https://www.pewresearch.org/fact-tank/2020/07/24/how-removing-unauthorized-immigrants-from-census-statistics-could-affect-house-reapportionment/.

[15]  The State of California's showing of standing suffices for all of the California Plaintiffs. "[O]nce the court determines that one of the plaintiffs has standing, it need not decide the standing of the others."  *Indep. Living Ctr. of S. California, Inc. v. Shewry*, 543 F.3d 1050, 1065 (9th Cir. 2008); s*ee also Dep't of Commerce*, 139 S. Ct. at 2565.

[16]  The U.S. House of Representatives also brought suit, and that case was consolidated with the case brought by state residents.  *See U.S. House of Representatives*, 525 U.S. at 320-21.

because they demonstrated that the use of statistical sampling in determining the apportionment

base was likely to dilute their voting power.  One of the plaintiffs lived and voted in Indiana, and

the evidence showed that the challenged order was likely to result in that State losing one

Representative.  The Court concluded that this plaintiff's "expected loss of a Representative to

the United States Congress *undoubtedly* satisfies the injury-in-fact requirement of Article III

standing."  *Id.* at 331 (emphasis added).

That analysis applies with equal force to this case.  Here, standing is satisfied because the

Apportionment Exclusion Order will, among other things, dilute the voting power of Plaintiffs

Liccardo and Yilma.  Both Plaintiffs reside in California, where they regularly exercise their

right to vote.  *See* Decl. of Sam Liccardo ¶ 3; Decl. of Zerihoun Yilma ¶ 3.  And like the State of

Indiana in *U.S. House of Representatives*, Liccardo and Yilma's State (California) is expected to

lose "a Representative to the United States Congress."  525 U.S. at 331.[17]

In addition to the apportionment injury, the San Jose Plaintiffs have also shown that the

Order is presently harming them by chilling the response to the census.  *See* Barreto Decl. ¶¶ 14-

31, 34-83.  The governmental and organizational Plaintiffs are, as a direct result, expending

substantial resources to educate those in immigrant and minority communities that their

participation in the census is important, and to encourage them to respond to the census.  *See,*

*e.g.*, BAJI Decl. ¶¶ 17-20; Barreto Decl. ¶¶ 37-39, 44.  The San Jose Plaintiffs thus have, like the

California Plaintiffs, "undoubtedly" established an injury-in-fact that is sufficient under Supreme

Court precedent.  *U.S. House of Representatives*, 525 U.S. at 332.

Defendants have argued in related litigation that it is unclear whether Plaintiffs' asserted

injuries will ever occur because the Apportionment Exclusion Order includes qualifying

language that renders its ultimate effect uncertain.  The Order directs the exclusion of

undocumented immigrants from the apportionment base "to [1] the maximum extent feasible and

---

[17]  The harms to these Plaintiffs establish the San Jose Plaintiffs' standing.  *See Shewry*, 543 F.3d
at 1065.  But other San Jose Plaintiffs will suffer harm as well.  For example, Plaintiff Rodney
Ellis resides in Texas where he is registered to vote and regularly exercises his right to vote.  *See*
Decl. of Rodney Ellis ¶ 4.  Texas, like California, is "highly likely" to "lose a congressional seat"
if undocumented immigrants are excluded from the apportionment base.  Gilgenbach Decl. ¶¶ 5,
22-23, 29, 30, 32-33, 38-40.

[2] consistent with the discretion delegated to the executive branch." 85 Fed. Reg. at 44680. According to Defendants, those qualifications make any claim speculative because the effect of the Order ultimately "depends on what is feasible and on how the President exercises his discretion." Defs' Br. in Response to the Ct.'s July 21, 2020 Order and Request for Scheduling Order at 3, *Alabama v. U.S. Dep't of Commerce*, No. 18-cv-00772, (D. Ala. Aug. 3, 2020), ECF No. 158; *see also* Br. in Support of Defs' Mot. to Dismiss at 6-11, *New York v. Trump*, No. 20-cv-5770 (S.D.N.Y. Aug. 19, 2020), ECF No. 118.

Whether framed in terms of standing or ripeness, Defendants' argument fails.  The inquiry, either way, is the same—whether the issues presented are "definite and concrete, not hypothetical or abstract." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc).  The Order establishes that there is nothing abstract or speculative about Defendants' planned exclusion of undocumented immigrants from the apportionment base. It states that the President has "*determined*" it is proper to exclude undocumented immigrants, and announces that it is the "*policy of the United States*" "[f]or the purpose of the reapportionment of Representatives following the 2020 census . . . to exclude from the apportionment base aliens who are not in a lawful immigration status." 85 Fed. Reg. at 44680 (emphasis added).  And in an accompanying signing statement, President Trump confirmed that the Apportionment Exclusion Order is an authoritative directive carrying the force and effect of law:  "Today I am . . . *directing* the Secretary of Commerce to exclude illegal aliens from the apportionment base following the 2020 census."[18]  The President's intention to exclude all undocumented immigrants from the apportionment base, and his direction to the other Defendants to aid him in this effort, could not be clearer.  Absent judicial action, there is every reason to believe that an unconstitutional and *ultra vires* apportionment will occur "[o]n the first day, or within one week" of the first legislative session of the 117th Congress, 2 U.S.C. § 2a(a)—on or within a week from January 3, 2021.

---

[18]  Ex. 8, White House, *Statement From the President Regarding Apportionment* (July 21, 2020), https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment/ (emphasis added).

Defendants' claim that the controversy is nonetheless unripe is doctrinally incorrect and logically unsound—and plainly just a tactic to evade judicial review.  Qualifying an executive action by stating that it will be carried out only "to the maximum extent feasible" is no qualification at all.  *Of course* this Order—like any order—can be executed only to the extent feasible; no order can be carried out *beyond* the maximum extent feasible.  The Apportionment Exclusion Order would thus be no different without the feasibility language, and other executive orders without that language would be no different with it.

The second qualification—to the extent "consistent with the discretion delegated to the executive branch"—is likewise meaningless, because the President has *already stated* that he believes excluding undocumented immigrants from the apportionment base is within his executive discretion:  "The discretion delegated to the executive branch to determine who qualifies as an 'inhabitant' includes authority to exclude from the apportionment base aliens who are not in a lawful immigration status."  85 Fed. Reg. at 44679.  The mere possibility that the President might change his mind cannot defeat ripeness.  *Compare, e.g.*, *In re Coleman*, 560 F.3d 1000, 1005 (9th Cir. 2009) (case was ripe even though it involved "a single factual contingency" that might not occur "at all"), *with Portland Police Ass'n v. City of Portland*, 658 F.2d 1272, 1274 (9th Cir. 1981) (case was *un*ripe because it involved "a series of contingencies" and plaintiffs presented no credible threat of harm).

