1    JEFFREY BOSSERT CLARK
     Acting Assistant Attorney General
2    DAVID MORRELL
     Deputy Assistant Attorney General
3    ALEXANDER K. HAAS (SBN 220932)
     Branch Director
4    DIANE KELLEHER
     BRAD P. ROSENBERG
5    Assistant Branch Directors
     DANIEL D. MAULER
6    Trial Attorney
     Civil Division, Federal Programs Branch
7    U.S. Department of Justice
     1100 L Street, NW
8    Washington, D.C.  20005
     Telephone:    (202) 616-0773
9    Facsimile:    (202) 616-8470
     E-mail:       dan.mauler@usdoj.gov
10   *COUNSEL FOR DEFENDANTS*

11              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
12

13   CITY OF SAN JOSE, CALIFORNIA, *et al.*,
                                                  **DEFENDANTS' NOTICE OF MOTION
                     Plaintiff,                   AND MOTION TO DISMISS, OR IN THE
14                                                ALTERNATIVE, MOTION FOR PARTIAL
              v.                                  SUMMARY JUDGMENT;**
15   DONALD J. TRUMP, *et al.*,
                                                  **MEMORANDUM OF POINTS AND
16                   Defendants.                  AUTHORITIES IN SUPPORT OF
                                                  DEFENDANTS' MOTION; and,**
17
                                                  **OPPOSITION TO PLAINTIFFS' MOTION
18                                                FOR PARTIAL SUMMARY JUDGMENT**

19   STATE OF CALIFORNIA, *et al.*,               No. 5:20-cv-05167-LHK-RRC-EMC

20                   Plaintiff,                   No. 5:20-cv-05169-LHK-RRC-EMC
              v.
21
     DONALD J. TRUMP, *et al.*,
22
                     Defendants.
23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE** that at 1:30 p.m. on October 8, 2020, in Courtroom 8 of the United States District Court, located at 280 South 1st Street in San Jose, CA 95113, Defendants Donald J. Trump, Wilbur L. Ross, Jr., the U.S. Department of Commerce, and Steven Dillingham (the "Defendants") will move to dismiss, or in the alternative, for summary judgment on, Counts 1 and 3 of the Amended Complaint filed by the Plaintiffs in Case No. 5:20-cv-05167-LHK-RRC-EMC. [1]  Similarly, the Defendants will move to dismiss, or in the alternative, for summary judgment on, Counts 1, 2, and 3 in the Amended Complaint filed by the Plaintiffs in Case No. 5:20-cv-05169-LHK-RRC-EMC.  Defendants' motion is made pursuant to Rule 12, or in the alternative, Rule 56, of the Federal Rules of Civil Procedure.

Defendants seek an order either dismissing the aforementioned claims or granting summary judgment to the Defendants thereupon.  Defendants' motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of John M. Abowd, Ph.D., and the Declaration of Albert E. Fontenot, Jr.

---

[1] On August 21, 2020, this Court entered an order memorializing a stipulation between the parties that the Defendants' "dispositive motions will cover only the causes of action from Plaintiff's operative complaints as to which Plaintiffs seek partial summary judgment, and that Defendants' deadlines to respond to those causes of action not raised in Plaintiffs' partial summary judgment motions are stayed under further order from the Court."  *See* ECF No. 58 in Case No. 5:20-cv-05167.  On August 27, 2020, the Plaintiffs in Case No. 5:20-cv-05167 moved for partial summary judgment on Counts 1 (Apportionment and Enumeration Clauses) and 3 (Ultra Vires violation of the Census Act, 2 U.S.C. § 2a and 13 U.S.C. § 141) of their Amended Complaint.  *See id.* at ECF No. 63.   On that same date, the Plaintiffs in Case No. 5:20-cv-05169 moved for partial summary judgment on Counts 1 (Enumeration and Apportionment Clauses), 2 (Violation of the Separation of Powers), and 3 (Ultra Vires Violation of the Census Act) of their Amended Complaint.  Pursuant to this Court's order of August 21st (*see* ECF No. 58 in Case No. 5:20-cv-05167), the Defendants' dispositive motion seeks dismissal or judgment upon those same counts that the Plaintiffs move upon.  Defendants reserve all rights to respond to the counts (including Plaintiffs' Administrative Procedure Act and Equal Protection Claims) remaining in the Amended Complaints, and Defendants stand ready to do so whenever the Court directs.

DEFENDANTS' DISPOSITIVE MOTION AND
OPPOSITION TO SUMMARY JUDGMENT
Case No. 5:20-cv-05167; Case No. 5:20-cv-05169

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

I.     The Census and Apportionment Generally........................................... 2

II.    The July 21, 2020, Presidential Memorandum ............................................ 3

III.   Plaintiffs' Challenge ..................................................................................... 4

ARGUMENT ................................................................................................................ 5

I.     The Court Lacks Jurisdiction Because Plaintiffs' Claims Are Unripe. ........ 5

   A.  It Is Currently Unknown What Numbers the Secretary May Report to the President. ....................................................................................................... 6

   B.  Other Considerations Underscore that Plaintiffs' Claims Are Not Ripe...................... 7

II.    The Court Lacks Jurisdiction Because Plaintiffs' Lack Standing. ............... 8

   A.  Plaintiffs' Alleged Apportionment Injuries Are Too Speculative to Confer Standing. ....................................................................................................... 9

   B.  Plaintiffs' Allegations That the Presidential Memorandum Will Reduce Participation in the 2020 Census and Cause the Organizational Plaintiff to Expend Resources Are Speculative, Not Traceable to the Memorandum, and Not Redressable by a Favorable Ruling. ...................................................... 10

      1.  Plaintiffs' Alleged Census Participation Injuries Are Speculative. ...................... 10

      2.  The Alleged Injuries are Not Traceable to the Memorandum. ............................... 13

      3.  A Favorable Ruling Would Not Redress Plaintiffs' Alleged Injuries.................... 15

III.   Plaintiffs Fail to State a Claim..................................................................... 17

   A.  Plaintiffs Fail to State an Apportionment Clause Claim. ............................ 17

      1.  Only "Inhabitants" Who Have Their "Usual Residence" in a State Need Be Included in the Apportionment.......................................................... 18

      2.  The Executive Has Significant Discretion to Define Who Qualifies as an "Inhabitant." ............................................................................................ 21

3.   The Apportionment Clause Does Not Require Inclusion of All Illegal Aliens as "Inhabitants" Having a "Usual Residence" in a State. ...................................... 24

B.   Plaintiffs Have Failed to State *Ultra Vires* or Separation-of-Powers Claims. ............. 30

C.   Plaintiffs' Demands for Relief Against the President Must Be Dismissed. ................. 34

IV.   Plaintiffs are Not Entitled to a Permanent Injunction. ................................................. 36

A.   Plaintiffs Cannot Establish Any Irreparable Harm. ..................................................... 36

1.   Plaintiffs Cannot Establish Any Irreparable Apportionment Injury. ..................... 37

2.   Plaintiffs Cannot Establish Any Irreparable Enumeration Injury. ......................... 38

a.   Plaintiffs' Theory of Harm Relies on Hypothetical, Attenuated Events Involving Independent Third-Parties. .................................................................. 38

b.   The Alleged Harm is at Odds with Existing Evidence. ..................................... 40

B.   The Remaining Factors Weigh Against an Injunction. ................................................. 41

CONCLUSION ............................................................................................................................. 42

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Alabama v. Dep't of Commerce,*
 396 F. Supp. 3d 1044 (N.D. Ala. 2019) ........................................................................... 24, 32

*Arlington Heights v. Metro. Hous. Dev. Corp.,*
 429 U.S. 252 (1977) ................................................................................................................ 19

*Bas v. Steele,*
 2 F. Cas. 988 (Washington, Circuit Justice, C.C.D. Pa. 1818) ............................................... 20

*Bernal v. Fainter,*
 467 U.S. 216 (1984) ................................................................................................................ 27

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke,*
 889 F.3d 584 (9th Cir. 2018) ................................................................................................... 30

*Chae Chan Ping v. United States,*
 130 U.S. 581 (1889) ........................................................................................................... 26, 27

*Chafin v. Chafin,*
 568 U.S. 165 (2013) ................................................................................................................ 15

*Clapper v. Amnesty Int'l USA,*
 568 U.S. 398 (2013) ........................................................................................................ *passim*

*Colwell v. Dep't. of Health & Human Serv.,*
 558 F.3d 1112 (9th Cir. 2009) ................................................................................................... 7

*Dep't of Commerce v. Montana,*
 503 U.S. 442 (1992) ........................................................................................................... 8, 38

*Dep't of Commerce v. U.S. House of Representatives,*
 525 U.S. 316 (1999) ................................................................................................................ 38

*Dep't of Commerce v. New York,*
 139 S. Ct. 2551 (2019) ..................................................................................................... *passim*

*Doe 2 v. Trump,*
 319 F. Supp. 3d 539 (D.D.C. 2018) ....................................................................................... 36

*DHS v. Thuraissigiam,*
 140 S. Ct. 1959 (2020) ............................................................................................................ 26

*eBay Inc. v. MercExchange, LLC,*
 547 U.S. 388 (2006) ................................................................................................................ 36

*Evenwel v. Abbott,*
 136 S. Ct. 1120 (2016) ............................................................................................................ 19

28

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
 313 F.3d 852 (4th Cir. 2002) ............................................................ 32

*Fong Yue Ting v. United States*,
 149 U.S. 698 (1893) ............................................................ 26

*Franchise Tax Board v. Hyatt*,
 139 S. Ct. 1485 (2019) ............................................................ 29

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992) ............................................................ *passim*

*FW/PBS, Inc. v. City of Dall.*,
 493 U.S. 215 (1990) ............................................................ 12

*G.C. and K.B. Invs., Inc. v. Wilson*,
 326 F.3d 1096 (9th Cir. 2003) ............................................................ 37

*Gonzalez v. Holder*,
 771 F.3d 238 (5th Cir. 2014) ............................................................ 29

*Guerrero v. Clinton*,
 157 F.3d 1190 (9th Cir. 1998) ............................................................ 35

*Hylton v. Brown*,
 12 F. Cas. 1123 (C.C.D. Pa. 1806) ............................................................ 21

*Kaplan v. Tod*,
 267 U.S. 228 (1925) ............................................................ 25, 29

*Kleindienst v. Mandel*,
 408 U.S. 753 (1972) ............................................................ 26, 27

*Landon v. Plasencia*,
 459 U.S. 21 (1982) ............................................................ 26

*Leng May Ma v. Barber*,
 357 U.S. 185 (1958) ............................................................ 26

*Los Angeles v. Lyons*,
 461 U.S. 95 (1983) ............................................................ 40

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ............................................................ 9

*Mississippi v. Johnson*,
 71 U.S. (4 Wall.) 475 (1866) ............................................................ 34, 35, 36

*Monsanto Co. v. Geertson Seed Farms*,
 561 U.S. 139 (2010) ............................................................ 37

*Montana v. BNSF Ry. Co.*,
   623 F.3d 1312 (9th Cir. 2010) .................................................................. 37, 40

*Munns v. Kerry*,
   782 F.3d 402 (9th Cir. 2015) ............................................................................ 9

*Mont. Env't Info. Ctr. v. Stone-Manning*,
   766 F.3d 1184 (9th Cir. 2014) ......................................................................... 7

*N. Cheyenne Tribe v. Norton*,
   503 F.3d 836 (9th Cir. 2007) ......................................................................... 42

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) ..................................................................................... 5, 6

*Nat'l Treas. Emps. Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) ...................................................................... 35

*New York v. Department of Commerce*,
   315 F. Supp. 3d 502 (S.D.N.Y. 2018) .......................................................... 15

*New York v. Department of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019) .................................................... 11, 33

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) .................................................................... 36

*Nishimura Ekiu v. United States*,
   142 U.S. 651 (1892) ....................................................................................... 27

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................. 41, 42

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
   523 U.S. 726 (1998) ............................................................................. 5, 6, 7, 8

*Plyler v. Doe*,
   457 U.S. 202 (1982) ................................................................................. 28, 31

*Public Citizen v. U.S. Trade Representative*,
   5 F.3d 549 (D.C. Cir. 1994) .......................................................................... 32

*Raines v. Byrd*,
   521 U.S. 811 (1997) ......................................................................................... 9

*Reno v. Flores*,
   507 U.S. 292 (1993) ....................................................................................... 30

*Rizzo v. Goode*,
   423 U.S. 362 (1976) ....................................................................................... 40

*Salmon Spawning & Recovery All. v. Gutierrez*,
   545 F.3d 1220 (9th Cir. 2008) ...................................................................... 13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Scott v. Pasadena Unified Sch. Dist.*,
   306 F.3d 646 (9th Cir. 2002) .......................................................................... 6

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ................................................................................... 9, 13

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .................................................................................. 8

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) .................................................................................. 13, 16

*Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*,
   559 U.S. 662 (2010) ..................................................................................... 5

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ................................................................................. 12, 17

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ..................................................................................... 9

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ...................................................................... 36

*Texas v. United States*,
   523 U.S. 296 (1998) .................................................................................... 6, 7

*The Schooner Exchange v. McFaddon*,
   11 U.S. (7 Cranch) 116 (1812) ...................................................................... 27

*The Venus*,
   12 U.S. (8 Cranch.) 253 (1814) ..................................................................... 23

*Thomas v. Anchorage Equal Rights Comm'n*,
   220 F.3d 1134 (9th Cir. 2000) ........................................................................ 7

*Toland v. Sprague*,
   23 F. Cas. 1353 (C.C.E.D. Pa. 1834) ............................................................. 21

*U.S. ex rel. De Rienzo v. Rodgers*,
   185 F. 334 (3d Cir. 1911) ............................................................................. 29

*U.S. Steel Corp. v. Multistate Tax Comm'n*,
   434 U.S. 452 (1978) .................................................................................... 29

*United States v. Laverty*,
   26 F. Cas. 875 (D. La. 1812) ........................................................................ 21

*United States v. The Penelope*,
   27 F. Cas. 486 (D. Pa. 1806) ........................................................................ 21

*Utah v. Evans,*
  536 U.S. 452 (2002) ............................................................................. 8, 18, 34, 37

*Warth v. Seldin,*
  422 U.S. 490 (1975) ........................................................................................... 16

*Wash. Env't Council v. Bellon,*
  732 F.3d 1131 (9th Cir. 2013) ........................................................................... 13

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982) ........................................................................................... 42

*Wesberry v. Sanders,*
  376 U.S. 1 (1964) ............................................................................................... 19

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990) ............................................................................................. 9

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................... 36, 41, 42

*Wisconsin v. City of New York,*
  517 U.S. 1 (1996) ..................................................................................... 8, 22, 38

