1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CITY OF SAN JOSE, CALIFORNIA, et al.,<br>                    Plaintiffs,<br>          v.<br><br>DONALD J. TRUMP, et al.,<br>                    Defendants. | No. 20-CV-05167-RRC-LHK-EMC |

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br>                    Plaintiffs,<br>          v.<br><br>DONALD J. TRUMP, et al.,<br>                    Defendants. | No. 20-CV-05169-RRC-LHK-EMC<br><br>**ORDER GRANTING PLAINTIFFS'<br>MOTION FOR PARTIAL SUMMARY<br>JUDGMENT AND DENYING<br>DEFENDANTS' MOTION TO DISMISS** |

Before:       RICHARD R. CLIFTON, United States Circuit Judge
              LUCY H. KOH, United States District Judge
              EDWARD M. CHEN, United States District Judge

PER CURIAM.

1

Before us are Plaintiffs' Motion for Partial Summary Judgment and Defendants' Motion to Dismiss, or in the Alternative, Motion for Partial Summary Judgment regarding the Presidential Memorandum of July 21, 2020, which declared that, "[f]or the purposes of the reapportionment of Representatives following the 2020 census, it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status." *Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020) (the "Presidential Memorandum").

Plaintiffs, which include the State of California, numerous cities and counties across the country, a school district, a public interest organization, and citizens, challenge the legality of the Presidential Memorandum.[1] We conclude that the Presidential Memorandum violates the Constitution and two statutes. Specifically, the Presidential Memorandum violates the Apportionment and Enumeration Clauses of Article I, Section 2 of the Constitution and Section 2 of the Fourteenth Amendment of the Constitution; the constitutional separation of powers; the Census Act of 1954; and the Reapportionment Act of 1929.

Our decision is not based on any preference we might have on the question of whether, as a matter of policy, undocumented immigrants should be included for purposes of determining the apportionment of seats in the House of Representatives. The Presidential Memorandum provides reasons for its policy, but those are not for us to review. Rather, our conclusion is based upon our determination of what the law requires. The policy which the Presidential Memorandum attempts to enact has already been rejected by the Constitution, the applicable statutes, and 230 years of

---

[1] Specifically, this case is brought by Plaintiffs State of California; City of Los Angeles, California; City of Long Beach, California; City of Oakland, California; Los Angeles Unified School District, County of Los Angeles; City of San Jose, California; King County, Washington; Arlington County, Virginia; Harris County, Texas; Black Alliance for Just Immigration; Sam Liccardo; Rodney Ellis; Zerihoun Yilma; Lovette Kargbo-Thompson; and Santcha Etienne (collectively, "Plaintiffs") against Defendants President Donald J. Trump; Secretary of Commerce Wilbur L. Ross, Jr.; the Department of Commerce; the U.S. Census Bureau; and the Director of the U.S. Census Bureau Steven Dillingham (collectively, "Defendants").

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

1   history.

2          Having considered the parties' submissions; the parties' oral arguments at the October 8,

3   2020 hearing; the relevant law; and the record in this case, we GRANT Plaintiffs' Motion for

4   Partial Summary Judgment and DENY Defendants' Motion to Dismiss, or in the Alternative,

5   Motion for Partial Summary Judgment.[2]

6   **I.      BACKGROUND**

7          Prior to discussing the merits in this case, the Court provides the following background

8   information in turn: (1) constitutional history; (2) proposed constitutional amendments and

9   statutory history; (3) Executive Branch practice; (4) 2019 litigation regarding the census

10  citizenship question; (5) the President's announcement to proceed with the citizenship question;

11  (6) Executive Order 13,880 or the "Collecting Information Executive Order"; (7) census data

12  collection; and (8) the Presidential Memorandum.

13         **A. Constitutional History**

14         Article I, Section 2 requires an "actual Enumeration" to be conducted "every . . . ten Years"

15  for the purpose of apportioning representatives to the states. U.S. Const. art. I, § 2, cl. 3.

16  Representatives were apportioned based on a formula, which involved "adding to the whole

17  Number of free Persons, including those bound to Service for a Term of Years, and excluding

18  Indians not taxed, three fifths of all other Persons." *Id*. Section 2 of the Fourteenth Amendment

19  modified this formula to "count[] the whole number of persons in each state, excluding Indians not

20  taxed." U.S. Const. amend. XIV, § 2. The drafting history of Article I, Section 2 and Section 2 of

21  the Fourteenth Amendment show the Framers' focus on including noncitizens in the

22  apportionment base.

23  _____

24  [2] Plaintiffs do not move for summary judgment on their other claims. Those claims are that the
    Presidential Memorandum violates the Fifth and Fourteenth Amendments through

25  malapportionment and intentional discrimination; 13 U.S.C. § 195's ban on statistical sampling;

26  the Apportionment and Enumeration Clauses' ban on inaccurate data and statistical sampling; and
    the Administrative Procedure Act ("APA"). We thus do not address these other claims in this order.

27

28  Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
    ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
    DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

In 1787, when the Constitution was drafted, the Framers chose to constitutionalize the requirement that a census be conducted every decade. A purpose of this requirement was to regularly apportion the congressional representatives allocated to each state. As ratified, Article I, Section 2 requires an "actual Enumeration" to be conducted "within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years." U.S. Const. art. I, § 2, cl. 3. The "actual Enumeration" would count "the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." *Id.*

This ratified text reflected earlier drafts as well. The previous draft of Article I, Section 2 comprised two clauses—an Apportionment Clause and a Direct Taxation Clause. The draft Apportionment Clause provided that Congress would "regulate the number of representatives by the number of inhabitants, according to the rule hereinafter made for direct taxation." 2 *Records of the Federal Convention of 1787* at 566, 571 (M. Farrand ed. 1911) (emphasis added).[3] The Direct Taxation Clause stated that "[t]he proportions of direct taxation shall be regulated by the whole number of free citizens *and* inhabitants, of every age, sex, and condition, including those bound to servitude for a term of years, and three fifths of all other persons not comprehended in the foregoing description, (except Indians not paying taxes)." *Id.* at 571 (emphasis added). These provisions were later consolidated into Article I, Section 2 by the Committee of Style. *Id.* at 553.

In the debates on Article I, Section 2, the Framers recognized that the number of representatives would be determined by the number of persons residing in each state, not the number of voters. 1 Farrand, *supra*, at 580–81 (notes of James Madison on Constitutional

---

[3] Farrand's *Records of the Federal Convention of 1787* gathers materials from the Constitutional Convention of 1787, including the official journal and the contemporaneous notes of participants in the convention. *See The Records of the Federal Convention of 1787*, 25 Harv. L. Rev. 198, 199 (1911) (explaining that "these three volumes are indispensable to anyone who is searching at first hand for any fact as to the transactions of the Federal Convention"). Accordingly, Farrand has been cited by the Supreme Court. *See Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 576 U.S. 787, 815 (2015) (citing Farrand).

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

1    Convention proceedings on Wednesday, July 11, 1787). According to a speech by Alexander

2    Hamilton, "every individual of the community at large has an equal right to the protection of

3    government." *Id*. at 473 (notes of Representative Robert Yates of New York on Constitutional

4    Convention proceedings on Friday, June 29, 1787).

5         In *The Federalist* No. 54, James Madison explained the importance of Article I, Section 2:

6    "It is a fundamental principle of the proposed Constitution, that . . . the aggregate number of

7    representatives allotted to the several States is to be . . . founded on the aggregate number of

8    inhabitants . . . ." *The Federalist* No. 54. *The Federalist* Nos. 56 and 58 confirm the Constitution's

9    decision to apportion based on the number of inhabitants. *See The Federalist* No. 56 (noting that

10   the Constitution mandates "a representative for every thirty thousand inhabitants"); *The Federalist*

11   No. 58 (stating that the Constitution requires "readjust[ing], from time to time, the apportionment

12   of representatives to the number of inhabitants"). Madison acknowledged that "[t]he qualifications

13   on which the right of suffrage depend are not, perhaps, the same in any two States. . . . In every

14   State, a certain proportion of inhabitants are deprived of this right [but] . . . will be included in the

15   census by which the federal Constitution apportions the representatives." *The Federalist* No. 54.

16        In 1865, the Civil War ended, and the Thirteenth Amendment abolished slavery. On June

17   13, 1866, Congress passed the Fourteenth Amendment. By July 9, 1868, the Fourteenth

18   Amendment was ratified by the states.

19        At the debates over the Fourteenth Amendment, Congress discussed how to adjust the

20   apportionment formula. *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1128 (2016) ("[T]he

21   apportionment issue consumed more time in the Fourteenth Amendment debates than did any

22   other topic.") (quoting J. Sneed, *Footprints on the Rocks of the Mountain: An Account of the*

23   *Enactment of the Fourteenth Amendment* 28 (1997)). The Fourteenth Amendment changed the

24   formula for apportionment by deleting the provisions for slaves as well as indentured servants.

25   *Compare* U.S. Const. art. I, § 2, cl. 3 *with* U.S. Const. amend. XIV, § 2. The new formula

26   apportioned representatives based on "the whole number of persons in each state, excluding

27

28

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

Indians not taxed." U.S. Const. amend. XIV, § 2.

The drafters of the Fourteenth Amendment considered making more changes to Article I, Section 2. "Concerned that Southern States would not willingly enfranchise freed slaves," the drafters considered the "possibility of allocating House seats to States on the basis of voter population." *Evenwel*, 136 S. Ct. at 1127 (citing Sneed at 28). Representative Thaddeus Stevens of Pennsylvania drafted a proposal "that would have allocated House seats to States 'according to their respective legal voters'" instead of population. *Id.* at 1128 (quoting Cong. Globe, 39th Cong., 1st Sess. 10 (1866)). However, the drafters ultimately rejected this proposed language. *Id.*

The drafters of the Fourteenth Amendment instead embraced "the principle upon which the Constitution itself was originally framed, that the basis of representation should depend upon numbers . . . not voters." Cong. Globe, 39th Cong., 1st Sess. 2766–67 (1866) (statement of Senator Jacob Howard of Michigan introducing the Fourteenth Amendment on the Senate floor). The drafters of the Fourteenth Amendment understood that the Constitution had traditionally based apportionment on the number of persons residing in each state, not the number of citizens. *See, e.g.*, *id.* at 705 (statement of Senator William Fessenden of Maine) ("The principle of the Constitution, with regard to representation, is that it shall be founded on population . . . . [W]e are attached to that idea, that the whole population is represented; that although all do not vote, yet all are heard. That is the idea of the Constitution.").

During the debates, the drafters acknowledged that the apportionment base would include immigrants:

- "Every man in this House knows perfectly well in the several States . . . unnaturalized citizens cannot vote . . . yet for these persons the States are entitled to representation." *Id.* at 353 (statement of Representative Andrew Jackson Rogers of New Jersey)

- "'Persons' and not 'citizens,' have always constituted the basis" for apportionment, and a proposal to use voters "would narrow the basis of taxation and cause considerable inequalities in this respect, because the number of aliens in some States is very large, and growing larger now, when emigrants reach our shores at the rate of more than a State a year." *Id.* at 359 (statement of Representative Roscoe Conkling of New York)

United States District Court
Northern District of California

- A proposal to base representation on voters would "take[] from the basis of representation all unnaturalized foreigners" *Id*. at 411 (statement of Representative Burton Cook of Illinois)

- "Under the Constitution as it now is and as it always has been, the entire immigrant population of this country is included in the basis of representation." *Id.* at 432 (statement of Representative John Bingham of Ohio)

- "Foreigners are counted." *Id.* at 961 (statement of Senator Charles Buckalew of Pennsylvania)

- The Fourteenth Amendment cannot "throw[] out of the basis at least two and a half millions of unnaturalized foreign-born men and women." *Id*. at 1256 (statement of then-Senator (later Vice President) Henry Wilson of Massachusetts)

- "Representation is now based upon population," including "foreigners not naturalized." *Id.* at 2944 (statement of Senator George Henry Williams of Oregon)

- Apportioning based on voters would be "a blow which strikes the two million one hundred thousand unnaturalized foreigners who are now counted in the basis of representation from that basis." *Id*. at 2987 (statement of Senator Luke Poland of Vermont)

Like the Framers, the drafters of the Fourteenth Amendment found it important to include noncitizens in the apportionment base. The drafters reasoned that noncitizens' interests would be represented by the elected government, even if the noncitizens did not vote. *See id*. at 141 ("[N]o one will deny that population is the true basis of representation; for women, children, and other non-voting classes may have as vital an interest in the legislation of the country as those who actually deposit the ballot.") (statement of Representative James Blaine of Maine). Thus, Congress passed and the states ratified the following text: "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2.

### B.  Proposed Constitutional Amendments and Statutory History

Members of Congress and their legal counsel have consistently maintained that it would be unconstitutional to exclude noncitizens from the apportionment base. Since the passage of the first federal immigration laws in 1875, members of Congress have tried to introduce constitutional amendments and legislative proposals that would have excluded noncitizens from the

7

apportionment base. All have failed to pass.

For example, in 1929, Congress considered two constitutional amendments that would have changed the apportionment formula to exclude noncitizens. That year, Representative Homer Hoch of Kansas introduced a constitutional amendment that would have expressly excluded noncitizens from the apportionment base. The constitutional amendment would have changed the Fourteenth Amendment's apportionment formula to the following:

> Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed and aliens.

*To Amend the Constitution: Hearing on H.J. Res. 102 and H.J. Res. 351 Before the H. Comm. on the Judiciary*, 70th Cong. 1 (1929).

At the same time that the Hoch Constitutional Amendment was being considered, Congress was also considering a constitutional amendment introduced by Representative Gale Stalker of New York. That constitutional amendment would have expressly excluded noncitizens from the apportionment:

> Aliens shall be excluded in counting the whole number of persons in each State for apportionment of Representatives among the several States according to their respective numbers.

*Id.* Neither constitutional amendment was passed by Congress.

Also in 1929, Congress enacted the Reapportionment Act. During consideration of the bill that became the Reapportionment Act of 1929, Congress discussed whether noncitizens and immigrants without lawful status should be counted by the census and included in the apportionment base. The number of undocumented immigrants at that time was not trivial. One estimate by then-Senator (later Vice President) Alben Barkley of Kentucky was that there were "at least three or four million men and women who enjoy no legal status, who are subject to deportation if the Government could find them." 71 Cong. Rec. 1976 (1929). Given that each congressional seat represented a population of 250,000 people in 1929, a population of undocumented immigrants of that magnitude would have affected the number of seats assigned to

8

each state. *Id.* at 1963. In fact, in 1929, several states explicitly excluded noncitizens from the population base used to apportion their state legislatures. *See id.* at 1967 (listing New York, North Carolina, California, and Tennessee as limiting their apportionment base in some manner beyond residency). New York's state legislature, for example, used an apportionment base of "the number of their respective inhabitants, excluding aliens." *Id.*

Both houses of Congress considered amending the Reapportionment Act bill to exclude undocumented immigrants from the apportionment base. The Senate considered an amendment that would have excluded "aliens" from the apportionment base. 71 Cong. Rec. 2065 (1929) (restating the proposed amendment prior to the vote). The amendment resulted in a debate on the Senate floor over several days. *See, e.g.*, *id.* at 1958–1982; *id.* at 2338–64. References were made during the floor debate to undocumented immigrants, those "smuggled into the United States" and in the country "without the authority of [the] United States Government." *Id.* at 1967; *see, e.g.*, *id.* at 1974–76.

As a policy matter, the Senate amendment received prominent support. For instance, Senator David Reed of Pennsylvania, who co-authored the Immigration Act of 1924 that limited immigration from Southern and Eastern Europe and banned immigration from Asia, assured his Senate colleagues that "everything in my experience and outlook would lead me to vote for this amendment if that possibly could be done." *Id.* at 1958. However, the Senate Legislative Counsel evaluated the amendment and advised that "there is no constitutional authority for the enactment of legislation excluding aliens from enumeration for the purposes of apportionment of Representatives among the States." C.E. Turney, Law Assistant, Senate Legislative Counsel, *Power of Congress to Exclude Aliens from Enumeration for Purposes of Apportionment of Representatives* (Apr. 30, 1929), reprinted at 71 Cong. Rec. 1821–22 (1929).

Senator Reed thus concluded that he could not vote for the amendment because it was unconstitutional. Senator Reed reasoned that "the oath which we take to support the Constitution includes the obligation to support it when we dislike its provisions as well as when we are in

9

sympathy with them." 71 Cong. Rec. 1958 (1929). In concluding that the amendment was unconstitutional, Senator Reed emphasized that the Constitution deliberately used the word "persons" instead of the word "citizens," and "the word 'persons' must be taken in its literal sense." *Id.* Consequently, the Senate rejected the amendment. *Id.* at 2065.

Representatives in the House proposed three amendments to the Reapportionment Act that would have resulted in aliens, or some subset of aliens, being excluded from the apportionment base.

- The Bankhead Amendment would have "registered the names and addresses of all aliens and shall have entered upon such registration a statement of each alien showing by what right or authority of law he had entered the United States." 71 Cong. Rec. 2338–39 (1929). The aim of the Amendment was to eventually exclude those illegally in the country from the apportionment base. *Id.* at 2339. This amendment was rejected. *Id.* at 2343.

- Later the same day, the Thurston Amendment was introduced which would have added "and excluding aliens" after "Indians not taxed." *Id.* at 2360. Concerns were raised about the constitutionality of excluding aliens from the apportionment base. *Id.* at 2360–61.

- Representative Hoch volunteered his own amendment seeking to cure the perceived issues with the Thurston Amendment. *Id.* at 2361. The Hoch Amendment added a new paragraph to the law: "The word 'persons' as used in this section shall not be construed to include aliens. If any provision of this section is declared unconstitutional the validity of the remainder of the act shall not be affected thereby." *Id.*

The debate on these three amendments included a prolonged discussion of "aliens who are unlawfully in this country." *Id.* at 2264; *see, e.g., id.* at 2260, 2264–68, 2276, 2339. Initially, the Hoch Amendment (which construed the word "persons" not "to include aliens," *id.* at 2361) was adopted. *Id.* at 2363. Two days later, however, the Hoch Amendment was stricken from the Act by a floor amendment. *Id.* at 2449–50. Though Representative Hoch attempted to reintroduce his amendment on the House floor, *id.* at 2451, it was ruled out of order by the chair, a decision upheld by a vote of the members present. *Id.* at 2454.

Ultimately, the Reapportionment Act of 1929 was passed by a Congress that understood that the census count and apportionment base would include undocumented immigrants. The Reapportionment Act reiterated that the apportionment base is what the Fourteenth Amendment

10

United States District Court
Northern District of California

provides—the "number of persons in each State, excluding Indians not taxed." An Act To Provide for the Fifteenth and Subsequent Decennial Censuses and To Provide for Apportionment of Representatives in Congress ("Reapportionment Act of 1929" or "Reapportionment Act"), Pub. L. No. 71-13, ch. 28, § 22(a), 46 Stat. 21, 26 (1929) (codified as amended at 2 U.S.C. § 2a(a)). As amended, the Reapportionment Act provides:

> [T]he President shall transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member.

2 U.S.C. § 2a(a); *accord* U.S. Const. amend. XIV, § 2 (counting the "number of persons in each State, excluding Indians not taxed"). Following this statutory and constitutional requirement to base apportionment on the "number of persons in each State," the Reapportionment Act of 1929 also provided that the Secretary of Commerce would report a "tabulation of total population by States" to the President. § 2, 46 Stat. at 21. This reporting requirement was then repeated in the Census Act of 1954, which codified various census-related laws into Title 13 of the United States Code. *See* An Act To Revise, Codify, and Enact Into Law, Title 13 of the United States Code, entitled "Census" ("Census Act of 1954" or "Census Act"), Pub L. No. 83-740, ch. 1158, § 143(b), 68 Stat. 1012, 1020 (1954) (codified as amended at 13 U.S.C. § 141 *et seq.*).

Following the rejected amendments to the Reapportionment Act of 1929, later proposals to exclude undocumented immigrants from the apportionment base were also rejected as unconstitutional. In 1940, for example, during a debate on a bill that would have excluded aliens from the apportionment base, Representative Emanuel Celler of New York was asked whether it would be lawful to exclude "aliens who are in this country in violation of law." 86 Cong. Rec. 4372 (1940). "The Constitution says that all persons shall be counted," Representative Celler replied. "I cannot quarrel with the founding fathers. They said that all should be counted. . . . The

11

1    only way we can exclude them would be to pass a constitutional amendment." *Id.* The bill was

2    subsequently defeated. *Id.* at 4386.

3        In advance of the 1990 Census, a 1989 legislative amendment was introduced in the Senate

4    that would have mandated that "aliens in the United States in violation of the immigration laws

5    shall not be counted" for the purposes of apportionment. 135 Cong. Rec. 14539–40 (1989).

6    Senator Dale Bumpers of Arkansas admitted that he did "not want to go home and explain [his]

7    vote on this [amendment] any more than anyone else does." *Id.* at 14551. Nevertheless, Senator

8    Bumpers voted against the amendment because he thought the amendment was unconstitutional.

9    "I wish the Founding Fathers had said you will only enumerate 'citizens,'" Senator Bumpers

10   concluded, "but they did not. They said 'persons,' and so that is what it has been for 200 years. We

11   have absolutely no right or authority to change that peremptorily on a majority vote here." *Id.*

12       **C.  Executive Branch Practice**

13       Like Congress, the Executive Branch has consistently maintained that all residents of each

14   state must be counted, regardless of their legal status or citizenship. The first census statute, which

15   governed the 1790 Census, instructed "assistants" to count "the number of the *inhabitants* within

16   their respective districts," not the number of *citizens.* Act of Mar. 1, 1790, § 1, 1 Stat. 101, 101

17   (emphasis added). Then, in the nineteenth century, residents were counted even when they were in

18   a state unlawfully.