In addition, the Order is *presently* harming Plaintiffs by chilling the response to the census.  *See* Barreto Decl. ¶¶ 14-31, 34-83.  The undercount that the Order *is currently causing* and Plaintiffs' diversions of staff and financial resources to mitigate that undercount are neither speculative nor uncertain.  *See id.* ¶¶ 37-39, 44; *see also* BAJI Decl. ¶¶ 17-20.

Finally, Plaintiffs' injuries are traceable to Defendants and redressable by a favorable ruling.  Defendants' enforcement of the Apportionment Exclusion Order in the upcoming reapportionment will cause the State of California to lose a seat in Congress, which in turn will dilute Plaintiffs Liccardo and Yilma's votes.  Those harms are redressable by a favorable ruling that declares that the Apportionment Exclusion Order is unlawful and enjoins certain Defendants

from carrying it out.  *See Dep't of Commerce*, 139 S. Ct. at 2566; *U.S. House of Representatives*, 525 U.S. at 331-33; *State of California v. Ross*, 362 F. Supp. 3d 749, 755-56 (N.D. Cal. 2018).

**B.  The Apportionment Exclusion Order Is Unconstitutional**

The Constitution requires apportioning Representatives "among the several States according to their respective numbers" by "counting the whole number of persons in each State." U.S. Const. amend. XIV, § 2; *see also id.* art. I, § 2, cl. 3 (requiring apportionment by "adding" "the whole Number of free Persons" through an "actual Enumeration").  As confirmed by the Constitution's structure, drafting history, and over two centuries of consistent historical practice by all three branches of government, the phrase "persons in each State" means that the apportionment must be based on all people residing in each State—not just voters, citizens, or legal residents, but the *total population*.  *See infra* at 14-27.  Against this weight of authority, the Order's central justification is that "persons in each State" means "inhabitants," and the President has discretion to decide who counts as an inhabitant.  But "inhabitant" means a person who resides in a place, and the President has no discretion to narrow the ordinary and accepted definition of the term to suit his political objectives.  Undocumented persons who reside in a State are inhabitants of that State as a matter of text, history, and practice, and the Order to exclude them from the apportionment count is blatantly unconstitutional.  *See infra* at 27-29.

**1.  The Constitution's Text and Structure Require Apportionment Based on Total Population**

The Constitution "was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning."  *Dist. of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quotations and citation omitted).  And when that ordinary meaning is clear, "there is no room for construction and no excuse for interpolation or addition." *United States v. Sprague*, 282 U.S. 716, 731 (1931).  Here, the ordinary meaning of the phrase "persons in each State" is indisputable—it requires counting all people residing in each State. The meaning of "person" has not changed since the founding.  The 1766 edition of Samuel Johnson's dictionary defined "person" as an "[i]ndividual or particular man or woman"; "[m]an or woman considered as opposed to things"; "[h]uman being"; "[a] general loose term for a

human being."[19]  "Person" meant the same thing when the Fourteenth Amendment was ratified in 1868.[20]  And it means the same thing today.[21]

Consistent with the word's ordinary meaning, foreign-born non-citizens unquestionably were considered "persons" under law at the time of the Founding.  Indeed, the first volume of William Blackstone's influential *Commentaries on the Laws of England*, published in 1765—entitled "The Rights of Persons"—included a chapter on the rights of "People, Whether Aliens, Denizens, or Natives."[22]  Chancellor Kent's *Commentaries on American Law*, published in 1826, likewise had a chapter on the rights of "Aliens and Natives"—which was included in his volume on "The Law Concerning The Rights of *Persons*."[23]

In light of the clarity of this language, the Supreme Court has repeatedly held that all human beings are persons within the meaning of the Constitution.  As early as *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Court held that "person," as used in the Due Process Clause of the Fifth Amendment, is not limited to citizens but means what it says.  "These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws."  *Id.* at 369.

Even more to the point, the Court has explicitly held that, as used in Section 1 of the Fourteenth Amendment, "person" encompasses undocumented immigrants.  In *Plyler v. Doe*, the Court addressed whether a Texas statute that withheld from local schools any funds for the education of undocumented immigrants violated the Equal Protection Clause of the Fourteenth Amendment.  457 U.S. 202 (1982).  Although the Justices disagreed sharply on other aspects of

---

[19]  Ex. 32, *Person*, Samuel Johnson, *A Dictionary of the English Language* (3d ed. 1766).

[20]  Ex. 12, *Person*, Noah Webster, *An American Dictionary of the English Language* (1868).

[21]  Ex. 35, *Person*, *Merriam-Webster Online Dictionary* ("Human, Individual"), https://www.merriam-webster.com/dictionary/person (last accessed Aug. 26, 2020).

[22]  Ex. 13, 1 W. Blackstone, *Commentaries on the Laws of England* ch. 10 (1765) (emphasis added).

[23]  Ex. 14, 2 J. Kent, *Commentaries on American Law* 33-63 (1826) (emphasis added); *see also id.* at 43 ("An alien is a *person* born out of the jurisdiction of the United States." (emphasis added)).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the case, they *unanimously* agreed that an undocumented person is a "person" under the Fourteenth Amendment:  "Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term."  *Id.* at 210; *id.* at 243 (no "quarrel" with that holding) (Burger, C.J., dissenting).  And the Court specifically rejected the argument that the term "person" as it appears in the Due Process clause of Section 1 of the Fourteenth Amendment means something different than what "person" means in the Equal Protection clause of the same section in the same amendment.  *Id.* at 210-14.[24]

There is no sound reason to conclude that the *same* drafters of the *same* constitutional amendment used the *same* word in Section 2 to bear a fundamentally different meaning.  *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2680 (2015) (Roberts, C.J., dissenting) ("When seeking to discern the meaning of a word in the Constitution, there is no better dictionary than the rest of the Constitution itself.").  Just as undocumented immigrants are persons under Section 1 of the Fourteenth Amendment, so too are they persons under Section 2.

Furthermore, the structure of the Apportionment Clause and other provisions in the Constitution likewise show that the phrase "persons in each State" was meant to include all human beings residing in each State.  When the drafters sought to exclude certain classes of persons, they did so expressly.  The Founders excluded "Indians not taxed," and discounted persons who were not "free"—slaves—by forty percent for enumeration purposes.  U.S. Const. art. I, § 2, cl. 3.  The drafters of the Fourteenth Amendment retained the exclusion of "Indians not taxed," while abrogating the three-fifths clause.  *See id.* amend. XIV, § 2.  And when the Founders sought to describe a *subset* of "persons," they also did that expressly.  *See id.* art. I, § 2, cl. 2 ("No Person shall be a Representative who shall not have . . . been seven Years a Citizen of the United States"); *id.* § 3, cl. 3 ("No Person shall be a Senator who shall not have . . . been nine

---

[24]  The Supreme Court has similarly concluded in the context of the Due Process Clause that undocumented immigrants fall within the meaning of "persons."  *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").

Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State for which he shall be chosen"); *id.* art. II, § 1, cl. 5 ("No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President").

These examples—and others—confirm the Constitution's purposeful distinction between *persons* and *citizens*. *See, e.g.*, *id.* amend. XIV, § 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."); *id.* § 3 ("when the right to vote at any election . . . is denied to any of the male inhabitants of such State, being . . . citizens of the United States, . . . the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens"). This consistent "difference of phraseology" reveals a "difference of constitutional intention." *Martin v. Hunter's Lessee*, 14 U.S. 304, 334 (1816) (Story, J.); *see also Fong Yue Ting v. United States*, 149 U.S. 698, 739 (1893) (Gray, J.) ("It is worthy of notice that in [the Bill of Rights] the word 'citizen' is not found. In some of them the descriptive word is 'people,' but in the fifth it is broader, and the word is 'person.'"). It drives home the intended meaning of the language chosen: All persons residing in each State are counted for purposes of apportionment.

## 2. The Constitution's Drafting History Confirms that Apportionment Must Be Based on Total Population

The Constitution's drafting history confirms that the Apportionment Clause requires an apportionment based on total population. After the Constitutional Convention's substantive deliberations were finished, the draft Apportionment Clause provided that Congress would "regulate the number of representatives by the number of inhabitants, according to the rule hereinafter made for direct taxation," and the Direct Taxation Clause provided that "[t]he proportions of direct taxation shall be regulated by *the whole number* of free *citizens and inhabitants of every age, sex, and condition*, including those bound to servitude for a term of years, and three fifths of all other persons not comprehended in the foregoing description,

(except Indians not paying taxes)."[25]  That language was referred to the Committee of Style, which had the task of making stylistic revisions but no substantive changes.[26]  The Committee of Style, in turn, reported back the final language of Article I, Section 2:  "Representatives and direct taxes shall be apportioned among the several states which may be included within this Union, *according to their respective numbers*, which shall be determined by adding to *the whole number* of free *persons*, including those bound to servitude for a term of years, and excluding Indians not taxed, three fifths of all other *persons*."[27]

        This drafting history shows that the Framers understood the final language—"persons"—to extend beyond "citizens" and to include "inhabitants of every age, sex, and condition."  Had the Framers intended to limit apportionment based on citizenship or immigration status, they would have omitted the additional language specifying "inhabitants of every . . . condition."  The drafting history is also consistent with the debates at the Convention, which "make at least one fact abundantly clear:  When the delegates agreed that the House should represent 'people' they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants."  *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964).  As James Madison explained, "[i]t is a fundamental principle of the proposed Constitution, that as the aggregate number of representatives allotted to the several States is to be . . . founded on the aggregate number of inhabitants."[28]  "There can be no truer principle than this," Alexander Hamilton declared at the Convention, "that every individual of the community at large has an equal right to the protection of government."[29]

        The debates at the Convention confirm that the Founders recognized the distinction between this "rule of Representation" and "suffrage."[30]  They were acutely aware that the

---

[25]  Ex. 15, 2 *Records of the Federal Convention of 1787* at 566, 571 (M. Farrand ed. 1911) (emphasis added).

[26]  *See id.* at 547, 553.

[27]  *Id.* at 590; *see also id.* at 607-08 (approval of Article I, § 2 on Sept. 13).

[28]  Ex. 16, The Federalist No. 54.

[29]  Ex. 17, 1 *Records of the Federal Convention of 1787* at 473 (M. Farrand ed. 1911).

[30]  *Id.* at 580-81.

apportionment base would include "categories of persons who were ineligible to vote—women, children, bound servants, convicts, the insane, and, at a later time, aliens."  *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 774 (9th Cir. 1990).  James Madison thus readily acknowledged that, by design, "[i]n every State, a certain proportion of inhabitants are deprived of [the] right [to vote but] . . . will be included in the census by which the federal Constitution apportions the representatives."[31]

The drafting history of the Fourteenth Amendment likewise confirms that the phrase "persons in each State" includes undocumented immigrants residing in the States.  The 39th Congress, which enacted the Fourteenth Amendment, began its first session on December 4, 1865, shortly after the Civil War (and two days before ratification of the Thirteenth Amendment).[32]  Because recently freed slaves had become "free Persons" under the Enumeration Clause, they had greater weight in apportionment, and Southern representation in Congress was expected to increase significantly.[33]

Apportionment was thus a principal focus of the debate surrounding the Fourteenth Amendment.  Early on, language was proposed "that would have allocated House seats to States 'according to their respective legal voters'" instead of according to population.  *Evenwel v. Abbott*, 136 S. Ct. 1120,  1128 (2016).  Both this proposal and the ensuing debate were *predicated* on the fact that, under the then-existing Apportionment Clause, people without the right to vote, including unnaturalized immigrants, were included in the apportionment base.  *See, e.g.*, Ex. 18, Cong. Globe, 39th Cong., 1st Sess. at 141 (statement of Rep. Blaine) ("As an abstract proposition no one will deny that population is the true basis of representation; for women, children, and other non-voting classes may have as vital an interest in the legislation of the country as those who actually deposit the ballot"); *id.* at 353 (1866) (statement of Rep. Rogers) ("Every man in this House knows perfectly well in the several States . . . unnaturalized

---

[31]  Ex. 16, The Federalist No. 54 (James Madison).

[32]  *See* Ex. 18, Cong. Globe, 39th Cong., 1st Sess. 1, 3 (Dec. 4, 1865).

[33]  *See* Ex. 19, William W. Van Alstyne, *The Fourteenth Amendment, the "Right" to Vote, and the Understanding of the Thirty-Ninth Congress*, 1965 Sup. Ct. Rev. 33, 46.

citizens cannot vote . . . yet for these persons the States are entitled to representation."); *id.* at 359 (1866) (statement of Rep. Conkling) ("'Persons,' and not 'citizens,' have always constituted the basis" and "it would narrow the basis of taxation and cause considerable inequalities in this respect, because the number of aliens in some States is very large, and growing larger now, when emigrants reach our shores at the rate of more than a State a year"); *id.* at 432 (1866) (statement of Rep. Bingham) ("Under the Constitution as it now is and as it always has been, the entire immigrant population of this country is included in the basis of representation."); *id.* at 961 (1866) (statement of Sen. Buckalew) ("By the existing Constitution representation is based upon the whole number of inhabitants in the States, exclusive of Indians not taxed," such that "foreigners are counted."); *id.* at 2944 (1866) (statement of Sen. Williams) ("Representation is now based upon population," including "foreigners not naturalized."); *id.* at 2944 (1866) (statement of Sen. Edmunds) ("The fathers who founded this Government acted upon the idea not only that the representation, as a principle, in general was to be based upon population, independent of the franchise, independent of citizenship.").