*Yakus v. United States,*
  321 U.S. 414 (1944) ........................................................................................... 42

*Zartarian v. Billings,*
  204 U.S. 170 (1907) ........................................................................................... 26

**Constitutional Provisions**

U.S. Const. art. I, § 2, cl. 2 ...................................................................................... 3

U.S. Const. art. I, § 2, cl. 3 ................................................................... 3, 17, 18, 22

U.S. Const., art. II, § 1 ........................................................................................... 33

U.S. Const., art. II, § 2 ........................................................................................... 33

U.S. Const. amend. XIV, § 5 ................................................................................. 22

**Statutes**

2 U.S.C. § 2a .................................................................................................. *passim*

5 U.S.C. § 706 ........................................................................................................ 4

8 U.S.C. § 1101 *et seq.* ........................................................................................ 30

8 U.S.C. § 1182 ..................................................................................................... 28

13 U.S.C. § 4 ................................................................................................................ 3

13 U.S.C. § 9 ........................................................................................................... 14, 39

13 U.S.C. § 141 ..................................................................................................... *passim*

13 U.S.C. § 195 .......................................................................................................... 4, 6

13 U.S.C. § 214 ......................................................................................................... 14, 39

 Act of Apr. 14, 1802, 2 Stat. 153 .............................................................................. 28

Act of Mar. 1, 1790, 1 Stat. 101 ................................................................................ 19

Act of Mar. 26, 1790, 1 Stat. 103 .............................................................................. 29

Act of May 6, 1870, 16 Stat. 118 ............................................................................... 20

Act of May 23, 1850, 9 Stat. 428 ............................................................................... 20

**Regulations**

83 Fed. Reg. 5525 (Feb. 8, 2018) ........................................................................ *passim*

85 Fed. Reg. 44,679 (July 21, 2020) .................................................................... *passim*

Collecting Information About Citizenship Status in Connection with the Decennial Census,
    Exec. Order No. 13,880, 84 Fed. Reg. 33,821 (July 11, 2019) ................................... 4

**Other Authorities**

1 Robert Phillimore, *Commentaries Upon International Law* (1854) ........................... 27

1 & 2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ........................... 21

2 The Records of the Federal Convention of 1787 (Max Farrand ed., rev. ed. 1966) ............. 18, 23

41 Annals of Cong. 1595 (1824) ............................................................................. 21

*2019 Census Test Report,* Census Bureau (Jan. 3, 2020),
    https://www2.census.gov/programs-surveys/decennial/2020/program-management/census-
    tests/2019/2019-census-test-report.pdf ............................................................. 11, 41

*2020 Census Detailed Operational Plan for: 18. Nonresponse Followup Operation (NRFU)*, Apr.
    16, 2018, https://www2.census.gov/programs-surveys/decennial/2020/program-management/
    planning-docs/NRFU-detailed-operational-plan.pdf ................................................. 38

*2020 Census Research and Testing Management Plan*, Dec. 28, 2015,
    https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-
    docs/research-testing-plan.pdf ............................................................................ 38

Census Bureau, *Review of 2020 Operational Plan Schedule*, Aug. 17, 2020,
https://2020census.gov/content/dam/2020census/materials/news/2020-operational-plan-
schedule-review.pdf ................................................................................................................ 38

Cong. Globe, 39th Cong., 1st. Sess. 359 (1866) ................................................................ 19, 27, 28

*Data Protection and Privacy Program*, Census Bureau,
https://www.census.gov/about/policies/privacy.html .............................................. 14

Dennis L. Murphy, Note, *The Exclusion of Illegal Aliens from the Reapportionment Base:
A Question of Representation*, 41 CASE W. RES. L. REV. 969 (1991) ................................ 20, 21

Dillingham Statement, August 3, 2020, https://www.census.gov/
newsroom/press-releases/2020/delivering-complete-accurate-count.html ................................ 4

Emmerich de Vattel, *The Law of Nations* (1817) ....................................... 21, 23, 27, 29

Kristin D. Burnett, *Congressional Apportionment*, U.S. Census Bureau (Nov. 2011),
https://www.census.gov/prod/cen2010/briefs/c2010br-08.pdf .................................. 25

Noah Webster, *American Dictionary of the English Language* (1828) .................................. 21, 29

*The Federalist* No. 42 (Jacob E. Cooke ed., 1961) ........................................................ 23

*The Federalist* No. 54 (Jacob E. Cooke ed., 1961) ........................................................ 19

*The Federalist* No. 56 (Jacob E. Cooke ed., 1961) ........................................................ 19

*The Federalist* No. 58 (Jacob E. Cooke ed., 1961) ........................................................ 19

Thomas Dyche & William Pardon, *A New General English Dictionary* (16th ed. 1781) ............. 21

*U.S. Customs and Border Protection – Border Patrol Oversight: Hearing Before the H.
Subcomm. on Homeland Security of the Comm. on Appropriations*, 116th Cong. (2019)
(testimony of Carla L. Provost, Chief, U.S. Border Patrol), https://docs.house.gov/meetings/
AP/AP15/20190724/109834/HHRG-116-AP15-Wstate-ProvostC-20190724.pdf. .................. 25

U.S. ICE ERO, *U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement
and Removal Operations Report* (2019) ............................................................. 25, 26

1

**INTRODUCTION**

2   Plaintiffs—consisting of the State of California, various political jurisdictions from

3   throughout the country, a nonprofit organization, and individuals—bring constitutional and

4   statutory challenges to a memorandum that the President issued on July 21, 2020, titled Excluding

5   Illegal Aliens From the Apportionment Base Following the 2020 Census (the "Presidential

6   Memorandum" or "Memorandum"), 85 Fed. Reg. 44,679 (July 21, 2020).  That Memorandum

7   provides that for purposes of reapportionment of Representatives in Congress following the 2020

8   census, "it is the policy of the United States to exclude" illegal aliens from the apportionment base

9   "to the extent feasible and to the maximum extent of the President's discretion under the law."  *Id.*

10  at 44,680.  It directs the Secretary of Commerce to submit to the President two tabulations in

11  connection with the apportionment—one tabulation includes an enumeration according to the

12  methodology set forth in the Final 2020 Census Residence Criteria and Residence Situations, 83

13  Fed. Reg. 5525 (Feb. 8, 2018) ("Residence Criteria"), and the second, "to the extent practicable,"

14  requires the Secretary to provide information permitting the President to exclude illegal aliens from

15  the apportionment base.  Because Plaintiffs' various challenges to this Memorandum fail as a matter

16  of law, Plaintiffs' Motions for Partial Summary Judgment (5:20-cv-05167; ECF 63; 5:20-cv-05169,

17  ECF No. 37) (hereinafter, the "Motion") should be denied.[2]

18  As a threshold matter, this Court lacks subject-matter jurisdiction over Plaintiffs' claims for

19  two reasons:  1) Plaintiffs' claims are not ripe, and 2) Plaintiffs lack standing to challenge the

20  Presidential Memorandum.  Plaintiffs' alleged injuries, including lost representation in Congress,

21  decreased federal funding, and diversion of resources, are speculative.  At this point, it is unknown

22  what numbers the Secretary of Commerce will provide the President.  Accordingly, any allegation

23  as to the impact of the President's apportionment decision is wholly theoretical and legally

24  insufficient.

25  Plaintiffs' allegations that the Presidential Memorandum will have a significant chilling

26  effect on immigrant communities' participation in the census likewise are speculative, conclusory,

27

28  [2] Plaintiffs' motions for summary judgment are substantively identical.  Defendants will cite case no. 5:20-cv-05167 when referring to Plaintiffs' motions and supporting evidence.

and based on hearsay.  Plaintiffs rely on affidavits from fact and expert witnesses that contain only generalized, second- or third-hand hearsay accounts of alleged harm and unsubstantiated conjectures.

In addition to these jurisdictional defects, Plaintiffs' Motion should be denied on its merits. Plaintiffs assert that the Presidential Memorandum violates the Administrative Procedure Act ("APA"), the constitutional separation of powers, principles of equal protection under the Fifth and Fourteenth Amendments, and the Apportionment Clauses of Article I and the Fourteenth Amendment along with, 13 U.S.C. § 141, and 2 U.S.C. § 2a.  Each of these claims fail as a matter of law.

First, Plaintiffs' claims fail because the Supreme Court in *Franklin v. Massachusetts* expressly recognized the broad scope of authority delegated by Congress to the President in relation to apportionment.  505 U.S. 788, 799 (1992).  Second, Plaintiffs' claims under the Apportionment Clauses, 13 U.S.C. § 141, and 2 U.S.C. § 2a, are legally deficient, because they are inconsistent with the Executive Branch's longstanding discretion to define who qualifies as "inhabitants" (or "persons in each State") for purposes of apportionment.  Finally, insofar as Plaintiffs seek relief against the President, such relief is precluded by Supreme Court precedents barring judicial intrusion on the President's exercise of policy-making discretion.

Plaintiffs are not entitled to either partial summary judgment or an injunction.  Plaintiffs cannot succeed on their claims because of threshold jurisdictional flaws, and the claims are meritless in any event.[3]

# BACKGROUND

## I.    The Census and Apportionment Generally

The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State." U.S. Const. amend. XIV, § 2.  To make apportionment possible, the Constitution requires that the

---

[3] On the same day as the filing of this brief, a three-judge panel in the Southern District of New York ruled in favor of plaintiffs challenging the Presidential Memorandum.  *See* Opinion and Order (ECF No. 164), *New York v. Trump*, 1:20-cv-5770 (RCW) (PWH) (JMF) (S.D.N.Y. Sept. 10, 2020). Defendants note, however, that the New York decision is not binding on this Court.

1    federal government conduct a census every ten years in such a manner as directed by Congress.  *Id.*
2    art. I, § 2, cl. 3.  Each State's number of Representatives, together with its two Senators, also
3    determines the number of electors for President and Vice President in the Electoral College.  *See*
4    *id.* art. II, § 1, cl. 2.

5            Congress, in turn, has by law directed the Secretary of Commerce to conduct a census of
6    the "total population" every 10 years "in such form and content as he may determine." 13 U.S.C.
7    § 141(a) and (b).  The Census Bureau assists the Secretary of Commerce in the performance of this
8    responsibility.  *See* 13 U.S.C. §§ 2, 4.  The Census Bureau has promulgated criteria to count most
9    people for census purposes "at their usual residence, which is the place where they live and sleep
10   most of the time."  Residence Criteria, 83 Fed. Reg. at 5,533.  Following completion of the 2020
11   census, by December 31, 2020, the Secretary of Commerce must submit to the President "[t]he
12   tabulation of total population by States … as required for the apportionment of Representatives in
13   Congress among the several States." 13 U.S.C. § 141(b).  "On the first day, or within one week
14   thereafter, of the first regular session of the [117th Congress]," the President must "transmit to the
15   Congress a statement showing the whole number of persons in each State … and the number of
16   Representatives to which each State would be entitled … by the method known as equal
17   proportions."  2 U.S.C. § 2a(a).

18   **II.      The July 21, 2020, Presidential Memorandum**

19           On July 21, 2020, the President issued a Memorandum to the Secretary of Commerce
20   regarding the exclusion of illegal aliens from the apportionment base following the 2020 census.
21   *See* 85 Fed. Reg. at 44,679-81.  The Presidential Memorandum states that "it is the policy of the
22   United States to exclude" such aliens from the apportionment base "to the extent feasible and to
23   the maximum extent of the President's discretion under the law."  *Id.* at 44,680.  The Presidential
24   Memorandum directs the Secretary of Commerce to submit to the President two tabulations.  One
25   is an enumeration "tabulated according to the methodology set forth in" the Residence Criteria.  *Id.*
26   The second calls for "information permitting the President, to the extent practicable," to carry out
27   the stated policy, *i.e.*, an apportionment excluding illegal aliens.  *Id.*

28

1    To date, the Census Bureau is still evaluating the usability of administrative records

2  pertaining to citizenship status in connection with the decennial census, *see* Collecting Information

3  About Citizenship Status in Connection with the Decennial Census, Exec. Order No. 13,880, 84

4  Fed. Reg. 33,821-25 (July 11, 2019), and formulating a methodology for potentially excluding

5  illegal aliens.    *See* August 3, 2020, Dillingham Statement, https://www.census.gov/

6  newsroom/press-releases/2020/delivering-complete-accurate-count.html ("The Census Bureau

7  continues its work on meeting the requirements of Executive Order 13,880 issued July 11, 2019

8  and the Presidential Memorandum issued July 21, 2020.   A team of experts [is] examining

9  methodologies and options to be employed for this purpose.   The collection and use of pertinent

10  administrative data continues.").

11    **III.    Plaintiffs' Challenge**

12    On July 27, 2020, the City of San Jose, California; King County, Washington; Arlington

13  County, Virginia; a nonprofit organization; and several individuals filed a complaint challenging

14  the Presidential Memorandum (the "San Jose action").  *See* 5:20-cv-05167, ECF 1.  The following

15  day, the State of California, along with two cities and a school district, filed a similar complaint

16  (the "California action").   *See* 3:20-cv-05169, ECF 1.   Plaintiffs amended their complaints on

17  August 18 and 24, 2020, respectively.  *See* 5:20-cv-05167, ECF 46; 5:20-cv-05169, ECF 28.   In

18  their Amended Complaints, Plaintiffs allege that the Presidential Memorandum violates

19  requirements contained in Article I; the Fifth Amendment; the Fourteenth Amendment; the Census

20  Act (13 U.S.C. § 141 and 2 U.S.C. § 2a) to base apportionment on the "whole number of persons

21  in each State"; the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; 13 U.S.C. §§ 141 and

22  195 with respect to the use of statistical sampling; and "separation of powers."  San Jose Am.

23  Compl. ¶¶ 110-33; California Am. Compl. ¶¶ 51-102.

24    Plaintiffs in the San Jose action further allege that if the President excludes illegal aliens

25  from the apportionment base, Plaintiffs will be injured by (i) the "dilute[ingon]" of the "voting

26  power" of the individual plaintiffs; (ii) causing the imposition of a burden on nonprofit plaintiff to

27  "to divert resources—including time and money—from other important matters that it ordinarily

28  would be addressing through presentations, workshops, publications, technical assistance, and

1    trainings" to address this exclusion and vote dilution; and (iii) "the chilling effect of the

2    Apportionment Exclusion Order on the response rate to the ongoing 2020 Census," which Plaintiffs

3    claim will injure all Plaintiffs.  San Jose Am. Compl., ¶¶ 105-106, 109.  Meanwhile, Plaintiffs in

4    the California action similarly claim that the exclusion of illegal aliens will injure them by (i)

5    reducing congressional representation; (ii) causing Plaintiffs to "expend additional resources"; (iii)

6    reducing federal funding; and (iv) causing a "chilling effect" on census responses.  California Am.