19       For example, escaped slaves who were unlawfully present in northern states were counted

20   in the 1860 Census as part of the apportionment base in those northern states. *See* An Act

21   Respecting Fugitives From Justice, and Persons Escaping From the Service of Their Masters, 9

22   Stat. 462, 462–63 (1850) (requiring free states to return escaped slaves to their owners); U.S.

23   Census Bureau, *1860 Census: Population of the United States* at vi-vii, xi, xvxvi (Gov't Printing

24   Office 1864), ECF No. 64-22 at 5–6 (counting escaped slaves in the census).[4]

25   _____

26   [4] "ECF No." stands for the identification number of Electronic Case Files on a case docket. Unless

27

28   Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
     ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
     DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

1    This tradition of counting persons in unlawful status continued even through the creation

2    of the modern Census Bureau in 1902. President Ronald Reagan's Census Bureau Director, for

3    example, affirmed the consistency of historical practice in congressional testimony in 1985.

4    Director John Keane testified that the "[t]raditional understanding of the Constitution and the legal

5    direction provided by the Congress has meant that for every census since the first one in 1790, [the

6    Bureau] ha[s] tried to count residents of the country, regardless of their status." *Enumeration of*

7    *Undocumented Aliens in the Decennial Census: Hearing on S. 99-314 Before the Subcomm. on*

8    *Energy, Nuclear Proliferation, & Gov't Processes of the S. Comm. on Governmental Affairs*, 99th

9    Cong. 19 (1985) (statement of Census Director John Keane).

10    Similarly, during both Republican and Democratic administrations, the Department of

11    Justice ("DOJ") has consistently maintained that the Constitution requires including

12    undocumented immigrants in the apportionment base. The DOJ in President Jimmy Carter's

13    Administration, for example, took the position during litigation in 1980 that the Fourteenth

14    Amendment "requir[es] that all the inhabitants of the states, including illegal aliens, be counted for

15    the apportionment." Defs. Reply Mem., *Fed'n for Am. Immigration Reform* ("*FAIR*") *v. Klutznick*,

16    No. 79-3269, 1980 WL 683642 (D.D.C. Jan. 3, 1980).

17    The DOJ in President Reagan's Administration reached the same conclusion. Specifically,

18    in 1988, the DOJ evaluated a bill to exclude "illegal aliens" from the apportionment base. The

19    DOJ concluded that "it [was] unconstitutional" and stated that "[i]f it were passed [by Congress],

20    [DOJ] would recommend that the President veto it." Letter from Thomas M. Boyd, Acting Ass't

21    Attorney Gen., to Rep. William D. Ford, Chairman, Comm. on the Post Office & Civil Serv.,

22    House of Representatives, at 1 (June 29, 1988), reprinted at *1990 Census Procedures and*

23    *Demographic Impact on the State of Michigan: Hearing Before the Committee on Post Office and*

24    *Civil Service, House of Representatives*, 100th Cong. 240–44 (1988), ECF No. 64-29 at 2.

25    _____

26    otherwise specified, citations to ECF numbers refer to documents on the *City of San Jose* docket,
case number 20-CV-05167-RRC-LHK-EMC.

27

28
Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

Assistant Attorney General Boyd noted that the DOJ's view was based not only on DOJ's longstanding position, but also DOJ's recent "reexamin[ation]" of that position. *Id.* at 5. Assistant Attorney General Boyd wrote:

> The Department of Justice has advised previous Congresses considering identical legislation that aliens must be included within the census for purposes of apportioning congressional Representatives, and has adopted that position in court. We have reexamined this position and continue to believe that it is sound. Accordingly, we find that to the extent that [the bill] would exclude illegal aliens from the census, it is unconstitutional.

*Id.* at 4–5 (footnotes citing DOJ brief and congressional testimony from the Office of Legal Counsel omitted).

Again, in 1989, the DOJ in President George H.W. Bush's Administration evaluated a similar legislative proposal to exclude undocumented immigrants from the apportionment base. Specifically, the DOJ found that the Fourteenth Amendment and Article I, Section 2 of the Constitution "require that inhabitants of States who are illegal aliens be included in the census count." Letter from Carol T. Crawford, Ass't Attorney Gen., to Sen. Bingaman (Sept. 22, 1989), 135 Cong. Rec. S12234 (1989). The Executive Branch has not deviated from that conclusion until the present day.

**D.  Litigation Regarding the Census Citizenship Question**

On March 26, 2018, the Secretary of Commerce announced that he had decided to include a question about citizenship on the 2020 decennial census. That decision was challenged in several lawsuits, including one litigated in the Southern District of New York, based on concern that inclusion of such a question would discourage noncitizens from responding to the census. After the New York district court remanded the decision to add the citizenship question to the Secretary, the case was appealed to the Supreme Court.

On June 27, 2019, the Supreme Court affirmed the district court's decision remanding to the agency. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2576 (2019). The Supreme Court held that the plaintiffs had standing to file suit. *Id*. at 2565. The Supreme Court then concluded

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

1  that the Secretary's decision did not violate the Enumeration Clause, did not violate the Census

2  Act, and was supported by evidence. *Id.* at 2567, 2571, 2573.

3      However, the Supreme Court affirmed the district court's decision remanding the decision

4  to the agency because the Secretary's decision rested on pretextual reasoning. *Id.* at 2575. The

5  Secretary had justified his decision to include a citizenship question based on DOJ's request for

6  citizenship data to better enforce the Voting Rights Act. The Supreme Court concluded that "the

7  decision to reinstate a citizenship question cannot be adequately explained in terms of DOJ's

8  request for improved citizenship data to better enforce the [Voting Rights Act]." *Id.* The Supreme

9  Court considered the fact that "the Secretary [of Commerce] began taking steps to reinstate a

10  citizenship question about a week into his tenure, but [the record] contains no hint that he was

11  considering [Voting Rights Act] enforcement in connection with that project." *Id.* Moreover, the

12  Supreme Court emphasized that "it was not until the Secretary contacted the Attorney General

13  directly that DOJ's Civil Rights Division expressed interest in acquiring census-based citizenship

14  data to better enforce the [Voting Rights Act]." *Id.* Based on the facts surrounding the Secretary's

15  decision, the Supreme Court concluded that there was "a significant mismatch between the

16  Secretary's decision and the rationale he provided." *Id.* Accordingly, the Supreme Court concluded

17  that the district court was correct in remanding to the agency. *Id.* at 2576.

18      **E.  President's Announcement to Proceed with Citizenship Question**

19      President Donald J. Trump responded to the Supreme Court's decision in several ways. On

20  June 27, 2019, the same day as the Supreme Court's decision, the President announced that it

21  "[s]eems totally ridiculous that our government, and indeed Country, cannot ask a basic question

22  of Citizenship in a very expensive, detailed and important Census." @realDonaldTrump, Twitter

23  (June 27, 2019, 10:37 AM),

24  https://twitter.com/realDonaldTrump/status/1144298731887628288?s=20.

25      A week later, on July 3, 2019, the President announced that the government was

26  "absolutely moving forward, as we must," with the citizenship question:

27                                          15

United States District Court
Northern District of California

The News Reports about the Department of Commerce dropping its quest to put the Citizenship Question on the Census is incorrect or, to state it differently, FAKE! We are absolutely moving forward, as we must, because of the importance of the answer to this question.

@realDonaldTrump, Twitter (July 3, 2019, 8:06 AM),

https://twitter.com/realDonaldTrump/status/1146435093491277824?s=20.

**F. Collecting Information Executive Order**

On July 11, 2019, however, the President stated that to renew efforts to add the citizenship question "would have produced even more litigation and considerable time delays." *Remarks by President Trump on Citizenship and the Census* (July 11, 2019),

https://www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/.

On July 11, 2019, the President thus issued Executive Order 13,880, "a new option to ensure a complete and timely count of the non-citizen population." *Id.* The President stated, "I'm hereby ordering every department and agency in the federal government to provide the Department of Commerce with all requested records regarding the number of citizens and non-citizens in our country. They must furnish all legally accessible records in their possession immediately." *Id.*

On July 16, 2019, Executive Order 13,880 was published in the Federal Register. *Collecting Information About Citizenship Status in Connection With the Decennial Census*, Exec. Order No. 13,880, 84 Fed. Reg. 33,821 (July 16, 2019) (the "Collecting Information Executive Order"). The relevant text of the Collecting Information Executive Order is as follows:

> The [Supreme] Court's ruling . . . has now made it impossible, as a practical matter, to include a citizenship question on the 2020 decennial census questionnaire. After examining every possible alternative, the Attorney General and the Secretary of Commerce have informed me that the logistics and timing for carrying out the census, combined with delays from continuing litigation, leave no practical mechanism for including the question on the 2020 decennial census.

> Nevertheless, *we shall ensure that accurate citizenship data is compiled in connection with the census by other means*. To achieve that goal, I have determined that it is imperative that all executive departments and agencies (agencies) provide the Department the maximum assistance permissible, consistent with law, in determining the number of citizens and non-citizens in the country, including by

16

providing any access that the Department may request to administrative records that may be useful in accomplishing that objective. . . . The executive action I am taking today *will ensure that the Department will have access to all available records in time for use in conjunction with the census*.

Therefore, to eliminate delays and uncertainty, and to resolve any doubt about the duty of agencies to share data *promptly* with the Department, I am hereby ordering all agencies to share information requested by the Department *to the maximum extent permissible* under law.

*Id.* at 33,821–22 (emphasis added).

The Collecting Information Executive Order further states that the data being collected "is important for multiple reasons, including the following":

- "data on the number of citizens and aliens in the country is needed to help us understand the effects of immigration on our country and to inform policymakers considering basic decisions about immigration policy";

- "the lack of complete data on numbers of citizens and aliens hinders the Federal Government's ability to implement specific programs and to evaluate policy proposals for changes in those programs";

- "data identifying citizens will help the Federal Government *generate a more reliable count of the unauthorized alien population in the country*" and "*[a]ccurate and complete data on the illegal alien population* would be useful for the Federal Government in evaluating many policy proposals"; and

- "it may be open to States to design State and local legislative districts based on the population of voter-eligible citizens." *Id.* at 33,822–23 (emphasis added).

As noted above, the order expressly contemplated that the data collected would be used in connection with the 2020 Census. *See id.* at 33,821–22 (stating that "we shall ensure that accurate citizenship data is compiled in connection with the census by other means" and that "[t]he executive action I am taking today will ensure that the Department will have access to all available records in time for use in conjunction with the census").

## G.  Census Data Collection

In March 2020—approximately nine months after the Collecting Information Executive Order issued—conventional data collection for the 2020 Census began. Census data collection "begin[s] with a questionnaire to which households are asked to self-respond and end[s] with a set

17

of procedures known as 'Non-Response Follow-Up' operations." *New York v. Trump*, No. 20-CV-5770 (RCW) (PWH) (JMF), 2020 WL 5422959, at *6 (S.D.N.Y. Sept. 10, 2010) (three-judge court) (per curiam). Non-Response Follow-Up (also referred to as "NRFU") is conducted in person "to ensure that any household that did not self-respond to the census is nonetheless counted." *Id.* at *28; *see also Nat'l Urban League v. Ross*, No. 20-CV-05799-LHK, 2020 WL 5441356, at *1–2 (N.D. Cal. Sep. 10, 2020) (noting that NRFU involves "in-person contact attempts at each and every housing unit that did not self-respond to the decennial census questionnaire"). NRFU "'is entirely about hard-to-count populations," *id.* at *1; *see also California v. Ross*, 358 F. Supp. 3d 965, 986 (N.D. Cal. 2019) (noting that hard-to-count populations "are hard to locate, hard to contact, hard to persuade, and hard to interview"; adding that, "[f]or some hard-to-count subgroups, more than one of these obstacles applies"), which include undocumented immigrants and recent immigrants. *See id.* (also identifying other hard-to-count groups such as low-income persons, persons who do not live in traditional housing, persons who do not speak English fluently or have limited English proficiency, people who have distrust in the government, and racial and ethnic minorities). "In all recent censuses, the Census Bureau has differentially undercounted hard-to count subpopulations, most notably Hispanics, even after implementing all NRFU operations." *Id.* at 992.

The operational plan for the 2020 Census had originally scheduled the NRFU process to begin in May 2020 and to end in July 2020. However, in April 2020, the operational plan for the census was modified because of the COVID-19 pandemic. Under the COVID-19 plan, the NRFU process was adjusted to take place from August 11, 2020 through October 31, 2020. On August 3, 2020, the Census Bureau announced a new plan (called the "Replan"), which would have data collection (including NRFU) end one month earlier on September 30, 2020. This action by the agency precipitated the lawsuit *National Urban League v. Ross*, No. C-20-5799 LHK (N.D. Cal.). After significant litigation in that case, data collection ended on October 15, 2020.

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

### H.  Presidential Memorandum

On July 21, 2020, just a few weeks before the critical NRFU phase was to begin, the President issued the memorandum being challenged in the instant case. The memorandum, titled "Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census," was then published in the Federal Register on July 23, 2020. 85 Fed. Reg. 44,679; *see* 44 U.S.C. § 1505(a) (requiring publication in the Federal Register of "[e]xecutive orders, except those not having general applicability and legal effect or effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof"). The Presidential Memorandum provides in relevant part as follows:

- "In order to apportion Representatives among the States, the Constitution requires the enumeration of the population of the United States every 10 years." 85 Fed. Reg. at 44,679.

- "The Constitution does not specifically define which persons must be included in the apportionment base." *Id.*

- "In Executive Order 13880 of July 11, 2019 [*i.e.*, the Collecting Information Executive Order], I instructed executive departments and agencies to share information with the Department of Commerce, to the extent permissible and consistent with law, to allow the Secretary to obtain accurate data on the number of citizens, non-citizens, and illegal aliens in the country." *Id.* at 44,680.

- "For the purpose of the reapportionment of Representatives following the 2020 census, it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C. 1101 *et seq.*), to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *Id.*

- "Affording congressional representation, and therefore formal political influence, to States on account of the presence within their borders of aliens who have not followed the steps to secure a lawful immigration status under our laws undermines [the] principles" of representative democracy. *Id.*

- "States adopting policies that encourage illegal aliens to enter this country and that hobble Federal efforts to enforce the immigration laws passed by the Congress should not be rewarded with greater representation in the House of Representatives. Current estimates

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

suggest that one State [*i.e.*, California[5]] is home to more than 2.2 million illegal aliens, constituting more than 6 percent of the State's entire population. Including these illegal aliens in the population of the State for the purpose of apportionment could result in the allocation of two or three more congressional seats than would otherwise be allocated." *Id.*

- "I have . . . determined that respect for the law and protection of the integrity of the democratic process warrant the exclusion of illegal aliens from the apportionment base, to the extent feasible and to the maximum extent of the President's discretion under the law." *Id.*

- "In preparing his report to the President under section 141(b) of title 13, United States Code, the Secretary [of Commerce] shall take all appropriate action, consistent with the Constitution and other applicable law, to provide information permitting the President, to the extent practicable, to exercise the President's discretion to carry out the policy set forth [above]. The Secretary shall also include in that report information tabulated according to the methodology set forth in *Final 2020 Census Residence Criteria and Residence Situations*, 83 FR 5525 (Feb. 8, 2018)." *Id.*

Thus, under the Presidential Memorandum, the Secretary is now required, to the extent "feasible" or "practicable," to include two different sets of numbers for each State in his report to the President. *Id.* The first set of numbers will be comprised of the total population of each State as determined by the Residence Rule, which includes noncitizens "living in the United States," regardless of their immigration status. *Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525, 5533 (Feb. 8, 2018) (the "Residence Rule"). The second set of numbers will be derived by subtracting from the total population of each State the number of "aliens who are not in a lawful immigration status." Presidential Memorandum, 85 Fed. Reg. at 44,680.

In the instant action, Plaintiffs challenge the Presidential Memorandum on various

---

[5] According to the Pew Research Center, California is the only state with approximately 2.2 million or more undocumented immigrants. *See* Pew Research Center, *U.S. unauthorized immigrant population estimates by state, 2016* (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/. Defendants have conceded that the state with 2.2 million illegal aliens described in the Presidential Memorandum is in fact California. *See* Tr. of Oct. 14, 2020 oral argument at 24: 6-10, *Useche v. Trump*, No. C-20-2225 PX-PAH-ELH (D. Md.).

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

grounds. Plaintiffs have moved for partial summary judgment on the following claims, which allege that the Presidential Memorandum: (1) violates the Apportionment and Enumeration Clauses of Article I, Section 2 and the Fourteenth Amendment of the Constitution; (2) violates the Census Act and the Reapportionment Act; and (3) violates the separation of powers. Stip. Re Topics for Early Dispositive Briefings, ECF No. 52 at 2.

This lawsuit is one of several challenging the Presidential Memorandum.

- *State of New York v. Trump*, No. C-20-5770 RCW-PWH-JMF (S.D.N.Y.). The three-judge court (hereafter, "*New York* court") found that the plaintiffs had standing based on the effect of the Presidential Memorandum on the census count and held that the Presidential Memorandum violates the statutes governing the census and apportionment. On September 10, 2020, a final judgment was entered in favor of the plaintiffs on the statutory claims. The government appealed to the Supreme Court on September 18, 2020. The Supreme Court has set the case for oral argument on November 30, 2020. *See Trump v. New York*, No. 20-366 (U.S.).

- *Common Cause v. Trump*, No. C-20-2023 CRC-GGK-DLF (D.D.C.). Oral argument was held on the plaintiffs' motion for partial summary judgment and the defendants' motion to dismiss on September 29, 2020.

- *Useche v. Trump*, No. C-20-2225 PX-PAH-ELH (D. Md.). Oral argument was held on the plaintiffs' motion for partial summary judgment or a preliminary injunction on October 14, 2020.

- *Haitian-Americans United, Inc. v. Trump*, No. C-20-11421 DPW-BMS-PBS (D. Mass.). Hearing on the defendants' motion to dismiss is set for November 2, 2020.

## II.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a plaintiff moves for summary judgment on claims that it has brought (*i.e.*, for which it has the burden of proof), it "must prove each element essential of the claims . . . by undisputed facts." *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 607 (N.D. Cal. 1992); *cf. Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis omitted); *Watts v. United States*, 703 F.2d 346, 347 (9th Cir. 1983) (stating that "[a] plaintiff who seeks summary judgment and who fails to produce sufficient evidence on one or more essential elements of the claim is 'no more entitled to a judgment . . . than is a plaintiff who has fully tried the case and who has neglected to offer evidence sufficient to support a finding on a material issue upon which [the plaintiff] bears the burden of proof'").

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    JURISDICTION & JUSTICIABILITY

Because Plaintiffs are moving for summary judgment, they have the burden of proving—specifically, by a preponderance of the evidence—that we have jurisdiction over their claims. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014) (noting that "[t]he plaintiff bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met").

In their Motion to Dismiss, or in the Alternative, Motion for Partial Summary Judgment, Defendants challenge jurisdiction as well as justiciability, asserting that Plaintiffs' claims are not ripe and that Plaintiffs lack standing to proceed with their claims. As a formal matter, Defendants

United States District Court
Northern District of California

have made a factual attack on jurisdiction/justiciability pursuant to Federal Rule of Civil

Procedure 12(b)(1). *See Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)

(distinguishing between facial and factual attacks on jurisdiction brought pursuant to Federal Rule

of Civil Procedure 12(b)(1)). A 12(b)(1) motion is not the same as a motion for summary

judgment. However, because Defendants have, in the alternative, moved for summary judgment,

we effectively have before us competing summary judgment motions on jurisdiction and

justiciability.

### A. Injury to Plaintiffs

To evaluate Defendants' ripeness and standing arguments, we must first assess what injury

is claimed by Plaintiffs. Plaintiffs are individuals, a nongovernmental organization, and

government entities. Plaintiffs maintain that the Presidential Memorandum has harmed them or

will harm them in the following ways.

- *Individuals.* In declarations, several of the individual plaintiffs assert that "the exclusion of undocumented immigrants from the apportionment base will lead to an undercount of persons in [their respective States] relative to other states such that [their States are] highly likely to lose a seat in Congress," thus depriving them of their "fair share of representation in the United States House of Representatives." Liccardo Decl. ¶ 4 (a California resident); Yilma Decl. ¶ 4 (a California resident); Ellis Decl. ¶ 4 (a Texas resident).

- *Organization.* Like the individuals, the Black Alliance for Just Immigration ("BAJI") organization has also submitted a declaration (from its Executive Director, Nana Gyamfi). BAJI is a nonprofit corporation "founded in April 2006 in response to the mobilization of immigrant communities and their supporters against repressive immigration bills that were pending before the United States Congress at the time." Gyamfi Decl. ¶ 4. BAJI has "approximately 1200 members [nationwide] who are predominantly Black immigrants, refugees, and/or African Americans." Gyamfi Decl. ¶ 5. Its "core mission is to educate and engage African American and Black immigrant communities to organize and advocate for racial, social, and economic justice for themselves and other underrepresented communities." Gyamfi Decl. ¶ 7. According to BAJI, the Presidential Memorandum has had a chilling effect on undocumented immigrants with respect to participation in the census, which means that there will be undercounting in the census. An undercount, in turn, means a dilution of political power and a loss of federal funding with respect to the immigrant communities that BAJI serves, which thereby "impedes [BAJI's] mission to advance [immigrant] communities' access to racial, social, and economic justice." Gyamfi

Decl. ¶ 13. BAJI, therefore, has had to "divert its essential and limited resources, including staff time and money, from other priorities and programs in order to counteract the harmful effects of the Apportionment Presidential Memorandum." Gyamfi Decl. ¶ 17. For example, BAJI has had to "conduct additional outreach . . . to encourage continued participation in the 2020 Census notwithstanding the Apportionment Presidential Memorandum's exclusionary message."[6] Gyamfi Decl. ¶ 18.