Ultimately, the Fourteenth Amendment retained total population, not the number of citizens, as the apportionment base. As Senator Howard explained in introducing the final version of the proposed Fourteenth Amendment on the Senate floor: "Its basis of representation is numbers . . .; that is, the whole population except untaxed Indians and persons excluded by the State laws for rebellion or other crime. . . . *Numbers, not voters*; *numbers, not property*; *this is the theory of the Constitution*." *Id.* at 2766-67 (emphasis added).

As this extensive drafting history illustrates, neither the Founders nor those who drafted the Fourteenth Amendment intended to distinguish among persons based on voting or citizenship status. They affirmatively disclaimed any such distinction and concluded that apportionment is based on all persons residing in each State.

### 3. Consistent Historical Practice Confirms that the Constitution Requires Apportionment Based on Total Population

In addition to bucking the plain text, structure, and drafting history of the Constitution, the Apportionment Exclusion Order's exclusion of undocumented immigrants from the

apportionment base departs radically from over two centuries of consistent practice and steadfast interpretations by all three branches of government.

Consistent historical practice informs constitutional meaning.  *See, e.g.*, *Evenwel*, 136 S. Ct. at 1132 ("What constitutional history and our prior decisions strongly suggest, settled practice confirms.").  Consistent historical practice has been a particularly important interpretive tool in cases involving the census and apportionment.  *See, e.g.*, *Dep't of Comm*erce, 139 S. Ct. at 2567 ("[O]ur interpretation of the Constitution is guided by a Government practice that 'has been open, widespread, and unchallenged since the early days of the Republic.'" (citation omitted)); *Wisconsin v. City of New York*, 517 U.S. 1, 21 (1996) (acknowledging "the importance of historical practice in" understanding the Enumeration Clause).  And the reverse is equally true:  As the Supreme Court recently noted, "lack of historical precedent" can be a "most telling indication of [a] severe constitutional problem."  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2201 (2020) (internal quotation marks omitted).  Here, the historical practice of counting every person in the apportionment base could not be more longstanding and uniform, and the Apportionment Exclusion Order's departure from that settled precedent could not be more stark.

From the very first census in 1790 until now, the apportionment base has *never* excluded undocumented immigrants.  Aside from the two shameful exceptions provided in the text—discounting slaves and excluding Indians not taxed—the apportionment base has always included *all* persons residing in each State.  Under the first census statute, marshals and their assistants conducted the census and were required to count "the number of the inhabitants within their respective districts."[34]  As the Census Bureau Director told Congress in 1985, "[t]raditional understanding of the Constitution and the legal direction provided by the Congress has meant that for every census since the first one in 1790, [the Bureau] ha[s] tried to count residents of the

---

[34] Ex. 20, Act of Mar. 1, 1790, § 1, 1 Stat.

country, regardless of their status."[35]  The data bears this out.  For example, in the 1860

Census—the only census that post-dates the Fugitive Slave Act of 1850 (which required free

States to return escaped slaves within their borders, who were deemed to have no lawful

presence there, *see* 9 Stat. 462, 462-65 (1850)) but pre-dates ratification of the Thirteenth

Amendment—fugitive slaves in Northern States were explicitly counted as part of their "free

colored population," despite their unlawful residence in those States.[36]  In other words, the 1860

census and resulting apportionment specifically counted in a State's population persons who

lacked "legal status" in that State under then-existing law.

This unbroken practice of counting *all* persons residing in each State reflects both

Congress and the Executive's consistent understanding of what the Constitution requires.  Bills

proposed to exclude "aliens" from apportionment have repeatedly been rejected for precisely this

reason.  In 1929, for example, the Senate Legislative Counsel analyzed whether such a bill would

be constitutional.[37]  After exhaustive research, the Senate Legislative Counsel observed that

"[t]he practical construction of the constitutional provision by Congress in its apportionment

legislation has been uniformly in favor of inclusion of aliens" and concluded that doing

otherwise was constitutionally impermissible:

> The "natural and obvious" meaning of the word "persons," the
> internal evidence relating to its use in the apportionment provisions
> of the fourteenth amendment and original constitutional provision

---

[35]  Ex. 21, *Enumeration of Undocumented Aliens in the Decennial Census: Hearing Before the Subcomm. on Energy, Nuclear Proliferation, & Gov't Processes of the S. Comm. on Governmental Affairs*, 99th Cong. 19 (1985) (statement of Census Director John Keane); *see also id.* at 91-92, *Fact Sheet: Illegal Aliens and the Decennial Census*, U.S. Dep't of Commerce, Bureau of the Census (July 18, 1985), *reprinted at* 99th Cong. 91-92 (1985) ("The Census Bureau conducts the decennial census as mandated by the Constitution and directed by the Congress:  The decennial census is based on total population.  The Census Bureau does not exclude persons because of their legal status.").

[36]  Ex. 22, U.S. Census Bureau, *1860 Census: Population of the United States* at vi-vii, xi, xv-xvi, (Gov't Printing Office 1864), https://www2.census.gov/library/publications/decennial/1860/population/1860a-02.pdf (discussing changes in the fugitive slave population from 1850 to 1860).

[37]  *See* Ex. 23, C.E. Turney, Law Assistant, Senate Legislative Counsel, *Power of Congress to Exclude Aliens from Enumeration for Purposes of Apportionment of Representatives* (Apr. 30, 1929), *reprinted at* 71 Cong. Rec. 1821-22 (1929) https://www2.census.gov/library/publications/decennial/1860/population/1860a-02.pdf.

superseded by that amendment, the use of the word in other constitutional provisions and the decisions of the courts thereon, the history of the fourteenth amendment, the evidence of the records of the Constitutional Convention, and the uniform past congressional construction of the term by Congress in its apportionment legislation all lead to the conclusion that the term "persons" as used in section 2 of the fourteenth amendment includes aliens as well as citizens. It is therefore the opinion of this office that there is no constitutional authority for the enactment of legislation excluding aliens from enumeration for the purposes of apportionment of Representatives among the States.[38]

Several constitutional amendments were proposed to modify the wording; all failed.[39]

Congress considered and rejected a similar proposal in 1940.[40] Representative Celler of New York put it simply: "If you want aliens out, you must amend the Constitution."[41] He went on:

For 150 years we have included aliens in the count. We cannot, by mere resolution of this body or the adjoining body, change that constitutional requirement. If you strike out aliens you have parted with a principle of government upon which the fathers agreed some 150 years ago, which they thought a reasonable adjustment of the whole problem. When we use the word "persons" we include all peoples. . . . We include women and minors; we include all persons, and it would be rather anomalous now for the first time to say that we shall not include aliens as now being persons.[42]

This debate also appears to be the first time that the subject of *undocumented* immigrants was raised explicitly. Representative Celler was asked whether "aliens who are in this country in violation of law have the right to be counted and represented in the Congress of the United States."[43] His response was blunt: "The Constitution says that all persons shall be counted. I cannot quarrel with the founding fathers. They said that all should be counted."[44]

In 1989, Congress considered—and rejected—an amendment to 13 U.S.C. § 141 that

---

[38] *Id.* at 1822.