7    Compl., ¶¶ 45-50.  Plaintiffs seek declaratory and injunctive relief.  Plaintiffs in the San Jose action

8    additionally request that the Court maintain monitorship over the action, San Jose Am. Compl.,

9    ¶ 10, while Plaintiffs in the California action seek mandamus relief, California Am. Compl., ¶ 5.

10           On August 27, 2020, Plaintiffs filed substantively-identical motions for partial summary

11   judgment.  In support of their Motions, Plaintiffs submitted declarations from Ruth Gilgenbach

12   (ECF 63-2, the "Gilgenbach Decl."), a statistician, and from Mathew A. Barreto, Ph.D., a political

13   science professor (ECF 63-3, the "Barreto Decl."), in addition to numerous other short declarations

14   from individuals.

15                                          **ARGUMENT**

16   **I.       The Court Lacks Jurisdiction Because Plaintiffs' Claims Are Unripe.**

17           The ripeness doctrine "is designed to prevent the courts, through avoidance of premature

18   adjudication, from entangling themselves in abstract disagreements over administrative policies,

19   and also to protect the agencies from judicial interference until an administrative decision has been

20   formalized and its effects felt in a concrete way by the challenging parties."  *Ohio Forestry Ass'n,*

21   *Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (citation omitted).  Ripeness incorporates both a

22   constitutional requirement and a prudential requirement.  *See Stolt-Nielsen S.A. v. Animal Feeds*

23   *Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010); *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S.

24   803, 808 (2003). "In measuring whether the litigant has asserted an injury that is real and concrete

25   rather than speculative and hypothetical, the ripeness inquiry merges almost completely with

26   standing."  *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002) (citation

27   omitted).  Courts will not consider "a claim to be ripe for judicial resolution 'if it rests upon

28   contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Id.* at

662 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  Under the ripeness doctrine, the Court also considers: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 733.

Here, Plaintiffs' claims do not meet the constitutional requirement for ripeness because the claims are, at bottom, about apportionment, not census procedures—and any alleged apportionment injury that States may, or may not, suffer is at this point "conjectural or hypothetical"—not  rather than "imminent."

### A.  It Is Currently Unknown What Numbers the Secretary May Report to the President.

The Presidential Memorandum states that "it is the policy of the United States to exclude" illegal aliens from the apportionment base "*to the extent feasible* and to the maximum extent of the President's discretion under the law."  85 Fed. Reg. at 44,680 (emphasis added).  It directs the Secretary of Commerce to provide two sets of numbers—one tabulated "according to the methodology set forth in" the Residence Criteria for counting everyone at their usual residence, and a second "permitting the President, *to the extent practicable*," to carry out the stated policy of excluding illegal aliens from the apportionment base.  *Id.* at 44,680 (emphasis added).

Notwithstanding Plaintiffs' suggestion that this Court ignore the prerequisite the President included in his directive, *see* Pls.' Br. 11-13, the extent to which it will be feasible for the Census Bureau to provide the Secretary of Commerce a second tabulation is, at this point, unknown.  *See* Abowd Decl. ¶ 15.  Similarly, Plaintiffs' specific claim under 13 U.S.C. § 195—alleging that the Census Bureau will impermissibly rely on sampling to enumerate the illegal alien population (San Jose Am. Compl. ¶¶ 7-16; California Am. Compl. ¶¶ 75-83)—is similarly unripe because it is conjectural and hypothetical.  Plaintiffs have provided nothing other than speculation that the Census Bureau will rely on sampling.  *See id.*  But as shown in the Declaration of Dr. Abowd, the Census Bureau is still in the "process of determining the appropriate methodologies" (Abowd Decl. ¶ 15), and "any methodology or methodologies ultimately used by the Census Bureau to implement

1  the [Presidential Memo] will not involve the use of statistical sampling for apportionment

2  purposes." *Id*. at ¶ 23.

3         Because it is not known what the Secretary may ultimately transmit to the President, it is

4  necessarily not yet known whether the President will be able to exclude any, some, or all illegal

5  aliens from the apportionment base.  As a result, Plaintiffs' apportionment claims are unripe as they

6  depend upon contingent future events that may not occur as anticipated or may never occur at all.

7  *See Mont. Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1190 (9th Cir. 2014) ("This dispute is

8  more an 'abstraction[ ]' than an 'actual case' because the supposed injury has not materialized and

9  may never materialize." (quoting *Colwell v. Dep't. of Health & Human Serv.*, 558 F.3d 1112, 1123

10  (9th Cir. 2009)).  Put simply, until the Census Bureau and Secretary of Commerce transmit the

11  information specified in the Presidential Memorandum, and until the President acts on the

12  information, any claim of apportionment injury is speculative.

13              **B.  Other Considerations Underscore that Plaintiffs' Claims Are Not Ripe.**

14         Given that the effects of the Presidential Memorandum and any apportionment injuries to

15  Plaintiffs are at this point unknown, other considerations, such as the hardship to the parties and

16  the fitness of the issues for judicial consideration, also counsel against the Court's exercise of

17  jurisdiction.  *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1141-42 (9th Cir.

18  2000).  For example, given the above-discussed uncertainties with respect to the effects of the

19  Presidential Memorandum, delayed review would not cause undue hardship to Plaintiffs.  *See, e.g.*,

20  *Ohio Forestry Ass'n*, 523 U.S. at 733-34 (challenge to agency action unripe where there is no

21  "significant practical harm" at the present time because a number of future actions would need to

22  occur to make the harm more "imminent" and "certain"); *Texas*, 523 U.S. at 300, 302 (claim unripe

23  where a number of actions would need to occur to cause the alleged harm, rendering it "too

24  speculative whether the problem . . . will ever need solving").  Further, judicial review would

25  improperly interfere with the Census Bureau's ongoing efforts to determine how to respond to the

26  Presidential Memorandum, which are currently in progress, and could impede the apportionment,

27  which has not yet occurred.  *See, e.g.*, *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 735 (action unripe

28  where judicial review "could hinder agency efforts to refine its policies").  Finally, the Court would

benefit from further real-world factual development.  *See, e.g.*, *id.* at 736 (action was unripe where it would require court to engage in "time-consuming judicial consideration . . . of an elaborate, technically based plan, which predicts consequences that may affect many different parcels of land in a variety of ways," involved issues that could change in the future, and "depending upon the agency's future actions . . . review now may turn out to have been unnecessary").  The actual tabulations that are called for by the Memorandum must be reported by no later than the end of this year, assuming the statutory deadlines in § 141 and § 2a are not extended by Congress.

Perhaps unsurprisingly, census and apportionment cases generally are decided post-apportionment, when census enumeration procedures are no longer at issue and the actual apportionment figures are known.  *See, e.g.*, *Franklin*, 505 U.S. at 790-91 (challenging allocation of Department of Defense's overseas employees to particular states following census); *Dep't of Commerce v. Montana*, 503 U.S. 442, 445-46 (1992) (challenging method of equal proportions to determine representatives); *Utah v. Evans*, 536 U.S. 452, 458-59 (2002) (challenging sampling method known as "hot-deck imputation" used by Census Bureau after analyzing census figures); *Wisconsin v. City of New York*, 517 U.S. 1, 4 (1996) (challenging decision not to use particular statistical adjustment to correct an undercount).  Here, Plaintiffs are not challenging the enumeration procedures themselves, but only the hypothetical apportionment that *might* result from actions that might be taken pursuant to the Presidential Memorandum.  *See, e.g.*, San Jose Am. Compl. ¶ 105; California Am. Compl. ¶ 46.  Consistent with this long line of Supreme Court precedent, such a challenge should await the actual apportionment.

## II.    The Court Lacks Jurisdiction Because Plaintiffs' Lack Standing.

For similar reasons, Plaintiffs lack standing to pursue their claims.  The doctrine of standing requires a plaintiff to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly traceable to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).  Mere "speculation" of future harm is insufficient to establish standing; instead, a

1   plaintiff must rely on facts alleged in its complaint that it is likely to be injured.  *Munns v. Kerry*,

2   782 F.3d 402, 410 (9th Cir. 2015).  The standing inquiry is "'especially rigorous when reaching the

3   merits of the dispute would force [the court] to decide whether an action taken by one of the other

4   two branches of the Federal Government was unconstitutional.'"  *Clapper v. Amnesty Int'l USA*,

5   568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)).  Plaintiffs bear

6   the burden of establishing the required elements of standing.  *Defs. of Wildlife*, 504 U.S. at 561.

7   Here, none of the injuries Plaintiffs allege satisfy these requirements.

8           **A.  Plaintiffs' Alleged Apportionment Injuries Are Too Speculative to Confer**

9              **Standing.**

10        The standing requirement of "injury in fact" requires an allegation that "[the plaintiff] has

11   sustained or is immediately in danger of sustaining a direct injury" as a result of the challenged

12   action.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (internal citations omitted).  The injury

13   or threat of injury must be "concrete and particularized" and "actual or imminent, not conjectural

14   or hypothetical."  *Defs. of Wildlife*, 504 U.S. at 560 (internal citations omitted).  Thus, an alleged

15   future injury must be "'certainly impending,' *or* there [must be] a 'substantial risk' that the harm

16   will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568

17   U.S. at 409 n. 5).  "'[A]llegations of possible future injury' are not sufficient."  *Clapper*, 568 U.S.

18   at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  As discussed above, Plaintiffs'

19   alleged apportionment injuries are speculative and conclusory, and at this point in time, there is no

20   "substantial risk" that harm will occur.  *See Susan B. Anthony List*, 573 U.S. at 158.  Similarly,

21   Plaintiffs' contention that they have standing due to the threat of a lost seat in Congress, *see* Pls.'

22   Br. 9, is unknown at this point.  Therefore, any injury to Plaintiffs—be it in the form of loss of a

23   Representative, loss of funding, or otherwise—is conjectural or hypothetical.  *Defs. of Wildlife*, 504

24   U.S. at 560.

25

26

27

28

1  **B.   Plaintiffs' Allegations That the Presidential Memorandum Will Reduce**

2  **Participation in the 2020 Census and Cause the Organizational Plaintiff to**

3  **Expend Resources Are Speculative, Not Traceable to the Memorandum, and**

4  **Not Redressable by a Favorable Ruling.**

5          **1.   Plaintiffs' Alleged Census Participation Injuries Are Speculative.**

6          The Presidential Memorandum does not purport to change the conduct of the census itself.

7  Instead, it relates to the calculation of the apportionment base used to determine the number of

8  representatives to which each state is entitled.   There is, facially, no reason why such a

9  Memorandum should have any effect on census participation response rates.  To the contrary, as

10  explained by the Census Bureau's Associate Director for Decennial Census Programs, Albert E.

11  Fontenot, Jr., the Census Bureau's counting operations are almost complete, and the Memorandum

12  does *not* affect how the Census Bureau is conducting its remaining enumeration operations or "the

13  Census Bureau's commitment to count each person in their usual place of residence."  Decl. of

14  Albert E. Fontenot, Jr. ¶13; *see also id.* at ¶¶ 8, 10, 12.  And although Plaintiffs submit a variety of

15  declarations to purportedly bolster their claims that the Memorandum has a chilling effect on

16  respondents, those declarations are impermissibly conjectural, conclusory, and hearsay.

17          For example, Dr. Barreto's declaration provides an opinion regarding the so-called "chilling

18  effect" of the Memorandum on individuals' participation in the 2020 Census that is based on

19  multiple levels of conjecture.  Dr. Barreto cites several Spanish-language news sources as providing

20  hearsay statements that activists and organizations are concerned about the Memorandum causing

21  fear in Hispanic and immigrant communities; that several studies have found that immigrant

22  communities will rely on Spanish-language news sources; that the Census Bureau has worked with

23  Spanish-language media; and that various studies, many of them from decades ago, suggest that

24  response rates are affected by the overall socio-political environment.  Barreto Decl. ¶¶ 15-17, 32-

25  39.  This "evidence" is insufficient to support Plaintiffs' allegations that the Memorandum will

26  significantly reduce the number of aliens who participate in the census so as to materially affect

27  federal funding and degrade the quality of census data.  Although Dr. Barreto discusses studies

28  reflecting concerns among aliens about citizenship information in the census generally and a

citizenship question on the census specifically (*see, e.g.*, Barreto Decl. ¶¶ 25-26, 67-68, 74, 82), this is far attenuated from the issues in this case, which involve the Presidential Memorandum. This case does not involve a citizenship question on the census questionnaire or a change to the Census Bureau's process under the Residence Criteria.

Tellingly, Dr. Barreto cites no study actually addressing the Presidential Memorandum's effect on the 2020 Census. And Dr. Barreto's discussion of citizenship-question studies is grounded in inaccuracies. Notably, he fails to address, or even acknowledge, the shortcomings that the U.S. District Court for the Southern District of New York identified in the very study Dr. Barreto now cites for the proposition that the placement of a citizenship question on a census questionnaire would depress response rates. *Compare* Barreto Decl. ¶ 82 *with New York v. Department of Commerce*, 351 F. Supp. 3d 502, 581 n.36 (S.D.N.Y. 2019) (noting that the Court would place "only limited weight on Dr. Barreto's study" because it had a flawed design, and did not weigh the resulting data "to match the population totals"), *aff'd in part*, *reversed in part & remanded*, 139 S. Ct. 2551 (2019).

Further, Dr. Barreto fails to consider the results of the randomized controlled trial published by the Census Bureau after the Supreme Court issued its opinion in the citizenship question litigation, which found *no* statistically-significant depression of response rates for households that received a test questionnaire containing a citizenship question. *See* Abowd Decl. ¶ 13; *see also 2019 Census Test Report,* Census Bureau (Jan. 3, 2020), https://www2.census.gov/programs-surveys/decennial/2020/program-management/census-tests/2019/2019-census-test-report.pdf (Census Test Report). That study contained a sample of 480,000 housing units, and was "capable of detecting response differences as small as 0.5 percentage points." *See* Abowd Decl. ¶ 13. Overall, "[t]he test questionnaire with the citizenship question had a self-response rate of 51.5 percent; [while] the test questionnaire without the citizenship question had a self-response rate of 52.0 percent." Census Test Report at ix. And while some narrow subgroups exhibited statistically-significant lower self-response rates, *id.* at x, the Census Bureau concluded that "[c]urrent plans for staffing for Nonresponse Followup would have sufficiently accounted for subgroup differences seen in this test." *Id. See generally* Abowd Decl. ¶ 13. As Dr. Abowd reports, this new finding

1    illustrates the benefit of a "randomized controlled" design, which properly isolates the independent

2    variable (there, the citizenship question) and measures its effects.  Abowd Decl. ¶ 13.