- *Government entities.*[7] The government entities contend, because of the Presidential Memorandum, the respective states where they are located are likely to lose a seat in the House of Representatives. The Presidential Memorandum will also have an impact on (1) their state and local redistricting, (2) their share of federal funding, and (3) their ability to perform critical governmental functions, all of which are dependent on the census data. *See generally New York*, 2020 WL 5422959, at *4–5 (describing ways in which federal, state, and local governments use census data—*e.g.*, federal government uses census data to allocate money to states; state governments use census data to draw intrastate political districts and to allocate governmental resources and to impose expenses among local governments; and local governments use census data to perform essential government functions). *See also* Reamer Decl. (expert testifying about impact of undercounting on the distribution of federal domestic assistance funds to states and localities); Westall Decl. (discussing use of census data for City of Los Angeles redistricting, public services, and funding received from federal government); Bodek Decl. (discussing use of census data for County of Los Angeles General Plan); Crain Decl. (discussing use of census data for Los Angeles Unified School District redistricting); Dively Decl. (discussing use of census data for King County public services and funding received from federal government); Ramsey Decl. (discussing use of census data for Harris County funding received from federal government); Shah Decl. (discussing use of census data for Harris County public services); Ellis Reply Decl. (discussing use of census data for Harris County funding received from federal government and redistricting).

We hold that one or more Plaintiffs have standing based on two harms: (1) the

apportionment injury, and (2) the census degradation injury. We then address Plaintiffs' chilling

---

[6] As indicated by the above, BAJI is claiming that it has suffered harm directly as an organization. *See E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020) (noting that "[o]rganizations can assert standing on behalf of their own members or in their own right").

[7] The government entities are: (1) in No. C-20-5167, the City of San Jose; King County, Washington; Arlington County, Virginia; and Harris County, Texas; and (2) in No. C-20-5169, the State of California, the City of Los Angeles, the City of Long Beach, the City of Oakland, Los Angeles Unified School District, and the County of Los Angeles.

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

effect injury.

First, the apportionment injury is the loss of one or more congressional seats if undocumented immigrants are excluded from the apportionment base. Plaintiffs have submitted a declaration from an economics expert who "conclude[s] that removing undocumented immigrants from the population for the purposes of congressional redistricting is highly likely to cause California and Texas to each lose a congressional seat." Gilgenbach Decl. ¶ 5. "Other states, including New Jersey, may also lose a congressional seat." *Id.* The Gilgenbach declaration is not contested. Moreover, the Presidential Memorandum explicitly acknowledges that at least one state will lose two or three congressional seats. *See* 85 Fed. Reg. at 44,680 ("Current estimates suggest that one State is home to more than 2.2 million illegal aliens . . . . Including these illegal aliens in the population of the State for the purpose of apportionment could result in the allocation of two or three more congressional seats than would otherwise be allocated.").

Second, the census degradation injury arises because, if undocumented immigrants are not included as part of the census, then the census is undercounting the population, which then impacts, *inter alia*, state and local redistricting (by diluting the political power of areas with high concentrations of affected immigrants), state and local governments' share of federal funding, and state and local governments' ability to perform critical governmental functions—all of which are dependent on and affected by the accuracy and completeness of census data. Plaintiffs have provided declarations from local government entities which address the impact of the Presidential Memorandum on their local redistricting, their share of federal funding, and their ability to perform critical governmental functions. These declarations are also uncontested.

Finally, the last harm claimed by Plaintiffs is a chilling effects injury—*i.e.*, injury caused by the chilling effect the Presidential Memorandum has on census participation by undocumented immigrants or those with ties to undocumented immigrants. *See, e.g.*, Gyamfi Decl. (testifying that BAJI has had to divert its resources to address the chilling effects the Presidential Memorandum has on census participation). Now that census field operations have ended, Defendants argue that

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

1    any case based on the chilling effect injury is moot. *See* Notice of Supp. Authority at 2, ECF No.

2    99 (Oct. 14, 2020).

3        The standard for finding mootness, however, is tougher than the standard for finding lack

4    of standing because "to abandon the case at an advanced stage may prove more wasteful than

5    frugal." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 192 (2000).

6    Moreover, the mootness doctrine has an exception for injuries "capable of repetition, yet evading

7    review." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (quoting

8    *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)); *see also Honig v. Doe*, 484 U.S. 305, 320 n.6 (1988)

9    (capacity for repetition need not have a "demonstrated probability"). Capacity for repetition may

10    be found from the Census Bureau's willingness to "reopen field operations for a brief period" if

11    "further proceedings [in *National Urban League*] were to result in a final judgment in [the

12    *National Urban League* plaintiffs'] favor." Reply in Support of Application for a Stay, *Ross v.*

13    *National Urban League*, No. 20A62 (U.S. Oct. 10, 2020). The Presidential Memorandum could

14    evade review despite a "brief" reopening of field operations that would certainly be for a period

15    "less than two years," which generally "is too short to complete judicial review." *Kingdomware*

16    *Techs.*, 136 S. Ct. at 1976.

17        Nonetheless, we need not find that the chilling effects injury is "capable of repetition, yet

18    evading review" because that injury is unnecessary to find Article III standing here.[8] *Id*. We note,

19    however, that in the *New York* court's order addressing the validity of the Presidential

20    Memorandum, the *New York* court referred to census degradation as a byproduct of chilling

21    effects. That is, if undocumented immigrants and/or those close to them are chilled from

---

[8] Even if the chilling effects injury no longer confers standing, many Plaintiffs in this case still
have standing to proceed based on the apportionment injury and/or census degradation injury.
"[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy
requirement." *Rumsfeld v. Forum for Acad. & Instit. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006);
*accord Dep't of Commerce v. New York*, 139 S. Ct. at 2565 ("For a legal dispute to qualify as a
genuine case or controversy, at least one plaintiff must have standing to sue.").

26

1    participating in the census because of the Presidential Memorandum, then there will be

2    undercounting in the census, and undercounting in turn will impact federal funding, state and local

3    redistricting, and provision of state and local government services. This is undoubtedly true.

4    However, even absent any chilling effect, the exclusion of undocumented immigrants from the

5    census will have an effect on federal funding, state and local redistricting, and provision of state

6    and local government services. These harms, in addition to Plaintiffs' loss of congressional

7    representation, give Plaintiffs Article III standing. Moreover, Defendants' mootness argument does

8    not impact the declaratory relief ordered by the *New York* court or herein.

9        **B.  Ripeness and Standing**

10        Rather than contesting the facts put forward by Plaintiffs, Defendants argue that the

11    possibility of future apportionment and census degradation injuries is too speculative, and thus,

12    there is a ripeness/standing problem. *See Ripplinger v. Collins*, 868 F.2d 1043, 1047 n.3 (9th Cir.

13    1989) (noting that "[t]he courts have addressed the question of whether future injury is sufficient

14    as an issue of standing, ripeness, and/or justiciability"). Defendants invoke both constitutional

15    ripeness and prudential ripeness.

16        **1.  Constitutional Ripeness and Standing**

17        Constitutional ripeness and standing, both predicated on Article III of the U.S.

18    Constitution, are closely related concepts. *See Bova v. City of Medford*, 564 F.3d 1093, 1095–96

19    (9th Cir. 2009); *see also Poe v. Ullman*, 367 U.S. 497, 503–04 (1961) (noting that "[t]he various

20    doctrines of 'standing,' 'ripeness,' and 'mootness' . . . are but several manifestations . . . of the

21    [same] primary conception"). For Article III standing, a plaintiff must show, *inter alia*, that it has

22    "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and

23    'actual or imminent, not conjectural or hypothetical.'" *Spokeo v. Robins*, 136 S. Ct. 1540, 1548

24    (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see also In re Zappos.com,*

25    *Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (stating the same). With respect to a "future injury," a

26    plaintiff has standing to sue "if the threatened injury is certainly impending, or there is a

27

28    

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158

(2014) (internal quotation marks omitted); *see also Zappos.com*, 888 F.3d at 1024 (stating the

same). Indeed, just last year in the census citizenship question case, the Supreme Court reiterated

that, for standing, a future injury "may suffice if the threatened injury is certainly impending, or

there is a substantial risk that the harm will occur."[9] *Dep't of Commerce v. New York*, 139 S. Ct. at

2565 (quoting *Susan B. Anthony List*, 573 U.S. at 158). Similarly,

> "[a] claim is not ripe for adjudication if it rests upon contingent future events that
> may not occur as anticipated, or indeed may not occur at all." That is so because, if
> the contingent events do not occur, the plaintiff likely will not have suffered an
> injury that is concrete and particularized enough to establish . . . standing. In this
> way, ripeness and standing are intertwined.

*Bova*, 564 F.3d at 1096 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *see also Mont.*

*Envtl. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1189–90 (9th Cir. 2014) (stating that the

standing and ripeness analyses are the same, requiring plaintiffs to show a "substantial risk" that

the harm would occur).

     According to Defendants, to the extent Plaintiffs invoke an apportionment or census

degradation injury, their claims are not ripe for review and they lack standing to proceed because

(1) the Presidential Memorandum states that "it is the policy of the United States to exclude"

undocumented immigrants from the apportionment base only "to the extent feasible" or "to the

---

[9] In *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), the Supreme Court focused on
whether the future injury was "certainly impending," but acknowledged that, "[i]n some instances
we have found standing based on a 'substantial risk' that the harm will occur." *Id.* at 414 n.5
(further holding that, "to the extent that the 'substantial risk' standard is relevant and is distinct
from the 'certainly impending' requirement, respondents fall short of even that standard" in the
case under consideration). Post-*Clapper*, the Supreme Court has continued to apply the disjunctive
test—*i.e.*, was the future injury "certainly impending" *or* was there a "substantial risk" that it
would occur?—including in the census citizenship question case. *See Dep't of Commerce v. New
York*, 139 S. Ct. at 2565. The focus in *Clapper* on the heightened "certainly impending" test was
informed by the fact that the case required review of "actions of the political branches in the fields
of intelligence gathering and foreign affairs." *Clapper*, 568 U.S. at 409. This case involves neither
intelligence gathering nor foreign affairs.

United States District Court
Northern District of California

1   maximum extent feasible," 85 Fed. Reg. at 44,680, and (2) "the extent to which it will be feasible

2   . . . is, at this point, unknown." Defs.' Opp'n at 6; *see also id.* at 7 (arguing that, "[b]ecause it is not

3   known what the Secretary may ultimately transmit to the President, it is necessarily not yet known

4   whether the President will be able to exclude any, some, or all aliens from the apportionment

5   basis").

6          Defendants fail to negate the substantial risk of cognizable injury. As an initial matter, we

7   note that the government cannot categorically evade judicial review simply by invoking qualifying

8   language such as "to the extent feasible." In *City & County of San Francisco v. Trump*, 897 F.3d

9   1225 (9th Cir. 2018), the Ninth Circuit addressed a similar issue. There, the court considered

10  whether the Executive Branch could validly withhold all federal grants from so-called "sanctuary"

11  cities and counties. The Ninth Circuit held that the executive order providing for such withholding

12  violated the constitutional principle of separation of powers and, in so holding, rejected several of

13  the government's arguments on jurisdiction/justiciability, including the government's contention

14  that the Executive Order was "all bluster and no bite," equivalent to a "'gesture without motion.'"

15  *Id.* at 1238. In this regard, the Ninth Circuit acknowledged that the Executive Order included a

16  qualifier, or a savings clause—*i.e.*, that there would be withholding of federal grants only to the

17  extent "'consistent with law.'" *Id.* at 1239. Even so, the Ninth Circuit held that "[s]aving clauses

18  are read in their context, and they cannot be given effect when the Court, by rescuing the

19  constitutionality of a measure, would override clear and specific language." *Id.* "Because the

20  Executive Order unambiguously commands action, here there is more than a 'mere possibility that

21  some agency might make a legally suspect decision.'" *Id.* at 1240. Moreover, the Ninth Circuit

22  pointed out that "the Administration's interpretation would simply lead us into an intellectual cul-

23  de-sac" because, if the phrase "consistent with law" could "preclude[] a court from examining

24  whether the Executive Order is consistent with law, judicial review is a meaningless exercise."

25

26

27                                                29

28

*Id.*[10]

Here too, the Presidential Memorandum cannot avoid judicial review through similar savings clause language. Just as the executive order in *City & County of San Francisco* limited itself to be "consistent with law," the Presidential Memorandum "shall be implemented consistent with applicable law." 85 Fed. Reg. at 44,680; *see also id.* ("the Secretary shall take all appropriate action, consistent with the Constitution and other applicable law . . . ."). That language does not render the Presidential Memorandum unreviewable. Indeed, Defendants do not rely on the "consistent with law" language in the Presidential Memorandum to contest ripeness.

Instead, Defendants rely on the language of the Presidential Memorandum which states, "the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status" is limited "*to the maximum extent feasible and consistent with the discretion delegated to the executive branch*." *Id.* (emphasis added); *see also id.* ("to the extent feasible and to the maximum extent of the President's discretion under the law"). Pursuant to that policy, "the Secretary shall take *all appropriate action*, consistent with the Constitution and other applicable law, to provide information permitting the President, *to the extent practicable*, to exercise the President's discretion to carry out the policy set forth." *Id.* (emphasis added). Yet none of this qualifying language "override[s] clear and specific language" that "commands action." *City & County of San Francisco*, 897 F.3d at 1239–40. In fact, the qualifying language is immediately offset by adjacent modifiers: "*all* appropriate action" to "the *maximum* extent feasible." 85 Fed.

_____

[10] In so holding, the court distinguished *Building & Construction Trades Department v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) ("*Allbaugh*"), in which the D.C. Circuit considered an executive order with a savings clause and held that, "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration." The court in *City & County of San Francisco* noted, "*Allbaugh* is distinguishable. Because the Executive Order unambiguously commands action, here there is more than a 'mere possibility that some agency might make a legally suspect decision.'" 897 F.3d at 1240 (quoting *Allbaugh*, 295 F.3d at 33).

United States District Court
Northern District of California

Reg. at 44,680 (emphasis added); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 591 (1952) (reviewing Executive Order 10,340, which ordered agencies to "cooperate with the Secretary of Commerce to the *fullest extent possible*" (emphasis added)). Although *City & County of San Francisco* did not address the qualifier "to the maximum extent feasible," its broader message teaches that where a challenged order otherwise has clear commanding language, such qualifiers cannot function to evade judicial scrutiny.

Here, although the Presidential Memorandum purports to qualify the exclusion of undocumented immigrants from the census in terms of "feasibility," the determination of the President to accomplish the memorandum's explicit and singular goal of excluding undocumented immigrants from the census count is abundantly clear. *See City & County of San Francisco*, 897 F.3d at 1239–40 (stating that, "[b]ecause the Executive Order [regarding withholding funds from sanctuary cities and counties] unambiguously commands action, here there is more than a 'mere possibility that some agency might make a legally suspect decision'"). The directive of the Presidential Memorandum here is even clearer than the proposed citizenship question in *Department of Commerce v. New York* which was facially neutral and did not expressly indicate how citizenship information would be used.

From the day the memorandum first issued, the President made clear his commitment to the exclusion of undocumented immigrants from the apportionment base. In a public statement issued on the same day as the memorandum, the President noted: "Last summer in the Rose Garden, I told the American people that I would not back down in my effort to determine the citizenship status of the United States population. Today, I am following through on that commitment by directing the Secretary of Commerce *to exclude illegal aliens from the apportionment base following the 2020 census.*" The White House, *Statement from the President Regarding Apportionment* (July 21, 2020), https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment/ (emphasis added).

Then, on July 23, 2020, the Presidential Memorandum was published in the Federal

31

United States District Court
Northern District of California

Register. Publication in the Federal Register is reserved for only those presidential documents that "hav[e] general applicability and legal effect" against members of the public, not just "Federal agencies or persons in their capacity as officers, agents, or employees thereof." 44 U.S.C. § 1505(a)(1); *see* Presidential Memorandum, 85 Fed. Reg. 44,679.

The Administration's commitment to a "general[ly] applicable and legally effect[ive]" Presidential Memorandum has continued to the present. 44 U.S.C. § 1505(a)(1). For instance, after the *New York* court issued its decision on September 10, 2020, holding that the Presidential Memorandum violates the statutes governing the census and apportionment, the Administration promptly appealed. In a public statement, the Administration proclaimed that it "intends to vindicate [the President's] policy determination" that undocumented immigrants should be excluded from the census. The White House, *Statement from the Press Secretary* (Sept. 18, 2020), https://www.whitehouse.gov/briefings-statements/statement-press-secretary-091820/.

Defendants' reliance on "to the extent feasible" is especially misplaced here because the evidence shows that it is in fact feasible to exclude undocumented immigrants from the census—at the very least, a subset of that group. Defendants recently submitted a notice of supplemental authority with the Court. *See* Notice of Supp. Authority, ECF No. 90 (Oct. 6, 2020). That authority consists of a brief that the Trump Administration filed with the Supreme Court as part of its appeal of the *New York* court order enjoining enforcement of the Presidential Memorandum. In that brief, the Administration explicitly states:

> If . . . relief is granted . . . , the [Census] Bureau currently anticipates that, by December 31, it will provide the President with information regarding any "unlawful aliens in ICE Detention Centers" whom the President could, consistent with the discretion delegated to him by law, exclude from the apportionment base, thereby implementing his [Presidential] Memorandum. In addition, the Bureau currently plans to provide the President with "[o]ther [Presidential Memorandum] related outputs" by Monday, January 11, 2021, and would continue to work on a quicker timetable to implement that aspect of the Memorandum sooner if feasible.

*Id.* (quoting Supp. Br. at 5). The brief thus makes clear—in no uncertain terms—that exclusion is feasible. Indeed, at the hearing, the Court pressed defense counsel on feasibility. The Court asked

whether "there will be some number [excluded from the census], you just don't know what [that number] is." Tr. of Oct. 8, 2020 Hearing at 7. Defense counsel replied: "We expect there to be some number, yes." *Id.* The Administration clearly assumed that exclusion is feasible, or the Presidential Memorandum would have been a pointless exercise.

The breadth of the Collecting Information Executive Order further supports the likelihood that exclusion is feasible. The Collecting Information Executive Order expressly states that, at the time the Secretary of Commerce had decided to include a citizenship question on the census, "the Census Bureau had determined based on experience that administrative records to which it *had* access would enable it to determine citizenship status for approximately *90 percent of the population*." 84 Fed. Reg. at 33,821 (emphasis added). Since the Collecting Information Executive Order was promulgated in July 2019, more than a year ago, Defendants have made progress towards implementing the President's Memorandum. Defendants have represented that the Census Bureau has entered into memoranda of understanding with agencies and states to obtain administrative records such as driver's license information. Specifically, at the initial case management conference on August 18, 2020, Defendants stated:

> DEFENDANTS: So pursuant to that executive order, the Census Bureau has entered into a series of memoranda of understanding with various other executive branch agencies, as well as I believe some states, to obtain administrative records, subject to the census bureau's strict confidentiality rules, that the census bureau can then use to see if they will allow it—"it" being the Census Bureau—to ascertain the illegal alien population. That process—
>
> THE COURT: Sorry to interrupt you. Can you give me some examples of administrative records? I mean, they're getting them from the state?
>
> DEFENDANTS: It might be, for example, driver's license information from states, I believe. It might be records from the Department of Homeland Security or the Social Security Administration that would—depending on how the records might be matched against the information that the Census Bureau is collecting pursuant to its enumeration process that would allow the Census Bureau potentially to identify the illegal alien population.

Tr. of Aug. 18, 2020 Case Mgt. Conf. at 32:2–21, ECF No. 60 (Aug. 26, 2020).

United States District Court
Northern District of California

United States District Court
Northern District of California

Faced with the instant motion, Defendants have not offered any evidence that there are any significant impediments to fulfilling the Presidential Memorandum.[11] *See also New York*, No. 20-cv-5770 RCW-PWH-JMF (S.D.N.Y.), ECF No. 172 (government's motion for a stay pending appeal asserting potential irreparable injury, thus indicating that exclusion is feasible).

Despite the undisputed risk that at least some undocumented immigrants will be excluded, Defendants argue that Plaintiffs' asserted apportionment injury is too speculative because, unless a significant number of undocumented immigrants are excluded, a state will not actually suffer the loss of a congressional seat. But Defendants ignore the fact that Plaintiffs need only show a substantial risk of harm, not "absolute certainty." *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) (holding that "[i]t is sufficient that plaintiffs have demonstrated a 'likelihood of injury that rises above the level of unadorned speculation'"). Plaintiffs have adequately established a substantial risk of the loss of a congressional seat given (1) Defendants' access to records that enable them "to determine citizenship status for approximately 90 percent of the population," 84

---

[11] Plaintiffs have established a prima facie case of feasibility. As a result, Defendants have the burden of production to establish otherwise—particularly because Defendants, rather than Plaintiffs, have access to evidence on feasibility. "Fairness and common sense often counsel against requiring a party to prove a negative fact, and favor, instead, placing the burden of coming forward with evidence on the party with superior access to the affirmative information." *United States v. Cortez-Rivera*, 454 F.3d 1038, 1041 (9th Cir. 2006); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 359 n.45 (1977) (noting that "[p]resumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to confirm with a party's superior access to the proof"); *cf. Medina v. Cal.*, 505 U.S. 437, 455 (1992) (O'Connor, J., concurring) (stating that, "[i]n determining whether the placement of burden of proof is fundamentally unfair, relevant considerations include [*inter alia*] whether the government has superior access to evidence"). Accordingly, courts have placed the burden of production on the party with access to the information. *Cf., e.g.*, *Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 965 (9th Cir. 2001) (shifting burden to the police department to show that officers had probable cause for an arrest because "the police department . . . is in the better position to gather information about the arrest"); *Lew v. Moss*, 797 F.2d 747, 751 (9th Cir. 1986) (concluding that defendant had the burden of production to show his new residence in Hong Kong). Defendants have produced no such evidence here.