[39] *See* Ex. 24, H.J. Res. 20, 71st Cong. (1929); S.J. Res. 4, 62, 71st Cong. (1929).

[40] *See* Ex. 25, 86 Cong. Rec. 4371-75.

[41] *Id.* at 4372.

[42] *Id.*

[43] *Id.*

[44] *Id.*

would have required the Secretary of Commerce to adjust the census numbers so that "aliens in the United States in violation of the immigration laws shall not be counted" under 13 U.S.C. § 141(b) for apportionment.[45]  During debate, Senator Bumpers from Arkansas explained that he did "not want to go home and explain [his] vote on this [amendment] any more than anyone else does," but that "[f]or 200 years we have counted illegal aliens in our census."[46]  He went on:  "I wish the Founding Fathers had said you will only enumerate 'citizens,' but they did not.  They said 'persons,' and so that is what it has been for 200 years.  We have absolutely no right or authority to change that peremptorily on a majority vote here."[47]

Most recently, in 2009, a proposed constitutional amendment to exclude undocumented immigrants from apportionment was referred to committee.[48]  But it never got out of committee.[49]

The Executive Branch, under Presidents of both parties, also has consistently recognized that the Constitution requires apportionment based on total population irrespective of citizenship or immigration status.  In 1980, under President Jimmy Carter, the Department of Justice (DOJ) argued—in an apportionment suit where private plaintiffs sought to *exclude* undocumented immigrants from the census and apportionment base—that the Fourteenth Amendment "*require[s]* that all the inhabitants of the states, *including illegal aliens*, be counted for the apportionment of the United States House of Representatives."  Defs.' Reply Br. at 6, *Fed'n for Am. Immigration Reform v. Klutznick*, No. 79-3269, 1980 WL 683642 (D.D.C. Jan. 3, 1980) (emphasis added).  "[F]or 200 years," DOJ explained, "the decennial census has counted all residents of the states irrespective of their citizenship or immigration status."  Defs.' Post-Arg. Mem. at 1, *Klutznick*, No. 79-3269 (D.D.C. Feb. 15, 1980).  And excluding undocumented

---

[45] *See* Ex. 26, 135 Cong. Rec. 14539-40 (1989).
[46] *Id.* at 14551.
[47] *Id.*
[48] *See* Ex. 27, H.J. Res. 11, 111th Cong. (2009).
[49] *Cf.* Ex. 28, Cong. Rsch. Serv., R41048, *Constitutionality of Excluding Aliens from the Census for Apportionment and Redistricting Purposes* 2 (2012) (detailing attempted constitutional amendments).

1
2
3
4

immigrants from the apportionment would be "a radical revision of the constitutionally mandated system for allocation of Representatives to the States of the Union and an equally radical revision of the historic mission of the decennial census," which could only be achieved through "the proper means of a constitutional amendment." *Id.*

5
6
7
8
9
10
11
12
13

In 1988, under President Ronald Reagan, the Director of the Office of Management and Budget sought the views of DOJ on yet another proposal to exclude "illegal aliens" from the apportionment base. DOJ concluded that the proposed legislation was "unconstitutional," and noted that "[i]f it were passed, [DOJ] would recommend that the President veto it."[50] DOJ explained that "the Congress that passed the Fourteenth Amendment in 1866 not only recognized that aliens would be counted in the census *but insisted upon their inclusion*" in the census and apportionment.[51] DOJ observed that even though the Reconstruction Congress "did not discuss the issue of illegal aliens when it debated the Fourteenth Amendment," it was already "possible to be an illegal alien in 1866."[52]

14
15
16
17
18
19
20
21

In 1989, under President George H.W. Bush, DOJ came to the same conclusion. Once again, a Senator had "requested the views of the Department of Justice concerning the constitutionality of proposed legislation excluding illegal or deportable aliens from the decennial census count."[53] DOJ responded that "section two of the Fourteenth Amendment which provides for 'counting the whole number of persons in each state' and the original Apportionment and Census Clauses of Article I section two of the Constitution require that inhabitants of States who

22
23
24

[50] Ex. 29, Letter from Thomas M. Boyd, Acting Assistant Attorney General at 5 (June 29, 1988), *reprinted at 1990 Census Procedures and Demographic Impact on the State of Michigan: Hearing Before the Committee on Post Office and Civil Service, House of Representatives*, 100th Cong. 240-44 (1988).

[51] *Id.* at 3 (emphasis added).

25
26
27

[52] *Id.* at 4 (citing Act of July 6, 1798, ch. 66, 1 Stat. 577). Specifically, "[t]he United States has had a statute since 1798 governing arrest and exclusion of aliens from hostile countries," and the authority under that statute "had been exercised prior to 1866." *Id.* So the concept of "illegal aliens" was not unknown when the Fourteenth Amendment was ratified.

28

[53] *See* Ex. 30, Letter from Carol T. Crawford, Assistant Attorney General (Sept. 22, 1989), 135 Cong. Rec. S12234 (1989).

are illegal aliens be included in the census count."[54]

In 2015, under President Barack Obama, DOJ again observed that Article I, § 2 and the Fourteenth Amendment "were purposely drafted to refer to 'persons,' rather than to voters, and to include people who could not vote"—specifically including "aliens."  Br. for the United States as Amicus Curiae at 18, *Evenwel*, No. 14-940, 2015 WL 5675829, at *18 (citation omitted)). DOJ explained that this was because "the federal government act[s] in the name of (and thereby represent[s]) all people, whether they [are] voters or not, and whether they [are] citizens or not." *Id.* at 19.