3        Likewise, the various fact witness declarations offer nothing to show that the Presidential

4    Memorandum will have a chilling effect on participation of immigrants in the 2020 census.  For

5    example, many of the declarations provide no support whatsoever for the Plaintiffs' assertions.  *See,*

6    *e.g.*, ECF No. 63-5, ¶ 4; ECF No. 63-5, ¶ 5; ECF No. 63-6, ¶ 4 (identical language speculating that

7    the exclusion of illegal immigrants is likely to result in decreased congressional representation in

8    declarant's state).  One other declaration from the executive director of a community organization

9    asserts that she heard from unspecified "members and others in the immigrant communities" that

10   they were hesitant to participate in the 2020 Census as a result of the Presidential Memorandum.

11   ECF No. 63-4, ¶ 9 (Gyamfi Decl.).   But other than generalized hearsay and subjective opinions,

12   this declaration provides no specific examples to support its allegations.  *See, e.g.*, *id.* ¶ 16.  It

13   certainly does not provide sufficient support that the Presidential Memorandum would have an

14   appreciable effect on the participation of illegal aliens in the remaining months of the 2020 census.[4]

15       Simply put, Plaintiffs' alleged injuries all depend entirely on (i) the assumption that a

16   significant percentage of illegal aliens who otherwise would have participated in the census will be

17   deterred from doing so despite outreach by the Census Bureau, and (ii) this lack of participation

18   will materially degrade the census data, which will (iii) result in an appreciable effect on

19   apportionment, redistricting, and funding.  Plaintiffs fail to allege sufficient facts that the above

20   sequence of events will occur with any likelihood.

21       Finally, Plaintiffs' claim that the Presidential Memorandum will cause the organizational

22   plaintiff "to divert resources—including time and money—from other important matters that it

23   ordinarily would be addressing through presentations, workshops, publications, technical

24   assistance, and trainings," San Jose Am. Compl., ¶ 82, does not demonstrate sufficient injury to

25

26   [4] Indeed, Plaintiffs' lack of support for a supposed "chilling effect" is exemplified by Black
     Alliance for Just Immigration's failure to "make *specific* allegations establishing that at least one
27   *identified* member had suffered or would suffer harm," which is reason alone to reject standing for
     that organization.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphases added); *see*
28   *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 235 (1990) (ruling that affidavit which "fails to identify
     the individuals" who allegedly were injured "falls short of establishing" standing).

1   establish standing.  Plaintiffs "cannot manufacture standing merely by inflicting harm on

2   themselves based on their fears of hypothetical future harm that is not certainly impending."

3   *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 416 (2013).  Thus, because Plaintiffs cannot

4   otherwise demonstrate injury, the expenditure of resources is insufficient on its own to show

5   standing.  *See id.*

6             **2.   The Alleged Injuries are Not Traceable to the Memorandum.**

7        Separate from the question of injury, the materials submitted by Plaintiffs fail to show that

8   any diminution in census response rates is fairly traceable to the Memorandum.  *Steel Co. v. Citizens*

9   *for a Better Env't*, 523 U.S. 83, 103 (1998) (for plaintiff to establish standing "there must be

10  causation—a fairly traceable connection between the plaintiff's injury and the complained-of

11  conduct of the defendant").  To satisfy the "traceability" or "causation" prong of the Article III

12  standing test, allegations must provide more than "unadorned speculation" to "connect their injury

13  to the challenged actions." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976).  Where

14  a theory of injury rests on a "highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410, a

15  plaintiff's jurisdictional claims are unfounded, *see Wash. Env't Council v. Bellon*, 732 F.3d 1131,

16  1143 (9th Cir. 2013) ("[S]imply saying that the Agencies have failed to curb emission of

17  greenhouse gases, which contribute (in some undefined way and to some undefined degree) to their

18  injuries, relies on an 'attenuated chain of conjecture insufficient to support standing.'" (quoting

19  *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1228 (9th Cir. 2008)).

20        Here, as noted above, the primary basis for linking the Memorandum to response rates

21  comes from Plaintiffs' expert, Dr. Barreto.  He opines that immigrant communities are less likely

22  to respond to the census after the Memorandum because (1) immigrant communities' trust in the

23  government and willingness to share information was undermined, Barreto Decl. ¶¶ 14, 20, by

24  (2) third-party reports featuring "immigrants, as well as individuals who worked with community-

25  based organizations that serve immigrants, and even journalists, all stat[ing] that they believed the

26  July 21 [Memorandum] was an effort to sow confusion and distrust, and to reduce the count of

27  Latinos and immigrants on the 2020 Census," Barreto Decl. ¶¶ 36, 15, which were carried on

28  (3) various media sources, particularly Spanish-language ones, which are highly influential in the

DEFENDANTS' DISPOSITIVE MOTION AND
OPPOSITION TO SUMMARY JUDGMENT    13
Case No. 5:20-cv-05167; Case No. 5:20-cv-05169

immigrant and Latino communities, Barreto Decl. ¶¶ 16, 35.  Dr. Barreto posits this chain as an unbroken line.  But the media, and the community activists they feature, are *independent actors*; those entities' messages about the Memorandum are the product of their own interpretations and views, many of which are at odds with the plain terms of the Memorandum.  *See, e.g.*, Barreto Decl. ¶ 36 (listing media messages characterizing the Memorandum as something "intended to promote fear").  More fundamentally, these declarations offer just predictions, without fact-based allegations claiming a particularized effect of the Memorandum on response rates.

It makes little sense for Plaintiffs to attribute whatever harm is caused by those independent actors to the Memorandum itself, particularly if their messages convey the incorrect impression that the Memorandum increases the "risk of [individuals'] information being linked to immigration records and [those individuals] facing immigration enforcement."  Barreto Decl. ¶ 75.  Any contention or concern that the Secretary's compliance with the Memorandum will somehow facilitate immigration enforcement is contrary to established statutory provisions mandating strict confidentiality for census responses.  *See generally* 13 U.S.C. § 9 (providing that personal information collected by the Census Bureau cannot be used against respondents by any government agency or court); *id.* § 214 (setting forth penalty for wrongful disclosure of information).  Indeed, the Census Bureau devotes resources to educating the public about the privacy and confidentiality of census responses specifically to allay such fears of adverse use.  *See, e.g.*, *Data Protection and Privacy Program*, Census Bureau, available at https://www.census.gov/about/policies/privacy.html (last visited Sept. 10, 2020); Fontenot Decl. ¶ 11.  Because nothing in the Memorandum undermines these statutory protections, it is unreasonable to trace fear of immigration enforcement to the Memorandum itself, rather than to the messages conveyed by other actors in Plaintiffs' chain of causation.  *See, e.g.*, Barreto Decl. ¶ 59 (noting that immigrants "may not do the full research to realize they can still fill out the Census safely, *because they hear the news which is connecting* the July 21 [Memorandum] to Trump's longstanding desire to increase deportation of undocumented immigrants" (emphasis added)).

The presence of such independent sources distinguishes this case from the litigation over the placement of a citizenship question on the census form, in which the Supreme Court found that

1   the placement of such a question could predictably cause lower self-response rates among certain

2   communities. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).  That case presented

3   a situation not found here:  namely, the direct collection of information from respondents.  The

4   Memorandum is not itself directed at census respondents and appears, even in Plaintiffs' telling, to

5   be filtered to them through third-party intermediary sources.  How those sources may or may not

6   interpret the Memorandum should not be dispositive of the Memorandum's effects.  Put another

7   way, the alleged injuries here depend on "a chain of causation" with multiple "discrete links, each

8   of which 'rest[s] on [the plaintiffs'] highly speculative fear that' governmental actors" would

9   exercise their "discretion in a [] way" that would adversely affect Plaintiffs.  *See New York v. Dep't*

10  *of Commerce*, 315 F. Supp. 3d 766, 787 (S.D.N.Y. 2018) (summarizing *Clapper*, 568 U.S. at 410-

11  14, and distinguishing citizenship question case from *Clapper* partly on this basis).  Such a

12  speculative chain of causation is insufficient to establish standing.

13          Moreover, the organizational plaintiff cannot show that any alleged diversion of resources,

14  is traceable to Defendants' conduct.  *See* San Jose Am. Compl., ¶ 82.  Black Alliance for Just

15  Immigration had sufficient motivation to spend funds on "presentations, workshops, publications,

16  technical assistance, and Trainings" before the Presidential Memorandum ever issued.  *See*

17  *Clapper*, 568 U.S. at 417 ("even before § 1881a was enacted, they had a similar incentive to engage

18  in many of the countermeasures that they are now taking").

19                  **3.  A Favorable Ruling Would Not Redress Plaintiffs' Alleged Injuries.**

20          Finally, even if Plaintiffs could establish the existence of a "chilling" effect traceable to the

21  Memorandum, they still fail to establish the last prong of standing:  namely, that the effect would

22  be cured by a favorable ruling from this Court.  "Federal courts may not decide questions that

23  cannot affect the rights of litigants in the case before them or give opinions advising what the law

24  would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alterations

25  and citations omitted).  Where a plaintiff requests prospective relief in the form of a declaratory

26  judgment or injunction, the plaintiff must show that "prospective relief will remove the harm" and

27  the plaintiff "personally would benefit in a tangible way from the court's intervention."  *Warth v.*

28  *Seldin*, 422 U.S. 490, 505, 508 (1975).  "Relief that does not remedy the injury suffered cannot

1   bootstrap a plaintiff into federal court; that is the very essence of the redressability

2   requirement." *Steel Co.*, 523 U.S. at 107.

3        Here, it is entirely speculative that there are enough aliens who, while currently deterred

4   from participating in the census, would *decide* to participate if this Court granted Plaintiffs relief,

5   particularly when any relief granted by this Court would be subject to appeal.  Indeed, nothing that

6   Plaintiffs have submitted speaks to this issue with any particularity.  The closest Plaintiffs come is

7   Dr. Barreto's report discussing research studies from 2018 that endeavored to predict how the

8   removal of a citizenship question from the census questionnaire would affect response rates.

9   Barreto Decl. ¶¶ 82-83.  But, as noted above, those studies are inconsistent with the large, and

10  statistically rigorous, study published in 2020 by the Census Bureau, which showed no statistically-

11  significant diminution of response rates in the first instance.  Abowd Decl. ¶¶ 13, 17.  Further, there

12  is no reason to expect the Memorandum, which asks nothing of respondents, to have a significant

13  effect on response rates—and even less reason to expect that any people deterred from responding

14  to the census would change their mind if the Memorandum were enjoined, especially since the

15  census would conclude long before any such injunction would become final on appeal.

16       If anything, the declarations proffered by Plaintiffs tend to paint the opposite picture.  The

17  declarations repeatedly allege a macro-environment of mistrust around immigration.  *See, e.g.*,

18  Barreto Decl. ¶ 59.  It is hard to imagine that precluding the Secretary from complying with a

19  Memorandum that does not implicate immigration enforcement or change census operations would

20  alter the kind of mistrust that Plaintiffs allege to be in effect currently.

21       Finally, any alleged diversion of resources, *see* San Jose Am. Compl., ¶ 82, would not be

22  redressed for these very same reasons.  Just as the organizational plaintiff had the same motivation

23  to spend funds to encourage census participation before issuance of the Presidential Memorandum,

24  *see Clapper*, 568 U.S. at 417, it will continue to have that incentive after a ruling in Plaintiffs'

25  favor.

26                                    * * *

27       The Supreme Court has emphasized that standing is not an "ingenious academic exercise in

28  the conceivable."  *Summers*, 555 U.S. at 499.  Plaintiffs cannot "establish standing simply by

1    claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does

2    not regulate, constrain, or compel any action on their part." *Clapper*, 568 U.S. at 419.  Rather,

3    Plaintiffs can establish standing only by shouldering the substantial burden of showing that the

4    Court, in a real way, can remedy an injury Plaintiffs have suffered as a result of some action

5    Defendants took.  *Id.*  Plaintiffs have failed to meet that burden here.

6    **III.     Plaintiffs Fail to State a Claim.**

7              Even if the Court concludes that it has subject-matter jurisdiction over Plaintiffs' claims,

8    Plaintiffs' failure to adequately plead any claim serves as an independent, additional basis for the

9    Court to dismiss the relevant counts in the Amended Complaints and to deny Plaintiffs' Motion.

10              **A.  Plaintiffs Fail to State an Apportionment Clause Claim.**

11             The operative Apportionment Clause mandates that Representatives shall be "apportioned

12   among the several States according to their respective numbers, counting the whole number of

13   persons in each State, excluding Indians not taxed."  U.S. Const. amend. XIV, § 2.  But, after

14   accounting for the express exclusion of "Indians not taxed," neither this Clause nor its predecessor

15   in Article I was ever understood to mandate the inclusion of every person present within the

16   boundaries of each State at the time of the census.  *See id.* art. I, § 2, cl. 3.  To the contrary, from

17   the time of the Founding through the ratification of the Fourteenth Amendment and continuing to

18   the present day, the Apportionment Clause has been understood to require counting "inhabitants"—

19   a term that Plaintiffs agree is "synonymous" with "persons."  Pls.' Br. 27.  In other words, only

20   usual residents—those with a fixed and enduring tie to a State, as recognized by the Executive—

21   need be deemed "persons *in [that] State*," U.S. Const. amend. XIV, § 2 (emphasis added).  And

22   because the word "inhabitants" is sufficiently indeterminate, the Supreme Court has recognized

23   that the term confers significant discretion on the Executive to make legal determinations about

24   who qualifies as an "inhabitant" without treating his physical presence in a particular jurisdiction

25   (or lack thereof) as dispositive.  *See Franklin*, 505 U.S. at 804-06.

26             This well-established framework plainly forecloses Plaintiffs' facial challenge to the

27   Presidential Memorandum.  For Plaintiffs to succeed, they must establish that the Constitution

28   requires including *all* illegal aliens in the apportionment base.  But that is obviously incorrect.  To

give just one example, nothing in the Constitution requires that illegal aliens residing in a detention facility after being arrested while crossing the border must be accounted for in the allocation of Representatives (and hence political power).  This is fatal to Plaintiffs' Motion.

**1. Only "Inhabitants" Who Have Their "Usual Residence" in a State Need Be Included in the Apportionment.**

As the Supreme Court has explained, "'[u]sual residence,' was the gloss given the constitutional phrase 'in each State' by the first enumeration Act [of 1790] and has been used by the Census Bureau ever since to allocate persons to their home States." *Franklin*, 505 U.S. at 804. The Act also uses "other words [ ] to describe the required tie to the State:  'usual place of abode,' [and] 'inhabitant[.]'" *Id.* at 804-05.  These terms "can mean more than mere physical presence, and [have] been used broadly enough to include some element of allegiance or enduring tie to a place." *Id.* at 804.