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS

1  Fed. Reg. at 33,821; (2) the President's clear intent to have "maximum" exclusion such that two or

2  three congressional seats could be reallocated, *see also* 85 Fed. Reg. at 44,680 (pointing out that

3  one state—*i.e.*, California—"is home to more than 2.2 million illegal aliens" and "[i]ncluding

4  these aliens in the population of the State for the purpose of apportionment could result in the

5  allocation of two or three more congressional seats than would otherwise be allocated"); (3) the

6  Gilgenbach declaration which demonstrates the likely loss of Congressional seats; and (4) the lack

7  of any evidence of any significant barriers to the Secretary's ability to carry out the Presidential

8  Memorandum which directs that all undocumented immigrants—without exception—be excluded.

9  There is no evidence that a substantial portion of undocumented immigrants will be exempted

10  from the implementation of the Presidential Memorandum.

11      Furthermore, exclusion of undocumented immigrants from the census has an impact on

12  more than the loss of a congressional seat. As noted above, Plaintiffs have also claimed a census

13  degradation injury because census data informs redistricting at the state and local level and

14  impacts federal funding received by state and local governments. Defendants do not dispute that

15  the loss of such funding constitutes injury cognizable under Article III. Indeed, in *Department of*

16  *Commerce v. New York*, the Supreme Court recognized that "[t]he population count derived from

17  the census is used not only to apportion representatives but also to allocate federal funds to the

18  States and to draw electoral districts." 139 S. Ct. at 2561; *see also* Reamer Decl. ¶ 16 & Ex. 2 at

19  6–8, ECF No. 86-1 (describing 18 large federal financial assistance programs that rely at least in

20  part on census data); Amicus Br. of the League of Women Voters at 17–21, ECF No. 79

21  (describing how census data affects funding for Medicaid and other health programs, Community

22  Development Block Grants, and Title I Grants to Local Educational Agencies). The Supreme

23  Court thus found that a sufficient likelihood of an undercount which would lead to "many of

24  respondents' asserted injuries, including loss of federal funds that are distributed on the basis of

25  state population," was sufficient to confer Article III standing. 139 S. Ct. at 2565.

26      As for the impact of the census count on the states' ability to draw electoral districts, as the

27

28  Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

*New York* court found, states "have long relied on federal decennial census data for countless sovereign purposes," including redistricting. *New York*, 2020 WL 5422959, at *17.[12] For example, the Rhode Island Constitution mandates using census data to establish the House and Senate districts. *New York*, 2020 WL 5422959, at *17. Texas relies on census data to redistrict. Tex. Const. art. III, §§ 25, 26, & 28; *see also* Tex. Gov't Code § 2058.002 (Legislature or Legislative Redistricting Board may act on a federal decennial census before September 1 of the year after the calendar year during which the census was taken). In California, census data is used to draw state and local legislative lines. *See* Cal. Elec. Code §§ 21500 (census used for supervisorial districts in each county), 21601 (census used in drawing city council districts); *see also* Census-Promotions-Voters & Voting, Stats. 2018 ch. 652, § 1(a)(1)–(3), 2018 Cal. Legis. Serv. Ch. 652 (A.B. 2592) (State Legislature finding that "[t]he federal decennial census is important because census figures affect congressional representation, state redistricting, federal formula grant allocations, state funding to local governments, local programs, and planning activities for the next 10 years"). As local examples, Section 204(a) of the Los Angeles City Charter requires that City Council Districts be drawn with equal populations based on the federal census. *See* Westall Decl. ¶ 17, *State of California v. Trump*, No. 20-CV-05169, ECF No. 62-1. The Los Angeles Unified School District will likewise redraw its Board District lines using the 2020 Census. *See* Crain Decl. ¶ 17, *State of California v. Trump*, No. 20-CV-05169, ECF No. 62-7.

At the hearing, Defendants effectively conceded that these harms from census degradation can arise without the same magnitude of exclusion necessary for a loss of a congressional seat. *See* Tr. of Oct. 8 Hearing at 8–9 (defense counsel agreeing that, even if exclusion of undocumented immigrants was not of such a magnitude that there was no impact on apportionment of congressional seats, a local government entity could still suffer harm from such exclusion— *e.g.*,

---

[12] States may potentially use other data to draw districts. *Cf. Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) (discussing census population data and American Community Survey citizen-voting-age-population data); *Burns v. Richardson*, 384 U.S. 73 (1966) (redistricting by registered voter population base).

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

loss of federal funding). Thus, there is a substantial risk that a sizeable enough exclusion of undocumented immigrants from the census in a state such as California—which has, according to the Presidential Memorandum, 2.2 million "illegal aliens"—will affect federal funding received by one or more of the government entity plaintiffs in these cases. *Cf. Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) (stating that, "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury'"); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (stating that "[e]conomic harm to a business clearly constitutes an injury-in-fact[,] [a]nd the amount is irrelevant[;] [a] dollar of economic harm is still an injury-in-fact for standing purposes").

Accordingly, we hold that there is a substantial risk that Plaintiffs will suffer the apportionment and census degradation injuries, *Susan B. Anthony*, 573 U.S. at 158, and therefore (1) Plaintiffs have standing and (2) Plaintiffs' claims are ripe for review. With regard to standing, we note that Defendants did not challenge traceability or redressability for either the apportionment or census degradation injury. *See Lujan*, 504 U.S. at 560–61 (listing elements of standing: injury in fact, redressability, and traceability). In any event, we find that traceability and redressability are clearly established in the instant case. For example, the Presidential Memorandum explicitly references a loss of congressional seats for California if undocumented immigrants are excluded from the apportionment case. Traceability and redressability are also established given the failure of Defendants to contest the Plaintiffs' declarations on both the apportionment and census degradation injuries.

## 2. Prudential Ripeness

Implicitly acknowledging deficiencies in their position, Defendants pressed a prudential ripeness argument at the hearing. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (stating that ripeness "is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration"); *In re Coleman*, 560 F.3d 1000, 1006 (9th Cir. 2009) (stating that this two-part test is used to determine

1   the prudential component of ripeness in the administrative context). Most notably, Defendants

2   asserted that we should not consider Plaintiffs' lawsuit now because apportionment challenges are

3   typically considered *after* the apportionment has been completed. *See* Defs.' Opp'n at 8 (arguing

4   that "census and apportionment cases generally are decided post-apportionment, when census

5   enumeration procedures are no longer at issue and the actual apportionment figures are known");

6   *see also* Tr. at 11 (arguing that Plaintiffs' pre-apportionment case is "*Department of Commerce v.*

7   *House of Representatives*, [525 U.S. 316 (1999),] but that was not about the apportionment, that

8   was about sampling, which was part of the actual enumeration procedures" and thus had to be

9   decided before the census was conducted).

10      Defendants' argument, however, is unpersuasive. The majority of cases cited by

11   Defendants were brought post-apportionment because it was not clear which state would be

12   harmed until after the census was completed and the apportionment was determined.

13      For example, in *Department of Commerce v. Montana*, it was not clear that Montana would

14   be harmed until after the 1990 apportionment. 503 U.S. 442 (1992). The 1990 census "revealed

15   that the population of certain States . . . had increased more rapidly than the national average." *Id*.

16   at 445. Accordingly, "application of the method of equal proportions to the 1990 census caused 8

17   States to gain . . . additional seats in the House of Representatives and 13 States to lose an equal

18   number." *Id*. Until this process was completed, it was not clear that Montana would lose a seat.

19      Similarly, in *Franklin v. Massachusetts*, Massachusetts was not clearly going to lose a seat

20   until after apportionment was completed. 505 U.S. at 790. "[A]s a result of the 1990 census and

21   reapportionment, Massachusetts [had] lost a seat in the House of Representatives." *Id.* In response

22   to that loss, Massachusetts and two of its registered voters "challeng[ed], among other things, the

23   method used for counting federal employees serving overseas." *Id.* That method of counting

24   included the government's "allocation of 922,819 overseas military personnel to the State

25   designated in their personnel files as their 'home of record'"—an allocation which "altered the

26   relative state populations enough to shift a Representative from Massachusetts to Washington." *Id*.

27                                                      38

28   Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
     ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
     DEFENDANTS' MOTION TO DISMISS

at 791.

In *Utah v. Evans*, Utah's injury was not clear until after apportionment. 536 U.S. 452, 458 (2002). Utah lost one representative after "three forms of imputation [used by the Census Bureau to fill in gaps in information and resolve conflicts in data] increased the final year 2000 [census] count by about 1.2 million people," but because this was "spread unevenly across the country, it [made] a difference" in apportionment. *Id*. at 458. Specifically, "imputation increased North Carolina's population by 0.4% while increasing Utah's population by only 0.2%," which meant that North Carolina received one more Representative and Utah one less. *Id*.[13]

The instant case presents a far different situation. Here, it is clear who would be harmed by the exclusion of undocumented immigrants. The Presidential Memorandum contemplates that California will lose congressional seats. *See* 85 Fed. Reg. at 44,680. It states that "[c]urrent estimates suggest that one State is home to more than 2.2 million illegal aliens, constituting more than 6 percent of the State's entire population." *Id*. Accordingly, "[i]ncluding these illegal aliens in the population of the State for the purpose of apportionment could result in the allocation of two or three more congressional seats than would otherwise be allocated." Defendants have conceded that the state with 2.2 million illegal aliens described in the Presidential Memorandum is in fact California. *See* Tr. of Oct. 14, 2020 oral argument at 24: 6-10, *Useche v. Trump*, No. C-20-2225 PX-PAH-ELH (D. Md.). In addition, Professor Gilgenbach testifies in her uncontested declaration that "removing undocumented immigrants from the population for the purposes of congressional redistricting is highly likely to cause California and Texas to each lose a congressional seat." "Other states, including New Jersey, may also lose a congressional seat." Gilgenbach Decl. ¶ 5.

---

[13] Defendants also cite *Wisconsin v. City of New York*, 517 U.S. 1, 10–11 (1996), for the proposition that courts should review census litigation after apportionment. *Wisconsin*, however, was actually brought pre-apportionment. The Supreme Court heard the case post-apportionment only because the *Wisconsin* "parties [had] entered into an interim stipulation providing . . . that the Secretary would reconsider the possibility of a statistical adjustment." *Wisconsin*, 517 U.S. at 10. In July 1991, after the census was completed, the Secretary issued his decision to not adjust, so "[t]he plaintiffs returned to court." *Id.* at 12.

United States District Court
Northern District of California

1          Moreover, none of Defendants' cases holds that apportionment claims must always be

2   decided post-apportionment. In *Utah v. Evans*, the Supreme Court implicitly recognized that a pre-

3   apportionment resolution may be necessary in certain circumstances. 536 U.S. at 462–63. The

4   Supreme Court recognized that post-apportionment challenges could only be brought in certain

5   circumstances, such as "if a lawsuit is brought soon enough after completion of the census and

6   heard quickly enough." *Id*. at 463. The Supreme Court concluded that a post-apportionment

7   resolution was possible in that case only because of its specific facts, including the fact that "the

8   relevant calculations and consequent apportionment-related steps would be purely mechanical,"

9   and "several months would remain prior to the first post . . . census congressional election." *Id*.

10          Ultimately, a prudential ripeness analysis weighs in Plaintiffs'—not Defendants'—favor.

11   The issues raised in Plaintiffs' claims are particularly fit for judicial decision because they are

12   purely legal in nature. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (noting

13   that, "[i]n deciding whether an agency's decision is, or is not, ripe for judicial review, the Court

14   has" considered, *inter alia*, "whether the courts would benefit from further factual development of

15   the issues presented"). Defendants dispute ripeness. They argue that "the legal analysis may differ

16   based on what subsets of illegal aliens are, in fact, excluded because the Secretary has deemed it

17   feasible, and the President has determined that it is practicable and within his discretion." Defs.'

18   Sur-Reply at 4. However, (1) the Presidential Memorandum does not expressly refer to exclusion

19   of only subsets of undocumented immigrants—in fact, it contemplates exclusion "to the maximum

20   extent feasible" and contains no exceptions and no carve outs, and (2) Defendants have not

21   explained how excluding only subsets of undocumented immigrants would make a difference in

22   the legal analysis. As demonstrated below, the fundamental questions presented by Plaintiffs'

23   constitutional and statutory claims are pure legal questions of constitutional and statutory

24   construction. *See New York*, 2020 WL 5422959, at *24 (in discussing prudential ripeness, stating

25   that, "although the standing-related question of whether or to what extent Plaintiffs would suffer

26   apportionment-related harms would benefit from further factual development, the gravamen of

27                                              40

28   Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
    ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
    DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

1   Plaintiffs' claims—that the President lacks the authority to exclude illegal aliens from the

2   apportionment base—presents an issue that is purely legal, and will not be clarified by further

3   factual development").

4   Defendants contend still that there is an interest in delaying judicial review because

5   "judicial review would improperly interfere with the Census Bureau's ongoing efforts to determine

6   how to respond to the Presidential Memorandum, which are currently in progress, and could

7   impede the apportionment, which has not yet occurred." Defs.' Opp'n at 7. But this argument is

8   unavailing for at least two reasons. First, far from impeding the apportionment, judicial review

9   here aims to achieve a constitutionally and legally correct apportionment. Second, although

10  Defendants claim that judicial review would interfere with Census Bureau efforts to respond to the

11  Presidential Memorandum, this case does not affect the actual conduct of the census. *Cf. New*

12  *York*, 2020 WL 5422959, at *24 ("[o]n its face, the Presidential Memorandum does not purport to

13  regulate the actual conduct of the census"). As demonstrated by the order in *New York*, relief can

14  be tailored such that judicial review of the Presidential Memorandum would not bar Defendants

15  from continuing to count the number of undocumented immigrants. *See id.* at *35 (noting that

16  court's injunction would not bar "Defendants from continuing to study whether and how it would

17  be feasible to calculate the number of illegal aliens in each State"); *see also New York v. Trump*,

18  No. 20-CV-5770 (RCW) (PWH) (JMF), 2020 WL 5796815, at *5 n.8 (S.D.N.Y. Sept. 29, 2020)

19  (three-judge court) (per curiam) (denying stay pending appeal and indicating that the Secretary of

20  Commerce and the Census Bureau could continue to count the number of undocumented

21  immigrants even with the court's injunction).

22  Because the issues in the instant case are fit for judicial decision, we need not consider, as

23  part of our prudential analysis, what hardship Plaintiffs would suffer if our consideration were

24  withheld. *Abbott Labs.*, 387 U.S. at 148 (stating that ripeness "is best seen in a twofold aspect,

25  requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the

26  parties of withholding court consideration"). In *Oklevueha Native American Church of Hawaii,*

27

28

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

*Inc. v. Holder*, 676 F.3d 829 (9th Cir. 2012), the Ninth Circuit explained that it did not need to reach the question of whether there was hardship to the parties if review was delayed because Plaintiffs' claims were fit for review:

> As Plaintiffs' claims are fit for review now, we do not reach the second factor of the prudential ripeness inquiry—hardship to the parties in delaying review. Hardship serves as a counterbalance to any interest the judiciary has in delaying consideration of a case. *See Colwell*, 558 F.3d at 1129 ("[T]his hardship is insufficient to overcome the uncertainty of the legal issue presented in the case in its current posture."); *Municipality of Anchorage v. United States*, 980 F.2d 1320, 1326 (9th Cir. 1992) ("[M]ere potential for future injury does not overcome the interest of the judiciary in delaying review." (internal quotation marks omitted)). Because we can identify no interest in delaying review of Plaintiffs' claims, the hardship that would be imposed by any delay is not relevant.

*Id.* at 838–39; *see also Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 959 F.3d 341, 355–56 (9th Cir. 2020) (stating that, "[b]ecause Skyline's federal free exercise claim is fit for review now, we need not and do not reach the second prong of the prudential ripeness inquiry"; citing *Oklevueha* in support), *amended by* 968 F.3d 738 (9th Cir. July 21, 2020). Because the legal issues here are fit for review, delaying judicial review will not enhance the quality of the adjudication of this case.

Even if we were to consider hardship, Plaintiffs have sufficiently established such. Delaying judicial review until after the Secretary presents numbers to the President impacts the states' ability to do redistricting for upcoming elections in 2021 and 2022—which affects not only the states themselves but also local governments and individuals who reside in the states (including Plaintiffs). States must engage in redistricting even if apportionment has no impact on their number of Congressional seats. States usually receive data by the end of March to use in their redistricting cycles, *see Nat'l Urban League v. Ross*, No. 20-CV-05799-LHK, 2020 WL 5739144, at *2 (N.D. Cal. Sept. 24, 2020) (noting that "the Secretary of Commerce issues two reports pursuant to the Census Act: (1) 'the tabulation of total population by States' for congressional apportionment to the President by December 31, 2020, *see* 13 U.S.C. § 141(b); and (2) a

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

tabulation of population for redistricting to the states by April 1, 2021, *see id.* § 141(c)”), and some states are required to approve their redistricting plans just a few months later. *See* Pls.’ Reply at 13 (citing as an example that the Texas legislature must approve the State redistricting plan by May 31, 2021); *see also* How Changes to the 2020 Census Timeline Will Impact Redistricting (Brennan Center for Justice), https://www.brennancenter.org/sites/default/files/2020-05/2020_04_RedistrictingMemo.pdf (identifying the following states as having redistricting deadlines in May-July 2021: Alabama, Delaware, Illinois, Minnesota, Nevada, New Hampshire, Oklahoma, Oregon, and Texas). If we were to delay judicial review until January 2021, and, after our resolution, the case were appealed to the Supreme Court—a likely scenario, whichever side were to prevail—there is a significant risk that more than one state would not be able to meet their redistricting deadlines.

Indeed, the government has represented to the United States Supreme Court that a delay in redistricting could make it impossible to meet statutory and constitutional deadlines. In the government’s view, those deadlines justified the Supreme Court’s stay of the *National Urban League* injunction:

> [For example,] Louisiana and Mississippi have identified 24 state deadlines that the injunction puts at risk. Indeed, in a number of States, “the delays would mean deadlines that are established in state constitutions or statutes *will be impossible to meet.*” D. Ct. Doc. 204-7, at 3-4 (Sept. 23, 2020) (emphasis added).

*Ross v. National Urban League*, No. 20A62, ECF No. 98-3, at 11 (government’s reply brief, filed in support of application for stay pending appeal in *Ross v. National Urban League*, No. 20A62). Thus, time is of the essence.

We therefore find that the Plaintiffs have satisfied the requirements for standing, constitutional ripeness, and prudential ripeness. Accordingly, the time for review is now.

## IV.   MERITS

Most of the arguments made by the parties regarding the merits have focused, pro and con, on contentions that, under the Constitution, apportionment must be based on all persons residing

United States District Court
Northern District of California

1    in each state, including undocumented immigrants. Nonetheless, we recognize that courts have

2    long been admonished not to "pass upon a constitutional question although properly presented by

3    the record, if there is also present some other ground upon which the case may be disposed of."

4    *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *Slack v. McDaniel*, 529

5    U.S. 473, 485 (2000). That doctrine of constitutional avoidance led the New York court that

6    considered a similar challenge to base its decision that the Presidential Memorandum was

7    unlawful solely on statutory grounds. *See New York*, 2020 WL 5422959, at *25–32. Their decision

8    did not discuss the constitutional arguments.

9         We have elected a different approach to discussing the issues because, in our view, it is

10   easier to appreciate the relevant statutes with an understanding of the historical context in which

11   they were drafted and enacted. The statutes were adopted with the expectation that the population

12   count to be used for purposes of allocating seats in the House of Representatives would include all

13   inhabitants of the states, including those aliens who did not have lawful status. Indeed, as

14   demonstrated by the statutory history discussed below in Section IV-A-3-b, the prevailing

15   understanding in Congress was that it would be unconstitutional to exclude noncitizens, including

16   undocumented immigrants, from the apportionment base. Even members of Congress who

17   expressed a preference, as a matter of policy, to exclude aliens from the count acknowledged that

18   was not possible under the Constitution and thus was not the intent of the legislation that was

19   enacted. That was true at the time the Reapportionment Act was enacted in 1929, when the

20   relevant portions of the Census Act were subsequently adopted in 1954, and whenever the issue

21   was raised in Congress thereafter. Because that constitutional context is valuable to inform the

22   understanding of the statutes, we discuss it in much greater detail than the *New York* court order,

23   and we begin our discussion of the merits with constitutional issues.

24        In addition, we address the constitutional issues because time is of the essence. The

25   Secretary's report under Section 141(b) must be delivered to the President on December 31, 2020.

26   *See* 13 U.S.C. § 141(b); Decl. of Albert E. Fontenot, Jr., ECF No. 84-2 at 1. The Presidential

27

28

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Memorandum will also be reviewed on November 30, 2020 by the Supreme Court. *See* U.S.

2    Supreme Court, Miscellaneous Order (Oct. 16, 2020). In their jurisdictional briefs in the Supreme

3    Court, the parties in the *New York* case briefed not only the statutory issues on which the *New York*

4    court relied, but also the constitutional issues. *See* Mot. to Dismiss or Affirm, *Trump v. New York*,

5    No. 20-366, at 13–20; Motion to Affirm for Government Appellees, *Trump v. New York*, No. 20-

6    366, at 26–28; Reply, *Trump v. New York,* No. 20-366, at 8–11. Accordingly, we reach the

7    constitutional issues prior to the Supreme Court's consideration of the *New York* case in the event

8    that it would be helpful for a lower court to consider these issues. Though we reach the

9    constitutional claims, the statutory basis is sufficient to support our conclusion. Under the doctrine

10   of constitutional avoidance, we rely separately and primarily upon it.

11         Accordingly, we discuss the merits as follows. First, we conclude that the Presidential

12   Memorandum is unconstitutional. Next, we hold that the Presidential Memorandum violates the

13   Census and Reapportionment Acts. Finally, we explain why declaratory and injunctive relief

14   should issue against the Defendants.

15         **A.  The Presidential Memorandum is unconstitutional.**

16         The Constitution's text, drafting history, 230 years of historical practice, and Supreme

17   Court case law all support the conclusion that apportionment must be based on all persons residing

18   in each state, including undocumented immigrants. Below, we address how the Presidential

19   Memorandum conflicts with each in turn. We then reject Defendants' contrary arguments, which

20   lack merit.