Although the Supreme Court has never needed to squarely address this issue—in large part because no Administration has ever before proposed to exclude disfavored persons from the enumeration—the Court has repeatedly indicated its understanding that all persons residing in the United States must be counted.  Just last year, the Supreme Court detailed how "[t]he *population* count derived from the census"—not the *citizenship* count or *voter* count—"is used . . . to apportion representatives." *Dep't of Commerce*, 139 S. Ct. at 2561 (emphasis added); *see also, e.g.*, *Evenwel*, 136 S. Ct. at 1129 ("[I]t remains beyond doubt that the principle of representational equality figured prominently in the decision to count *people*, whether or not they qualify as voters." (emphasis added)); *Wisconsin*, 517 U.S. at 5 ("The Constitution requires an 'actual Enumeration' of the population every 10 years and . . . provides that the results of the census shall be used to apportion the Members of the House of Representatives among the States."); *Wesberry*, 376 U.S. at 13 ("[I]n allocating Congressmen[,] the number assigned to each State should be determined solely by the number of the State's inhabitants.").  And the only court that has ruled directly on the issue held that undocumented immigrants must be counted.  *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980) ("The language of the Constitution is not ambiguous.  It requires the counting of the 'whole number of persons' for apportionment purposes, and while illegal aliens were not a component of the population at the time the Constitution was adopted, they are clearly 'persons.'").

---

[54]  *Id.*  At that time, current Attorney General William Barr was the head of DOJ's Office of Legal Counsel and would have been expected to review and approve the DOJ opinion.

CASE NOS. 5:20-cv-05167, 5:20-cv-05169
PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PARTIAL SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Until now, no decision issued by any court, no law passed by any Congress, and no opinion issued or case argued by any Administration—of any political party—has deviated from the ordinary meaning of the Apportionment Clause and Section 1 of the Fourteenth Amendment that congressional apportionment must be based on total population, irrespective of citizenship or immigration status.  The Constitution's text, structure, and 230 years of history and uniform practice foreclose what Defendants seek to do here.

### 4.   Defendants Have No Discretion to Exclude Undocumented Immigrant Residents from the Apportionment Base

Defendants lack discretion to exclude from the apportionment base undocumented immigrants who reside in the States.  The Apportionment Exclusion Order invokes *Franklin v. Massachusetts*, 505 U.S. 788 (1992), and asserts that the President has the "discretion to settle the apportionment," including the authority to determine who is an "inhabitant" for apportionment purposes.  85 Fed. Reg. at 44679.  It asserts, moreover, that this discretion is sufficiently broad to allow the categorical exclusion of undocumented immigrants from the apportionment base.  *Id.*  But whatever discretion the President may have at the margins under *Franklin*,[55] it does not provide him the leeway to redefine fixed constitutional rules.

Defendants' focus on the term "inhabitants," rather than "persons" who reside a State is unavailing.  Unsurprisingly—because the terms are synonymous—Defendants' position contravenes the ordinary and accepted meaning of "inhabitant" as well.[56]  "Inhabitant" carries the same meaning today as it did 230 years ago.  An "inhabitant" is someone who "occupies a

[55]  To be sure, *Franklin* held that the President has a degree of discretion over the "policy judgments that result in 'the decennial census'" and that the President need not "adhere to the policy decisions in the Secretary's report [under 13 U.S.C. § 141(a)]."  505 U.S. at 799.  But, at the same time, the Supreme Court affirmed that "Section 2a . . . expressly require[s] the President to use . . . the data from the 'decennial census,'" *id.* at 797, and readily "admitted[]" the "*ministerial nature* of the apportionment calculation" that the President must conduct under § 2a.  *Id.* (emphasis added).

[56]  As the Court explained in *Franklin*, the use in the alternative of the term "inhabitant" dates back to the first enumeration Act's use of the term and James Madison's notes from the Convention.  *See* 505 U.S. at 804-05.

particular place regularly, routinely, or for a period of time."[57]  The millions of undocumented immigrants who live in the United States plainly are "inhabitants" of the States in which they reside.  No amount of "discretion" can change the meaning of words.

The Constitution's text and unbroken history also foreclose Defendants' claimed discretion.  As the Supreme Court has observed, the first census Act gave the constitutional phrase "in each State" the gloss of "[u]sual residence," and that gloss "has been used by the Census Bureau ever since to allocate persons to their home States."  *Franklin v. Massachusetts*, 505 U.S. 788, 804 (1992).  To be sure, "usual residence . . . can mean more than mere physical presence, and has been used broadly enough to include some element of allegiance or enduring tie to a place."  *Id.*  But as the discussion above illustrates, the drafters of the Apportionment Clause and the Fourteenth Amendment (and every Congress since) uniformly rejected the notion that one's legal status factored into being counted for apportionment.[58]

The Order's analogy to tourists and international visitors does not hold up either.  The Order points out that "aliens who are only temporarily in the United States" for business or tourism, "and certain foreign diplomatic personnel," are "persons" but nevertheless excluded from apportionment.  85 Fed. Reg. at 44679.  Those examples illustrate only the Order's faulty logic.  Yes, temporary visitors are excluded—*because* the United States is not their "usual residence" and they accordingly are not "inhabitants."  Foreign diplomats also are not "inhabitants" of the United States in the usual meaning of the word.  As the Supreme Court recognized in *Franklin*, under the historic understanding of "inhabitant," the mere fact that a government official "perform[s] . . . his duty abroad" does not mean the official becomes an

---

[57]  Ex. 31, *Inhabitant*, *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/inhabitant (last accessed Aug. 26, 2020); *see also* Ex. 32, *Inhabitant*, Samuel Johnson, *A Dictionary of the English Language* (3d ed. 1766) ("Dweller; one that lives or resides in a place."); Ex. 12, *Inhabitant*, Noah Webster, *An American Dictionary of the English Language* (1868) ("One who dwells or resides permanently in a place.").

[58]  That is why the Census Bureau's "Residence Rule" requires all residents of the United States, including all "foreign citizens," to be counted in the 2020 census, and recognizes that "[a]pportionment is based on the resident population, plus a count of overseas federal employees, for each of the 50 states."  Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525, 5526 n.1, 5533 (Feb. 8, 2018).

"inhabitant" of the foreign country.  505 U.S. at 805; *see also id.* ("In the related context of congressional residence qualifications, James Madison interpreted the constitutional term 'inhabitant' to include 'persons absent occasionally for a considerable time on public or private business.'" (internal citations omitted)).

 The Order's analogies are not only illogical but also factually inapt.  The Census Bureau's enumeration procedures already take into account whether a person's residence is only temporary:  The census counts persons, including undocumented immigrants, only at their "usual residence," which is defined by the Bureau as the place where a person lives and sleeps "most of the time."  And in any event, "[r]esearch and statistical reports have repeatedly found that undocumented immigrants," unlike temporary visitors, "see themselves as part of American society and indeed have longstanding ties in the cities and towns in which they permanently live."  Barreto Decl. ¶ 17; *see also id.* (survey found that 89% of Latino undocumented immigrants had lived in the United States for over five years).  Thus, the examples mentioned in the Order do not actually support Defendants' claimed discretion to exclude all undocumented immigrants, or undermine the uniform practice that the apportionment is based on total population of persons residing in each State—irrespective of legal status.