The settled understanding that only "inhabitants" who have their "usual residence" in the country must be counted stems from the drafting history of the Apportionment Clause.  In the draft Constitution submitted to the Committee of Style, the Apportionment Clause required "the Legislature [to] regulate the number of representatives by the number of *inhabitants*."  2 The Records of the Federal Convention of 1787, at 566, 571 (Max Farrand ed., rev. ed. 1966) (emphasis added).  The Committee of Style changed the language to provide that "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." U.S. Const. art. I, § 2, cl. 3.  But "the Committee of Style 'had no authority from the Convention to alter the meaning' of the draft Constitution," *Utah*, 536 U.S. at 475, and the Supreme Court has thus found it "abundantly clear" that, under the original Clause, apportionment "should be determined solely by the number of the State's inhabitants," *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964); *see also Franklin*, 505 U.S. at 804-05 (observing that "[t]he first draft" of the Apportionment Clause "used the word 'inhabitant,' which was omitted by the Committee of Style in the final provision").

Historical sources confirm this reading.  In *The Federalist*, James Madison repeatedly explained that apportionment under the new Constitution would be based on a jurisdiction's "inhabitants."  *See The Federalist* No. 54, at 369 (Jacob E. Cooke ed., 1961) (observing that "the aggregate number of representatives allotted to the several States[] is to be determined by a federal rule founded on the aggregate number of inhabitants"); *The Federalist* No. 56, at 383 (noting that the Constitution guarantees "a representative for every *thirty thousand inhabitants*") (emphasis added); *The Federalist* No. 58, at 391 (noting that the Constitution mandates a "readjust[ment] from time to time [of] the apportionment of representatives to the number of inhabitants"); *see also Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016) ("[T]he basis of representation in the House was to include all inhabitants" (emphasis omitted)).  Similarly, as the Supreme Court recognized, the first enumeration Act of 1790—titled "an act providing for the enumeration of the inhabitants of the United States"—directed "the marshals of the several districts of the United States" to count "the number of the inhabitants within their respective districts."  Act of Mar. 1, 1790, § 1, 1 Stat. 101, 101; *see Franklin*, 505 U.S. at 803-05 (relying on the Census Act of 1790 to apply the Apportionment Clause).

This understanding of "usual residence" and "inhabitant" was enshrined in the constitutional text and incorporated by historical practice when the Fourteenth Amendment's Apportionment Clause was ratified almost 80 years later.  According to Representative Roscoe Conkling, a member of the committee that drafted the Fourteenth Amendment, the operative Apportionment Clause's streamlined language—requiring apportionment based on "the whole number of persons in each State"—was meant to fully include former slaves in the apportionment base and otherwise "adhere[] to the Constitution as it is."  Cong. Globe, 39th Cong., 1st. Sess. 359 (1866).  The Amendment's text confirms that understanding: it underscores that a person who possesses sufficient ties to a State will be included by specifying that "the persons *in each State*" must be counted, U.S. Const. amend. XIV, § 2 (emphasis added)—a phrase that the Supreme Court later explained to be equivalent to the term "inhabitant."  *Franklin*, 505 U.S. at 804-05.  Indeed, the very next sentence of section 2 of the Fourteenth Amendment equates "persons in each State" with "inhabitants" by penalizing in the apportionment any State that denies the right to vote to the "male

1    inhabitants of such State" who would otherwise be eligible to vote (principally by reason of

2    citizenship and age).  U.S. Const. amend. XIV, § 2.  Unsurprisingly, the first census after ratification

3    of the Fourteenth Amendment was conducted in accordance with the same procedures that had been

4    used for the 1850 census, *see* Act of May 6, 1870, ch. 87, § 1, 16 Stat. 118, 118, which, in turn had

5    required  "all [States'] inhabitants to be enumerated," Act of May 23, 1850, ch. 11, § 1, 9 Stat. 428,

6    428; *see also Franklin*, 505 U.S. at 804 ("'Usual residence,' was the gloss given the constitutional

7    phrase 'in each State' by the first enumeration Act [of 1790] and has been used by the Census

8    Bureau ever since to allocate persons to their home States.").

9            Reading the Apportionment Clause to contemplate apportionment of Representatives based

10   on "inhabitants" (or "usual residents") also helps explain the historical exclusion of certain people

11   from the apportionment base.  For example, transient aliens, such as those temporarily residing here

12   for vacation or business, are not included in the apportionment base. *See, e.g.*, *Final 2020 Census*

13   *Residence Criteria*, 83 Fed. Reg. at  5533; Dennis L. Murphy, Note, *The Exclusion of Illegal Aliens*

14   *from the Reapportionment Base: A Question of Representation*, 41 CASE W. RES. L. REV. 969, 980

15   (1991).  That makes sense, as such aliens were not considered "usual residents" or "inhabitants"

16   either at the Founding or the ratification of the Fourteenth Amendment.   As contemporaneous

17   sources using the term make clear, to qualify as an "inhabitant," one had to, at a minimum, establish

18   a fixed residence within a jurisdiction and intend to remain there.  *See, e.g.*, *Bas v. Steele*, 2 F. Cas.

19   988, 993 (Washington, Circuit Justice, C.C.D. Pa. 1818) (No. 1088) (concluding that a Spanish

20   subject who had remained in Philadelphia as a merchant for four months before seeking to leave,

21   "was not an inhabitant of this country, as no person is an inhabitant of a place, but one who acquires

22   a domicil there").[5]

23   _____

24        [5]  *See also, e.g, Hylton v. Brown*, 12 F. Cas. 1123, 1129 (C.C.D. Pa. 1806)  (charging jury while
     riding circuit that a particular individual "was no more an inhabitant of this state than I am, who

25   spend one-third of each year in this city; or any other person, who comes here to transact a certain
     piece of business, and then returns to his family"); *Toland v. Sprague*, 23 F. Cas. 1353, 1355

26   (C.C.E.D. Pa. 1834) (No. 14,076) (distinguishing an "inhabitant" from a "transient passenger");
     *United States v. Laverty*, 26 F. Cas. 875, 877 (D. La. 1812) ("An inhabitant is one whose domicile

27   is here, and settled here, with an intention to become a citizen of the country."); *United States v.*
     *The Penelope*, 27 F. Cas. 486, 489 (D. Pa. 1806) ("[T]he following has always been my definition

28   of the words 'resident,' or 'inhabitant,' which, in my view, mean the same thing.  'An inhabitant,
     or resident, is a person coming into a place with an intention to establish his domicil, or permanent
     residence; and in consequence actually resides … .'"); 41 Annals of Cong. 1595 (1824) (referring

1   Likewise, foreign diplomats stationed overseas arguably remained "inhabitants" of their

2   native countries rather than of their diplomatic posts.  *See Franklin*, 505 U.S. at 805 (confirming

3   that American diplomat stationed overseas could still qualify as an "inhabitant" who is "in" his

4   home State for purposes of "the related context of congressional residence qualifications");

5   Emmerich de Vattel, *The Law of Nations*, ch. 19, § 213 (1817) (explaining that diplomats could not

6   qualify as "inhabitants" because "the envoy of a foreign prince has not his settlement at the court

7   where he resides").  And unsurprisingly, foreign diplomatic personnel living on embassy grounds

8   have previously been excluded from the apportionment base.  Murphy, *supra*, at 980.

9   Tourists and diplomats may be "persons" within a State's boundaries at the time of the

10  Enumeration, but no one seriously contends that they must be included in the apportionment base

11  under the Constitution.  Physical location does not, in short, necessarily dictate whether one is an

12  "inhabitant" (or "usual resident") of a particular jurisdiction.

13  **2.  The Executive Has Significant Discretion to Define Who Qualifies as**

14  **an "Inhabitant."**

15  Crucially, the term "inhabitant"—and the concept of "usual residence"—is sufficiently

16  ambiguous to give Congress, and by delegation the Executive, significant discretion to define the

17  contours of "inhabitants" for apportionment purposes.  That discretion is rooted in the Constitution.

18  Article I provides that apportionment numbers are determined by an "actual Enumeration"

19  performed every 10 years "in such Manner as" Congress "shall by Law direct."  U.S. Const. art. I,

20  § 2, cl. 3; *see also id.* amend. XIV, § 5 (giving Congress the power to "enforce, by appropriate

21  legislation, the provisions of" the Fourteenth Amendment, including the operative Apportionment

22  Clause).  This "text of the Constitution vests Congress with virtually unlimited discretion in

23  conducting the decennial 'actual Enumeration,' [and] … [t]hrough the Census Act, Congress has

---

24  to "the common acceptation" of "inhabitant" as "the persons whose abode, living, ordinary

25  habitation, or home" is within a particular jurisdiction); Thomas Dyche & William Pardon, *A New General English Dictionary* (16th ed. 1781) ("a person that resides or ordinarily dwells in a place

26  or home"); 1 & 2 Samuel Johnson, *A Dictionary of the English Language s. v.* abode, inhabitant, reside, residence, resident (6th ed. 1785) (a "[d]weller," or one who "lives or resides" in a place,

27  with the terms "reside," "residence," and "resident" defined with reference to an "abode"—*i.e.*, a "continuance in a place"); Noah Webster, *American Dictionary of the English Language* (1828)

28  (defining "inhabitant" as a "dweller; one who dwells or resides permanently in a place, or who has a fixed residence, as distinguished from an occasional lodger or visitor").

delegated its broad authority over the census to the Secretary." *Wisconsin*, 517 U.S. at 19 (citations omitted). But the Secretary is not the final word on apportionment, and indeed is not the one responsible for determining the apportionment base. Instead, by statute, the Secretary must report census numbers to the President. *See* 13 U.S.C. § 141(b). And it is the President, then, who "transmit[s] to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives." 2 U.S.C. § 2a(a). In doing so, the President has full "authority to direct the Secretary in making policy judgments that result in 'the decennial census'; he is not expressly required to adhere to the policy decisions reflected in the Secretary's report." *Franklin*, 505 U.S. at 799. So "the Secretary cannot act alone; she must send her results to the President, who makes the calculations and sends the final apportionment to Congress." *Id.* at 800. That "final act" by the President is "not merely ceremonial or ministerial," but remains "important to the integrity of the process." *Id.* Indeed, it is "the President's personal transmittal of the report to Congress" that "settles the apportionment" of Representatives among the States. *Id.* at 799.

Of course, the Executive's decisions in this area must be "consonant with … the text and history of the Constitution," *Franklin*, 505 U.S. at 806, but the term "inhabitants"—and the concept of "usual residence"—are sufficiently indeterminate to give him significant discretion within constitutional bounds. *See id.* at 804-06 (discussing how the notion of "usual residence" has been applied differently over time). Indeed, Madison acknowledged that the word "inhabitant" was "vague" in discussing the House Qualifications Clause. 2 The Records of the Federal Convention of 1787, at 216-17; *cf. Franklin*, 505 U.S. at 805 (in the course of applying the Apportionment Clause, drawing on Madison's interpretation of the "term 'inhabitant'" in "the related context of congressional residence qualifications"). As noted above, historical evidence confirms that the term "inhabitant" was understood to require, at a minimum, a fixed residence within a jurisdiction and intent to remain there. Moreover, Founding-era sources also reflect that, especially with respect to aliens, the term could be understood to further require a sovereign's permission to enter and

1    remain within a given jurisdiction.  *See, e.g.*, *The Venus*, 12 U.S. (8 Cranch.) 253, 289 (1814)

2    (Marshall, C.J., concurring in part and dissenting in part) (quoting Vattel for the proposition that

3    "inhabitants, as distinguished from citizens, are strangers who are *permitted* to settle and stay in the

4    country" (emphasis added)); *The Federalist* No. 42, at 285 (Madison) (discussing provision of the

5    Articles of Confederation that required every State "to confer the rights of citizenship in other States

6    … upon any whom *it may allow to become inhabitants* within its jurisdiction" (emphasis added)).

7              Accordingly, the Executive has wide discretion to make legal determinations about who

8    does and does not qualify as an "inhabitant" for purposes of inclusion in or exclusion from the

9    apportionment base.  In *Franklin*, for example, the Supreme Court held that the Executive Branch

10   could allocate over 900,000 military personnel living overseas to their home States on the basis of

11   the Secretary's judgment that such people "had retained their ties to the States."  505 U.S. at 806.

12   That allocation "altered the relative state populations enough to shift a Representative from

13   Massachusetts to Washington"—and had not been used "until 1970," save for a "one-time

14   exception in 1900."  *Id.* at 791-93.  Nevertheless, as the Court explained, even though the recent

15   approach was "not dictated by" the Constitution, it was "consonant with [its] text and history" and

16   thus a permissible "judgment" within the Executive Branch's discretion, even where Congress had

17   not expressly authorized this practice.  *Id.* at 806.  In the course of reaching this judgment, the Court

18   also listed a number of other legal determinations of usual residency that the Executive Branch has

19   permissibly chosen to use over the years—including determinations the Census Bureau has since

20   abandoned.  For example, "up until 1950, college students were counted as belonging to the State

21   where their parents resided, not to the State where they attended school," and at the time the case

22   was decided, "[t]hose persons who are institutionalized in out-of-state hospitals or jails for short

23   terms [were] also counted in their home States."  *Id.* at 805-06.  Under the current Residence

24   Criteria, however, college students who live at school during the academic year and prisoners

25   housed in out-of-state jails, even for the short term, are counted in the State in which those

26   institutions are located.  Residence Criteria, 83 Fed. Reg. at 5534, 5535.

27

28

1    Plaintiffs have never challenged the Residence Criteria in court.[6]  Nor can they, given

2    constitutional text, history, and Supreme Court precedent.  The Presidential Memorandum is no

3    different insofar as it reflects the Executive Branch's discretionary decision to direct the Secretary

4    in making policy judgments that result in the decennial census.  *Franklin*, 505 U.S. at 799.

5    **3.  The Apportionment Clause Does Not Require Inclusion of All Illegal**

6    **Aliens as "Inhabitants" Having a "Usual Residence" in a State.**

7    Plaintiffs maintain that the Presidential Memorandum facially violates the Apportionment

8    Clause because *all* illegal aliens necessarily qualify as "persons in each State," and because the

9    Memorandum contemplates the exclusion of such aliens—in some as-yet unknown number—for

10   apportionment purposes.  Put differently, Plaintiffs posit that the Constitution prohibits the

11   exclusion of *any* illegal alien from the apportionment base, and that the Memorandum's

12   announcement of that possibility violates the Apportionment Clause.  But none of the constitutional

13   constraints on the Executive's discretion to define the contours of "inhabitants" or "usual

14   residence" require including *all* illegal aliens in the apportionment.