21         **1.   The Constitution's text establishes that apportionment shall be based on all
               persons residing in a state, including undocumented immigrants.**
22

23         In analyzing Plaintiffs' constitutional argument, "[w]e start with the text." *Gamble v.*

24   *United States*, 139 S. Ct. 1960, 1965 (2019). The Constitution's text demonstrates that

25   apportionment must be based on the number of all persons residing in a state, including

26   undocumented immigrants. After analyzing the constitutional text, we discuss the original public

27   meaning of that text.

28
Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

### a. The constitutional text itself demonstrates that the count must include undocumented immigrants residing in each state.

"When seeking to discern the meaning of a word in the Constitution, there is no better dictionary than the rest of the Constitution itself." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2680 (2015) (Roberts, C.J., dissenting for four justices); *accord Chiafalo v. Washington*, 140 S. Ct. 2316, 2331 (2020) (Thomas, J., concurring in the judgment) (quoting same).

We presume that differences in terminology reflect differences in meaning. *See Martin v. Hunter's Lessee*, 14 U.S. 304, 334 (1816) (concluding that a "difference of phraseology" can reflect a "difference of constitutional intention"); *see also Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017) ("[W]e presume differences in language like this convey differences in meaning.").

Conversely, we presume that the same terminology conveys the same meaning. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (reasoning that "the people" is "a term of art employed in select parts of the Constitution" and has the same meaning in each part of the Constitution); *see also Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. at 2680 (Roberts, C.J., dissenting for four justices) ("The unambiguous meaning of 'the Legislature' in the Elections Clause . . . is confirmed by other provisions of the Constitution that use the same term in the same way.").

In addition, we presume that "expressing one item of a commonly associated group or series excludes another left unmentioned." *United States v. Vonn*, 535 U.S. 55, 65 (2002); *see FAIR v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980) (three-judge court) (using this principle to analyze Article I, Section 2).

Article I, Section 2 establishes that the apportionment base would include all "persons," except for specific subsets of "persons":

> Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons,

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons.

Art. I, § 2, cl. 3. Importantly, the text bases apportionment on the "number of . . . Persons," not the number of "citizens."

Article I, Section 2 also references specific subsets of "persons," including free persons, indentured servants ("those bound to Service for a Term of Years"), "Indians not taxed", and enslaved people ("all other Persons"). The distinct terminology used to describe "persons" as opposed to subsets of persons demonstrates that the term "persons" refers to all persons, not a subset of persons.

Furthermore, Article I, Section 2 excluded one subset of persons from the apportionment: "Indians not taxed." The exclusion of "Indians not taxed" demonstrates that the term "persons" would be all-inclusive unless an express exception was provided. The absence of an exception for noncitizens demonstrates their inclusion.

Although the Fourteenth Amendment eliminated the provisions for indentured servants and slaves, it retained the settled understanding that "persons in each state" meant all persons residing in each state:

> Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election . . . is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state.

U.S. Const. amend. XIV, § 2.

We note two significant aspects of the Fourteenth Amendment's text. First, like Article I, Section 2, the Fourteenth Amendment used the term "persons" instead of the more limited term "citizens." This textual variation demonstrates that the term "persons" in the Fourteenth Amendment refers to all persons, not certain subsets of persons such as "citizens."

47

Second, the Fourteenth Amendment expressly excludes "Indians not taxed" from the apportionment base. In contrast to the exclusion of Indians, the lack of an exclusion for noncitizens means that they must be included within the apportionment base. *See Vonn*, 535 U.S. at 65 ("[E]xpressing one item of a commonly associated group or series excludes another left unmentioned."); *FAIR*, 486 F. Supp. at 576 (using this principle to analyze Article I, Section 2).

We agree with the three-judge court of the D.C. District Court, which concluded that the Constitution unambiguously requires the counting of undocumented immigrants:

> The language of the Constitution is not ambiguous. It requires the counting of the "whole number of persons" for apportionment purposes, and while illegal aliens were not a component of the population at the time the Constitution was adopted, they are clearly "persons." By making express provision for Indians and slaves, the Framers demonstrated their awareness that without such provisions, the language chosen would be all-inclusive.

*FAIR*, 486 F. Supp. at 576.

In sum, the Constitution used the term "persons," not the narrower term "citizens," to describe those who were to be included in the apportionment base. When the Founders chose to exclude specific subsets of persons, such as Indians not taxed, they did so. Aliens, documented or not, were not so excluded. Hence, the plain text of the Constitution includes undocumented immigrants.

### b. The original public meaning of the term "persons in each state" includes all persons residing within a state.

Since the Founding, the term "persons in each state" has been unambiguously understood to include all persons residing in each state, regardless of their immigration status. U.S. Const. amend. XIV, § 2.

"The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Dist. of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)); *cf. Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."). When

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

1  ordinary public meaning is clear, "there is no room for construction and no excuse for

2  interpolation or addition." *Sprague*, 282 U.S. at 731.

3       At the time of the Founding, the phrase "persons in each state" included all persons

4  residing in each state, irrespective of their citizenship status. When the Constitution was drafted, a

5  dictionary defined "person" as an "[i]ndividual or particular man or woman"; "man or woman

6  considered as opposed to things"; "human being"; or "[a] general loose term for a human being."

7  *Person*, Samuel Johnson, *A Dictionary of the English Language* (3d. ed. 1766). At the time of the

8  drafting of the Fourteenth Amendment, "person" was similarly defined as "[a] living human being;

9  a man, woman, or child." *Person*, Noah Webster, An American Dictionary of the English

10  Language (1868).

11       The "normal and ordinary" meaning of the term "persons" clearly includes noncitizens,

12  including undocumented immigrants. *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Whatever his

13  status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that

14  term"); *New York*, 2020 WL 5422959, at *29 (S.D.N.Y. 2020) (three-judge court) ("The ordinary

15  meaning of the word 'person' is 'human' or 'individual' and surely includes citizens and non-

16  citizens alike."). Defendants themselves concede that the ordinary meaning of "person" includes

17  undocumented immigrants. Defs.' Opp'n at 31.

18       Legal sources from the Founding support the conclusion that the term "persons" includes

19  noncitizens. The volume of William Blackstone's *Commentaries on the Laws of England* that

20  covered "The Rights of Persons" included a chapter on rights of "People, Whether Aliens,

21  Denizens, or Natives"; this chapter presents "aliens" as a subset of "persons." 1 Blackstone

22  *Commentaries on the Laws of England*, ch. 10 (1765). Similarly, the volume of Chancellor Kent's

23  *Commentaries on American Law* that covered "The Law Concerning the Rights of Persons"

24  included a chapter on the rights of "Aliens and Natives." 2 *Kent Commentaries on American Law*

25  33–63 (1826). That volume defined an alien as a "person born out of the jurisdiction of the United

26  States." *Id*. In conclusion, since the Founding, the ordinary public meaning of "persons in each

27

28

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

1   state" has included undocumented persons residing in each state.

2   Recognizing this conclusion, Defendants concede that undocumented persons are

3   "persons." *See* Defs. Opp'n at 31. However, Defendants contend that undocumented persons need

4   not be included in the census because they are not "inhabitants." The term "inhabitants" appears in

5   a previous draft of Article I, Section 2. *See* Section IV-A-2, *infra*. Taking note of this previous draft,

6   the Supreme Court used the term in its decision in *Franklin v. Massachusetts*, which explained that

7   "usual residence" "was the gloss given the constitutional phrase 'in each State.'" 505 U.S. 788,

8   804–05 (1992). However, the term "inhabitants" does not appear in the text of the Constitution. *See*

9   U.S. Const. amend. XIV, § 2 (counting "persons in each state"); *see also* U.S. Const. art. I, § 2, cl. 3

10  (counting the "whole number of free Persons").

11  Even if we were to accept Defendants' invitation to use the term "inhabitants,"

12  undocumented persons residing in the United States are "inhabitants" of the United States. In

13  *Franklin*, the Supreme Court explained that "usual residence" "has been used broadly enough to

14  include some element of allegiance or enduring tie to a place." *Id*. at 804. The Supreme Court

15  acknowledged, however, that "[u]p to the present day, 'usual residence' has continued to hold broad

16  connotations." *Franklin*, 505 U.S. at 805–06 (explaining that the term "usual resident"

17  encompasses a wide range of persons, including persons who are temporarily absent from a state

18  because they are attending an out-of-state college or temporarily living abroad). The Census

19  Bureau's Residence Rule has also taken a broad view of "usual residents." *See*, *e.g.*, Residence

20  Rule, 83 Fed. Reg. at 5533 (counting persons based on their "usual residence, which is the place

21  where they live and sleep most of the time").

22  Undocumented immigrants who regularly reside in each state are "inhabitants" with their

23  "usual residence" in their state of residence. Undocumented immigrants residing in each state have

24  the requisite "enduring tie to a place" to make them usual residents under *Franklin*, since they live

25  and sleep most of the time in that state. *See Franklin*, 505 U.S. at 805. "A clear majority of

26  undocumented immigrants have lived in the United States for over five years and have families,

27

28
Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

hold jobs, own houses, and are part of their community." Barreto Decl. ¶ 18, ECF No. 63-3. One survey of Latino undocumented immigrants found that 89 percent have lived in the United States for at least five years, 74 percent have children living with them, 85 percent have a family member who is a United States citizen, and 87 percent said they hoped to one day become United States citizens if legislation provided that opportunity. *Id.*; *see also* Tr. of Oct. 8, 2020 hearing at 23:8–24:8 (government conceding that the question of whether recipients of Deferred Action for Childhood Arrivals (DACA) have "enduring ties" within the meaning of *Franklin v. Massachusetts*, 505 U.S. 788 (1992), is "a difficult question").

In arguing that undocumented immigrants do not have their "usual residence" in the state where they live most of the time, Defendants emphasize the fact that undocumented immigrants can be removed from the country at any time. However, the term "usual residence" refers to an individual's usual residence on "Census Day," without regard to where that individual might move afterwards. *See* Section IV-B-1-b, *infra* (explaining that undocumented persons are inhabitants despite the fact that they could be removed at any time). Thus, even if we accept Defendants' invitation to use the term "inhabitants" and *Franklin*'s concept of "usual residence," undocumented persons still must be counted in the census.

Having analyzed the constitutional text, we next address the drafting history of the Constitution, which clearly supports the inclusion of undocumented immigrants in the apportionment base.

### 2. The Constitution's drafting history supports the conclusion that apportionment was to be based on all persons residing in each state, including noncitizens.

The Constitution's drafting history confirms what the text has already made clear—the Framers intended to apportion representatives based on the number of persons residing in each state, including noncitizens. The drafters of the Fourteenth Amendment intended to retain this framework.

The drafting history of a constitutional provision can inform its meaning. *See, e.g., Ramos*

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

1  *v. Louisiana*, 140 S. Ct. 1390, 1400 (2020) (addressing Louisiana's argument about the drafting

2  history of the Sixth Amendment); *see also Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct.

3  1787, 1812 (2015) (Thomas, J., dissenting) ("It seems highly implausible that those who ratified

4  the Commerce Clause understood it to conflict with the income tax laws of their States and

5  nonetheless adopted it without a word of concern").

6      We first address the drafting history of Article I, Section 2. We then turn to the drafting

7  history of Section 2 of the Fourteenth Amendment. The drafting history shows that the Framers of

8  the Constitution and the drafters of the Fourteenth Amendment included noncitizens in the

9  apportionment base because noncitizens were worthy of representation, even if they could not

10  vote.

11      **a.  The drafting history of Article I, Section 2 demonstrates that
        apportionment was to be based on all persons in each state, including

12      noncitizens.**

13      The drafting history of Article I, Section 2 confirms the Framers' intent to apportion

14  representatives based on the number of persons in each state, including noncitizens. This

15  conclusion is supported by a previous draft of Article I, Section 2; the Constitutional Convention

16  debates; and the *Federalist Papers*.

17      As discussed in Section I-A, the previous draft of Article I, Section 2 consisted of two

18  different clauses—an Apportionment Clause and a Direct Taxation Clause. The draft

19  Apportionment Clause provided that Congress would "regulate the number of representatives by

20  the number of inhabitants, according to the rule hereinafter made for direct taxation." 2 Farrand,

21  *supra*, at 566, 571. The Direct Taxation Clause stated that "[t]he proportions of direct taxation

22  shall be regulated by the whole number of free citizens *and* inhabitants of every age, sex, and

23  condition, including those bound to servitude for a term of years, and three fifths of all other

24  persons not comprehended in the foregoing description, (except Indians not paying taxes)." *Id*. at

25  571 (emphasis added). The text of the Direct Taxation Clause shows that the Framers intended to

26  count "citizens" *and* "inhabitants of every age, sex, and condition."

27

28

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

The Direct Taxation Clause was later combined with the Apportionment Clause by the Committee of Style. *See* 2 Farrand, *supra*, at 553 (notes of James Madison on Constitutional Convention proceedings on Saturday, September 8, 1787). The final version read:

> Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons.

Art. I, § 2, cl. 3. Thus, the previous draft of Article I, Section 2 demonstrates that the Framers wanted to apportion representatives based on the number of persons residing in each state, not just the number of citizens.

The debates over Article I, Section 2 also demonstrate the Framers' intent to apportion based on persons, not citizens. "The debates at the [Constitutional] Convention make at least one fact abundantly clear: that when the delegates agreed that the House should represent 'people' they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants." *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964). In the debates over Article I, Section 2, the Framers recognized the distinction between the "rule of Representation" and "suffrage." 1 Farrand, *supra*, at 580–81 (notes of James Madison on Constitutional Convention proceedings on Wednesday, July 11, 1787). As Alexander Hamilton explained, apportionment was to be based on the number of persons residing in each state because "every individual of the community at large has an equal right to the protection of government." 1 Farrand, *supra*, at 472–73 (notes of Representative Yates of New York, on speech of Alexander Hamilton during Constitutional Convention proceedings on Friday, June 29, 1787).

The *Federalist Papers* also reflect the Framers' understanding that apportionment was to be done based on the number of persons residing in each state, not the number of voters. In *The Federalist* No. 54, James Madison explained that "[i]t is a fundamental principle of the proposed Constitution, that . . . the aggregate number of representatives allotted to the several States is to be . . . founded on the aggregate number of inhabitants." *The Federalist* No. 54. *The Federalist* Nos.

53

56 and 58 confirm the Constitution's decision to apportion based on the number of persons residing in each state, not the number of voters. *See The Federalist* No. 56, at 383 (noting that the Constitution mandates "a representative for every thirty thousand inhabitants"); *The Federalist* No. 58, at 391 (noting that the Constitution requires "readjust[ing], from time to time, the apportionment of representatives to the number of inhabitants"). Madison acknowledged that apportionment would be done based on the number of persons residing in each state, not the number of voters: "The qualifications on which the right of suffrage depend are not, perhaps, the same in any two States. . . . In every State, a certain proportion of inhabitants are deprived of this right [but] . . . will be included in the census by which the federal Constitution apportions the representatives." *The Federalist* No. 54.

Indeed, in analyzing the drafting history of Article I, Section 2, other courts have concluded that the Framers intended to include noncitizens in the apportionment base. The Supreme Court concluded that the constitutional debates made it "abundantly clear" that the Framers intended to apportion based on "the number of the State's inhabitants." *Wesberry*, 376 U.S. at 13. Similarly, the Ninth Circuit concluded that "[t]he framers were aware that this apportionment and representation base would include categories of persons who were ineligible to vote—women, children, bound servants, convicts, the insane, and, at a later time, aliens." *Garza v. County of Los Angeles*, 918 F. 2d 763, 774 (9th Cir. 1990). Finally, the three-judge court in *FAIR* emphasized that, "[a]ccording to James Madison, the apportionment was to be 'founded on the aggregate number of inhabitants' of each state . . . . The Framers must have been aware that this choice of words would include women, children, bound servants, convicts, the insane and aliens . . . . " *FAIR*, 486 F. Supp. at 576 (quoting *The Federalist*, No. 54, at 369 (J. Cooke ed. 1961)).

In sum, the drafting history of Article I, Section 2 establishes the Framers' clear intent to apportion based on the number of persons residing in each state, not the number of voters. We next address the drafting history of Section 2 of the Fourteenth Amendment.

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

**b. The drafting history of the Fourteenth Amendment confirms that apportionment was to be based on the number of persons residing in each state, including noncitizens.**

Like the drafters of the Constitution, the drafters of the Fourteenth Amendment intended to apportion based on the number of persons residing in each state, not just the number of citizens. Indeed, the drafters rejected a proposal to apportion based on the number of voters, instead choosing to continue apportioning based on the number of persons. Moreover, during the debates over the Fourteenth Amendment, the drafters explicitly acknowledged the consequences of their choice—the inclusion of noncitizens in the apportionment base. Thus, the drafting history of the Fourteenth Amendment confirms the drafters' intent to apportion based on the number of noncitizens.

During the drafting of the Fourteenth Amendment, Representative Thaddeus Stevens of Pennsylvania introduced a proposal that would have apportioned representatives "according to their respective legal voters." Cong. Globe, 39th Cong., 1st Sess. 10 (1866); *see also Evenwel*, 136 S. Ct. at 1128 (recounting the history of this proposal). However, the proposal "encountered fierce resistance from proponents of total-population apportionment." *Evenwel*, 136 S. Ct. at 1128. The proposal was rejected, leaving apportionment to be based on the number of people residing in each state, not the number of voters. *See id*. The drafters' rejection of the proposed language underscores their intent to continue to apportion based on total population.

Instead of accepting the new proposal, the drafters of the Fourteenth Amendment embraced "the principle upon which the Constitution itself was originally framed, that the basis of representation should depend upon numbers . . . not voters." Cong. Globe, 39th Cong., 1st Sess. 2766–67 (1866) (statement of Senator Howard introducing the Fourteenth Amendment on the Senate floor). The drafters of the Fourteenth Amendment understood that the Constitution had traditionally based apportionment on the number of persons residing in each state, including noncitizens. *See id*. at 705 (statement of Senator Fessenden) ("The principle of the Constitution . . . is that it shall be founded on population . . . . [W]e are attached to that idea, that the whole population is represented; that although all do not vote, yet all are heard. That is the idea of the

55

1   Constitution.").

2          In the debates over the Fourteenth Amendment, the drafters of the Fourteenth

3   Amendment—including representatives and senators from New Jersey, New York, Illinois, Ohio,

4   Pennsylvania, Massachusetts, Oregon, and Vermont quoted in Section I-A—explicitly

5   acknowledged their intent to continue to include noncitizens in the apportionment base. Like the

6   Framers, the drafters of the Fourteenth Amendment found it important to include noncitizens and

7   other non-voters in the apportionment base because even nonvoters' interests would be represented

8   by the elected government. *See id.* at 141 ("[N]o one will deny that population is the true basis of

9   representation; for women, children, and other non-voting classes may have as vital an interest in

10  the legislation of the country as those who actually deposit the ballot.") (statement of

11  Representative Blaine). Thus, the drafting history of both Article I, Section 2 and the Fourteenth

12  Amendment confirms that apportionment was to be based on the number of inhabitants, which

13  included noncitizens.

### 3. Historical practice reflects that Congress and the Executive Branch have consistently interpreted the Constitution as including in the apportionment base all persons residing in a state, including undocumented immigrants.

16          For over two hundred years, Congress, the Department of Justice, and the Census Bureau

17  have all consistently concluded that the Constitution mandates that the apportionment base must

18  include noncitizens. Even members of Congress who were in favor of excluding noncitizens have

19  concluded that to do so would be unconstitutional. This consistent understanding of the

20  Constitution's requirements by the executive and legislative branches of government affirms the

21  conclusion that undocumented immigrants must be included in the apportionment base.

22          When confronted with questions of constitutional interpretation, the Supreme Court has

23  emphasized the centrality of historical practice to resolving ambiguities in the meaning and

24  application of the Constitution. *See, e.g.*, *Evenwel*, 136 S. Ct. at 1132 (considering "constitutional

25  history" and "settled practice" to resolve constitutional dispute regarding apportionment); *NLRB v.*

26  *Noel Canning*, 573 U.S. 513, 525 (2014) (analyzing the "longstanding 'practice of the

27

28

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

*United States District Court*
*Northern District of California*

government'" to determine the constitutionality of recess appointments) (quotation omitted). In fact, the Supreme Court has routinely relied on historical practice to decide constitutional questions in the context of the census. *See Dep't of Commerce*, 139 S. Ct. at 2567 (explaining that the Supreme Court's "interpretation of the Constitution is guided by a Government practice that 'has been open, widespread, and unchallenged since the early days of the Republic'") (quotation omitted); *Wisconsin*, 517 U.S. at 21 (looking to the "importance of historical practice"); *Franklin*, 505 U.S. at 806 (looking to historical practice to resolve constitutional question regarding enumeration).

At oral argument, Defendants conceded that historical practice does not support their argument. The Court asked Defendants: "Has there ever been an instance in the last 200 years where the Census Bureau has decided not to count people solely on the basis of the legality of their immigration status? . . . Is there any history in the census that contradicts what is done through this census?" Tr. of Oct. 9, 2020 Hearing at 19:23–20:4, *City of San Jose v. Trump*, No. 20-cv-05167 (N.D. Cal Oct. 9, 2020). Defense counsel conceded: "We are not aware of any . . . ." *Id.* at 20:5. In response, the Court pressed Defendants: "It's not just the Census Bureau, but it's also Congress and the Department of Justice have never supported your position; is that correct? Is there any historical precedent that Congress or the Department of Justice supported your position?" *Id.* at 21:7–11. Defense counsel replied: "That's correct." *Id.* at 21:12. Likewise, we have failed to identify any historical practice that would support Defendants' argument.

Historical practice confirms that the Constitution requires undocumented immigrants to be included in the apportionment base. We address in turn: (a) historical practice prior to the passage of federal immigration laws in 1875; (b) legislative proposals to exclude noncitizens after 1875; (c) the DOJ's stance across administrations that undocumented immigrants cannot be excluded from the apportionment base; and (d) the Census Bureau's consistent practice of counting undocumented immigrants who reside in each state. In each case, historical practice reflects a shared understanding that the Constitution requires the apportionment base to include all persons

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

1    who reside in each state.