## C.  The Apportionment Exclusion Order Is *Ultra Vires*

 In addition to violating the Constitution, the Apportionment Exclusion Order contravenes the Census Act and the Reapportionment Act.  These statutory violations provide independent bases to grant Plaintiffs their requested relief.

### 1.  The Order Violates the Census Act

 The Apportionment Exclusion Order violates the Census Act by instructing Secretary Ross to provide the President with something other than "[t]he tabulation of *total population*" required by statute.  13 U.S.C. § 141(b) (emphasis added).  The Census Act specifies the responsibilities—and the discretion—of the Secretary of Commerce when it comes to the census and apportionment.  *See id*. § 141.  Section 141(a) addresses the census and confers limited discretion on the Secretary:  "The Secretary shall . . . take a decennial census of population as of the first day of April . . . in such form and content as he may determine."  Section 141(b), in turn,

addresses the Secretary's duties with respect to apportionment: "The tabulation of total population by States under [§ 141(a)] as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States."

Section 141(b) thus unambiguously requires the Secretary to report "for the apportionment" a "tabulation of total population by State."  The Apportionment Exclusion Order, however, directs the Secretary to report something else:  to "provide information permitting the President" to exclude undocumented immigrants from the apportionment base.  85 Fed. Reg. 44680.  And that would be unlawful.  Section 141(b)'s plain terms require the Secretary to transmit a tabulation of the total population in each State—meaning *all* persons residing in each State, regardless of citizenship, voter, or immigration status.  Splitting this tabulation into persons with "lawful immigration status" and those without, as the Order directs, would violate § 141(b)'s plain terms.

The Apportionment Clause and the Reapportionment Act (2 U.S.C. § 2a(a)) confirm that § 141(b)'s reference to "a tabulation of total population by State . . . as required for the apportionment" means a tabulation based on the "whole number of Persons" without regard to citizenship or immigration status.  It is presumed that Congress legislates with knowledge of the law and acts with awareness of "all previous statutes on the same subject."  *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972).  The Reapportionment Act was passed in 1929 and governs what the President must do with the report he receives from the Secretary.  The operative language in § 141(b), setting forth the Secretary's duties, was passed later, in 1954.  S*ee* Pub. L. No. 83-740, 68 Stat. 1012, 1020 (1954).  Because both statutes implement the Apportionment Clause, and because § 2a(a) directs the President to "transmit to the Congress a statement showing the whole number of persons in each State," § 141(b)'s direction for the Secretary to report to the President a tabulation of total population by State . . . as required for the apportionment" can mean only a tabulation of the "whole number of Persons."

The Secretary, moreover, has no "discretion" under the statute to depart from this

command.  The text confers no such discretion.  *See Dep't of Commerce*, 139 S. Ct. at 2568 (observing that, while certain provisions of the Census Act such as 13 U.S.C. §§ 5, 6, 141(a), and 141(g), confer "broad authority" on the Secretary, other provisions—including § 141(b)— "constrain[] the Secretary's authority").  And because the Apportionment Clause, which underlies § 141(b), mandates that apportionment be based on the "whole number of persons in each State," Congress could not constitutionally have delegated to the Secretary any discretion to prepare the apportionment report based on a different count.

### 2.  The Order Violates the Reapportionment Act

The Apportionment Exclusion Order further violates 2 U.S.C. § 2a(a) by mandating an apportionment based on something other than the "decennial census of the population" and calculated by something other than application of the mathematical "method of equal proportions."

Section 2a(a) provides that "the President shall transmit to the Congress a statement showing the *whole number of persons* in each State, excluding Indians not taxed, *as ascertained under the . . . census of the population*, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as *the method of equal proportions* . . . ."  2 U.S.C. § 2a(a) (emphasis added).  So the apportionment data must come from the "census of the population," and the apportionment must be calculated using "the method of equal proportions."  The Apportionment Exclusion Order flouts both these requirements.

*First*, the Order reveals that Defendants' apportionment will not be based solely on the "decennial census."  The Order directs Secretary Ross to take "all appropriate action . . . to provide information permitting the President" to exclude undocumented immigrants from the apportionment base.  85 Fed. Reg. at 44680.  But the "decennial census" does not provide information about citizenship or legal status.  *See generally Dep't of Commerce*, 139 S. Ct. 2551. So that information can only come from some other source.  Indeed, the Order *tells us* it will come from another source—the Order refers back to the July 11, 2019 executive order directing federal departments and agencies "to share information with the Department of Commerce . . . to

allow the Secretary to obtain accurate data on the number of citizens, non-citizens, and illegal aliens in the country."  85 Fed. Reg. at 44680.

Even if Secretary Ross were able to provide President Trump with non-census information on the number of undocumented immigrants in the United States, § 2(a) does not permit the President to use that information in calculating the apportionment.  Section 2a(a) (and the Constitution) directs that the apportionment be "*ascertained under the . . . census of the population*."  *See U.S. House of Representatives*, 525 U.S. at 321-22 ("Using . . . [the census] information, the President must then 'transmit to the Congress a statement showing the whole number of persons in each State . . . and the number of Representatives to which each State would be entitled.") (quoting 2 U.S.C. § 2a(a)); *Franklin*, 505 U.S. at 797 ("Section 2a . . . expressly require[s] the President to use . . . the data from the 'decennial census.'").  As DOJ argued in *Franklin*, "[i]t would be unlawful [for the President] . . . just to say, these are the [population] figures [from the census], they are right, but I am going to submit a different statement" to Congress.  Tr. of Oral Argument at 12, *Franklin*, 505 U.S. 788 (Deputy Solicitor General John G. Roberts, Jr.).

*Second*, the Order violates 2 U.S.C. § 2a(a) by mandating an apportionment based on a mathematical method other than "the method of equal proportions."  The "method of equal proportions" is a mathematical method of apportionment that Congress adopted in 1941 because it minimized discrepancies in the population sizes of congressional districts between any pair of States.  *See U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 453-54 (1992);  *See U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 453-54 (1992); *see also* Ex. 33, Professor Edward Huntington, *Memorandum on the Method of Equal Proportions*, *reprinted at* 71 Cong. Rec. 4965 (Mar. 2, 1929).