15   For example, if the Census Bureau finds it feasible to identify unlawfully present aliens who

16   resided in a Customs and Border Patrol (CBP) or Immigration and Customs Enforcement (ICE)

17   facility within a State on census day after being arrested while illegally entering the country, it

18   would be permissible to exclude them.  Such individuals—like alien tourists who happen to be

19   staying in the country for a brief period on and around census day—cannot reasonably be said to

20   have established "the required tie to [a] State," *Franklin*, 505 U.S. 804, or to be "inhabitants" under

21   any definition of that term.[7]

22

23   _____

24   [6] In fact, several plaintiffs (City of San Jose, King County, State of California, and Arlington
     County) have intervened to *defend* the Residence Criteria against a current challenge.  *See Alabama
     v. Dep't of Commerce*, Case No. 2:18-cv-772-(RDP) (N.D. Ala.).

25   [7] These populations may be significant.  During fiscal year 2019, ICE held in custody an
     average daily population of 50,165 aliens.  U.S. ICE ERO, *U.S. Immigration and Customs

26   Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report*, at 5 (2019) (ICE
     ERO    Report),    https://www.ice.gov/sites/default/files/documents/Document/2019/eroReport

27   FY2019.pdf.  And on any given day in the summer of 2019, CBP held in custody between 8,000
     and 12,000 detainees.  *U.S. Customs and Border Protection – Border Patrol Oversight: Hearing

28   Before the H. Subcomm. on Homeland Security of the Comm. on Appropriations*, 116th Cong.

1    Likewise, if feasibly identified, the Executive may exclude aliens who have been detained

2    for illegal entry and paroled into the country pending removal proceedings, or who are subject to

3    final orders of removal.[8]  Such aliens do not have enduring ties to any State sufficient to become

4    "inhabitants" with their "usual residence" in the United States.  The government has either allowed

5    them into the country solely conditionally while it is deciding whether they should be removed, or

6    has conclusively determined that they must be removed from the country.  In *Kaplan v. Tod*, 267

7    U.S. 228 (1925), for instance, the Supreme Court addressed the case of an alien minor who had

8    been denied entry at Ellis Island in 1914 but could not be returned to Russia during the First World

9    War and was therefore paroled into the country to live with her father in 1915.  When the case

10   reached the Supreme Court almost ten years later in 1925, it turned entirely on the question whether

11   the alien minor had been "dwelling in the United States" or had "begun to reside permanently" in

12   the United States for purposes of federal immigration statutes, which would have conferred

13   derivative citizenship on her upon her father's naturalization in 1920.  *Id.* at 230.  The Court held

14   that, during her parole, she "never has been dwelling within the United States" and "[s]till more

15   clearly she never has begun to reside permanently in the United States."  *Id.*  As the Court explained,

16   she "could not lawfully have landed in the United States" because she fell within an inadmissible

17   category of aliens, and "until she legally landed [she] 'could not have dwelt within the United

18   States.'"  *Id.* (quoting *Zartarian v. Billings*, 204 U.S. 170, 175 (1907)).  In the Court's view, she

19   was in "the same" position as an alien "held at Ellis Island for deportation."  *Id.* at 231; *see also,*

20   *e.g.*, *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (holding that parole cannot affect an alien's

21   status and does not place an alien "legally 'within the United States'").  Indeed, the Supreme Court

22   recently reaffirmed that "aliens who arrive at ports of entry—even those paroled elsewhere in the

23   _____

24   (2019) (testimony of Carla L. Provost, Chief, U.S. Border Patrol), https://docs.house.gov/meetings/
     AP/AP15/20190724/109834/HHRG-116-AP15-Wstate-ProvostC-20190724.pdf.

25      [8] ICE's non-detained docket surpassed 3.2 million cases in fiscal year 2019, a population large
     enough to fill more than four congressional districts under the 2010 apportionment.  ICE ERO

26   Report at 10; Kristin D. Burnett, *Congressional Apportionment*, U.S. Census Bureau (Nov. 2011),
     https://www.census.gov/prod/cen2010/briefs/c2010br-08.pdf.  The non-detained docket includes

27   aliens who are both pre- and post-final order of removal, and who have been released on parole,
     bond, an order of recognizance, an order of supervision, or who are in process for repatriation.  ICE

28   ERO Report at 10.

1  country for years pending removal—are 'treated' for due process purposes 'as if stopped at the
2  border,'" and that the same principle applies to those detained "shortly after unlawful entry." *DHS*
3  *v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020).

4       Plaintiffs emphasize that Framers of both the original Apportionment Clause and the
5  Fourteenth Amendment intended to include aliens in the apportionment base. Pls.' Br. 14-27. But
6  Plaintiffs' historical evidence about the treatment of aliens does not and cannot resolve the distinct
7  question whether *illegal* aliens must be included—for the simple reason that there were no federal
8  laws restricting immigration (and hence no illegal aliens) until 1875. *See Kleindienst v. Mandel*,
9  408 U.S. 753, 761 (1972). And Plaintiffs provide no evidence to support the proposition that by
10 employing the concepts of "inhabitants" and "usual residence," the Framers of either the original
11 Constitution or Fourteenth Amendment were understood to have bound future generations to
12 allocate political power on the basis of aliens living in the country in violation of federal law. To
13 the contrary, as the Supreme Court has explained, the Framers understood the "fundamental
14 proposition[]" that the "power to admit or exclude aliens is a sovereign prerogative."
15 *Thuraissigiam*, 140 S. Ct. at 1982.[9] This "ancient principle[] of the international law of nation-
16 states" is necessary to the sovereign's rights to define the polity ("the People") that make up the
17 nation and to preserve itself, as both the Supreme Court and 19th-century international law scholars
18 recognized.[10] It is fundamentally antithetical to those elementary principles to say, as Plaintiffs do,

19       [9] *See also, e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Chae Chan Ping v. United States*,
20 130 U.S. 581, 604 (1889); *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893).

21       [10] *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972); *see, e.g.*, *Nishimura Ekiu v. United States*,
22 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law, that every sovereign nation
   has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance
23 of foreigners within its dominions, or to admit them only in such cases and upon such conditions
   as it may see fit to prescribe.") (citing Vattel and Phillimore); Vattel, *The Law of Nations*, bk. 2, §§
24 94, 100 (explaining that the sovereign's authority to "forbid the entrance of his territory either to
   foreigners in general, or in particular cases," "flow[ed] from the rights of domain and sovereignty");
25 1 Robert Phillimore, *Commentaries Upon International Law*, ch. 10, § CCXIX (1854) (similar);
   *see also, e.g.*, *Bernal v. Fainter*, 467 U.S. 216, 221 (1984) ("The exclusion of aliens from basic
26 governmental processes is not a deficiency in the democratic system but a necessary consequence
   of the community's process of political self-definition. Self-government, whether direct or through
27 representatives, begins by defining the scope of the community of the governed and thus of the
   governors as well: Aliens are by definition those outside of this community."); *Chae Chan Ping*,
28 130 U.S. at 603–04 (recognizing that a sovereign's power to "exclude aliens from its territory" is

1  that illegal aliens can arrogate to themselves the right to redistribute "political power" within this

2  polity by flouting the sovereign power of the United States to define who can enter and become

3  part of the polity.  Pls.' Br. 14-27.  As Representative Conkling explained, "political representation

4  does not belong to those who have no political existence.  The government of a free political society

5  belongs to its members, and does not belong to others."  Cong. Globe, 39th Cong., 1st Sess., at 356

6  (1866); *see also id.* at 2962 (Sen. Poland) (advocating that representation be based on "all the

7  members of a State or community" because "they are all subject to its laws; they must all share its

8  burdens; and they are all interested in legislation and government").  Nothing in the debates

9  suggests that the Framers of the Fourteenth Amendment would have treated aliens whose very

10 presence in this country is forbidden by federal law as "members" of the "political society."

11 Rejecting Plaintiffs' approach is certainly "consonant with" the terms and history of the Fourteenth

12 Amendment.  *Franklin*, 505 U.S. at 806.

13     If anything, the debates over the Fourteenth Amendment indicate that the rationale the

14 Framers offered for including aliens in the apportionment base do not apply to illegal aliens.

15 Specifically, various legislators made clear that unnaturalized aliens should be included in the

16 apportionment base precisely because the law provided them with a direct pathway to citizenship—

17 mainly, an oath of loyalty and five years of residence in the United States, *see* Act of Apr. 14, 1802,

18 1802, ch. 28, 2 Stat. 153.  As Representative Conkling noted, "[t]he political disability of aliens

19 was not for this purpose counted against them, *because it was certain to be temporary*, and they

20 were admitted at once into the basis of apportionment."  Cong. Globe, 39th Cong., 1st Sess., at 356

21 (1866) (emphasis added); *see also, e.g.*, *id.* at 3035 (Senator Henderson explaining that "[t]he road

22 to the ballot is open to the foreigner; it is not permanently barred").  Indeed, the five-year residency

23 requirement meant that aliens could "acquire [the vote] in the current decade"—and thus

24

25 "an incident of every independent nation" and is "part of its independence," and "[i]f it could not
   exclude aliens it would be to that extent subject to the control of another power"); *The Schooner*
26 *Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.) ("The jurisdiction of
   the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no
27 limitation not imposed by itself.  Any restriction upon it, deriving validity from an external source,
   would imply a diminution of its sovereignty to the extent of the restriction, and an investment of
28 that sovereignty to the same extent in that power which could impose such restriction.").

1    unnaturalized aliens could be voting citizens before the next apportionment.   *Id.* at 354

2    (Representative Kelley).   And even an opponent of the inclusion of aliens in the apportionment

3    agreed that unnaturalized aliens were on "a short period of probation—five years; and in most of

4    the states the great body of them are promptly admitted to citizenship." *Id.* at 2987 (Sen. Sherman).

5    That rationale does not extend to illegal aliens, who generally are prohibited by law from becoming

6    citizens and are subject to removal. 8 U.S.C. §§ 1182(a)(9), 1227(a), 1255(a) & (c), 1427(a).

7         Plaintiffs are also wrong in arguing that *Plyler v. Doe*, 457 U.S. 202 (1982), requires the

8    inclusion of illegal aliens in the apportionment base. Pls.' Br. 15-16.   *Plyler* held only that illegal

9    aliens are "persons within the jurisdiction" of a State for purposes of the Equal Protection Clause,

10   457 U.S. at 210, which is inapposite here.   In contrast to the Apportionment Clause, the Equal

11   Protection Clause has never been understood to be limited to "inhabitants" or "usual residents" of

12   a State.   That is why no one seriously contends that alien tourists visiting the United States should

13   be included in the apportionment base, even though they are undoubtedly "persons" protected by

14   the Equal Protection Clause.   *See also Mathews*, 426 U.S. at 78 ("The fact that all persons, aliens

15   and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion

16   that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion

17   that all aliens must be placed in a single homogeneous legal classification.").

18        Indeed, Plaintiffs' reading of *Plyler*—that *all* illegal aliens must be included in the

19   apportionment base—is at odds with history and precedent.   Likewise, Plaintiffs' suggestion that

20   the historical understanding of the word "inhabitant," as used in reference to the census, was

21   understood to include all aliens is unavailing.   *See* Pls.' Br. 17-20.   Nothing in the terms

22   "inhabitants" or "usual residence" suggests that this concept covers all illegal aliens.   Rather, as

23   noted above, the Supreme Court has observed that the term "'[u]sual residence' … has been used

24   broadly enough to include some element of allegiance or enduring tie to a place." *Franklin*, 505

25   U.S. at 804.   In addition, the Founding generation was aware that the term "inhabitant" could be

26   understood to require that an alien be given *permission* to settle and stay in a jurisdiction according

27   to the definition provided by Vattel, whom the Supreme Court has extolled as the "founding era's

28   foremost expert on the law of nations." *Franchise Tax Board v. Hyatt*, 139 S. Ct. 1485, 1493

(2019); *see* 1 Vattel, *The Law of Nations* ch. 19, § 213 (defining "inhabitants, as distinguished from citizens," as "foreigners, who are permitted to settle and stay in the country").[11]  And in *Kaplan*, the Supreme Court held that an alien who had not effected a lawful entry into the country could not be characterized as "dwelling" in the country under the latest version of a naturalization law dating from 1790 that had conditioned derivative citizenship for certain aliens on their "dwelling" in the United States—a concept linked with becoming an "inhabitant" since the Founding Era.  267 U.S. at 230; *see* Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103, 104; *cf.* Noah Webster, *American Dictionary of the English Language* (1828) (defining "inhabitant" as a "dweller; one who dwells or resides permanently in a place").  Illegal aliens, however, cannot claim the relevant "enduring ties" to this country, or that they are "dwelling" in this country, precisely because they have not legally entered and as a matter of law may be removed from the country at any time.  *See also Gonzalez v. Holder*, 771 F.3d 238, 245 (5th Cir. 2014) (applying *Kaplan* to an alien who "entered the United States at the age of seven, albeit illegally, and … remained in the country" for 16 years); *U.S. ex rel. De Rienzo v. Rodgers*, 185 F. 334, 338 (3d Cir. 1911) (explaining that an alien "cannot begin" to "reside permanently" in the United States "if he belongs to a class of aliens debarred from entry into the country by the act to regulate the immigration of aliens into the United States").

Ultimately, however, it is neither necessary nor appropriate for this Court to resolve whether any particular category of illegal aliens must be deemed "inhabitants" for purposes of the apportionment.  In order to prevail on this facial challenge to the Presidential Memorandum, Plaintiffs must establish that there is *no* category of illegal aliens that may be lawfully excluded from the apportionment.  *See, e.g.*, *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 599 (9th Cir. 2018) ("To prevail in a facial challenge, [a plaintiff] 'must establish that no set of circumstances exists under which the [challenged provision] would be valid.'" (quoting *Reno v. Flores*, 507 U.S. 292, 301 (1993)).  Plaintiffs have not, and indeed cannot,

---

[11]  As the Supreme Court has observed: "The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel.  In 1775, Benjamin Franklin acknowledged receipt of three copies of a new edition, in French, of Vattel's Law of Nations and remarked that the book 'has been continually in the hands of the members of our Congress now sitting.'"  *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 462 n.12 (1978) (ellipsis and citations omitted).