2        **a. From the 1790 Census to the passage of federal immigration laws in 1875,**
         **the apportionment base included all persons who resided in the state**
3        **without regard to legal status.**

4        From the original 1790 Census onwards, historical practice reflects the inclusion of

5    noncitizens in the apportionment base. The first census statute, for example, instructed "assistants"

6    to count "the number of the *inhabitants* within their respective districts." Act of Mar. 1, 1790, § 1,

7    1 Stat. 101, 101 (emphasis added); *see* Section I-C, *supra*. The drafters of the statute did not use

8    the available category of "citizens," but rather chose the more expansive category of "inhabitants,"

9    despite the clear implication that this choice would include persons who were not citizens.

10       This broad approach to the apportionment base held true even when persons were known

11   to be in a state illegally as fugitive slaves. The Fugitive Slave Act of 1850 required that free states

12   return slaves captured within their borders to their owners, if ownership could be established. *See*

13   9 Stat. at 462–63. Although escaped slaves were therefore unlawfully present in northern free

14   states in 1860, they were counted in the 1860 Census as part of the apportionment base in those

15   northern states. *See* U.S. Census Bureau, 1860 Census: Population of the United States at vi-vii,

16   xi, xvxvi (Gov't Printing Office 1864); ECF No. 64-22 at 5–6. Thus, early historical practice

17   reflects that even where persons were in a state unlawfully, they were still counted as part of the

18   apportionment base of that state.

19       **b. After the passage of federal immigration laws in 1875, Congress has**
         **uniformly rejected as unconstitutional legislative proposals to exclude**
20       **immigrants from the apportionment base.**

21       Defendants correctly point out that pre-1875 historical practice cannot definitively resolve

22   questions regarding undocumented immigrants because there were not federal immigration laws

23   until 1875. Defs.' Opp'n at 26; *see also Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972)

24   (explaining the history of federal immigration legislation). However, as detailed in Section I-B and

25   recounted below, substantial evidence of historical practice after 1875 confirms that the

26   apportionment base has consistently been understood to include all persons residing in a state,

27

28
         58

including undocumented immigrants.

Since 1875, members of Congress have repeatedly tried to exclude noncitizens from the apportionment base. For example, in 1929, Congress simultaneously considered two constitutional amendments that would have excluded noncitizens from the apportionment base. The first, which was introduced by Representative Hoch, would have changed the Fourteenth Amendment's apportionment formula to the following:

> Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed and aliens.

*To Amend the Constitution: Hearing on H.J. Res. 102 and H.J. Res. 351 Before the H. Comm. on the Judiciary*, 70th Cong. 1 (1929). The second was a constitutional amendment introduced by Representative Stalker that would have expressly excluded noncitizens from the apportionment:

> Aliens shall be excluded in counting the whole number of persons in each State for apportionment of Representatives among the several States according to their respective numbers.

*Id*. Neither constitutional amendment was passed. The introduction of these constitutional amendments reflects Congress's understanding that the Constitution includes noncitizens in the apportionment base, so excluding noncitizens from the apportionment base would require a constitutional amendment, rather than a mere legislative proposal.

Congress has also considered legislative proposals that would have excluded noncitizens from the apportionment base. However, these proposals have consistently been rejected by members of Congress on the ground that the Constitution requires counting all persons that reside in a state. *See FAIR*, 486 F. Supp. at 576 (discussing congressional proposals to exclude undocumented immigrants from the apportionment base and concluding that "it appears to have been generally accepted that such a result would require a constitutional amendment."). Even members of Congress who wanted to exclude undocumented immigrants as a matter of policy have rejected proposals on the grounds that they conflict with the Constitution. *See Section I-B, supra.*

United States District Court
Northern District of California

1        For example, when a bill was proposed in 1929 to exclude "aliens" from the apportionment

2   base, the Senate Legislative Counsel found that "[t]he practical construction of the constitutional

3   provisions by Congress in its apportionment legislation has been uniformly in favor of inclusion of

4   aliens." 71 Cong. Rec. 1821–22 (1929). The Senate Legislative Counsel thus stated "the opinion

5   of this office that there is no constitutional authority for the enactment of legislation excluding

6   aliens from enumeration for the purposes of apportionment of Representatives among the States."

7   *Id.*

8        Following the Senate Legislative Counsel's legal opinion, even members of Congress who

9   adamantly supported excluding aliens from the apportionment base concluded that they could not

10   vote for the amendment because it was unconstitutional. For example, Senator David Reed of

11   Pennsylvania, who in 1924 had co-authored a law restricting immigration from Southern and

12   Eastern Europe and banning immigration from Asia, decided that he could not vote for it. Senator

13   Reed lamented at a hearing on the 1929 amendment to the Reapportionment Act: "I want to vote

14   for it; everything in my experience and outlook would lead me to vote for this amendment if that

15   possibly could be done." 71 Cong. Rec. 1958 (1929). However, Senator Reed concluded that he

16   could not vote for the amendment because it was unconstitutional:

> 17   [I]f it were a free question I should unhesitatingly vote to substitute the word
> "citizens" for "persons" or to substitute the words "voters who actually have cast
> 18   their votes at the last general election," yet I am forced to the conclusion that the
> word "persons" must be taken in its literal sense; that it was not an accident that it
> 19   occurred but was the deliberate choice, first, of the Constitutional Convention and
> next of the Congress in acting on the fourteenth amendment.
> 20

21   *Id.* The amendment to exclude aliens from the apportionment base did not pass.

22        Later members of Congress have also consistently maintained that undocumented

23   immigrants must be included in the apportionment base. As recounted in Section I-B above, even

24   proponents of excluding "aliens in the United States in violation of the immigration laws" from

25   the apportionment base refused to support statutory amendments that would have done so.

26   135 Cong. Rec. 14539–40. Senator Dale Bumpers of Arkansas admitted that he did "not want to

27

28   Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

go home and explain [his] vote on this [amendment] any more than anyone else does." *Id.* at

14551. Nevertheless, Senator Bumpers voted against the amendment because he thought the

amendment was unconstitutional. "I wish the Founding Fathers had said you will only enumerate

'citizens,'" Senator Bumpers concluded, "but they did not. They said 'persons,' and so that is what

it has been for 200 years. We have absolutely no right or authority to change that peremptorily on

a majority vote here." *Id.*

These examples illustrate that legislative proposals to exclude undocumented immigrants

from the apportionment base have consistently been rejected by Congress. Even members of

Congress who strongly favored excluding undocumented immigrants as a matter of policy

understood that such exclusion was unconstitutional. This consistent historical practice

demonstrates that the Constitution requires the apportionment base to include all persons who

reside in a state, including undocumented immigrants.

### c. The Department of Justice has consistently argued that the apportionment base must include undocumented immigrants.

In addition, during both Democratic and Republican administrations, the Department of

Justice has consistently maintained that the apportionment base must include undocumented

immigrants. *See* Section I-C, *supra*. As recounted in detail in Section I-C, the DOJ maintained this

view throughout the Administrations of Presidents Jimmy Carter, Ronald Reagan, and George

H.W. Bush. DOJ forcefully stated its view to both Congress and the courts. For instance, as the

DOJ in President George H.W. Bush's Administration explained to a senator who sought DOJ's

views on a proposal to exclude "illegal or deportable aliens" from the census, "section two of the

Fourteenth Amendment which provides for 'counting the whole number of persons in each state'

and the original Apportionment and Census Clauses of Article I section two of the Constitution

require that inhabitants of States who are illegal aliens be included in the census count." 135

Cong. Rec. S12234 (1989); *see also FAIR*, 1980 WL 683642 (brief in the District of Columbia

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1  during President Carter's Administration).[14]

2      These examples illustrate that, until the current Administration, the DOJ has consistently

3  concluded that it would be unconstitutional to exclude undocumented immigrants from the

4  apportionment base. The consistent conclusions of the DOJ confirm that the Constitution requires

5  the apportionment base to include all persons who reside in each state regardless of immigration

6  status.

7      **d.  The Census Bureau has consistently included undocumented immigrants in the census count and apportionment base.**

8

9      Finally, across presidential administrations from both parties, the Census Bureau itself has

10  included undocumented immigrants in the apportionment base, regardless of the administration's

11  stance on immigration in other contexts.

12      In 1985, for example, President Reagan's Census Bureau Director John Keane told

13  Congress that the "[t]raditional understanding of the Constitution and the legal direction provided

14  by the Congress has meant that for every census since the first one in 1790, [the Bureau] ha[s]

15  tried to count residents of the country, regardless of their status." *Enumeration of Undocumented*

16  *Aliens in the Decennial Census: Hearing on S. 99-314 Before the Subcomm. on Energy, Nuclear*

17  *Proliferation, & Gov't Processes of the S. Comm. on Governmental Affairs*, 99th Cong. 19 (1985)

18  (statement of Census Director John Keane), ECF No. 64-21 at 24.

19      In *FAIR*, the three-judge court explained that undocumented immigrants had consistently

20  been counted in the census. 486 F. Supp. at 566. The three-judge court noted that "[t]he Census

21  Bureau has always attempted to count every person residing in a state on census day, and the

22  population base for purposes of apportionment has always included all persons, including aliens

23

24    [14] As Plaintiffs point out, Attorney General William Barr was head of the DOJ's Office of Legal

25  Counsel at the time of this letter and likely would have been consulted on its legal conclusions.

26  The DOJ under Attorney General Barr now takes the opposite position in the present litigation.

27  This stands in contrast to the DOJ's position in 1989 and in every other administration when the question arose.

28  Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

1    both lawfully and unlawfully within our borders." *Id*. Thus, the government's "interpretation of the

2    constitutional language [in defense of including undocumented immigrants in the apportionment

3    base] is bolstered by two centuries of consistent interpretation." *Id*.

4            In fact, even the current Administration's Census Bureau promulgated a rule (after notice

5    and comment and consideration of hundreds of comments) that counts undocumented immigrants

6    in the 2020 Census. *See* Residence Rule, 83 Fed. Reg. at 5525; *see also New York*, 2020 WL

7    5422959, at *5 (describing the Residence Rule in detail). The Census Bureau is "guided by the

8    constitutional and statutory mandates to count all residents of the several states," and the

9    Residence Rule is designed "to ensure that the concept of usual residence is interpreted and

10   applied, consistent with the intent of the Census Act of 1790, which was authored by a Congress

11   that included many of the framers of the U.S. Constitution and directed that people were to be

12   counted at their usual residence." 83 Fed. Reg. at 5526. The Residence Rule provides that

13   "[c]itizens of foreign countries living in the United States" are to be "[c]ounted at the U.S.

14   residence where they live and sleep most of the time," with exceptions for two types of foreign

15   citizens. *Id.* at 5533. The first exception is that "[c]itizens of foreign countries living in the United

16   States who are members of the diplomatic community" are "[c]ounted at the embassy, consulate,

17   United Nations' facility, or other residences where diplomats live." *Id.* The other exception is

18   that "[c]itizens of foreign countries visiting the United States, such as on a vacation or business

19   trip" are "[n]ot counted in the census." *Id.* Thus, the Residence Rule counts *all* noncitizens except

20   those "visiting the United States, such as on a vacation or business trip." *Id*. Persons whose usual

21   residence in a state are to be counted even if they are undocumented immigrants.

22           In promulgating that categorical rule, the Census Bureau specifically considered a

23   comment that "expressed concern about the impact of including undocumented people in the

24   population counts for redistricting because these people cannot vote." *Id.* at 5530. Even so, the

25   Census Bureau decided to "retain the proposed residence situation guidance for foreign citizens in

26   the United States." *Id.* In doing so, the Census Bureau stressed that "[f]oreign citizens are

27                                                          63

28   Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
     ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
     DEFENDANTS' MOTION TO DISMISS

1    considered to be 'living' in the United States if, at the time of the census, *they are living and*

2    *sleeping most of the time at a residence in the United States*." *Id.* (emphasis added).

3            Here, it is undisputed that most undocumented immigrants live and sleep most of the time

4    at a residence in the United States. As we have discussed above, "a clear majority of

5    undocumented immigrants have lived in the United States for over five years and have families,

6    hold jobs, own houses, and are part of their community." Barreto Decl. ¶ 18, ECF No. 63-3; *see*

7    Section IV-A-1-b, *supra*.

8            In sum, the "longstanding practice of the government," including Congress, the

9    Department of Justice, and the Census Bureau demonstrate that the apportionment base must

10   include all persons residing in each state regardless of their immigration status. *Noel Canning*, 573

11   U.S. at 525 (quotation marks omitted). As a result, the Presidential Memorandum not only violates

12   the Constitution but also contravenes two hundred years of history.

**4. Under Supreme Court case law, the term "persons" includes undocumented immigrants.**

14   Supreme Court case law confirms what the text, drafting history, and 230 years of

15   historical practice make clear—the Constitution requires the inclusion of undocumented

16   immigrants in the census. In interpreting the Fourteenth Amendment, the Supreme Court has held

17   that undocumented immigrants are "person[s] within [a state's] jurisdiction." U.S. Const., amend.

18   XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the

19   laws.").

20           Only ten years after the first federal immigration law was passed in 1875, the Supreme

21   Court held that noncitizens were persons within a state's jurisdiction for the purposes of the

22   Fourteenth Amendment's Equal Protection Clause. In *Yick Wo v. Hopkins*, the Supreme Court

23   concluded that the Fourteenth Amendment's Equal Protection Clause, which prohibits a state from

24   "deny[ing] to any person within its jurisdiction the equal protection of the laws," applied to the

25   noncitizen plaintiffs, who were statutorily barred from naturalization. 118 U.S. 356, 368–69

26   (1886) (quoting U.S. Const., amend. XIV, § 1); *see Ozawa v. United States*, 260 U.S. 178, 192–93

28   Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1    (1922) (explaining that, as of 1886, naturalization was confined to white persons and persons of

2    African descent). The Supreme Court reasoned that the Fourteenth Amendment's "provisions are

3    universal in their application, to all persons within the territorial jurisdiction, without regard to any

4    differences of race, of color, or of nationality." *Yick Wo*, 118 U.S. at 369.

5            The Supreme Court has also held that undocumented immigrants are persons within a

6    state's jurisdiction for purposes of the Fourteenth Amendment's Equal Protection Clause. In *Plyler*

7    *v. Doe*, the Supreme Court addressed whether a Texas law that prohibited undocumented children

8    from enrolling in the state's public schools violated the Fourteenth Amendment's Equal Protection

9    Clause, which establishes that "[n]o State shall . . . deny to any person within its jurisdiction the

10   equal protection of the laws." 457 U.S. 206, 210 (1982) (quoting U.S. Const., amend. XIV, § 1)

11   (emphasis removed). The Supreme Court unanimously rejected Texas's argument that

12   "undocumented aliens, because of their immigration status, are not 'persons within the

13   jurisdiction' of the State of Texas, and that they therefore have no right to the equal protection of

14   Texas law." *Id*. at 210; *see also id*. at 243 (Burger, C.J., dissenting) (agreeing with the majority on

15   this point). The Supreme Court concluded that "[w]hatever his status under the immigration laws,

16   an alien is surely a 'person' in any ordinary sense of that term." *Id*. The Supreme Court therefore

17   concluded that undocumented immigrants are persons within the jurisdiction of a state. *Id*. at 210–

18   16.

19           In *Plyler*, the Supreme Court held that the term "person[s] within the jurisdiction of [a]

20   state" in the Fourteenth Amendment's Equal Protection Clause included undocumented

21   immigrants because the Supreme Court had previously defined "persons" in the Fourteenth

22   Amendment's Due Process Clause in the same way. *See id*. at 211–13; Section IV-A-1-b, *supra*.

23   Similarly, the Supreme Court's holding in *Plyler* that the term "persons within the jurisdiction of

24   [a] state" includes undocumented immigrants supports the conclusion that "persons in each state"

25   in Section 2 of Article I of the Constitution includes undocumented immigrants.

26           Defendants argue that *Plyler* is inapposite because it addressed the Equal Protection

27                                                    65

28   Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
     ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
     DEFENDANTS' MOTION TO DISMISS

1    Clause, which was not limited to "inhabitants" like the Apportionment Clause. *See* Defs. Opp'n at

2    28. But the Apportionment Clause does not use the term "inhabitants" — rather, it uses the term

3    "persons in each state," which is similar to the words the Supreme Court interpreted in *Plyler*.

4    *Compare* U.S. Const., amend. XIV, § 1 ("No State shall . . . deny to *any person within its*

5    *jurisdiction* the equal protection of the laws.") (emphasis added) with U.S. Const. XIV, § 2

6    (apportioning representatives based on "*the whole number of persons in each State*"). Thus, *Plyler*

7    supports the conclusion that "persons in each state" includes undocumented immigrants.

8         In sum, the Supreme Court has held that undocumented immigrants residing in a state are

9    persons within a state's jurisdiction and entitled to constitutional rights. Supreme Court case law

10   thus supports the inclusion in the apportionment base of undocumented immigrants who reside in

11   and have enduring ties to a state.

12              **5.  Defendants' arguments lack merit.**

13        Despite the Constitution's text, drafting history, 230 years of historical practice, and

14   Supreme Court case law, Defendants argue that the President can constitutionally exclude

15   undocumented immigrants from the apportionment. However, Defendants' arguments lack merit.

16   Although Defendants argue that undocumented immigrants were not "persons in each state," the

17   sources on which Defendants rely are unpersuasive. Defendants' reliance on *Franklin v.*

18   *Massachusetts* is similarly misplaced. We address each in turn.

              **a.  Contrary to Defendants' arguments, undocumented immigrants are**
              **"persons in each state."**

19

20

21        Defendants argue that undocumented immigrants were not "persons in each state" at the

     time of the Founding and thus should be excluded from the apportionment base. *See* Defs. Opp'n
22
     at 20–23. Defendants' argument contravenes the Constitution's text and drafting history, 230 years
23
     of historical practice, and Supreme Court case law. *See* Sections IV-A-1, IV-A-2, IV-A-3, IV-A-4,
24
     *supra*. Defendants thus rely upon the following three irrelevant sources that have nothing to do
25
     with apportionment or the census:
26
27        •  A statement from a French international law treatise by Swiss scholar Emmerich de Vattel;

                                    66
28   Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
     ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
     DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

- A statement from *The Federalist* No. 42 about the Articles of Confederation; and
- Case law concluding that foreign tourists and businessmen do not dwell in the United States.

None of these sources supports excluding undocumented immigrants from the apportionment base. We address each source in turn.

First, Defendants rely on a statement from an international law treatise written in French by Emmerich de Vattel, a Swiss scholar of international law. Defs.' Opp'n at 22–23. Chief Justice Marshall quoted the statement in a concurring opinion in *The Venus*, 12 U.S. (8 Cranch.) 253, 288 (1814) (Marshall, C.J., concurring). The quoted statement was that "inhabitants, as distinguished from citizens, are strangers who are permitted to settle and stay in the country." *The Venus*, 12 U.S. (8 Cranch.) 253, 289 (1814) (Marshall, C.J., concurring) (quoting Vattel).

Yet neither Vattel's statement nor *The Venus* has any relation to apportionment or the census. Vattel's statement analyzed "the law of nations" and even on that topic, Chief Justice Marshall noted that Vattel's statement was cursory ("not very full to this point," as Chief Justice Marshall put it). *Id.* at 289, 291. *The Venus* concerned international businessmen and the condemnation of those businessmen's sundry goods (*e.g.*, "casks of white lead") aboard a ship after the War of 1812. *Id.* at 253 (majority op.). In short, *The Venus* addressed the effect of "a declaration of war" on international commercial relationships and international commercial property. *Id.* at 292 (Marshall, C.J., concurring). As Chief Justice Marshall explained, the status of a merchant's "commercial objects" in war turned on the merchant's commercial intentions, which were hard to discern "solely from the fact of residence":

> A merchant residing abroad for commercial purposes may certainly intend to continue in the foreign country so long as peace shall exist, provided his commercial objects shall detain him so long, but to leave it the instant war shall break out between that country and his own . . . .
>
> The intention to be inferred solely from the fact of residence during peace, *for commercial purposes*, is, in my judgment, necessarily conditional, and *dependent on the continuance of the relations of peace* between the two countries."

*Id.* at 288, 291 (emphasis added).

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

1      Nothing suggests that the Constitution enshrined Vattel's international law definition of

2  "inhabitants"—or *The Venus*'s analysis of the laws of war—in the constitutional term "persons in

3  each state" for the purposes of the Enumeration and Apportionment Clause. After all, "[t]he

4  Constitution was written to be understood by the voters; its words and phrases were used in their

5  normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576 (quoting

6  *Sprague*, 282 U.S. at 731). As set forth above, the ordinary meaning of "persons in each state"

7  includes all persons residing in a country without regard to their permission to settle. *See* Section

8  IV-A-1, *supra*.

9      Second, Defendants rely on a statement made by James Madison in *The Federalist* No. 42.

10  Defs.' Opp'n at 23. Madison stated that the Articles of Confederation required states "to confer the

11  rights of citizenship in other States . . . upon any whom it may allow to become inhabitants within

12  its jurisdiction." *The Federalist* No. 42. Suffice it to say, the Articles of Confederation predated the

13  Constitution, the Constitution's requirement of a decennial census, and the bedrock principle that

14  the States are united under one sovereign. Thus, like the French international law treatise,

15  Madison's statement about the Articles of Confederation has nothing to do with the census or

16  apportionment.

17      Third, Defendants cite cases which concluded that noncitizen travelers, such as foreign

18  tourists or foreign businessmen, were not considered inhabitants of a state. *See, e.g., Bas v. Steele*,

19  2 F. Cas. 988, 993 (Washington, Circuit Justice, C.C.D. Pa. 1818) (No. 1,088) (concluding that a

20  Spanish subject who had remained temporarily in Philadelphia as a merchant "was not an

21  inhabitant of this country, as no person is an inhabitant of a place, but one who acquires a domicil

22  there"); *Toland v. Sprague*, 23 F. Cas. 1353, 1355 (C.C.E.D. Pa. 1834) (No. 14,076)

23  (distinguishing an "inhabitant" from a "transient passenger"). Defendants argue that Plaintiffs

24  must show that it would be unconstitutional to exclude these foreign travelers. This showing of

25  unconstitutionality is required, Defendants argue, because Plaintiffs bring a facial challenge

26  against the Presidential Memorandum. Defs.' Opp'n at 29.