And the method of equal proportions mandates the use of the States' *population* to calculate the apportionment.  *See, e.g.*, *Montana*, 503 U.S. at 452 n.26 (explaining that the method involves dividing "the population of each State"); Ex. 34, U.S. Census Bureau, *Computing Apportionment* (last revised Mar. 30, 2020), https://www.census.gov/topics/public-

sector/congressional-apportionment/about/computing.html ("This method assigns seats in the House of Representatives according to a 'priority' value.  The priority value is determined by multiplying the population of a state by a 'multiplier.'"); Br. for Gov't Appellants, *Montana*, 503 U.S. 442, 1992 WL 672939, at *9-11 ("Under all of the methods, the formula for establishing each State's priorities has as its numerator the population of the State.").  Thus, the Order violates § 2a(a) by proposing a calculation of the apportionment based on something *other* than total population.

### D. The Apportionment Exclusion Order Violates the Constitution's Separation of Powers

For similar reasons, the Apportionment Exclusion Order violates separation of powers principles.  To avoid one branch of government usurping the powers of another, the Framers delineated distinct lines of responsibility between each branch to serve as "structural protections against abuse of power."  *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).  The Constitution provides that all legislative powers are vested exclusively in Congress, U.S. Const. art. I, § 1, while the President's role, in contrast, is to "take Care that the Laws be faithfully executed," *id.* art. II, § 3.  Indeed, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).  These constitutional provisions, among others, "were intended to erect enduring checks on each Branch" of government.  *INS v. Chadha*, 462 U.S. 919, 957 (1983).  "To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded."  *Id.* at 957-58.

Consistent with these principles, the Enumeration Clause, as amended by the Fourteenth Amendment, vests Congress with wide discretion to determine how the decennial census is conducted.  *Dep't of Commerce v. New York*, 139 S. Ct. at 2566.  Congress has fulfilled this duty by enacting the Census Act and the Reapportionment Act.  As discussed above, the former requires the Secretary of Commerce to report to the President "[t]he tabulation of *total population* by States" for the purpose of congressional apportionment, 13 U.S.C. § 141(b) (emphasis added), while the latter mandates that the President "shall transmit to the Congress a

statement showing the *whole number of persons* in each State . . . and the number of

Representatives to which each State would be entitled under an apportionment" calculated by

"the method of equal proportions."  2 U.S.C. § 2a(a) (emphasis added).  Neither of these

provisions, nor any other congressional enactment, authorizes the President to exclude

undocumented immigrants from the apportionment base.

Yet the Apportionment Exclusion Order flouts Congress's faithful implementation of the

Constitution's Enumeration and Apportionment Clauses by proclaiming that the President

intends to exclude undocumented immigrants from the apportionment base.  Such unilateral

action is "incompatible" with Congress's clearly expressed will.  *See Youngstown*, 343 U.S. at

637 (Jackson, J., concurring).  When the President usurps Congress's authority in this manner,

"his power is at its lowest ebb," *id.*, and he has failed his duty to "take Care that the Laws be

faithfully executed," U.S. Const. art II, § 3.  The Order thus violates separation of powers

principles, and on this additional basis, is unconstitutional.

**E.  Plaintiffs Are Entitled to Declaratory Relief and Permanent Injunctions**

Finally, Plaintiffs are entitled to their requested remedies of declaratory relief and

permanent injunctions.

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its

jurisdiction [except specified federal tax actions and bankruptcy proceedings] . . . any court of

the United States . . .  may declare the rights and other legal relations of any interested party

seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C.

§ 2201(a).  "The phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and

'Controversies' that are justiciable under Article III."  *MedImmune, Inc. v. Genentech, Inc.*, 549

U.S. 118, 127 (2007).  As explained, *supra* at 9-14, this dispute is justiciable under Article III

because it is ripe and Plaintiffs have standing.  Declaratory relief is therefore proper here.

For a permanent injunction, a plaintiff must satisfy a four-factor test:

> (1) that [plaintiff] has suffered an irreparable injury; (2) that
> remedies available at law, such as monetary damages, are
> inadequate to compensate for that injury; (3) that, considering the
> balance of hardships between the plaintiff and defendant, a remedy
> in equity is warranted; and (4) that the public interest would not be

disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

All four factors are satisfied here.  Plaintiffs will suffer irreparable injury from California's loss of representation in Congress in the Electoral College and the resulting dilution of individual Plaintiffs' votes, and Plaintiffs are currently suffering injury as a result of the Apportionment Exclusion Order's chilling effect on the census response.  *See Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984) ("alleged constitutional infringement will often alone constitute irreparable harm").  No legal remedies can adequately compensate for these injuries.  *See Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011).  Moreover, the balance of hardship and public interest are best served by precluding Defendants from implementing a scheme that will deprive Plaintiffs of their rights under the Constitution and the Census and Reapportionment Acts.

## VI.   CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in the San Jose Plaintiffs' favor on the First and Third Claims for Relief and the California Plaintiffs' favor on the First, Second, and Third Claims for Relief, and should award the relief requested.

Dated:  August 27, 2020

Respectfully submitted,

**LATHAM & WATKINS LLP**

By:  /s/  Richard P. Bress
Richard P. Bress (admitted *pro hac vice*)
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone:  202.637.2200
Facsimile:  202.637.2201

Kristen Clarke (admitted *pro hac vice*)
Jon M. Greenbaum (Bar No. 166733)
Ezra D. Rosenberg (admitted *pro hac vice*)
Dorian L. Spence (admitted *pro hac vice*)
Maryum Jordan (admitted *pro hac vice*)
Ajay Saini (admitted *pro hac vice*)
**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone:  202.662.8600
Facsimile:  202.783.0857

*Attorneys for Plaintiffs City of San Jose, California; King County, Washington; Black*

Steven M. Bauer (Bar No. 135067)
Sadik Huseny (Bar No. 224659)
Amit Makker (Bar No. 280747)
Shannon D. Lankenau (Bar No. 294263)
Cindy Guan (Bar No. 317036)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone:  415.391.0600

CASE NOS. 5:20-cv-05167, 5:20-cv-05169
PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PARTIAL SUMMARY JUDGMENT

1   *Alliance for Just Immigration; Sam Liccardo;*        Facsimile:  415.395.8095
    *Zerihoun Yilma;  and  Lovette  Kargbo-*
2   *Thompson*

3   Mark Rosenbaum (Bar No. 59940)                          *Attorneys  for  Plaintiffs  City  of  San  Jose,*
    **PUBLIC COUNSEL**                                      *California; King County, Washington;*
4   610 South Ardmore Avenue                                *Arlington County, Virginia; Black Alliance for*
    Los Angeles, California 90005                           *Just Immigration; Sam Liccardo; Zerihoun*
5   Telephone:  213.385.2977                                *Yilma; and Lovette Kargbo-Thompson*
    Facsimile:  213.385.9089
6
    *Attorneys  for  Plaintiff  City  of  San  Jose,*
7   *California*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28