1   make that showing.  Rather than facing that question, Plaintiffs divert attention by asking the Court

2   to decide a much different question—and more than is necessary to resolve this case—by seeking

3   a holding that the Apportionment Clause would prohibit the exclusion of all categories of illegal

4   aliens.  That question is not properly presented here.  The Presidential Memorandum states that it

5   will be the policy of the United States "to exclude from the apportionment base aliens who are not

6   in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C.

7   § 1101 *et seq*.), to the *maximum extent feasible and consistent with the discretion delegated to the*

8   *executive branch.*"  85 Fed. Reg. at 44,680 (emphasis added).  And Plaintiffs have rushed to Court

9   before the Census Bureau has determined which illegal aliens it may be "feasible" to exclude,

10  before the Census Bureau has reported any numbers to the Secretary, before the Secretary has

11  reported any numbers to the President, and before the President has reported any numbers to

12  Congress.  Accordingly, this Court need not and should not resolve whether the Apportionment

13  Clause necessarily *excludes* or *includes* any particular category of illegal aliens from the

14  apportionment base.  For Plaintiffs to prevail in their challenge to the Memorandum, they must

15  establish that there is *no* category of illegal aliens that could ever be excluded.  They cannot do

16  so.[12]

17             **B.  Plaintiffs Have Failed to State *Ultra Vires* or Separation-of-Powers Claims.**

18             Plaintiffs posit that the Memorandum directs the President and the Secretary of Commerce

19  to perform unlawful, *ultra vires* actions that violate 13 U.S.C. § 141 and 2 U.S.C. § 2a.  *See* Pls.'

20  Br. 29-33.  Plaintiffs go on to argue that the President has violated the Constitution's separation-

21

---

22          [12] Plaintiffs cite *Fed. for Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564
23  (D.D.C. 1980) and the arguments raised in that case by the government for the supposed proposition
    that the apportionment base must include illegal aliens.  *See* Pls.' Br. 26.  In *FAIR*, the court simply
24  noted that, as a matter of historical practice, "the population base for purposes of apportionment
    has always included all persons, including aliens both lawfully and unlawfully within our
25  borders."  *FAIR*, 486 F. Supp. at 576.  To be sure, the court indicated that it saw "little on which to
    base a conclusion that illegal aliens should now be excluded" from the apportionment base.  *Id.*  But
26  the court hardly came to a final "determination."  To the contrary, the court "conclude[d] that [it]
    lack[ed] jurisdiction to decide the merits of the case because the plaintiffs lack standing to raise the
27  issue."  *Id.* at 566.  Further, the direct appeal from the three-judge *FAIR* Court to the Supreme Court
    was dismissed for lack of jurisdiction, 447 U.S. 916 (1980).  Moreover, *FAIR* is not controlling on
28  this Court and, in all events, predates *Franklin*, which controls the outcome here.

of-powers principle. *See id.* at 33-34. These claims fail. Every other census and apportionment conducted under 13 U.S.C § 141 and 2 U.S.C. § 2a has been shaped by policy choices made by the Executive under this statutory scheme, and the Memorandum merely reflects another permissible policy choice made by the Executive pursuant to powers delegated by Congress.

Nothing in the statutory language of "total population," 13 U.S.C. § 141(b), or "whole number of persons in each State," 2 U.S.C. § 2a(a), requires counting every person physically present on Census Day, even if they lack "usual residence" in the United States. It is, of course, true that the word "person" in § 2a makes no distinction based on citizenship or immigration status. And no one disputes that aliens (legal or illegal) are "persons." *Cf. Plyler*, 457 U.S. 202. But § 2a does not reference only "persons"; it tracks the Fourteenth Amendment's text mandating apportionment based on the "whole number of persons *in each State*." 2 U.S.C. § 2a(a) (emphasis added). Congress is presumed to legislate with familiarity of the legal backdrop for its legislation, and that legal backdrop *supports* the exclusion of individuals from apportionment if they do not have a "usual residence" in the United States. *Franklin*, 505 U.S. at 804. Indeed, it is not even clear what authority Congress would have to authorize a different definition of the apportionment base than the one prescribed by the Constitution. That is why no apportionment conducted under the Census Act has included literally everyone physically present in the country. Just as the Memorandum does not violate the Constitution merely by contemplating the exclusion of some as-yet-unknown number of illegal aliens for lack of "usual residence," neither does it violate the identical language of § 2a.[13]

Nor does it matter that the President is making an independent choice in the apportionment process. While the apportionment calculation itself—feeding numbers into a mathematical formula known as the "method of equal proportions"—is "admittedly ministerial," there is nothing "ministerial" about the President's role in obtaining the numbers used in that formula. *Franklin*, 505 U.S. at 793, 799 (explaining that "the admittedly ministerial nature of the apportionment

---

[13] This "usual residence" approach is consistent with the approach taken in the Census Bureau's 2018 Residence Criteria. As with every census, the Census Bureau always planned to exclude some people from the 2020 Census without a "usual residence" in a particular State. *See Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525, 5526 (Feb. 8, 2018).

calculation itself does not answer the question [of] whether the apportionment is foreordained by the time the Secretary gives her report to the President"). To the contrary, "§ 2a does not curtail the President's authority to direct the Secretary in making policy judgments that result in 'the decennial census.'" *Id.* at 799.[14] And that is exactly what the President has done here: direct the Secretary to report two sets of numbers, from which the President will choose the numbers to plug into the "method of equal proportions." *See* 2 U.S.C. § 2a(a); 85 Fed. Reg. at 44,680.

Plaintiffs' position is incompatible with the Supreme Court's view of the President's role as more than merely ceremonial or ministerial. *See Franklin*, 505 U.S. at 789. "[I]t is the President's personal transmittal of the report to Congress" that "settles the apportionment" of Representatives, making the President "important to the integrity of the process." *Id.* at 799–800. Plaintiffs' attempt to reduce the President to mere statistician cannot be squared with the Supreme Court's holding that § 2a contemplates his exercise of substantial discretion.

Plaintiffs also seem to suggest that the Memorandum is unlawful merely because the President has directed the Secretary to provide information about illegal aliens. *See, e.g.*, Pls.' Br. 29 (asserting that the Memorandum "violates the Census Act by instructing Secretary Ross to provide the President with something other than '[t]he tabulation of total population'"). But that contention also fails. Article II empowers the President to supervise the conduct of subordinate officials like the Secretary, *see* U.S. Const., art. II, § 1, and the Opinions Clause further empowers the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices," *id.*, art. II, § 2, cl. 1. In *Franklin*, even the dissenting Justices acknowledged that § 2a "does not purport to limit

---

[14] Other courts since *Franklin* have likewise understood that § 2a allows the President to perform a significant role beyond the mere "ministerial" calculation leading to reapportionment. *See Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 860 (4th Cir. 2002) (likening an EPA report to the Secretary's § 141(b) report because it "is advisory and does not trigger the mandatory creation of legal rules, rights, or responsibilities," allowing the President "to embrace or disregard" the Secretary's report); *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (characterizing the Commerce Secretary's report to the President a "moving target" because "the President has statutory discretion to exercise supervisory power over the agency's action); *Alabama v. Dep't of Commerce*, 396 F. Supp. 3d 1044, 1055 (N.D. Ala. 2019) (noting that in fulfilling his responsibilities under § 2a, "the President is not necessarily bound to follow the Secretary's tabulation").

the President's 'accustomed supervisory powers' over the Secretary of Commerce." 505 U.S. at 813 n.11 (Stevens, J., concurring in part and concurring in judgment). So Plaintiffs cannot preclude the President from obtaining information from the Secretary, nor the Secretary from providing it.

Plaintiffs also seek to contravene Supreme Court precedent (and 230 years of history) by arguing that the numbers used for apportionment must be derived solely from individual responses to the census questionnaire. *See* Pls.' Br. 31-33; *see also id.* at 27 n. 55. The Census Bureau has *never* tallied the total number of "usual residents" based only on questionnaire responses. In fact, for the first 170 years of American census taking, no census questionnaire existed because all enumeration was done in person. *See New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 520 (S.D.N.Y.) (Furman, J.), *aff'd in part, rev'd in part and remanded,* 139 S. Ct. 2551 (2019). And for the 2020 Census, individuals have been, and will be, enumerated through (1) census-questionnaire responses online, by mail, or by phone; (2) in-person visits by enumerators; (3) "proxy" responses given by those such as a neighbor or landlord; (4) high-quality administrative records from other federal agencies; and, as a last resort, (5) filling gaps in data collected by imputing other data from the same area. *Id.* at 521. In the citizenship-question litigation, extensive testimony on each of those enumeration methods was elicited, but neither the court nor the parties ever suggested that any of them violated the Census Act. *See generally id.* at 572–626. Indeed, the Supreme Court has *specifically approved* the use of purported "non-census data"—like administrative records and imputation—in apportionment without remotely hinting that either one was unlawful. *See Franklin*, 505 U.S. at 794–96, 803–06 (approving the use of "home of record" information from Defense Department personnel files for apportionment); *Utah*, 536 U.S. at 457–59, 473–79 (approving the Census Bureau's use of "hot-deck imputation" for apportionment).

In any event, it is entirely premature for Plaintiffs to surmise that the President will rely on population counts generated separately from the decennial census if he is going to exclude some as-yet-unknown number of illegal aliens from apportionment. Pls.' Br. 20. As discussed above, it is not yet known what numbers the Secretary will transmit to the President pursuant to the Presidential Memorandum. And Plaintiffs cannot assume that those numbers will be derived from improper sources.

1   Plaintiffs' attempt to manufacture *ultra vires* or separation-of-powers claims is unavailing.

2   By delegation of the Census Act, the Executive stands in the shoes of Congress and may properly

3   exclude individuals from apportionment for lack of "usual residence"—just as he has done in every

4   other apportionment calculated under the Census Act.  Plaintiffs' other similar arguments that the

5   President is violating the Take Care Clause, *see* Pls.' Br. 34, or that he is carrying out a unilateral

6   action violating congressional will, *see id.*, fail for the same reasons.

7   **C. Plaintiffs' Demands for Relief Against the President Must Be Dismissed.**

8   Plaintiffs ask this court to issue a writ of mandamus that would compel "the President to

9   transmit to the Congress a statement showing the whole number of persons in each State, including

10   undocumented immigrants, and the number of congressional representatives to which each State

11   would be entitled under an apportionment calculated by the method of equal proportions,"

12   California Am. Compl. at 21, as well as a "permanent injunction enjoining Defendants and all those

13   acting in concert with them from excluding undocumented immigrants from the apportionment

14   base following the 2020 Census," *id.* at 20.  As the Supreme Court has long recognized, however,

15   federal courts cannot exercise authority over the President's discretionary policy judgments.  *See*

16   *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866) (the judicial branch has "no jurisdiction

17   of a bill to enjoin the President in the performance of his official duties").  In *Franklin*, the Supreme

18   Court reaffirmed this constitutional principle.  *See* 505 U.S. at 802 (noting that "grant of injunctive

19   relief against the President [] is extraordinary, and should have raised judicial eyebrows").

20   Plaintiffs may contend that their injunctive and mandamus claims fit within a narrow exception that

21   the Supreme Court potentially left open for actions seeking to direct the President to perform

22   "ministerial" functions.  *See id.* at 802-03 (noting that *Mississippi v. Johnson* "left open the question

23   whether the President might be subject to a judicial injunction requiring the performance of a purely

24   'ministerial' duty"); *see also Mississippi v. Johnson*, 71 U.S. at 498 (defining "ministerial duty" as

25   "one in respect to which nothing is left to discretion").

26   *Franklin*, however, forecloses that argument in this case.  Specifically, the Supreme Court

27   recognized that under 2 U.S.C. § 2a, "the Secretary [of Commerce] cannot act alone"; instead, the

28   President has the "authority to direct the Secretary in making policy judgments."  *Franklin*, 505

U.S. at 799-800.  This "clear[ly]" demonstrates Congress's belief that "it was important to involve a constitutional officer," *i.e.*, the President, "in the apportionment process."  *Id.* at 799.  The President's role and "duties" in the congressional apportionment process, therefore, "are not merely ceremonial or ministerial."  *Id.* at 800.

Even if *Franklin* and *Mississippi v. Johnson* could be read to allow a court to issue a writ of mandamus or injunctive relief compelling the President to perform purely ministerial functions, *see Nat'l Treas. Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974), that possible exception has no application here—because the President's implementation of the Presidential Memorandum is part of his duties under 2 U.S.C. § 2a, which "are not merely ceremonial or ministerial."  *Franklin* applies squarely to Plaintiffs' request for mandamus and injunctive relief.  505 U.S. at 800-03.

Moreover, and at a minimum, even if a writ of mandamus or injunctive relief against the President in the performance of his statutory duties were theoretically available, *Franklin* makes clear that it "would require an express statement by Congress" authorizing such relief.  *Franklin*, 505 U.S. at 801.  Plaintiffs have identified no such "express statement" and none exists.  *See also Guerrero v. Clinton*, 157 F.3d 1190, 1191 n.2 (9th Cir. 1998) ("mandamus against the President would be 'extraordinary.'" (quoting *Franklin*, 505 U.S. at 802)).

Plaintiffs additionally seek a declaration "that any statement from the President to the Congress under 2 U.S.C. § 2a(a) that excludes undocumented persons residing in the United States from the apportionment base is null and void."  San Jose Am. Compl. at 40 (Prayer for Relief).  Such relief against the President is inappropriate.  The D.C. Circuit, following *Franklin*, has determined that "declaratory relief" against the President for his non-ministerial conduct "is unavailable."  *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010).  This is because "[a] court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions."  *Id.* at 1012 (emphasis added) (citing *Mississippi*, 71 U.S. at 499); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) ("Sound separation-of-power principles counsel the Court against granting [injunctive and declaratory] relief against the President directly.").  Thus, "similar considerations regarding a court's power to issue [injunctive] relief

1    against the President himself apply to [a] request for a declaratory judgment." *Swan v. Clinton*,

2    100 F.3d 973, 977 n.1 (D.C. Cir. 1996).

3    **IV.     Plaintiffs are Not Entitled to a Permanent Injunction.**

4         Plaintiffs argue that they are entitled to a permanent injunction preventing Defendants from

5    excluding illegal aliens from the census apportionment. *See* Pls.' Br. 34-35. The "extraordinary

6    remedy" of an injunction "may only be awarded upon a clear showing that the plaintiff is entitled

7    to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain permanent

8    injunctive relief, Plaintiffs bear the burden of demonstrating (1) "that [they have] suffered an

9    irreparable injury;" (2) "that remedies available at law, such as monetary damages, are inadequate

10   to compensate for that injury; (3) that, considering the balance of hardships between the parties, a

11   remedy in equity is warranted;" and (4) "that the public interest would not be disserved by a

12   permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

13        While Plaintiffs acknowledge that these factors apply, Plaintiffs dedicate a mere three

14   sentences to explaining how they have satisfied them. *See* Pls.' Br. 35. They cite nothing in the

15   record to support such a contention. Plaintiffs therefore fall well short of raising serious questions,

16   let alone satisfying their burden. *See Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable

17   discretion; it does not follow from success on the merits as a matter of course.").