27                                              68

United States District Court
Northern District of California

1          Supreme Court precedent forecloses Defendants' argument. *See City of Los Angeles v.*

2     *Patel*, 576 U.S. 409, 418 (2015) (rejecting the City's argument that the plaintiffs needed to show

3     that every possible application of an ordinance was unconstitutional). When evaluating a facial

4     challenge, courts need to consider "only applications of the statute in which it actually authorizes

5     or prohibits conduct," not circumstances in which the law is irrelevant and does no work. *Patel*,

6     576 U.S. at 418; *see also Citizens United v. FEC*, 558 U.S. 310, 331 (2010) ("[T]he distinction

7     between facial and as-applied challenges is not so well defined that it has some automatic effect or

8     that it must always control the pleadings and disposition in every case involving a constitutional

9     challenge."). The Presidential Memorandum is "irrelevant" to persons like foreign tourists, who

10    are already excluded from the count based on the Residence Rule. *See* Residence Rule, 83 Fed.

11    Reg. at 5533 (excluding "[c]itizens of foreign countries visiting the United States, such as on a

12    vacation or business trip"). Accordingly, Plaintiffs need not demonstrate that it would be

13    unconstitutional for the Presidential Memorandum to exclude foreign tourists from the count—the

14    Residence Rule already excludes them.

15          Moreover, Defendants' cases about noncitizen travelers are inapposite in two ways. For

16    one, the cases had nothing to do with the census or apportionment. In addition, the cases' holdings

17    about "inhabitants" are inapplicable to undocumented immigrants. The cases merely held that

18    noncitizens transiting through the United States temporarily with no intention of remaining are not

19    "inhabitants." By contrast, millions of undocumented immigrants have lived in the United States

20    for decades and intend to remain. *See* Section IV-A-3-d, *supra* (discussing Barreto Decl. ¶ 18 and

21    Tr. of Oct. 8, 2020 hearing at 23:8–24:8). Accordingly, the inapposite cases Defendants cite cannot

22    overcome the Constitution's text and drafting history, 230 years of historical practice, and

23    Supreme Court case law.

24          Indeed, one case on which Defendants rely supports Plaintiffs' position. In *Kaplan v. Tod*,

25    267 U.S. 228 (1925), the Supreme Court considered a child's immigration status. The child, Esther

26    Kaplan, had been denied entry into the United States in 1915 but had been paroled in because she

27

69

28

1   could not be returned to Russia during World War I. *Id.* at 229. Ms. Kaplan later argued that she

2   had become a citizen after her father was naturalized. The Supreme Court rejected Ms. Kaplan's

3   argument because, under the immigration laws then in effect, the naturalization of parents affected

4   the status of children only if the children were "dwelling in the United States," and Ms. Kaplan

5   was not "dwelling in the United States within the meaning of the Act." *Id.* at 230. Defendants thus

6   argue that *Kaplan* shows that undocumented immigrants are not "dwelling in the United States"

7   for the purposes of the census.

8       Defendants omit, however, that "Esther Kaplan of the Supreme Court case *Kaplan v. Tod*,

9   267 U.S. 228 (1925), was enumerated in the 1920 census." Mendelsohn Decl. ¶ 3, ECF No. 87-5

10   (declaration of genealogist with supporting documentation). That the 1920 Census counted

11   Ms. Kaplan despite her undocumented status is unsurprising. Unlike the Presidential

12   Memorandum, *Kaplan* did not contravene the Constitution's text and drafting history and 230

13   years of historical practice. Rather, *Kaplan* addressed the narrow question of whether Ms. Kaplan

14   was "dwelling in the United States" for the purposes of naturalization under the immigration laws

15   in effect at that time. *Id.* at 230.

16       In conclusion, none of Defendants' arguments support the exclusion of undocumented

17   immigrants from the apportionment base.

18           **b.  The President does not have discretion under *Franklin v. Massachusetts* to
                 stray from the clear text of Article I, Section 2 and Section 2 of the
19                 Fourteenth Amendment.**

20       Defendants' last argument is that *Franklin v. Massachusetts*, 505 U.S. 788 (1992), gives

21   the President discretion to overcome the text and history of Article I, Section 2 and Section 2 of

22   the Fourteenth Amendment. We disagree. If anything, *Franklin* underscores that the President's

23   actions must be consonant with the text and history of the Constitution. In brief, *Franklin* confirms

24   that (1) constitutional text, drafting history, and historical practice cabin the President's discretion;

25   (2) the Presidential Memorandum is not a policy judgment that results in the decennial census; and

26   (3) the Apportionment Clause mandates a broad interpretation of "usual residence" for the

27

28
Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

purposes of apportionment. We discuss each point below in turn.

First, *Franklin* held that the President's discretion "to direct the Secretary in making policy judgments that result in 'the decennial census'" must be "consonant with . . . the text and history of the Constitution." *Franklin*, 505 U.S. at 799, 806 (quoting 2 U.S.C. § 2a). Defendants concede this, as they must. Defs.' Opp'n at 22. Still, Defendants contend that the meaning of "inhabitants" here is "sufficiently indeterminate to give [the President] significant discretion within constitutional bounds." *Id.* Not so. Whatever the precise bounds of the President's discretion to define "inhabitants," the Presidential Memorandum's exclusion of undocumented immigrants from the apportionment base violates the Constitution for the reasons discussed above.

Second, the executive discretion that the Supreme Court upheld in *Franklin* concerned a "policy judgment[] that result[ed] in the 'decennial census.'" *Id.* at 799. The Presidential Memorandum, by contrast, does not result in the decennial census. Rather, the Presidential Memorandum amends the apportionment calculation after the decennial census is completed. Defendants concede in their Motion to Dismiss that: "The Presidential Memorandum does not purport to change the conduct of the census itself. Instead, it relates to the calculation of the apportionment base used to determine the number of representatives to which each state is entitled." *See* Defs.' Opp'n at 10. Similarly, Albert E. Fontenot, Jr., the Census Bureau's Associate Director for Decennial Census Programs, declared that the Presidential Memorandum "has had no impact on the design of field operations for decennial census, or on the Census Bureau's commitment to count each person in their usual place of residence, as defined in the Residence Criteria." Decl. of Albert E. Fontenot, Jr., ECF No. 84-2 at 4. Thus, unlike the decision upheld in *Franklin*, the Presidential Memorandum bases an apportionment on something other than the "decennial census of the population." 2 U.S.C. § 2a(a); *see* Section IV-B-2, *infra*. As discussed in Section IV-B-2 below, this change in the apportionment base violates the Census and Reapportionment Acts.

Lastly, the interpretation of "usual residence" that Defendants advance in this case clearly

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

conflicts with the broad understanding of "usual residence" that the *Franklin* Court affirmed. *Franklin*, 505 U.S. at 804. In *Franklin*, the Court explained that "[usual residence] can mean more than mere physical presence, and has been used broadly enough to include some element of allegiance or enduring tie to a place." *Id.* Thus, the Court affirmed the constitutionality of the Secretary's decision to include in the apportionment base overseas American servicemembers who lacked physical presence in the United States because the servicemembers maintained "ties to their home States." *Id.* at 806. Allocating overseas servicemembers to their home states, the Court concluded, was "consistent with the constitutional language and the constitutional goal of equal representation." *Id.* at 804.

The Presidential Memorandum, by contrast, excludes undocumented immigrants from the apportionment base, despite their physical presence in their home state and their enduring ties to the United States. *See* Barreto Decl. ¶ 18, ECF No. 63-3. Rather than support this exclusion of undocumented immigrants from the apportionment base, *Franklin* makes clear that "usual residence" should be interpreted broadly for the purposes of apportionment. *Franklin*, 505 U.S. at 806. The Presidential Memorandum violates this clear principle by excluding undocumented immigrants from the apportionment base, and it finds no support in the holding of *Franklin*. This conclusion is confirmed by the statutory analysis of *Franklin* in Section IV-B-1-b, *infra*.

In sum, *Franklin* does not support Defendants' argument. The Presidential Memorandum is neither consonant with the text and history of the Constitution, nor is it consistent with the constitutional goal of equal representation.

**B.  The Presidential Memorandum violates the Census and Reapportionment Acts.**

As to Plaintiffs' statutory claims, we have conducted an independent analysis and reach the same conclusion as the *New York* court. We also agree with the basis for the *New York* court's decision as discussed in its order, at *25–32. The arguments presented to us were not entirely identical to the arguments presented to that court, but the primary thrusts of the arguments were similar. Where they were similar, we agree with and effectively adopt the analysis offered by the

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

*New York* court. Specifically, we agree with the *New York* court that the Census Act and the Reapportionment Act require the Census to count undocumented immigrants who would, but for their immigration status, be considered residents and that these individuals must be included in the apportionment base. *See New York*, 2020 WL 5422959, at *29–32. We further agree that the apportionment base must come from the Census and the Census alone. *Id*. at *25–29.

Our conclusions are based on (1) the ordinary meaning of the statutory text; (2) the interlocking statutory scheme of the Census and Reapportionment Acts; (3) statutory history; (4) 230 years of historical practice; and (5) Supreme Court case law. Below, we discuss each in turn. We further find that the Presidential Memorandum violates the separation of powers.

**1. The ordinary meaning of the text of the statutes establish that apportionment shall be based on all persons residing in a state, including undocumented immigrants.**

Plaintiffs' first statutory argument is that the policy announced in the Presidential Memorandum violates the statutes that govern the process of determining the number of seats in the U.S. House of Representatives to be assigned to each state. The ordinary public meaning of the Census and Reapportionment Acts compels us to agree for two reasons. To start, the Reapportionment Act includes "persons in each state" in the apportionment base, not just lawful "inhabitants." Moreover, even if Defendants are right that "inhabitants" is synonymous with "persons in each state," undocumented immigrants are inhabitants of the states in which they live.

**a. The Census and Reapportionment Acts include "persons in each state" in the apportionment base, not just lawful inhabitants.**

As quoted at greater length above in Section I-B, the plain text of the Census Act directs the Secretary to provide for apportionment purposes the "tabulation of total population by State," from the decennial census. 13 U.S.C. § 141(b). Similarly, the Reapportionment Act provides that the President must transmit "a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population." 2 U.S.C. § 2a(a). The Acts make no mention of restricting the apportionment population to only people with legal status.

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1     Defendants admit that the ordinary meaning of "person" includes undocumented

2 immigrants. Defs.' Opp'n at 31; *see also, e.g.*, Webster's New International Dictionary 1827 (2d

3 ed. 1943) (defining "person" as "[a] human being"). Defendants argue, though, that the addition of

4 "in each state" to the word "persons" creates ambiguity. Defendants contend that the full phrase

5 "persons in each state" refers to "inhabitants", a term they contend the Executive has wide

6 discretion to define. Defs.' Opp'n at 31–33.

7     Defendants' argument is unpersuasive for two reasons. First, the text of the

8 Reapportionment Act underscores that all "persons in each state" must be in the apportionment

9 base unless an express exception provides otherwise. The Reapportionment Act does this by

10 excluding just one group of persons: "Indians not taxed." 2 U.S.C. § 2a(a). A canon of statutory

11 interpretation is *expressio unius est exclusio alterius*: "to express or include one thing implies the

12 exclusion of the other, or of the alternative." Black's Law Dictionary (11th ed. 2019); *accord, e.g.*,

13 *Vonn*, 535 U.S. at 65 ("[E]xpressing one item of a comonly associated group or series excludes

14 another left unmentioned."). Given this canon of statutory interpretation, "persons in each State"

15 includes persons with varying legal statuses who live in a state—including undocumented

16 immigrants. *See* Section IV-A-1-a (discussion of the same text in the Constitution).

17     Second, since the time of the Reapportionment Act's enactment, the ordinary meaning of

18 the phrase "persons in each state" has never been "lawful inhabitants." To transmute "persons in

19 each state" into "lawful inhabitants," Defendants must ascribe significant meaning to the

20 preposition "in" before the phrase "each state" because Defendants concede that "persons"

21 includes undocumented immigrants. 2 U.S.C. § 2a(a). Yet the preposition "in" says nothing about

22 lawful status or temporal permanence. Rather, "in" expansively means "[o]f position or location.

23 . . . Of place or position in space or anything having material extension: Within the limits or

24 bounds of, within (any place or thing)." Oxford English Dictionary (2d ed. 1989),

25 https://www.oed.com/oed2/00113658. "[A]nything which is *in* a given space is not *out of* it,

26 and *vice versa*." *Id.* (emphasis in original); *see also* 4 Judicial and Statutory Definitions of Words

27

28

and Phrases (West 1st ed. 1904) ("'In,' when used with reference to geographical locations, is usually employed to designate inclusive space, and not mere nearness of location.").

Given these definitions, it would mar the English language to say that undocumented immigrants living in the United States are somehow "in" their country of origin. The preposition "in" was not used that way around the time of the Reapportionment Act's enactment. *See, e.g.*, *id.* (quoting F. Montgomery Tony (1898) at 9: "In a somewhat crowded train."); *id.* (quoting *Taffrail* by Pincher Martin (1916) at xiv. 248: "When I was in the old Somerset, in nineteen-nine,' somebody would start the ball rolling"); Corpus of Historical American English, BYU, https://www.english-corpora.org/coha/ (last visited Oct 18, 2020) (collecting historical usage of the phrase "in each state" by decade). Rather, the ordinary public meaning of "persons in each state" has included and still includes undocumented immigrants living in each state.

### b. Even if the Census and Reapportionment Acts only included "inhabitants" in the apportionment base, undocumented immigrants are "inhabitants."

Even if "persons in each state" were to mean "inhabitants," Plaintiffs prevail. The ordinary public meaning of "inhabitants" includes undocumented immigrants. As the *New York* court effectively explained, "it does not follow that illegal aliens—a category defined by legal status, not residence—can be excluded from the phrase ['persons in each state']. To the contrary, the ordinary definition of the term 'inhabitant' is 'one that occupies a particular place regularly, routinely, or for a period of time.'" *New York*, 2020 WL 5422959, at *29 (quoting Merriam-Webster's College Dictionary 601 (10th ed. 1997)). The *New York* court went on to hold: "however ambiguous the term may be on the margins, it surely encompasses illegal aliens who live in the United States—as millions of illegal aliens indisputably do, some for many years or even decades." *New York*, 2020 WL 5422959, at *29. We agree. The ambiguity in the term "persons in each state"—or the word "inhabitant"—is not so large as to allow the Defendants' effort to exclude undocumented immigrants.

Our search for additional definitions of inhabitance confirms the *New York* court's understanding. Inhabitance is unrelated to legal status. "Ordinarily *inhabitant* is not a synonym for

75

*citizen* or *resident*." Webster's New International Dictionary 1279 (2d ed. 1943) (emphasis in original). Instead, from the time before the Founding to today, "inhabiting" a place includes habitually occupying or sleeping there. *See, e.g.*, Black's Law Dictionary (11th ed. 2019) (defining "inhabit" as "[t]o dwell in; to occupy permanently or habitually as a residence"); 4 Judicial and Statutory Definitions of Words and Phrases (West 1st ed. 1904) ("As where one sleeps. In a case involving the settlement of a man, it was said that 'a man properly inhabits where he lies; as in the case where the house is in two leets, he is to be summoned to that in which his bed is.'" (quoting *Parish of St. Mary Colechurch v. Radcliffe* [1763], 1 Strange, 60. Eng. Rep. 385)). No matter the definition of "inhabitant" one chooses, undocumented immigrants inhabit the states in which they live. *See* Barreto Decl. ¶ 18 ("A clear majority of undocumented immigrants have lived in the United States for over five years and have families, hold jobs, own houses, and are part of their community.").

       Similarly, the Census Bureau has formally adopted a broad definition of "usual residence." As discussed in Section IV-A-3-d, the Census Bureau promulgated the Residence Rule after extensive notice and comment. "[C]onsistent with the intent of the Census Act of 1790" and "guided by constitutional and statutory mandates to count all residents of the several states," the Residence Rule codifies the Census Bureau's practice of counting noncitizens. 83 Fed. Reg. at 5526. The Residence Rule requires persons to be counted "at their usual residence, which is the place where they live and sleep most of the time"—and citizens of foreign countries living in the United States should be "[c]ounted at the U.S. residence where they live and sleep most of the time." *Id.* at 5533.[15]

---

[15] The Residence Rule buttresses our interpretation of the Census and Reapportionment Acts. The Residence Rule is the "fruit[] of notice-and-comment rulemaking" and thus the sort of agency action that courts give *Chevron* deference. *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001). Moreover, to the extent the Presidential Memorandum directs the Census Bureau to interpret the Residence Rule to exclude undocumented immigrants from the decennial census, that interpretation would violate the Residence Rule and fail to meet the conditions for *Auer* deference.

76

1    In response, Defendants offer a slight variant on arguments they made to the *New York*

2    court. In *New York*, Defendants made two arguments that "rel[ied] almost exclusively on the

3    Supreme Court's decision in *Franklin*." 2020 WL 5422959, at *27. One argument was that aliens

4    in this country temporarily, such as for business or tourism, may be excluded, but that is because

5    the United States is not their "usual residence," not because of their alien status. *Id.* at *30. The

6    other argument was that illegal aliens are subject to removal from this country. The *New York*

7    court rightly disagreed. The *New York* court held that undocumented immigrants, unlike tourists,

8    "indisputably inhabit" a state. *Id.* Moreover, "[a] person living in a State but facing future

9    removal" is still a "person[] in that State." *Id.*

10    Here, Defendants also rely on *Franklin v. Massachusetts*. Defs.' Sur-Reply at 10–11.

11    Specifically, Defendants rely on the fact that *Franklin* upheld a decision to allocate overseas

12    servicemembers to their state home of record for apportionment—even though Massachusetts

13    argued that "the Secretary should have allocated the overseas employees to their overseas stations,

14    because those were their usual residences." *Franklin*, 505 U.S. at 804. The *Franklin* Court

15    reasoned that despite the servicemembers lack of "mere physical presence," the Secretary could

16    still include them in the apportionment base. *Id.*

17    In Defendants' view, it follows that *Franklin* gives Defendants broad discretion to exclude

18    from apportionment undocumented immigrants who live in the United States. Defendants argue

19    that the possibility of deportation, even if not certain, means that undocumented immigrants are

20    not inhabitants of states. Defs.' Sur-Reply at 13. This argument mirrors one made and rejected in

21    1929 during the Congressional debate of an amendment to what became the Reapportionment Act

22    of 1929. *See* 71 Cong. Rec. 1976.

23    Defendants' argument failed then and fails now. People move within the United States; it is

24

25    *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–18 (2019) (describing conditions for *Auer* deference,
     which is judicial deference to agencies' reasonable readings of ambiguous regulations). The
26    Residence Rule would also be entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134,
     140 (1944), given the agency's expertise, historical consistency, and notice and comment process.
27

28    Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
     ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
     DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

1   a right protected under the Constitution. *See Saenz v. Roe*, 526 U.S. 489, 500–04 (1999)

2   (explaining that the Constitution protects "the right to go from one place to another, including the

3   right to cross state borders while en route"). Others, both citizens and non-citizens, move to other

4   countries. The possibility of leaving a state in the future does not impact current residency status.

5   *See* Residence Rule, 83 Fed. Reg. at 5533–36 (looking to residency, as defined by the Residence

6   Rule, "on Census Day"). Further, this analysis is not altered even when the government may

7   control the relocation of a given individual. People in prison can be transferred to a prison in a

8   different state, by the Federal Bureau of Prisons or by states who house prisoners elsewhere. They

9   are still residents of their current state for census purposes. *Id*. at 5535 ("Prisoners are counted at

10   the facility."). The possibility that their locations might subsequently change does not alter the

11   state of their current residence.

12       *Franklin* simply confirms the breadth of "usual residence" for the purposes of including

13   persons in the apportionment base. *Franklin*, 505 U.S. at 804; *see* Section IV-A-5-b, *supra*. "The

14   term can mean *more than* mere physical presence, and has been used *broadly enough* to include

15   some element of allegiance or enduring tie to a place." *Franklin*, 505 U.S. at 804 (emphasis

16   added). Thus, *Franklin* affirmed the constitutionality of including in the apportionment base—and

17   so apportioning a fair share of congressional representation to—American servicemembers who

18   lacked physical presence in the United States. *Id*. at 806. *Franklin* did not reach statutory claims.

19   *See id.* at 796–801 (stating that "[a]ppellees raise claims under both the APA and Constitution,"

20   but dismissing the APA claims).

21       *Franklin* did not give Defendants either the constitutional *or statutory* discretion to

22   exclude, from the apportionment base, undocumented immigrants who are both enduringly tied to

23   *and* physically present in a state. Defendants' lack of constitutional discretion is detailed above in

24   Section IV-A-5-b. Defendants' lack of statutory discretion follows from the text "persons in each

25   State." 2 U.S.C. § 2a(a). By including servicemembers in the apportionment base, the Secretary

26   essentially construed "persons in each State" to also include servicemembers with enduring ties to

27

28   Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
    ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
    DEFENDANTS' MOTION TO DISMISS

(but no physical presence in) that state. Given the history recounted in *Franklin*, the Secretary's statutory construction was reasonable. *See, e.g.*, *Franklin*, 505 U.S. at 804 (noting that President George Washington was counted at his home in Mount Vernon even though he had spent most weeks away from home).