18        **A.  Plaintiffs Cannot Establish Any Irreparable Harm.**

19        A permanent injunction is warranted only when a party can demonstrate that such

20   extraordinary relief is necessary to prevent "present or imminent risk of likely irreparable harm."

21   *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010). The risk of harm must be both

22   "substantial and immediate." *Montana v. BNSF Ry. Co.*, 623 F.3d 1312, 1317 n.3 (9th Cir. 2010)

23   (quoting *G.C. and K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1107 (9th Cir. 2003)).

24        Here, Plaintiffs claim that they "will suffer irreparable injury from California's loss of

25   representation in Congress in the Electoral College and the resulting dilution of individual

26   Plaintiffs' votes, and Plaintiffs are currently suffering injury as a result of the Apportionment

27   Exclusion Order's chilling effect on the census response." Pls.' Br. 35.

28

### 1.  Plaintiffs Cannot Establish Any Irreparable Apportionment Injury.

Because Plaintiffs filed suit before the Secretary has implemented the Memorandum—and before any census enumeration has even been completed—Plaintiffs cannot show any immediate threat of apportionment injury.  As detailed above, it is currently unknown what numbers the Secretary may ultimately transmit to the President.  *See, e.g.*, Abowd Decl. ¶ 15.  Plaintiffs' expert declaration posits only that the *wholesale* exclusion of illegal aliens may cause certain states to lose a Congressional seat.  *See* Pls.' Br. 9-11; *see generally* Gilgenbach Decl.  But that expert does not— and cannot—predict what apportionment injury any state might suffer from some hypothetical smaller exclusion, assuming a state suffers any injury at all.  Given that the Secretary of Commerce has not yet transmitted his report to the President, and the President has not yet transmitted any numbers to Congress, any effort to predict the ultimate effect of the Memorandum on apportionment, or the resulting political power of Plaintiffs, is entirely speculative.

More fundamentally, any purported apportionment injury that Plaintiffs could suffer is, as a legal matter, not irreparable.  The Supreme Court has regularly decided census cases that, like this one, contest the relative apportionment of representatives post-apportionment, because an erroneous or invalid apportionment number can be remedied after the fact.[15]  *See, e.g., Utah*, 536 U.S. at 462 (holding that post-apportionment redress is possible if the apportionment calculation contains an error); *see also Franklin*, 505 U.S. at 803 (finding that a post-apportionment order against the Secretary would provide redress for plaintiffs); *Dep't of Commerce v. Montana*, 503 U.S. at 445-46; *Wisconsin*, 517 U.S. at 1.  Indeed, in *Wisconsin*, it was not until *six years* after the 1990 census that the Court resolved an apportionment dispute based on those results.  This case is no different.  Accordingly, this Court could order adequate relief after apportionment when any injury to Plaintiffs is known with certainty, assuming there is any at all.  Indeed, the very fact that the Memorandum calls for the Secretary to report two numbers—one arrived at after the Census

---

[15]  The only census cases decided by the Supreme Court pre-apportionment involved challenges to the mechanics of conducting the census, which could not be undone post-apportionment.  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) (challenge to a citizenship question on the 2020 Census); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (challenge to the use of statistical sampling in the census).

1    Bureau applies its Residency Criteria, and another that would allow the President to remove some

2    number of illegal aliens that the Secretary is able to identify from the apportionment base—makes

3    clear that a post-apportionment remedy would be easy to craft.

**2. Plaintiffs Cannot Establish Any Irreparable Enumeration Injury.**

5    Plaintiffs' alternative efforts to link the Memorandum to some ongoing enumeration injury

6    fare no better.  As explained by Associate Director Fontenot, the Memorandum does *not* affect how

7    the Census Bureau is conducting its remaining enumeration operations.  *See* Fontenot Decl. ¶¶ 8,

8    12-13; *see generally* Census Bureau, *Review of 2020 Operational Plan Schedule*, Aug. 17, 2020,

9    https://2020census.gov/content/dam/2020census/materials/news/2020-operational-plan-schedule-

10   review.pdf ("Operational Plan").  Those operations include a variety of protocols specifically

11   designed over the course of the past decade to ensure that hard-to-count and minority

12   communities—some of the core constituencies for which Plaintiffs advocate—are accurately

13   reflected in the census.  *See generally* Fontenot Decl. ¶¶ 8-13; Operational Plan at 2-11 (describing

14   non-response follow-up, and other efforts to achieve "acceptable level of accuracy and

15   completeness, with a goal of resolving at least 99% of Housing Units in every state, comparable

16   with previous censuses"). [16]  Plaintiffs speculate that, notwithstanding these protocols, the

17   Memorandum will render the enumeration less accurate—purportedly by deterring immigrant

18   communities from participating. Pls.' Br. 11.  But these claims suffer from at least two fundamental

19   flaws, which seriously undermines the causation Plaintiffs are trying to establish.

**a. Plaintiffs' Theory of Harm Relies on Hypothetical, Attenuated Events Involving Independent Third-Parties.**

22   As discussed above in the standing section, Plaintiffs' theory for why the Memorandum

23   may depress response rates relies on a highly attenuated chain of events.  Plaintiffs' expert, Dr.

24   Barreto, opines that immigrant communities are less likely to respond to the census because of how

---

[16] *See also 2020 Census Detailed Operational Plan for: 18. Nonresponse Followup Operation (NRFU)*, Apr. 16, 2018, https://www2.census.gov/programs-surveys/decennial/2020/program-management/ planning-docs/NRFU-detailed-operational-plan.pdf; *see also 2020 Census Research and Testing Management Plan*, Dec. 28, 2015, https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/research-testing-plan.pdf, at 7.

that Memorandum is discussed in the media and by community activists.   Barreto Decl. ¶¶ 15-16, 35.  But those independent actors' messages are the product of their own interpretation, and often at odds with the plain terms of the Memorandum.  *See, e.g.*, Barreto Decl. ¶ 36 (listing media messages characterizing the Memorandum as something "intended to promote fear"); *id.* ¶ 59 (noting that aliens "may not do the full research to realize they can still fill out the Census safely, *because they hear the news which is connecting* the July 21 [Memorandum] to Trump's longstanding desire to increase deportation of undocumented immigrants" (emphasis added)).  It makes little sense to attribute whatever harm is caused by those independent actors' messaging to the Memorandum itself, particularly if their messages convey the incorrect impression that the Memorandum increases the "risk of [individuals'] information being linked to immigration records and [those individuals] facing immigration enforcement."  Barreto Decl. ¶ 75.  Given the strong privacy protections for census response data, any suggestion that the Secretary's compliance with the Memorandum will somehow facilitate immigration enforcement is flatly wrong.  *See generally* 13 U.S.C. § 9 (providing that personal information collected by the Census Bureau cannot be used against respondents by any government agency or court); *id.* § 214 (setting forth penalty for wrongful disclosure of information).

Setting aside the role of independent actors, Plaintiffs' theory of harm proves too much.  Plaintiffs' core claim is that the Memorandum will depress certain groups' participation in the census.  *See, e.g.*, Pls.' Br. 11; Barreto Decl. ¶ 14.  But the same line of reasoning could apply to almost any government action or statement that Plaintiffs find disagreeable.  Their theory would recognize harm sufficient for standing (and presumably for an injunction) based on a President's mere statements suggesting that he is exploring new legislation that would permit the Census Bureau to share data with immigration enforcement agencies.  That makes little sense.

The transmission of a general policy message—like the kind Plaintiffs claim the Memorandum sends—cannot suffice to show that the risk of irreparable harm is "immediate."  *BNSF Ry. Co.*, 623 F.3d at 1317 n.3.  The Supreme Court has repeatedly rejected efforts to conjure irreparable injury from a hypothetical series of events that could theoretically cause a plaintiff injury.  *See, e.g., Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *Rizzo v. Goode*, 423 U.S. 362,

1    372–73 (1976).  Indeed, it has explicitly noted that allegations of "fear[]" of future harm must be

2    assessed for reasonableness:  "[i]t is the *reality* of the threat of" future harm that is relevant, "not

3    the plaintiff's subjective apprehensions."  *Lyons*, 461 U.S. at 107 n.8 (emphasis added).  Where, as

4    here, fear is based on a series of conjectures and subjective misinterpretations—tethered not to

5    something the government has actually done, but to some different policy the government might

6    (or might not) pursue in the future—such fear cannot form the basis for irreparable harm.  *See id.*

7    at 107.  Merely harboring an objection to the President's expression of a policy preference falls far

8    short of the standard for injunctive relief.

9                         **b.  The Alleged Harm is at Odds with Existing Evidence.**

10          Plaintiffs' claims that the Memorandum is likely to decrease response rates is simply

11   inconsistent with empirical evidence.  Plaintiffs try to analogize the Memorandum to a citizenship

12   question on a census questionnaire.  *See, e.g.*, Barreto Decl. ¶¶ 14, 19, 25, 30, 70, 82, 93.  But, as

13   noted above, a randomized control trial published by the Census Bureau after the Supreme Court

14   issued its opinion in the citizenship question litigation found *no* statistically-significant depression

15   of response rates for households that received a test questionnaire containing a citizenship question.

16   *See* Abowd Decl. ¶ 13;  *see also 2019 Census Test Report,* Census Bureau (Jan. 3, 2020),

17   https://www2.census.gov/programs-surveys/decennial/2020/program-management/census-

18   tests/2019/2019-census-test-report.pdf (Census Test Report).  As explained by Dr. Abowd, this test

19   contained a sample of 480,000 housing units, and was "capable of detecting differences as small as

20   0.5 percentage points."  *See* Abowd Decl.¶ 13.  And while some narrow subgroups did exhibit

21   statistically-significant lower self-response rates, Census Test Report at x, the Census Bureau

22   concluded that "[c]urrent plans for staffing for Nonresponse Followup would have sufficiently

23   accounted for subgroup differences seen in this test."  Census Test Report at x.  This result was

24   contrary to the prediction of experts who previously testified during the citizenship-question

25   litigation, and some of whose declarations Plaintiffs again submit now.  *See generally* Abowd Decl.

26   ¶ 13; *see, e.g.*, Barreto Decl. ¶ 82.  This finding illustrates the benefit of a "randomized controlled

27   design," which properly isolates the independent variable (the citizenship question) and measures

28   its effects.  Census Test Report at ix; *see also* Abowd Decl. ¶ 13.

1    Plaintiffs cannot reasonably contend that the Memorandum would have a greater effect on

2    response rates than did the citizenship question.  Unlike a question on a census questionnaire, the

3    Memorandum does not call for respondents to submit any information, and it changes nothing about

4    the enumeration process.  *See* 85 Fed. Reg. at 44,679 (directing the Secretary to make use of existing

5    information).  Indeed, none of the declarants proffered by Plaintiffs identifies a rigorous survey or

6    statistical study measuring whether this kind of internal Government action, which seeks nothing

7    of respondents and has no connection to immigration enforcement, has any effect on response rates

8    within immigrant communities.  *See generally* Barreto Decl. ¶¶ 45-93.  And nothing Plaintiffs

9    submit purports to statistically measure the effect of the Memorandum itself on response rates.  *See*

10   *generally id.*

11   Under these circumstances, Plaintiffs cannot be said to establish anything more than the

12   abstract "possibility of irreparable injury."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  But, as the

13   Supreme Court has emphasized, the "'possibility' standard is too lenient" a basis upon which to

14   issue the drastic remedy of an injunction.  *Winter*, 555 U.S. at 22.  Given that irreparable harm is

15   one of the most important prerequisites for the issuance of an injunction, Plaintiffs' failure to

16   establish anything more than theoretical harm is sufficient basis to deny the injunction.

17                    **B.  The Remaining Factors Weigh Against an Injunction.**

18   On the other side of the ledger, the harm to the government and to the public interest from

19   an injunction would be great and immediate.  *See Nken*, 556 U.S. at 435 (explaining that harm to

20   opposing party and weighing the public interest "merge" when relief is sought against the

21   government).  In particular, an injunction would impede the Executive's historic discretion in

22   conducting both the census and the apportionment, contrary to Congressional intent.  *See generally*

23   *Franklin*, 505 U.S. at 796-800.

24   Plaintiffs offer nothing to support their claim that the equities favor an injunction, other than

25   to state—without citation to precedent or evidence—that "the balance of hardship and public

26   interest are best served by precluding Defendants from implementing a scheme that will deprive

27   Plaintiffs of their rights under the Constitution and the Census and Reapportionment Acts."  Pls.'

28   Br. 35.  In so doing, Plaintiffs seem to assume that the remaining injunction factors are irrelevant

1    so long as they can demonstrate irreparable injury.  But success on the merits alone does not entitle

2    a party to the extraordinary relief of a permanent injunction.  As courts have made clear time and

3    again, "injunctive relief is not automatic, and there is no rule requiring automatic issuance of a

4    blanket injunction when a violation is found."  *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843

5    (9th Cir. 2007); *see Winter*, 555 U.S. at 32; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312

6    (1982) ("[t]he award of an interlocutory injunction by courts of equity has never been regarded as

7    strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff"

8    (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).

9                                                **CONCLUSION**

10          For the foregoing reasons, the Court should deny the Plaintiffs' Motions for Partial

11    Summary Judgment and grant Defendants' Motion to Dismiss, or in the alternative, Motion for

12    Partial Summary Judgment.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                                        Respectfully submitted,

3                                        JEFFREY BOSSERT CLARK
4                                        Acting Assistant Attorney General

5                                        DAVID MORRELL
6                                        Deputy Assistant Attorney General

7                                        ALEXANDER K. HAAS (SBN 220932)
                                         Branch Director
8
                                         DIANE KELLEHER
9                                        BRAD P. ROSENBERG
                                         Assistant Branch Directors
10
                                         /s/ Daniel D. Mauler
11
                                         _____
12                                       DANIEL D. MAULER
                                         (Va. Bar No.: 73190)
13                                       Trial Attorney
                                         U.S. Department of Justice
14                                       Civil Division - Federal Programs Branch
15                                       1100 L Street, NW
                                         Washington, D.C.  20005
16                                       Telephone:   (202) 616-0773
                                         Facsimile:   (202) 616-8470
17                                       E-mail:      dan.mauler@usdoj.gov

18                                       *COUNSEL FOR DEFENDANTS*

19

20

21

22

23

24

25

26

27

28