The Presidential Memorandum, by contrast, construes "persons in each State" to *exclude* undocumented immigrants—the clear majority of which have enduring physical presence in and ties to a state. This statutory construction contravenes statutory text and *Franklin* itself, not to mention statutory and legislative history, 230 years of historical practice, and Supreme Court case law discussed below. *See* Section IV-B-3 to 5, *infra*. In sum, undocumented immigrants are "persons in each state" where they reside—their usual residence.

### 2. The statutes also provide that apportionment shall be based on the results of the Census alone.

Plaintiffs' other statutory argument is that the Presidential Memorandum further violates the statutes by basing an apportionment on something other than the "decennial census of the population," as that term is used in the Reapportionment Act. 2 U.S.C. § 2a(a). The *New York* court order reached that conclusion. *See New York*, 2020 WL 5422959, at *25–29. We do, as well.

We agree with the *New York* court that the statutory scheme requires the apportionment base be the tabulation delivered to the President in the 141(b) statement. The Reapportionment Act states the "President shall transmit to the Congress a statement showing the whole number of persons in each State . . . as ascertained under the . . . decennial census . . . and the number of Representatives to which each State would be entitled under . . . the method of equal proportions . . . ." 2 U.S.C. § 2a(a). The Supreme Court stated that Section 141(b) of the Census Act mandates that the census result in "a population count that will be used to apportion representatives, *see* § 141(b), 2 U. S. C. § 2a . . ." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568–69 (2019) (discussing provisions of the Census Act which "constrains the Secretary's authority to determine the form and content of the census"). The plain text of Section 2a(a) requires that the apportionment base come from the decennial census. This tabulation must come from the

79

1    Secretary who oversees the census process and transmits this data to the President under Section

2    141(b). *Id.*

3           Accordingly, Defendants' reliance on *Franklin* is again misplaced. "*Franklin* does not

4    suggest, let alone hold, that the President has authority to use something other than the census

5    when calculating the reapportionment; indeed, the Court did not even consider the plaintiffs'

6    challenge to the apportionment. At most, *Franklin* establishes that the President retains his 'usual

7    superintendent role' with respect to the conduct of the census—and can direct the Secretary to

8    make 'policy judgments *that result in "the decennial census*.""  *New York*, 2020 WL 5422959, at

9    *28 (emphasis in original) (quoting *Franklin* 505 U.S. at 799–800).

10          In addition to agreeing with the *New York* court on the above, we offer three additional

11    observations that support the analysis and conclusion above and in the *New York* court order.

12          First, Defendants argue to us, as it appears they may not have argued in the *New York* case,

13    that information generated separately from the normal Census Bureau process may still be

14    included within the "decennial census" as that term is used in the statute. The Presidential

15    Memorandum itself suggests to the contrary, however. As described by Defendants themselves, it

16    directs the Secretary "to report two sets of numbers." Defs.' Opp'n at 32. One set of numbers will

17    be "tabulated according to the methodology set forth in *Final 2020 Census Residence Criteria and*

18    *Residence Situations.*" 85 Fed. Reg. at 44,680. The other will be a set of figures adjusted by

19    information from unspecified sources, eliminating undocumented immigrants, despite their

20    inclusion in the normal Census tabulation based on their actual residences. *Id.* That is not a normal

21    understanding of the decennial census tabulation. The set of figures excluding undocumented

22    immigrants cannot be properly understood as being part of the decennial census as required under

23    2 U.S.C. § 2a(a).

24          Second, Defendants posit that the President may obtain the information requested in the

25    Presidential Memorandum under his power under the Opinions Clause, U.S. Const., art. II, § 2, to

26    "require the Opinion, in writing, of the principal Officer in each of the executive Departments."

27

28

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

Defs.' Opp'n at 32–33; Defs.' Sur-Reply at 14. The *New York* court order noted a somewhat similar argument but only in passing, as it concluded that argument to have been raised untimely and thus waived. *New York*, 2020 WL 5422959, at * 34 n.19. The substance of the argument does not persuade us. There is nothing to keep the President from requesting information from the Secretary, including, we assume, the population by state excluding undocumented immigrants. But information provided by the Secretary based on whatever sources does not make the data from the decennial census. If it is not, it cannot be used for apportionment. 2 U.S.C. § 2a(a).

Third, the Administration has indicated it will do everything in its power to meet the census tabulation deadline of December 31, 2020. ECF No. 98-3, at 12–13 (government's reply brief, filed in support of application for stay pending appeal in *Ross v. National Urban League*, No. 20A62). One of the ways the government will minimize the census processing time is that it will "postpon[e] certain steps necessary to fully implement the Presidential Memorandum until after December 31." *Id.* at 12. The Secretary will, therefore, submit his 141(b) report prior to the finalization of the data requested by the Presidential Memorandum. *Id.* That further demonstrates that the tabulation called for under the Memorandum will not be based on the census. That submission would necessarily be after the December 31, 2020 deadline in Section 141(b). The government has made clear that it views the December 31, 2020 deadline for transmittal of the 141(b) statement to be "mandatory language that is unambiguous and unconditional." *See* ECF No. 98-3, at 5 (government's reply brief, filed in support of application for stay pending appeal in *Ross v. National Urban League*, No. 20A62). This view is confirmed by the plan text of the Act: "[t]he tabulation . . . shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States." 13 U.S.C. § 141(b). As such, submitting the 141(b) statement *after* December 31, 2021 would violate the Census Act.

Congress has mandated through the statutes it enacted that the numbers used to apportion House seats among the states will come from the decennial census. By deviating from that approach, the Presidential Memorandum violates the statutes and exceeds the authority granted the

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

President. Nothing in the Census Act nor Reapportionment Act allows the President discretion to exclude undocumented immigrants from the apportionment base.

### 3. Statutory and legislative history confirm that the apportionment base includes undocumented immigrants.

Statutory and legislative history further support our conclusion. *See* Section I-B, *supra* (discussion of statutory history, such as rejected statutory amendments); *New York*, 2020 WL 5422959, at *30–32 (discussion of legislative history, such as the Senate and House Reports, which we will not repeat here). Congress intended apportionment to be done based on the full population, including undocumented immigrants.

The statutory history of the Reapportionment Act particularly informs the meaning of the relevant portions of the Census Act, subsequently adopted, given the interaction between the two Acts. "It is a commonplace of statutory interpretation that Congress legislates against the backdrop of existing law." *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) (internal quotation marks omitted). Even if the constitutional analysis of the Congress that enacted the statute was flawed—and we do not think it was—it was that belief that dictated the intent of that Congress. *Cf. Green v. Bock Laundry*, 490 U.S. 504, 508 (1989) ("Our task in deciding this case, however, is not to fashion the rule we deem desirable but to identify the rule that Congress fashioned.").

Perhaps of greatest significance from the history is the fact that during the consideration of the Reapportionment Act, both houses of Congress considered and rejected amendments which would have excluded "aliens" from the apportionment base. *See* Section I-B, *supra*; *see also, e.g.*, 71 Cong. Rec. 2065 (restating the proposed amendment prior to Senate vote); *id.* at 2360–61, 2451 (House entertaining multiple such amendments, one of them twice). The status of unlawful immigrants was explicitly addressed during the debate in each chamber. *Id.* at 1967, 1972–76 (Senate debates); *id.* at 2260, 2264–68, 2276, 2338–39 (House debates). The Senate proposal was rejected, *id.* at 2065, after the Senate Legislative Counsel opined that Congress lacked the constitutional authority to exclude "aliens from enumeration for the purpose of apportionment of

82

1   Representatives among the States." *Id.* at 1821–22. The House amendments were also rejected. *Id.*

2   at 2449–50, 2454.

3   In sum, the policy announced in the Presidential Memorandum of excluding

4   undocumented immigrants from the population to be used to assign seats in the U.S. House of

5   Representative violates the plain text of the Census Act and the Reapportionment Act. The history

6   of those statutes confirms that conclusion.

### 4.   230 years of historical practice reflects that all persons residing in a state regardless of immigration status are included in the apportionment base.

8   Historical practice buttresses our holding too. For over two hundred years, Congress, the

9   Department of Justice, and the Census Bureau have all consistently concluded that the

10  Constitution mandates that the apportionment base must include noncitizens. This consistent

11  understanding of the Constitution's requirements by the executive and legislative branches of

12  government affirms the conclusion that undocumented immigrants must be included in the

13  apportionment base.

14  "Unsurprisingly, the government's early, longstanding, and consistent interpretation of a

15  statute, regulation, or other legal instrument could count as powerful evidence of its original

16  public meaning." *Kisor*, 139 S. Ct. at 2426 (Gorsuch, J., concurring in the judgment for four

17  justices) (emphasis omitted) (citing Aditya Bamzai, *The Origins of Judicial Deference to*

18  *Executive Interpretation*, 126 Yale L.J. 908, 930–947 (2017)).

19  From the original 1790 Census onwards, the government has consistently included

20  noncitizens and persons without legal status in the apportionment base. *See* Section IV-A-3, *supra*

21  (describing over two hundred years of consistent historical practice by Congress, the DOJ, and the

22  Census Bureau).

23  The first census statute, for example, instructed "assistants" to count "the number of the

24  *inhabitants* within their respective districts," not the number of citizens. Act of Mar. 1, 1790, § 1, 1

25  Stat. 101 (emphasis added); *see* Section I-C, *supra*. As noted in *Franklin*, the first enumeration Act

26  of 1790 described the required tie to the state in terms of physical residence—"usual place of

27                                              83

abode," "inhabitant," "usual resident,"—not one's legal status. *Franklin*, 505 U.S. at 804. Thus, the "[t]raditional understanding of the Constitution and the legal direction provided by the Congress has meant that for every census since the first one in 1790, [the Census Bureau] ha[s] tried to count residents of the country, regardless of their status." *Enumeration of Undocumented Aliens in the Decennial Census: Hearing on S. 99-314 Before the Subcomm. on Energy, Nuclear Proliferation, & Gov't Processes of the S. Comm. On Governmental Affairs*, 99th Cong. 19 (1985) (statement of Census Director John Keane); *see also FAIR*, 486 F. Supp. at 576 ("The Census Bureau has always attempted to count every person residing in a state on census day, and the population base for purposes of apportionment has always included all persons, including aliens both lawfully and unlawfully within our borders.").

Early historical practice also reflects that the census counted persons who were known to be in a state illegally, including escaped slaves. *See* Section IV-A-3-a, *supra*. Although escaped slaves were unlawfully present in northern states in 1860, they were counted in the 1860 Census as part of the apportionment base in those northern states. *See* U.S. Census Bureau, 1860 Census: Population of the United States at vi-vii, xi, xvxvi. This early historical practice reflects that even where persons were in a state unlawfully, they were still counted as part of the apportionment base of that state.

The Census and Reapportionment Acts were authored against the longstanding historical practice of counting all persons residing in a state, including persons who were in a state illegally. No effort was made to distinguish this practice. The historical context therefore only serves to reinforce that Congress mandated that all persons who reside in each state must be included in the apportionment base, regardless of their legal status. As noted above, the Bureau's most recent Residence Rule, drawing from the first Census Act of 1790 and implementing the Constitution and current statutes, counts persons at "their usual residence, which is the place where they live and sleep most of the time," irrespective of legal immigration status. 83 Fed. Reg. at 5533.

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

### 5. Congress enacted the Census and Reapportionment Acts against the backdrop of Supreme Court holdings that undocumented immigrants are "persons" within a territorial jurisdiction.

In fact, before Congress enacted the Census and Reapportionment Acts, the Supreme Court had already held that noncitizens were persons within a state's jurisdiction. As discussed in Section IV-A-4, *Yick Wo* held that noncitizens statutorily barred from naturalization were persons within a state's jurisdiction and were thus protected by the Fourteenth Amendment's Equal Protection Clause. Similarly, *Plyler* held that undocumented immigrants were persons within a state's jurisdiction under the Fourteenth Amendment. Thus, Supreme Court case law supports the statutory interpretation of the Census and Reapportionments Acts that require the inclusion of undocumented immigrants in the apportionment base.

### 6. The Presidential Memorandum violates the separation of powers.

Our conclusions regarding the statutory violations lead us to note another constitutional concern asserted by Plaintiffs, that the Presidential Memorandum violates the constitutional separation of powers. We discuss it here because it is premised on the conclusion discussed above that the proposed exclusion violates the enactments of Congress and the authority provided to the Executive Branch in those statutes.[16]

The Constitution's Enumeration Clause "vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration.'" *Dep't of Commerce*, 139 S. Ct. at 2566 (quoting *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996)). Congress has "delegated its broad authority over the census to the Secretary." *Id.* Similarly, the Constitution requires Congress reapportion Representatives based on the decennial enumeration. U.S. Const., art. I, § 2, cl. 3. Congress delegated some of its reapportionment duties to the Secretary and the President. *See* 13 U.S.C. § 141(b); 2 U.S.C. § 2a(a). However, this delegation is not without constraints. It is limited by the text of the enabling statutes.

---

[16] The *New York* court did not address this issue as the plaintiffs in that case did not make a separation of powers claim.

85

United States District Court
Northern District of California

1    The Constitution vested the power to enumerate and reapportion solely in Congress. U.S.

2    Const., art. I, § 2, cl. 3. The President's only power in this area is to "take Care that the Laws be

3    faithfully executed." U.S. Const. art. II, § 3; *see also Youngstown*, 343 U.S. at 587 ("In the

4    framework of our Constitution, the President's power to see that the laws are faithfully executed

5    refutes the idea that he is to be a lawmaker."). As the Presidential Memorandum is "incompatible"

6    with the "expressed or implied will of Congress," the President's "power is at its lowest ebb."

7    *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *accord Zivotofsky ex rel. Zivotofsky v.*

8    *Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)).

9    Consequently, the President "may rely solely on powers the Constitution grants to him alone."

10   *Zivotofsky*, 576 U.S. at 10. The Presidential Memorandum is an incompatible presidential action

11   and, therefore, violates the separation of powers doctrine.

12   Under the doctrine of constitutional avoidance, noted in the introduction to Section IV, we

13   seek to avoid constitutional issues when we can decide a case on statutory grounds. Thus, we treat

14   this issue as we treat the constitutional concerns identified in Section IV-A. Our conclusion that

15   the policy announced in the Presidential Memorandum violates the relevant statutes is sufficient to

16   support our ultimate conclusion.

17   All told, the Presidential Memorandum is incompatible with the statutes that govern the

18   process of determining the population for the purpose of apportioning seats in the U.S. House of

19   Representative among the states. It seeks to do what Congress has not authorized and what the

20   President does not have the power to do. The Census Act and the Reapportionment Act do not

21   grant the President or the Secretary the authority to exclude undocumented immigrants from the

22   apportionment process.

23   **C.  Declaratory and injunctive relief should issue.**

24   Having concluded that the Presidential Memorandum violates federal constitutional and

25   statutory law, we now turn to the issue of remedies. Plaintiffs ask for both declaratory relief and an

26   injunction. *See City of San Jose v. Trump*, No. 20-5167 RRC-LHK-EMC (ECF No. 63-1)

27

86

1   (proposed order).

2       **1. Declaratory relief is warranted.**

3       The Declaratory Judgment Act provides that, "any court of the United States . . . may

4   declare the rights and other legal relations of any interested party seeking such declaration,

5   whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "The existence of another

6   adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R.

7   Civ. P. 57. Defendants only oppose declaratory relief in passing, without any detailed discussion.

8   Defs.' Opp'n at 15; Defs.' Sur-Reply at 14–16.

9       We agree with the *New York* court that declaratory relief is warranted here. *See New York*,

10  2020 WL 5422959, at *35. The policy announced in the Presidential Memorandum is unlawful

11  under the Constitution and the applicable statutes, as described in this order. This declaration will

12  help ensure that it is not implemented without necessitating injunctive relief against the President.

13  It will protect Plaintiffs against injuries. Declaratory relief will "remove the harm" Plaintiffs face

14  in a "tangible way." *Warth v. Seldin,* 422 U.S. 490, 505, 508 (1975).

15      **2. A permanent injunction is warranted.**

16      For injunctive relief, Plaintiffs ask that "Defendants Secretary of Commerce Wilber [sic] J.

17  Ross, U.S. Department of Commerce, Director of the Census Bureau Steven Dillingham, and U.S.

18  Census Bureau [be] enjoined from excluding all undocumented persons from the apportionment

19  base or assisting President Trump in that effort." Proposed Order, ECF No. 63-1.

20      "According to well-established principles of equity, a plaintiff seeking a permanent

21  injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must

22  demonstrate:"

23          (1) that it has suffered an irreparable injury; (2) that remedies available at law, such
            as monetary damages, are inadequate to compensate for that injury; (3) that,
24          considering the balance of hardships between the plaintiff and defendant, a remedy
            in equity is warranted; and (4) that the public interest would not be disserved by a
25          permanent injunction.

26  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

27

28  Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
    ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
    DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

1    In the instant case, Plaintiffs have satisfied all four factors. As to the first two factors, both

2  the apportionment injury and census degradation injury are irreparable and cannot be addressed

3  through a legal remedy such as monetary damages. Defendants contend that the apportionment

4  injury is not irreparable "because an erroneous or invalid apportionment number can be remedied

5  after the fact." Defs.' Opp'n at 37. Defendants are essentially re-arguing ripeness here. For the

6  reasons stated above, the dispute at issue is ripe. Defendants' argument misses the ultimate point.

7  An error in apportionment irreparably dilutes voting power and the allocation of political

8  representation. Moreover, census degradation would affect federal funding, state and local

9  redistricting, and the provision of local government services. Neither injury can be addressed

10  through a legal remedy.

11    In contrast to the irreparable injuries identified by Plaintiffs, Defendants have not

12  demonstrated any hardship. As indicated above, a permanent injunction would not impose any

13  obstacle to the conducting of the census. Moreover, Defendants could still collect information to

14  count undocumented immigrants, if they so choose. *Cf. New York*, 2020 WL 5422959, at *34

15  (noting that "any such hardship to Defendants can be mitigated, if not eliminated, by crafting the

16  injunction . . . to bar only the inclusion in the Secretary's Section 141 report of data concerning the

17  number of illegal aliens in each State and to allow the Census Bureau to continue its research

18  efforts"); *see also New York*, 2020 WL 5796815, at *2 (in denying government's motion to stay

19  judgment pending appeal, holding that Defendants failed to show that they would suffer

20  irreparable injury without a stay). Finally, Defendants will not suffer any cognizable hardship from

21  being enjoined from carrying out a policy, which even if issued by the President, violates the law.

22  The balance of hardships tips sharply in Plaintiffs' favor. Nor would the public interest be

23  disserved by a permanent injunction that prohibits an unlawful policy.

24    Accordingly, we grant a permanent injunction in favor of Plaintiffs. The *New York* court's

25  permanent injunction was limited to the Secretary's December 31, 2020 Section 141(b) report to

26  the President. We expand the scope of the permanent injunction to also apply to any reports

27

28

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

otherwise provided by the Secretary as part of the decennial census. We do so because Defendants stated after the *New York* permanent injunction was issued that the Secretary will provide the number of ICE detainees to the President on December 31, 2020 but will provide other numbers to the President pursuant to the Presidential Memorandum on January 11, 2020. *See* Email from Ron S. Jarmin, Dep. Dir., Census Bureau, to Wilbur Ross, Sec. of Commerce, *Nat'l Urban League v. Ross*, No. 20-cv-05799-LHK (Sept. 28, 2020), ECF No. 256-1 (stating that the Census Bureau will "finish the processing of the resident population, federally affiliated overseas and, if requested, unlawful aliens in ICE Detention Centers by 12/31" while "[o]ther PM [Presidential Memorandum] related outputs would be pushed to 1/11/2021"). Thus, we issue the following permanent injunction, which adds "or otherwise as part of the decennial census" to the *New York* permanent injunction:

> The Court enjoins all Defendants other than the President from including in the Secretary's report to the President pursuant to Section 141(b) any "information permitting the President . . . to exercise the President's discretion to carry out the policy set forth in section 2" of the Presidential Memorandum—that is, any information concerning the number of aliens in each State "who are not in a lawful immigration status under the Immigration and Nationality Act"—in the Secretary's report to the President pursuant to 13 U.S.C. § 141(b) or otherwise as part of the decennial census. Presidential Memorandum, 85 Fed. Reg. at 44,680 Presidential Memorandum, 85 Fed. Reg. at 44,680. Instead, consistent with the Census Act, the Secretary's Section 141(b) report shall include only "[t]he tabulation of total population by States under" Section 141(a) "as required for the apportionment of Representatives in Congress among the several States," 13 U.S.C. § 141(b)—that is, "information tabulated according to the methodology set forth in [the Residence Rule]," Presidential Memorandum, 85 Fed. Reg. at 44,680.

## V.   CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Partial Summary Judgment and DENIES Defendants' Motion to Dismiss, or in the Alternative, Motion for Partial Summary Judgment.[17]

---

[17] We believe that this matter was properly heard by a three-judge court for the reasons stated in

Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS

United States District Court
Northern District of California

1   **IT IS SO ORDERED.**

2

3   Dated: October 22, 2020

4                                _____/s/_____

5                                  RICHARD R. CLIFTON
United States Circuit Judge

6

7                                  _____/s/_____

8                                  LUCY H. KOH
United States District Judge

9

10                               _____/s/_____

11                               EDWARD M. CHEN
United States District Judge

12

13

14

15

16

17

18

19

20

21

22   _____

23   Judge Koh's request for the appointment of such a panel. *See* ECF No. 49. Even so, we follow the

24   lead of prior three-judge courts by certifying that Judge Koh, to whom these cases were originally
assigned, individually arrived at the same conclusions that we reached collectively. *See Swift &*

25   *Co. v. Wickham*, 382 U.S. 111, 114 n.4 (1965) (noting with approval that "[t]his procedure for
minimizing prejudice to litigants when the jurisdiction of a three-judge court is unclear has been

26   used before"); *New York*, 2020 WL 5422959, at *36 n.21 (adopting this procedure); *FAIR*, 486 F.

27   Supp. at 578 (same).

28   
Case Nos. 20-CV-05167-RRC-LHK-EMC & 20-CV-05169-RRC-LHK-EMC
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS